**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| THE CENTER FOR INVESTIGATIVE REPORTING, | : |
| | : |
| | : |
| | : |
| Plaintiff, | : |
| | : CIVIL ACTION |
| | : |
| v. | : |
| | : |
| SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY, | : |
| | : NO. 18-cv-01839-MMB |
| | : |
| Defendant. | : |
| | : |
| | : |

**MEMORANDUM IN SUPPORT OF THE CENTER FOR INVESTIGATIVE
REPORTING'S MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

I.     INTRODUCTION ..................................................................................................1

II.    BACKGROUND ...................................................................................................5

    A.     Relevant Procedural Background. ...........................................................6

    B.     SEPTA's Advertising Spaces. ...............................................................6

        1.     Intersection:  SEPTA's Advertising Manager. ...........................8

        2.     SEPTA's Advertising Standards...................................................9

        3.     SEPTA's Process for Reviewing Advertisements. ....................10

    C.     Rejection of CIR's Proposed Advertisement...........................................14

    D.     CIR's Second Advertising Proposal. .....................................................17

    E.     Continuing Harm to CIR........................................................................17

III.   ARGUMENT.......................................................................................................18

    A.     CIR Is Likely to Succeed on the Merits of its Claim Because SEPTA
        Cannot Meet Its Burden to Justify Its Restrictions on Speech..............18

        1.     SEPTA's Challenged Provisions Are Unconstitutional Because
            They Are "Not Capable of Reasoned Application" and Confer
            Unbridled Discretion to Censor Speech....................................20

            (a)     Restrictions on Speech that Are Not Capable of Reasoned
                Application and Confer Unbridled Discretion to Censor
                Speech Violate the First Amendment. ...........................21

            (b)     The Challenged Provisions Are Incapable of Reasoned
                Application and Confer Unbridled Discretion to Censor
                Speech. ..........................................................................24

            (c)     SEPTA Has Accepted Advertisements that Appear to
                Violate the Challenged Provisions.................................27

        2.     SEPTA's Application of its Advertising Standards is Not
            Viewpoint Neutral......................................................................32

            (a)     SEPTA Regularly Accepts Advertisements from Financial
                Institutions on the Subject of "Discriminatory Lending." .............33

(b)     Excluding Speakers that SEPTA Views as Controversial or
         Offensive is a Form of Viewpoint Discrimination. ......................34

3.     The Challenged Provisions Are Not "Reasonable." .................................39

(a)     SEPTA Has No Legitimate Interest in Shielding Its Riders
         from Controversial or Offensive Speech. ......................................39

(b)     The Challenged Provisions Are Not Reasonable in Light of
         SEPTA's Purpose for Its Advertising Spaces...............................41

(i)     SEPTA's Advertising Space Is Not Incompatible
         With Speech on "Political" Issues or "Matters of
         Public Debate." .................................................................42

(ii)    Revenue Generation.........................................................44

4.     SEPTA's Advertising Spaces are a Designated Public Forum, and
         the Challenged Provisions Fail Strict Scrutiny. .........................................45

(a)     SEPTA's Advertisement Spaces are a Designated Public
         Forum. ............................................................................................45

(b)     SEPTA's Content-Based Restrictions Fail Strict Scrutiny. ...........49

B.     CIR's Ongoing Loss of First Amendment Freedoms Constitutes
         "Irreparable Injury" Warranting a Preliminary Injunction. ...................................50

C.     An Injunction Will Not Harm SEPTA Nor Impair the Public Interest.................51

D.     The Court Should Waive the Bond Requirement. .................................................51

IV.    CONCLUSION.............................................................................................................52

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU v. Ashcroft*,
   322 F.3d 240 (3d Cir. 2003)..................................................................................51

*AIDS Action Commitee of Massachusetts, Inc. v. MBTA*,
   42 F.3d 1 (1st Cir. 1994)......................................................................................47

*American Civil Liberties Union v. Reno*,
   929 F. Supp. 824 (E.D. Pa. 1996), *aff'd*, 521 U.S. 844 (1997)............................50

*American Freedom Defense Initiative v. SEPTA*,
   92 F. Supp. 3d 314 (E.D. Pa. 2015) (Goldberg, J.)........................................ *passim*

*Ashcroft v. ACLU*,
   542 U.S. 656 (2004)..............................................................................................18

*B.H. v. Easton Area School District*,
   827 F. Supp. 2d 392 (E.D. Pa. 2011) ...................................................................51

*B.H. v. Easton Area School District*,
   725 F.3d 293 (3d Cir. 2013) (en banc)..................................................................18

*Board of Airport Commissioners of Los Angeles v. Jews for Jesus, Inc.*,
   482 U.S. 569 (1987)..............................................................................................23

*Bella Vista United v. City of Philadelphia*,
   Civ. No. 04-1014, 2004 U.S. Dist. LEXIS 6771, 2004 WL 825311 (E.D. Pa.
   Apr. 15, 2004)........................................................................................................51

*Child Evangelism Fellowship v. Stafford Township School District*,
   386 F.3d 514 (3d Cir. 2004)......................................................................4, 25, 35

*Christ's Bride Ministries v. SEPTA*,
   148 F.3d 242 (3d Cir. 1998)............................................................................ *passim*

*City of Chicago v. Morales*,
   527 U.S. 41 (1999)................................................................................................24

*City of Lakewood v. Plain Dealer Publishing*,
   486 U.S. 750 (1988)..............................................................................................24

*City of Philadelphia v Wells Fargo & Co., et al*,
   Civ. A. No. 17-02203 (E.D. Pa. 2017)..................................................................34

*Connick v. Myers*,
    461 U.S. 138 (1983)..................................................................................41

*Cornelius v. NAACP Legal Defense & Educational Fund, Inc.*,
    473 U.S. 788 (1985)............................................................................ *passim*

*Council of Alternative Political Parties v. Hooks*,
    121 F.3d 876 (3d Cir. 1997)......................................................................51

*Donovan ex rel. Donovan v. Punxsutawney Area School Board*,
    336 F.3d 211 (3d Cir. 2003)......................................................................19

*Eichenlaub v. Township of Indiana*,
    385 F.3d 274 (3d Cir. 2004)......................................................................19

*Elliott v. Kiesewetter*,
    98 F.3d 47 (3d Cir. 1996) .........................................................................51

*Elrod v. Burns*,
    427 U.S. 347 (1976)..................................................................................50

*FCC v. Pacifica Foundation*,
    438 U.S. 726 (1978)..................................................................................40

*First National Bank of Boston v. Bellotti*,
    435 U.S. 765 (1978)..................................................................................49

*Garrison v. Louisiana*,
    379 U.S. 64 (1964)....................................................................................41

*Globe Newspaper Co. v. Superior Court for the County of Norfolk*,
    457 U.S. 596 (1982)..................................................................................49

*Gregoire v. Centennial School District*,
    907 F.2d 1366 (3d Cir. 1990)....................................................................46

*Hopper v. City of Pasco*,
    241 F.3d 1067 (9th Cir. 2001) ..................................................................19

*International Society for Krishna Consciousness v. Lee*,
    505 U.S. 672 (1992) (O'Connor, J., concurring) ......................................42

*K.A. v. Pocono Mountain School District*,
    710 F.3d 99 (3d Cir. 2013)........................................................................39

*Kalman v. Cortes*,
    723 F. Supp. 2d 766 (E.D. Pa. 2010) (Baylson, J.)..................................24

*Kolender v. Lawson*,
    461 U.S. 352 (1983)................................................................................24

*Kreimer v. Bureau of Police*,
    958 F.2d 1242 (3d Cir. 1992).................................................................19

*Matal v. Tam*,
    137 S. Ct. 1744 (2017) .................................................................. *passim*

*Metromedia, Inc. v. City of San Diego*,
    453 U.S. 490 (1981) (Brennan, J., concurring).....................................23

*Mills v. Alabama*,
    384 U.S. 214 (1966)...............................................................................38

*Minnesota Voters Alliance v. Mansky*,
    138 S. Ct. 1876 (June 14, 2018)................................................... *passim*

*Mullin v. Sussex County*,
    861 F. Supp. 2d 411 (D. Del. 2012).......................................................51

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ..............................................................................41

*N.Y. Times Co. v. Sullivan*,
    403 U.S. 713 (1971) (Black, J., concurring).........................................38

*NAACP v. City of Philadelphia*,
    834 F.3d 435 (3d Cir. 2016).......................................................... *passim*

*Perry Education Ass'n v. Perry Local Educators' Ass'n*,
    460 U.S. 37 (1983)...............................................................19, 32, 40

*Pickering v. Board of Education*,
    391 U.S. 563 (1968)...............................................................................41

*Pittsburgh League of Young Voters Education Fund v. Port Authority of*
    *Allegheny County*,
    653 F.3d 290 (3d Cir. 2011)...............................................18, 19, 32, 34, 49

*Planned Parenthood v. Chicago Transit Authority*,
    767 F.2d 1225 (7th Cir. 1985) ..............................................................41

*Ridley v. MBTA*,
    390 F.3d 65 (1st Cir. 2004)....................................................................41

*Rosenberger v. Record & Visitors of the University of Virginia*,
    515 U.S. 819 (1995).............................................................19, 32, 38, 39

*Sammartano v. First Judicial District Court,*
  303 F.3d 959 (9th Cir. 2002) ............................................................................41

*Southeastern Promotions, Ltd. v. Conrad,*
  420 U.S. 546 (1975) ............................................................................................24

*Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Board,*
  502 U.S. 105 (1991) ............................................................................................40

*Street v. New York,*
  394 U.S. 576 (1969) ............................................................................................40

*Sypniewski v. Warren Hills Regional Board of Education,*
  307 F.3d 243 (3d Cir. 2002) ........................................................................18, 24

*Texas v. Johnson,*
  491 U.S. 397 (1989) ............................................................................................40

*United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio
  Regional Transit Authority,* 163 F.3d 341 (6th Cir. 1998) ................................19, 47

*United States v. Marcavage,*
  609 F.3d 264 (3d Cir. 2010) ..............................................................................49

*United States v. Playboy Entertainement Group, Inc.,*
  529 U.S. 803 (2000) ............................................................................................18

*Widmar v. Vincent,*
  454 U.S. 263 (1981) ............................................................................................49

**Statutes & Rules**

Minn. Stat. § 211B.11(1) (2017) ..............................................................................21

12 C.F.R. § 338.3(a) ..................................................................................................33

Fed. R. Civ. P. 65(c) ..................................................................................................51

## I.    INTRODUCTION

Plaintiff, The Center for Investigative Reporting ("CIR"), respectfully requests that the Court grant CIR's Motion for Preliminary Injunction and enjoin Defendant, Southeastern Pennsylvania Transportation Authority ("SEPTA"), from further censoring CIR and violating CIR's First Amendment rights.

CIR—the nation's oldest nonprofit investigative newsroom—created a journalistic comic to promote its investigative reporting on disparate treatment in the mortgage lending market.  CIR seeks to place its journalistic comic inside SEPTA buses.  However, SEPTA refuses to accept CIR's advertisement on the grounds that CIR's advertisement supposedly violates two provisions of SEPTA's advertising standards.  *See* Ex. 22 (Second Amendment to the Agreement by and Between SEPTA and Titan Outdoor LLC) ("Advertising Standards").[1]  Specifically, SEPTA claims that CIR's advertisement concerns "discriminatory lending" and therefore violates SEPTA's Advertising Standards prohibiting "political" advertisements and advertisements that address a "matter of public debate."[2]  The relevant standards provide:

> Prohibited Advertising Content.  Advertising is prohibited on transit facilities, products and vehicles if it or its content falls into one or more of the following categories –
>
> (a)      Advertisements promoting or opposing a political party, or promoting or opposing the election of any candidate or group of

---

[1]      All exhibits to this memorandum are attached to the Declaration of John S. Stapleton.

[2]      CIR describes its report as dealing with the topic of racially "disparate" lending, not "discriminatory" lending, and SEPTA specifically rejected the advertisement because it concerned "disparate lending."  *See* Ex. 16.  SEPTA's General Counsel and Rule 30(b)(6) corporate designee, Gino Benedetti, Esquire, testified that SEPTA views "disparate lending" and "discriminatory lending" to be interchangeable terms and that this topic is both the "political issue" and "matter of public debate" that prompted SEPTA to prohibit CIR's advertisement.  *See* Transcript of Deposition of Gino Benedetti, Esquire ("Benedetti Dep.") 146:19–147:7.

candidates for federal, state, judicial or local government offices are prohibited. In addition, advertisements that are political in nature or contain political messages, including advertisements involving political or judicial figures and/or advertisements involving an issue that is political in nature in that it directly or indirectly implicates the action, inaction, prospective action or policies of a government entity.

(b)      Advertisements expressing or advocating an opinion, position or viewpoint on matters of public debate about economic, political, religious, historical or social issues.

Ex. 22, at §§ II.A.9(b)(iv)(a) and (b) (collectively, the "Challenged Provisions").

Advertising is big business for SEPTA, but SEPTA is obligated to follow the Constitution.  SEPTA bears the burden of justifying any restrictions it imposes on speech in its advertising spaces.  The weight of SEPTA's burden depends on whether SEPTA's advertising spaces constitute a designated public forum, which would require SEPTA to demonstrate that its content-based restrictions on "political" and "public debate" advertisements satisfy strict scrutiny, or a nonpublic forum, which would require SEPTA to demonstrate that its content-based restrictions are reasonable and viewpoint neutral.  SEPTA's advertising spaces repeatedly have been found to be a designated public forum, most recently in 2015.  *Am. Freedom Defense Initiative v. SEPTA*, 92 F. Supp. 3d 314 (E.D. Pa. 2015) (Goldberg, J.) ("*AFDI*"); *Christ's Bride Ministries v. SEPTA*, 148 F.3d 242 (3d Cir. 1998).  SEPTA cannot meet its burden under either standard, and CIR is likely to succeed on the merits of its claim.

If SEPTA's advertising spaces are considered to be a nonpublic forum, the Challenged Provisions fail First Amendment scrutiny for at least three reasons.

*First*, the Challenged Provisions are unconstitutional because they are incapable of reasoned, objective application and afford SEPTA officials virtually unbridled, standardless discretion to censor speech.  SEPTA intentionally has refused to issue any guidance to help officials determine what topics are "political in nature" and what counts as a "matter of public

debate" on an "economic, political, religious, historical or social issue[]."  Like the restrictions on "political" speech struck down in *Minnesota Voters Alliance v. Mansky*, 138 S. Ct. 1876, 1888, 1891 (June 14, 2018), the Challenged Provisions are unconstitutional due to their extraordinarily expansive and unclear terms.  SEPTA's policy, like Minnesota's, fails to provide "objective, workable," and "sensible" rules for distinguishing between permitted and prohibited speech.  *Id.* at 1888, 1891.  Unsurprisingly, the record confirms that SEPTA has applied these amorphous provisions arbitrarily and unevenly.

*Second*, the Challenged Provisions are unconstitutional because SEPTA has applied them in a viewpoint discriminatory manner.  SEPTA refused CIR's advertisement because SEPTA said it concerned the subject of "discriminatory lending," which SEPTA deemed to be a "political" issue and a matter of "public debate."  Even if SEPTA deems CIR's advertisement to concern a viewpoint on a political debate, SEPTA regularly accepts advertisements from financial institutions that are aimed at African-American families and represent that the institutions are "Equal Housing Lenders" and "Equal Opportunity Lenders" that do not discriminate.  Having allowed advertisements from financial institutions on the topic of discriminatory lending, SEPTA cannot reject CIR's advertisement regarding that topic just because a SEPTA official believes that CIR's findings of racial disparities in lending are subject to debate while the financial institution's assertions of nondiscrimination are not.  The evidence also suggests that CIR is not the only victim of viewpoint discrimination in the application of SEPTA's Advertising Standards; SEPTA has applied the Challenged Provisions to exclude other advertisers that SEPTA officials deemed to be "controversial."  Excluding speakers because some may take issue with their viewpoint is viewpoint discrimination.  *Child Evangelism*

- 3 -

*Fellowship v. Stafford Twp. Sch. Dist.*, 386 F.3d 514, 527 (3d Cir. 2004) (*citing Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 812 (1985)).

*Third*, the Challenged Provisions are not "reasonable" in light of SEPTA's stated purpose of raising revenue while maintaining the safety and comfort of its passengers.  To the extent that the Challenged Provisions are aimed at the end goal of shielding riders from controversial or offensive speech, that is an illegitimate reason for government censorship.  *E.g.*, *Matal v. Tam*, 137 S. Ct. 1744, 1764 (2017).  But even assuming that SEPTA's desire to shield riders from controversial or offensive speech were in fact a means of achieving a legitimate government interest, such as preventing a loss of ridership and revenue, the Challenged Provisions do not meaningfully advance those goals, and SEPTA cannot demonstrate that the type of speech excluded by the Challenged Provisions is actually incompatible with SEPTA's advertising spaces.  In fact, SEPTA intentionally exposes riders to "political" content and "matters of public debate" through various other means, including by publishing news headlines on the very same digital displays it uses for advertisements, by allowing vendors in SEPTA stations to sell periodicals and show television programming including such content, and by SEPTA's own arbitrary application of its standards, which results in SEPTA accepting numerous advertisements regarding "political" content and matters of "public debate."  In addition, the record lacks any evidence that the Challenged Provisions have any positive impact on SEPTA's revenue, and they may actually cause SEPTA to lose revenue.

Further, SEPTA's advertising space is in fact a designated public forum, as both this Court and the Third Circuit have previously found.  SEPTA did not close the forum after this Court's 2015 decision in *AFDI*; rather, SEPTA has continued to accept numerous advertisements with content that violates the "political" and "public debate" prohibitions, including pro-

vaccination PSAs and advertisements on topics including the Democratic National Convention and the Affordable Care Act.  Because SEPTA's advertising space remains a designated public forum, its content-based restrictions on speech must satisfy strict scrutiny.  SEPTA cannot meet that demanding standard.

For these reasons, and as explained further in this Memorandum, CIR is likely to succeed on the merits of its claim.  Moreover, because CIR's constitutional rights are being violated, CIR is suffering irreparable harm, and the balance of harms and public interest also heavily weigh in favor of the issuance of an injunction.

Accordingly, the Court should grant CIR's motion for a preliminary injunction.

## II.     BACKGROUND

CIR is a nonprofit investigative news organization.  *See* Transcript of Deposition of Victoria Baranetsky ("Baranetsky Dep.") 59:6–13.  CIR's reporting has been widely recognized for its excellence, groundbreaking creativity, and impact.[3]  Reveal from the Center for Investigative Reporting ("Reveal") is a trade name and an unincorporated division of CIR. *Id.*

SEPTA is a state agency serving Southeastern Pennsylvania.  Benedetti Dep. 15:17–20; Ex. 86, § 8 (Defendant's Answer to Plaintiff's Complaint ("Answer") (Dkt. 10).

---

[3]     CIR has won Emmy awards, a George Foster Peabody Award, a Webby award, a Military Reporters and Editors Award, a Barlett & Steele Gold Award for investigative business journalism, Alfred I. DuPont-Columbia University awards, a George Polk Award, IRE Awards for multiplatform journalism, and an Edward R. Murrow Award for investigative reporting.  CIR was a finalist for the Pulitzer Prize in 2012, 2013, and 2018 and a recipient of the 2012 MacArthur Award for Creative and Effective Institutions.  This past year, CIR's documentary short, "Heroin(e)," was nominated for an Academy Award.  *See* Awards, Reveal News, https://www.revealnews.org/awards/ (last visited Aug. 14, 2018).

### A.     Relevant Procedural Background.

On May 2, 2018, CIR filed a single-count Complaint for Declaratory and Injunctive Relief (Dkt. 1), *see* Ex. 6, against SEPTA alleging that SEPTA is violating CIR's First Amendment right to freedom of speech by excluding CIR's proposed advertisements from SEPTA's advertising spaces.  SEPTA answered CIR's Complaint on June 5, 2018.  *See* Ex. 86.

In preparation for CIR's present motion for preliminary injunction, the parties exchanged documents and responses to interrogatories.  *See* Ex. 24 (SEPTA's Objections and Responses to Plaintiff's Combined Interrogatories and Request for Production of Documents); Ex. 87 (CIR's Objections and Responses to SEPTA's Interrogatories and Requests for Production of Documents).  SEPTA deposed D. Victoria Baranetsky, Esquire, General Counsel to CIR, as CIR's corporate designee pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure.  *See* Baranetsky Dep.  CIR deposed Gino Benedetti, Esquire, SEPTA's General Counsel, and Thomas Kelly, SEPTA's Director of Sales, both of whom were produced by SEPTA as designees in response to CIR's Notice of Deposition pursuant to Rule 30(b)(6).  *See* Benedetti Dep.; Transcript of Deposition of Thomas Kelly ("Kelly Dep."); Ex. 20 (CIR's Notice of Deposition).

### B.     SEPTA's Advertising Spaces.

SEPTA has approximately 325 million annual riders and operates subway and elevated rail lines, commuter trains, light rail lines, electric trolleys, and buses. Ex. 86, ¶ 18.  Its vehicles run throughout Philadelphia, as well as Bucks, Montgomery, Delaware, and Chester counties and parts of New Jersey and Delaware.  Benedetti Dep. 15:11–16.

To generate revenue, SEPTA decided to lease space for conventional print advertising on both the exterior and interior of the Authority's over 2,500 vehicles (including buses, trolleys, and trains) and more than 200 stations and facilities.  *Id*. 15:21–16:6, 17:5–10;

18:6–10; Ex. 21 (SEPTA's Advertising Opportunities webpage).  Generally, at any given time, some of SEPTA's advertisement space is empty or not leased.  Kelly Dep. 15:20–16:1.

In addition to print advertising, the available advertising spaces on many SEPTA vehicles also include digital displays.  In SEPTA's newest line of buses, which are progressively replacing SEPTA's older vehicles, these displays are called "infotainment" systems.[4]  The digital displays show a rotating selection of paid advertisements accepted by SEPTA interspersed with transit route information and news headlines from the Associated Press and Reuters.  Benedetti Dep. 18:24–19:4 (digital advertising currently available on trains and "a lot of" SEPTA buses); *id*. 24:20–25:24; *id*. 30:9–31:5 (screens show advertisements and news from Reuters and Associated Press and other information); *id*. 34:18–35:4 (digital displays have a 90- or 180-second loop that contains news headlines from Associated Press or Reuters, advertisements, and SEPTA system information).  SEPTA does not maintain a record of the newsfeeds that have run the digital displays, *see id*. 82:3–9, but SEPTA conceded that the news headlines shown to passengers could include anything that appears on the front page of a newspaper, including news about current events and political figures.  *Id*. 31:23–33:22.  For example, SEPTA confirmed that the headlines "U.S. Navy now allowing ponytails and other hairstyles for women, reversing policy that long forbade them to let their hair down" and "First Lady [Melania Trump] mingles with spouses of U.S. allies during two-day NATO summit in Brussels," both of which appeared

---

[4.]    SEPTA is in the process of modernizing its fleet of buses, and is replacing older models that did not have infotainment systems with newer models that feature infotainment systems or similar digital displays.  Benedetti Dep. 135:18–138:20.

on a digital display aboard a SEPTA vehicle, were representative of the type of news headlines that would appear on the digital displays.  *Id.* 36:10–38:17.

      SEPTA has never attempted to impose any restrictions or limits on the news headlines that may be displayed on the digital displays.  *Id.* 32:18–33:22, 45:4–20, 139:12–16.[5] SEPTA's view is that the news headlines on its digital displays promote safety, efficiency, and comfort for passengers, because the infotainment "provides our customers with information" and "gives them something to see while they're riding."  *Id.* 43:1–15.

      At some SEPTA stations, SEPTA leases space for newsstands where SEPTA patrons can buy newspapers, magazines, and other periodicals.  *Id.* 40:1–41:1.  SEPTA does not limit the type of content that newsstands are allowed to sell or show to patrons, other than restricting the selling of "risqué periodicals."  *Id.* 41:2–17.  SEPTA also leases space to other retailers within SEPTA stations and does not prohibit such retailers from having televisions or monitors showing the news, which some of them do.  *Id.* 41:18–42:16 (confirming that a store leasing space from SEPTA may tune a television to Fox News, MSNBC, CNN or any other channel of the store's choosing).

### 1.    Intersection:  SEPTA's Advertising Manager.

      SEPTA contracts with an independent, non-governmental entity, Intersection (formerly Titan Outdoor LLC), to manage SEPTA's advertising program.  *Id.* 20:13–21:9. Intersection sells advertising space on SEPTA vehicles and in SEPTA stations on SEPTA's

---

[5]     Mr. Benedetti testified that he informed a SEPTA employee that, in the future, he wanted to discuss the content of news headlines running on SEPTA's vehicle's digital displays.  *Id.* at 138:17–139:4.  However, Mr. Benedetti's conversation with the employee occurred during a break in Mr. Benedetti's deposition after he was questioned regarding the content of the messages appearing on those displays.  Prior to Mr. Benedetti's deposition, he never discussed the news headlines on the displays with employees.  *Id.* at 139:5–16.

behalf.  *Id.* 20:13–20.  Intersection's contract states that SEPTA and Intersection will split advertising revenue at the rate of 65 percent to SEPTA and 35 percent to Intersection, *id.* at 22:18–24, while also guaranteeing that SEPTA receives at least $150,000,000 in revenue over a nine-year period.  *Id.* at 22:18–24, 23:1–12; Ex. 80 (SEPTA to get at least $150M under advertisement contract, Philadelphia Inquirer (Apr. 24, 2014)).  The more advertising revenue Intersection generates, the more money it makes; conversely, Intersection bears the risk if it does not generate enough revenue to meet SEPTA's guarantee.  Benedetti Dep. 23:9–19.

    2.    **SEPTA's Advertising Standards.**

    Any person or group may seek to advertise on SEPTA's advertising spaces, and SEPTA accepts both commercial and non-commercial advertisements.  *Id.* at 19:14–20:9.  However, the Advertising Standards, which are contained in the contract between SEPTA and Intersection, currently list 20 categories of prohibited advertisements.  Ex. 22, §§ II.A.9(b)(iv)(a)–(v).  Provision (a) of the Advertising Standards purports to prohibit "political" advertisements, and provision (b) purports to prohibit advertisements concerning "matters of public debate."  *Id.*

    SEPTA adopted the current Advertising Standards in May 2015, following this Court's decision in *AFDI*, 92 F. Supp. 3d 314, which declared that SEPTA's advertising spaces were a designated public forum and ordered SEPTA to allow AFDI's anti-Islamic advertisement to run on SEPTA's buses.[6]  The Third Circuit also has held that SEPTA's advertising spaces

---

[6]    Some of SEPTA's buses running AFDI advertisements were vandalized with graffiti. Benedetti Dep. 159:1–160:5.  The AFDI advertisement is the only advertisement SEPTA was able to identify as causing vandalism specifically due to the advertisement's content, although SEPTA's vehicles generally are often vandalized with graffiti, and vandals routinely draw moustaches on the figures featured in advertisement artwork.  *Id.* 160:6–8, 161:13–14.

were a designated public forum and that SEPTA's removal of the advertisement at issue was unconstitutional.  *See Christ's Bride Ministries,* 148 F.3d 242.

In the 2015 amendment, SEPTA added prefatory language that stated that the express purpose of the Advertising Standards was "to accept such forms of advertising as will enhance the generation of revenues . . . without adversely affecting the patronage of passengers." Ex. 22 (section entitled "Non-Public Forum Status").  The amendment further stated that "SEPTA will retain strict control over the nature of the advertisements accepted for posting on or in its transit facilities, products, and vehicles and will maintain its advertising space strictly as a non-public forum." *Id.*  In addition, the amendment added new categories of prohibited content, including the Challenged Provisions.  SEPTA hoped that enacting the new restrictions and stating the express purpose would turn its advertising spaces into a nonpublic forum, subject to lesser judicial scrutiny, and that it could thereby avoid having to run controversial advertisements like AFDI's that might prompt a negative response.[7]

SEPTA never analyzed whether amending the Advertising Standards would or did affect SEPTA's revenue or ridership.  Benedetti Dep. 54:5–11; Kelly Dep. 8:2–9:3.

### 3.    SEPTA's Process for Reviewing Advertisements.

All advertisements running on SEPTA's advertising spaces are reviewed by Intersection and at least one SEPTA employee.  *See* Benedetti Dep. 60:5–61:5; *id.* 64:13–17.   If

---

[7]     Benedetti Dep. 54:12–55:9 ("[W]hat we faced with the AFDI case we wanted to avoid facing again.  And what we faced was a public outcry, an outcry from our employees who had to operate the buses, vandalism to certain of the buses that ran the ads and a barrage of reporters wanting to know what we were going to do about all of that. So we determined we didn't want to go through with that again.  We didn't want our customers to face that, nor our employees.  So, yeah, that's why we did it, to improve the customer experience, the employee experience and the safety of both."); *id.* 58:2–59:2 (when asked why SEPTA wants its advertising space to be considered a nonpublic forum, responding that "we don't want ads like the AFDI's ad. . . We want to be a nonpublic forum to avoid the situation we ran into with the AFDI.").

Intersection deems an advertisement acceptable, the advertisement is relayed to at least one SEPTA employee through a copy receipt.  Among other tasks, the SEPTA employee is supposed to ensure that the advertisement does not violate the Advertising Standards.  *Id.* 63:24–65:3, 168:12–170:5.  Advertisements that Intersection deems compliant, and that are not rejected or removed by SEPTA's employee, run in SEPTA's advertising spaces.  *Id.* 167:9–169:6.

If Intersection receives a proposed advertisement that it believes may violate the Advertising Standards, it must alert SEPTA's advertising department for review and approval. Ex. 22, § II(A)(9)(a).  Advertisements that Intersection and the reviewing SEPTA employee believe fall in a "gray area" and may not comply with the Advertising Standards are elevated to SEPTA's General Counsel, Mr. Benedetti, for further review.  Benedetti Dep. 168:12–21.  Mr. Benedetti is SEPTA's final arbiter regarding whether an advertisement complies with SEPTA's Advertising Standards.  *Id.* 79:17–21.

SEPTA intentionally refuses to publish any guidelines or written documents to aid Intersection or SEPTA officials in interpreting the Advertising Standards.  *Id.* 66:8–68:5, 101:8–13.  SEPTA explained that "[w]e purposely don't do that because we want to evaluate each proposed ad against the standards and then engage in the process we engage in to determine whether or not it matches our standards or doesn't."  *Id.* 69:3–18.

Mr. Benedetti described his own personal process for determining whether a proposed advertisement elevated to his level of review violates the Challenged Provisions as follows:

> Q.     How do you go about determining whether something is subject to debate?
> A:     That's a good question.
>        What I do, generally speaking, is I look at the ad first, and I just kind of absorb it, for lack of a better word.  I think about it.

> And then I go on the internet and I Google various phrases about, you know, what the advertisement is projecting, what message it is, and I see what comes up, and I see if there's a meaningful debate about the issue that the advertisement is promoting.

*Id.* 102:13–24.  His process also may involve reviewing case law that Mr. Benedetti deems relevant and discussing the advertisement with in-house and outside counsel.  *Id.* 101:8–16, 126:8–12.[8]  SEPTA's interpretation of its Advertising Standards may evolve over time because "[c]ase law can change how those standards are reviewed."  *Id.* 277:1–20.  Mr. Benedetti testified that he cannot tell whether any advertisement concept or specific advertisement violates the Challenged Provisions without engaging in this amorphous and ad hoc deliberative process.[9]  For example, when asked whether an advertisement that said "Thank you, Mayor Kenney" would be permissible, Mr. Benedetti responded, "I can't answer that without sitting down, going

---

[8]  *See also, e.g.*, *id.* 129:11–130:23 ("I probably would actually have counsel on this one, to be honest with you. . . I'd have to really sit down and think about this and maybe get some counsel on it."); *id.* 133:4–7 ("I'd have to sit down and think about that and go through the process and probably talk to counsel."); *id.* at 183:4–18 ("I have to consult with counsel for sure on something like that and I would have to sit down with Mr. Smith and talk it through and do searches and—it's not something I can do in a couple minutes with you, Mr. Stapleton.").

[9]  *Id.* 106:24–107:22 (when asked whether an image of a political figure could appear on an advertisement without violating (a), responding, "It's hard for me to answer questions like that in a vacuum.  I don't do that.  I look at the ad and we go through kind of a complete process to really understand it."); *id.* 110:1–15 (when asked whether the government could advertise without violating (a), responding "It's really hard for me to do this in a vacuum . . . I do this with the documents, the ads in front of me, with a dialogue with folks, with some research and some thinking."); *id.* 114:18–115:16 (when asked to confirm that an advertisement that merely involves a political issue violates (a), responding, "I'd have to see the advertisement and [make a] judgment about the advertisement.  I can't just rule out anything without seeing it, being deliberative about it, applying the standards, looking at case law.  There's a process here that I undergo."); *id.* 125:8–126:7 (when asked to confirm that an advertisement would violate the "public debate" prohibition if it expressed an opinion, position or viewpoint on a matter that involves a social issue, as defined by SEPTA to mean a matter that involves society at large, responding, "It could or it could not.  I'd have to see the ad.  These are not abstract academic decisions. . . I need to see it and go through my process with the folks I talk to to make that determination.").

through the process, talking to Mr. Smith, reading the standards, understanding the context." *Id.*
108:1–9, 128:23–129:4.

   Mr. Benedetti also testified that he could not determine whether any of the
following text would violate the Challenged Provisions:

- "Happy July Fourth"
- "Happy Ramadan"
- "Vote on Election Day"
- "You Have a Right to Vote"
- "Join the Boy Scouts"
- "Join the Military"
- "Do Not Join the Military"
- "U.S. Military: Defending Freedom"
- "ACLU: Defending Freedom"
- "AFDI: Defending Freedom"
- "Life, Liberty, and the Pursuit of Happiness"
- the text of the First Amendment
- "Don't Litter"
- "Only You Can Prevent Forest Fires"
- the text of the Fourteenth Amendment

*Id.* 131:17–134:7.  He further testified that he was uncertain whether the nomination of Hillary
Clinton was a "matter of public debate" without further research.  *Id.* 177:4–178:11.

   SEPTA has no formal appeal process following SEPTA's denial of an
advertisement.  *Id.* 78:17–79:16.  Sometimes, after deciding that a proposed advertisement
violates the Advertising Standards, Mr. Benedetti will discuss the decision with the advertiser,
and Mr. Benedetti might change his mind.  If Mr. Benedetti does not change his mind, the
advertiser's only recourse is to file a lawsuit.  *Id.* 78:17–79:16, 115:17–116:1.

- 13 -

SEPTA's discovery responses suggest that SEPTA has accepted approximately 2,750 advertisements under the current Advertising Standards.[10]  SEPTA has identified only 13 advertisements that it rejected in whole or in part, as well as two additional advertisements that SEPTA initially accepted, but which Mr. Benedetti personally observed on SEPTA vehicles and ordered to be taken down because he thought they did not comply with SEPTA's Advertising Standards.  Ex. 53 (July 17, 2018 email from J. Powell to Counsel); Benedetti Dep. 74:10–20.

### C.   Rejection of CIR's Proposed Advertisement.

In January 2018, CIR applied to place a paid advertisement on the interior of SEPTA buses.  Ex. 30.  CIR wanted to post a journalistic graphic derived from the 10-panel comic appearing on Reveal's website.  *See* Ex. 81 (Gabriel Hongsdusit and Cristina Kim, *A Stacked Deck: A visual look at discriminatory lending in the U.S.,* Reveal, (Feb. 21, 2018), *available at* https://www.revealnews.org/article/a-stacked-deck-a-visual-look-at-discriminatory-lending-in-the-u-s/).  The comic is based on an investigative news story published by Reveal regarding disparities in the conventional home mortgage market.  *See* Ex. 82 (Aaron Glantz and Emmanuel Martinez, *For People of Color, Banks Are Shutting the Door to Homeownership*, Reveal, Feb. 15, 2018, *available at* https://www.revealnews.org/article/for-people-of-color-banks-are-shutting-the-door-to-homeownership/).  That report was based on Reveal's year-long investigation analyzing 31 million federal public records made available through the Home

---

[10]    SEPTA's productions in this action to date are not clear regarding precisely how many discrete advertisements SEPTA has accepted and rejected under the current Advertising Standards.  In response to an interrogatory asking SEPTA to identify all advertisements that SEPTA accepted or rejected since SEPTA implemented the 2015 Advertising Standards, SEPTA produced a list titled "SEPTA ADVERTISEMENTS MAY 2015 TO APRIL 2018" with more than 2,750 line entries identifying a year, contract number, and entity name on each line.  *See* Ex. 24, at exhibit B.  It is not clear whether each entry refers to a single advertisement or a campaign of multiple advertisements; nor is it clear whether multiple line entries may refer to identical advertisement(s).

Mortgage Disclosure Act.  *Id.*  Reveal's data analysis relied on accepted techniques and methods used by leading academics, the Federal Reserve, and the Department of Justice to identify lending practices.  *Id.*  Reveal's analysis was independently reviewed and confirmed by the Associated Press.  *Id.*  The analysis showed that African-American and Hispanic people are denied conventional mortgage loans at rates far higher than their white counterparts in 61 cities across America, and particularly so in Philadelphia.  *Id.*

CIR sought to advertise its reporting on this issue by posting advertisements on SEPTA buses based on the informative comic in order to reach the broadest range of communities all across Philadelphia.  *See* Ex. 87 (CIR's Resp. to Interrog. No. 5).  CIR believed that advertising on SEPTA's vehicles, which move through many neighborhoods, offered a rare opportunity to reach interested readers all across the city, including but not limited to those affected by the lending disparities its investigation had uncovered.  *See id.*  According to its own website, SEPTA provides "various ways for advertisers to effectively communicate with the approximately 1 million commuters that ride SEPTA each day."  Ex. 21 (SEPTA's Advertising Opportunities webpage).

Intersection informed CIR that SEPTA would not accept CIR's proposed advertisement because, according to SEPTA's legal department, "[d]isparate lending is a matter of public debate and litigation."  Ex. 30 (Feb. 22, 2018 email from J. Roche to H. Ferguson, et al.).  CIR and SEPTA then exchanged four letters between March 2 and March 29, 2018.  *See* Exs. 16–19.  Ultimately, SEPTA reiterated its position that CIR's proposed advertisement is prohibited by the 2015 Advertising Standards because the advertisement "takes a position on issues that are matters of political, economic, and social debate" and "indirectly implicates the

action, inaction, prospective action or policies of a government entity," in violation of the

Challenged Provisions.  Ex. 17; Ex. 19.

Mr. Benedetti testified that, in making the final decision to reject CIR's proposed

advertisement, SEPTA reviewed the Reveal website, read a document explaining CIR's research

and the work underlying the reporting described in the proposed advertisement, read an article by

the American Bankers Association questioning CIR's reporting, and read web search results

indicating that there was some litigation against financial institutions for discriminatory lending

practices.  Benedetti Dep. 140:13–142:22; *see also id.* 11:23–13:10.  He concluded that the

subject of the proposed advertisement was a "political" issue and a "matter of public debate."  *Id.*

146:16–147:8; *see also id.* at 161:17–162:3.  Mr. Benedetti explained that, in his view, CIR was

taking a side on a matter of public debate because the American Bankers Association had

criticized CIR's methodology and conclusions.  *Id.* 147:15–148:4, 161:17–23.[11]  During his

deliberation, he thought about the AFDI advertisement, and was concerned that the public might

find CIR's advertisement controversial or offensive.[12]

SEPTA has made clear that CIR's advertisement was rejected because, in

SEPTA's view, the advertisement violated the Challenged Provisions, and has disclaimed any

---

[11]     In that vein, SEPTA apparently did not take into account that CIR is a respected and award-winning news organization or that its reporting was based on standard industry calculations applied to data contained in public records.

[12]     Benedetti Dep. 86:11–87:18 (testifying that SEPTA thought that CIR's advertisement "could have caused some concern among our riders"—specifically because of some of the images in the comic and because of "the debate that's going on in the public about the issues that are raised in the comic."); *id.* 90:7–91:2 (testifying that, in reviewing CIR's proposed ad, SEPTA "thought about the AFDI ad.  I thought about the nature of this ad and thought what it could do with people on the bus . . . I did think about the impact that the ad could have on our riders and our employees.").

other justification for rejecting it.  Ex. 24 at 5, 7 (SEPTA Resps. to Interrog. Nos. 1 & 3);

Benedetti Dep. 83:2–85:17, 98:1–5.

**D.     CIR's Second Advertising Proposal.**

Prior to this litigation, SEPTA never identified specific panels or aspects of the

proposed advertisement that concerned SEPTA, stating only that, in SEPTA's view, CIR's

advertisement addressed the subject of "disparate lending."  SEPTA did not invite CIR to amend

its proposal in any manner before rejecting it.  *See* Exs. 16–19.  However, during his deposition,

Mr. Benedetti identified two images in CIR's advertisement that personally stood out to him as

violative of SEPTA's Advertising Standards: an image showing keys attached to sticks of

dynamite handed from a white hand to a black hand, and an image Mr. Benedetti interpreted as

showing protesters yelling at a white banker.  Benedetti Dep. 156:9–12; 157:17–158:3.

To address Mr. Benedetti's stated concerns, CIR drafted an additional proposed

advertisement without those design elements, which it submitted to Intersection and SEPTA on

August 6, 2018.  Ex. 83 (Aug. 6, 2018 email from G. Hongsdusit to J. Roche); *id.* (Aug. 6, 2018

ltr. from J. Stapleton to M. Madden, et al.).  SEPTA responded that it would not consider the

advertisement or any other submission by CIR during the pendency of this litigation.

**E.     Continuing Harm to CIR.**

CIR still wishes to promote its news reporting on racial disparities in conventional

home mortgage markets in SEPTA advertising spaces.  It intends to hold an event about the

investigation in collaboration with local media partners in Philadelphia on or about the first week

of October and seeks to publish its proposed advertisement on SEPTA buses in the weeks

leading up to that project.  *See, e.g.*, Ex. 87 (CIR Resp. to Interrog. No. 4).

In addition, CIR anticipates that, in the future, it will want to place other

advertisements on SEPTA's advertising spaces, and that, because of CIR's mission to publish

investigative journalism, SEPTA is likely to reject those advertisements as being "political" and touching on matters of "public debate." *Id.* (CIR Resp. to Interrog. No. 5).

## III.  ARGUMENT

Under Rule 65 of the Federal Rules of Civil Procedure, this Court must weigh four factors when deciding whether to grant a motion for preliminary injunction: (1) has the movant shown a reasonable probability of success on the merits; (2) will the movant be irreparably harmed by denial of the relief; (3) will granting preliminary relief result in even greater harm to the non-moving party; and (4) is granting preliminary relief in the public interest. *B.H. v. Easton Area Sch. Dist.*, 725 F.3d 293, 302 (3d Cir. 2013) (en banc).

In cases involving the freedom of speech, the plaintiff's likelihood of success on the merits generally is dispositive. *See B.H.*, 725 F.3d at 302; *Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 258 (3d Cir. 2002).

### A.  CIR Is Likely to Succeed on the Merits of its Claim Because SEPTA Cannot Meet Its Burden to Justify Its Restrictions on Speech.

Content-based restrictions on speech "have the constant potential to be a repressive force in the lives and thoughts of a free people." *Ashcroft v. ACLU*, 542 U.S. 656, 660 (2004). When the government restricts speech based on its content, the restriction is presumptively invalid, and the government bears the burden to rebut that presumption. *E.g., United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 816–17 (2000) (citations omitted).

The amount of flexibility the government has to restrict speech on government-controlled property—here, SEPTA's advertising spaces—depends on the type of property at issue and whether it is a "traditional public," "designated public," or "nonpublic" forum. *E.g., Pittsburgh League of Young Voters Educ. Fund v. Port Auth. of Allegheny Cnty.*, 653 F.3d 290, 295–96 (3d Cir. 2011).

A "designated public forum" is government-owned property that does not qualify as a "traditional" public forum (*e.g.*, city streets or parks), but which the government has "intentionally opened up for use by the public as a place for expressive activity." *Id.* at 296 (quotation omitted). Municipal advertising spaces, including advertisement spaces within city halls, public transit stations, and city buses—including SEPTA's stations and buses—have all been found to be designated public fora based on the government's decision to open such places for public expression. *See Christ's Bride Ministries*, 148 F. 3d at 249–55 (SEPTA's stations); *AFDI*, 92 F. Supp. 3d at 326 (SEPTA buses); *United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 355 (6th Cir. 1998) (city buses); *Hopper v. City of Pasco*, 241 F.3d 1067, 1074–81 (9th Cir. 2001) (city hall). Content-based restrictions on speech in a "designated public forum" are analyzed under strict scrutiny.

A "nonpublic forum"—also known as a "limited public forum"—is a venue that has not been opened to speech by the public. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983) (discussing definition of nonpublic forum).[13] Content-based

---

[13] Government creates a "nonpublic forum" when it opens up space to the public for some main purpose other than facilitating speech in that space. For example, when the government operates a certain space as a polling place on Election Day and invites the public, subject to extensive regulations, into that space for the "sole purpose of voting," restrictions on speech within the polling place should be analyzed under nonpublic forum analysis. *Mansky*, 138 S. Ct. at 1886. If the government intentionally opens up its property for speech only by certain groups or for certain narrow expressive purposes, the property may also properly be analyzed as a nonpublic forum. *E.g.*, *Rosenberger v. Record & Visitors of the Univ. of Va.*, 515 U.S. 819 (1995) (government could create student activities fund as a nonpublic forum restricted to student groups meeting certain criteria); *Eichenlaub v. Twp. of Indiana*, 385 F.3d 274 (3d Cir. 2004) (township could create nonpublic "citizen's forum" at town government meeting and restrict comment to only issues germane to town government); *Donovan ex rel. Donovan v. Punxsutawney Area Sch. Bd.*, 336 F.3d 211, 225 (3d Cir. 2003) (school district created a nonpublic forum when it limited use of student activity period to certain student clubs); *Kreimer v. Bureau of Police*, 958 F.2d 1242, 1261 (3d Cir. 1992) (government could restrict use of public library as a nonpublic forum for "reading, writing, and quiet contemplation" but not for "oral and interactive" First Amendment activities).

restrictions on speech in a nonpublic forum must be "reasonable and viewpoint neutral." *NAACP v. City of Philadelphia*, 834 F.3d 435, 441 (3d Cir. 2016).  This standard is "more exacting" than ordinary rational basis review, and the government bears the burden to prove the constitutionality of its restriction on speech.  *Id.* (citations omitted).

Regardless of whether the Court analyzes SEPTA's advertisement spaces as a designated public forum or a nonpublic forum, the Challenged Provisions are unconstitutional. *See id.* at 442 (declining to reach the type of forum of the Philadelphia airport's advertising spaces because the fact that the "ban on noncommercial content is unreasonable means that it is unconstitutional no matter what we label the forum").  In Parts 1 through 3 of this Section, CIR demonstrates that, even if SEPTA successfully "closed" the forum in 2015 after decades of operating its advertising space as a designated public forum, the Challenged Provisions nonetheless fail to pass constitutional muster because they are not capable of reasoned application, SEPTA's application of the Challenged Provisions is viewpoint discriminatory, and the Challenged Provisions are not "reasonable" in light of the stated purposes of the forum.

In Part 4, CIR demonstrates that, in any event, SEPTA's advertising space remains a designated public forum.  Accordingly, even if the Challenged Provisions were sufficiently clear, reasonable, and viewpoint-neutral—which they are not—the Challenged Provisions are unconstitutional because they fail strict scrutiny.

Any one of these four reasons is sufficient to conclude that CIR is likely to succeed on the merits.

> **1.     SEPTA's Challenged Provisions Are Unconstitutional Because They Are "Not Capable of Reasoned Application" and Confer Unbridled Discretion to Censor Speech.**

The Supreme Court's recent decision in *Mansky* is directly on point, and is consistent with a long line of cases striking down amorphous restrictions on speech on First

Amendment grounds.  These cases demonstrate that SEPTA's Challenged Provisions are

unconstitutional because they fail to "articulate some sensible basis for distinguishing what may

come in from what must stay out," *Mansky*, 138 S. Ct. at 1888, and are "not capable of reasoned

application," *id.* at 1892.

**(a)      Restrictions on Speech that Are Not Capable of Reasoned
Application and Confer Unbridled Discretion to Censor
Speech Violate the First Amendment.**

In *Mansky*, the Supreme Court held that a Minnesota statute prohibiting the

wearing of a "political badge, political button, or other political insignia" in a polling place

violated the First Amendment.  *Id.* at 1883 (quoting Minn. Stat. § 211B.11(1) (2017)).  The

Court accepted that the interiors of Minnesota's polling places on Election Day were a nonpublic

forum for speech, *id.* at 1886; that Minnesota was pursuing a permissible objective in restricting

speech in order to try to maintain a calm atmosphere in the polling places, *id.* at 1887; and that

Minnesota had "good intentions" that were "generally worthy of [the Court's] respect," *id.* at

1892.  Yet, the Court still struck the statute as unreasonable because Minnesota's restrictions on

speech were "not capable of reasoned application," *id.* at 1892, as demonstrated by the plain text

of the statute and Minnesota's inability to articulate any principled way of interpreting and

applying it.  The Court observed:

> [The statute] does not define the term 'political."  And the word
> can be expansive.  It can encompass anything "of or relating to
> government, a government, or the conduct of governmental
> affairs," Webster's Third New International Dictionary 1755
> (2002), or anything "[o]f, relating to, or dealing with the structure
> or affairs of government, politics, or the state," American
> Heritage Dictionary 1401 (3d ed. 1996).

*Id.* at 1888; *see also id.* ("Under a literal reading of [the dictionary definitions of 'political,'] a

button or T-shirt merely imploring others to 'Vote!' could qualify.").

- 21 -

Minnesota issued a written policy to offer guidance on enforcement of the statute and to help officials understand what the term "political" covered, but the policy did not sufficiently cure the vagueness of the statute.  The Court accepted that the policy's statement that the statute prohibited "items displaying the name of a political party, items displaying the name of a candidate," and items demonstrating "support of or opposition to a ballot question," was "clear enough" and likely capable of objective application.  *Id.* at 1889.  But the Court concluded that the policy's statement that the statute prohibited "[i]ssue oriented material designed to influence or impact voting" did little more than replace the statute's unclear terms with another equally murky phrase.  The Court criticized the provision as "rais[ing] more questions than it answers," noting that Minnesota could not explain what qualifies as an "issue" other than to say that it included anything about which a political candidate or party has "taken a stance."  *Id.* at 1889.  The Court pointed out that it was impossible to determine, for example, whether the phrases "Support the Troops" or #MeToo would be banned, concluding:

> A rule whose fair enforcement requires an election judge to maintain a mental index of the platforms and positions of every candidate and party on the ballot is not reasonable.  Candidates for statewide and federal office and major political parties can be expected to take positions on a wide array of subjects of local and national import.

*Id.* at 1889–90.

The Court likewise concluded that Minnesota's policy statement that the statute banned items "promoting a group with recognizable political views" about "the issues confronting voters in a given election" also did not provide a sufficiently workable rule to save the statute.  *Id.* at 1890.  The Court questioned whether items featuring the ACLU, AARP, the World Wildlife Fund, or Ben & Jerry's would be banned because they all "have stated positions on matters of public concern," or whether merely wearing a uniform for the Boy Scouts of

America would be prohibited.  *Id.* at 1890.  Minnesota's attempt to narrow the ban to groups that

are "sufficiently well-known" did not make the prohibition workable, because, as the Court

observed, "that measure may turn in significant part on the background knowledge and media

consumption of the particular election judge applying it."  *Id.*

   The Court emphasized that, even in nonpublic forums, there must be some

objectively ascertainable boundaries on the government's discretion to restrict speech:

> The [government's] difficulties with its restriction go beyond close
> calls on borderline or fanciful cases.  And that is a serious matter
> when the whole point of the exercise is to prohibit the expression
> of political views.
>
> It is "self-evident" that an indeterminate prohibition carries with it
> "[t]he opportunity for abuse, especially where [it] has received a
> virtually open-ended interpretation." . . . We do not doubt that the
> vast majority of [government officials] strive to enforce the statute
> in an evenhanded manner, nor that some degree of discretion in
> this setting is necessary.  But that discretion must be guided by
> objective, workable standards.  Without them, a [government
> official's] own politics may shape his views on what counts as
> "political."

*Id.* at 1891 (quoting *Bd. of Airport Comm'rs of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569,

576 (1987)).[14]

   *Mansky* is just the latest in a long line of cases declaring that a restriction on

speech violates the First Amendment if it does not meaningfully constrain officials' discretion.

*E.g.*, *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 537–38 (1981) (Brennan, J.,

concurring) (observing that "[a]ccording such wide discretion to city officials to control the free

exercise of First Amendment rights is precisely what has consistently troubled this Court in a

---

[14]  Notably, the Court focused on the broad scope and text of the statute and the official
guidance interpreting the statute, rather than on plaintiffs' speech.  *See id.* at 1884.  The Court
merely noted, but never analyzed, the messages on plaintiffs' banned apparel.  *Id.*

long line of cases") (collecting cases); *Kalman v. Cortes*, 723 F. Supp. 2d 766, 803 (E.D. Pa. 2010) (Baylson, J.) (invalidating state Blasphemy Statute as unconstitutional because, among other reasons, "Bureau employees are left with 'unbridled discretion' to determine, in the absence of any standards, training, education, or guidance, which corporate names survive or fail the Blasphemy Statute, and thus 'who may speak and who may not based upon the content of the speech or the viewpoint of the speaker.'" (quoting *City of Lakewood v. Plain Dealer Publ'g*, 486 U.S. 750, 763 (1988))).  This is because "the danger of censorship and of abridgement of our precious First Amendment freedoms is too great where officials have unbridled discretion over a forum's use."  *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975).  As the Third Circuit has observed, indeterminate, content-based regulation of speech "'may authorize and even encourage arbitrary and discriminatory enforcement' by failing to 'establish minimal guidelines to govern . . . enforcement.'"  *Sypniewski*, 307 F.3d at 266 (quoting *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999); *Kolender v. Lawson*, 461 U.S. 352, 358 (1983)).

        **(b)**      **The Challenged Provisions Are Incapable of Reasoned Application and Confer Unbridled Discretion to Censor Speech.**

The Challenged Provisions are unconstitutional because they fail to provide any workable standards for judging what is permitted and what is prohibited, and instead confer on SEPTA and its agents essentially unfettered discretion to censor speech.  The language of the Challenged Provisions and the statute and policy at issue in *Mansky* are exceptionally similar. SEPTA's prohibition of "advertisements that are political in nature or contain political messages, including advertisements involving political or judicial figures and/or advertisements involving an issue that is political in nature in that it directly or indirectly implicates the action, inaction, prospective action or policies of a government entity," Ex. 22 at § II.A.9(b)(iv)(a), is a nearly verbatim copy of the common dictionary definitions of the word "political" that the Court

deemed too "expansive" in *Mansky*.  *Mansky*, 138 S. Ct. at 1888 (defining "political" as "of or relating to government, a government, or the conduct of governmental affairs," or anything "[o]f, relating to, or dealing with the structure or affairs of government, politics, or the state").[15]

   SEPTA's ban on "matters of public debate" is a broader and even more amorphous version of Minnesota's prohibition on "[i]ssue-oriented material" regarding political matters.  Whereas the statute struck down in *Mansky* dealt only with political issues, SEPTA bans "[a]dvertisements expressing or advocating an opinion, position or viewpoint on matters of public debate about economic, political, religious, historical or social issues."  Like Minnesota, SEPTA's designated witness could not provide any clarity about what qualifies as an "issue," nor could he explain when a topic rises to the level of being a "matter of public debate."  *See* Benedetti Dep. 119:24–120:7 (testifying that something becomes a "matter of public debate" when "I think if there's a—if it's something that's sort of got society's attention, it's not necessarily something that's parochial, local or, you know, what sports team you want to root for necessarily, but something that's reached the level that's being debated in the public.").[16]

---

[15] SEPTA conceded that it could not discern any distinction between the terms "political," "political in nature," "political message," and political "issues" used in the Challenged Provisions.  Benedetti Dep. 105:8–106:1.  When asked to define these terms, Mr. Benedetti testified that they mean "Of politics.  It could mean—it does mean anything that deals with things that are political in nature.  Anything that one party may support and another doesn't.  I don't mean any political party, but I mean individuals or groups."  *Id.* 100:22–101:5.  When asked for his view of what constitutes a "government policy," he responded, "it's hard for me to answer that answer abstractly."  *Id.* 232:13–16.

[16] The "public debate" prohibition is not significantly narrowed by the requirement that the advertisement express a "viewpoint."  The Third Circuit, in striking down a restriction on "all speech that promotes any point of view, whether 'religious, commercial or secular,'" observed that "[a]ll community-group speech promotes a point of view.  All of the specifically approved groups, including such familiar and well-regarded groups as the PTA and the 4-H Club, have a point of view.  Thus, this criterion is devoid of meaning."  *Child Evangelism Fellowship*, 386 F.3d at 528.  Indeed, SEPTA conceded that every possible viewpoint one could hold is debated by someone, and that every advertisement offers a viewpoint.  Benedetti Dep. 126:19–23.

SEPTA has not promulgated any guidelines to constrain officials' discretion by offering objective criteria as to what does, and does not, constitute a "political" issue or a "matter of public debate." *Id.* 66:8–69:18, 101:8–13. Whereas Minnesota unsuccessfully, but in good faith, attempted to clarify its unclear, expansive statute through official policies, SEPTA "purposely" chose to not devise any written guidance to clarify the Challenged Provisions, expressly reserving for itself the discretion to make unguided, subjective, and potentially inconsistent determinations anew in every case. *Id.* 69:3–18 (when asked whether SEPTA had put anything in writing to clarify terms used in the Challenged Provisions, responding, "We purposely don't do that because we want to evaluate each proposed advertisement against the standards and then engage in the process we engage in to determine whether or not it matches our standards or doesn't.").

As in *Mansky*, in order to apply the "political" or "public debate" prohibitions, a person would have to keep a mental index of everything any government could regulate as well as all economic, religious, historical, and social issues that have been discussed publicly. As in *Mansky*, the application of these provisions "may turn in significant part on the background knowledge and media consumption of the particular [person] applying it." *Mansky*, 123 S. Ct. at 1890.[17] The result is that the practical application of the Challenged Provisions "poses riddles

---

[17]   When asked how an Intersection official was supposed to determine whether a particular advertisement or topic is "political in nature," SEPTA's designee responded, "Based upon the conversations I've had with him, Mr. Goldsmith has had with him, his lawyers have had with him, his understanding of the industry, his understanding of what's going on in the world." Benedetti Dep. 104:1–10. When asked if he could shed any light on where he gets his

that even the State's top lawyers struggle to solve." *Id.*  SEPTA struggled to answer whether a series of basic advertisements would or would not violate the Advertising Standards.  *See supra* pp. 12–13 (citing Benedetti Dep. 131:17–134:7).[18]

        As in *Mansky*, the Challenged Provisions are unconstitutional.

> **(c)**     **SEPTA Has Accepted Advertisements that Appear to Violate the Challenged Provisions.**

        Given the vague and unworkable nature of the Challenged Provisions, it is unsurprising that the evidence shows that SEPTA has applied them inconsistently, and has run numerous advertisements that appear to violate the Challenged Provisions.

        SEPTA has run several advertisements that seem to "promot[e] a political party." Among them are numerous advertisements welcoming the delegates to the 2016 Democratic National Convention, an event that SEPTA conceded was "certainly" political in nature.  Ex. 31; Ex. 32; Benedetti Dep. 172:10–16.  Those "welcomes" came from corporations and traditional Democratic constituencies, like unions.  Ex. 31; Ex. 32 at SEPTA_002226.  Some of the advertisements promoted DNC-sponsored activities open to the public, including the

---

understanding of the term "political," SEPTA's general counsel responded, "I'm 56 years old. I've had some schooling.  I've had some experience.  Practiced law for a long time.  Try to stay up to date on things, talking to other people, you know, seeing what they think, getting their opinions.  Any number of those kinds of things."  *Id.* 117:20–118:4.

[18]     Mr. Benedetti also testified that, in many cases, the speaker's identity might determine whether a particular advertisement was prohibited.  *E.g.*, Benedetti Dep. 129:11–131:16 (testifying that whether an advertisement stating, "Happy Birthday, Mayor Kenney!" violated the Challenged Provisions would depend on who the advertiser was, and stating that if the advertiser were Kenney's wife, the advertisement would be more likely to be accepted than if the advertiser were City Council, a union, or a charter school); *id.* 183:4–185:4 (testifying that an accepted advertisement by the American Friends Service Committee may or may not have been unacceptable if the same advertisement had been submitted by the NAACP); Ex. 33.

"PoliticalFest," and encouraged people to use certain DNC-affiliated hashtags on social media. Ex. 31 at SEPTA_002128; Ex. 32 at SEPTA_002225–27.

Several of the DNC advertisements also featured the convention slogan, "Let's Make History Again," referring to Hillary Clinton, the first female presidential nominee of a major American political party.  Benedetti Dep. 177:4–178:7.  SEPTA's designee conceded that the DNC was the subject of protests, but testified that he could not say whether the nomination of Hillary Clinton was a "matter of public debate" without further research.  *Id.* 117:12–15, 177:4–178:11.

SEPTA ran an advertisement promoting one of the most politically divisive issues in recent memory, the Affordable Care Act.  Featuring a group of smiling people, the advertisement said, "HealthCare.gov," "JOIN THE MILLIONS."  Ex. 42.

SEPTA accepted and ran numerous other advertisements for governmental entities promoting government programs and policy:

- SEPTA ran a pro-immunization advertisement for the federal Centers for Disease Control proclaiming "Help him fight measles with the most powerful defense.  Vaccines." Ex. 43.

- SEPTA ran an advertisement by the City of Philadelphia informing residents that "Your landlord must ensure your home is safe. . . If your landlord has not given you lead paint safety information, Call 311 or Visit Phila.Gov/LeadHealthyHomes."  Ex. 44.

- SEPTA ran an advertisement for the Philadelphia Department of Labor informing residents that "Employee or Contractor.  Knowing the difference benefits you," and promoting a government website that helps the public learn about their legal rights.  Ex. 45; Benedetti Dep. 236:19–238:2.

- SEPTA ran an advertisement for the Montgomery County Health Department informing readers that "[e]mployers must provide a reasonable break time for an employee to

express breast milk for her nursing child for one year after
the child's birth, as well as a private place to do so." Ex.
46.  The advertisement directed readers in search of more
information to a government website. *Id.*

- SEPTA ran an advertisement for the Commonwealth of
  Pennsylvania that says, "Wanted by law enforcement?
  Tired of running?  Surrender and see favorable
  considerations.  SAFE RETURN." Ex. 47.

- SEPTA ran an advertisement for the City of Philadelphia
  proclaiming the City's "bold goal of becoming a 90% zero
  waste AND litter-free City by 2035" and prompting
  residents to take specific steps to advance those goals.  Ex.
  49.

- SEPTA ran an advertisement for the City of Philadelphia
  Department of Public Health that said, "Saving a Life Can
  Be This Easy," "Carry Naloxone (Narcan)," "Prevent
  Opioid Overdose."  Ex. 50.

SEPTA also ran advertisements by the Philadelphia FIGHT Community Health

Center stating "Have you or someone you know been impacted by mass incarceration?  Find out

how to fight for your rights, and the rights of your family, friends and community members."

Ex. 51.  The advertisement features drawings of wrists in handcuffs behind bars, a heart behind

bars, and two people speaking on a telephone in a prison's visitation room.  *Id.*

All of the above would appear to violate the Challenged Provisions for being

"political in nature" and "directly or indirectly implicat[ing] the action, inaction, prospective

action or policies of a government entity." Ex. 22.  They also seem to violate the prohibition on

advertisements "expressing or advocating an opinion, position or viewpoint on matters of public

debate about . . . political . . . issues." *Id*.

And SEPTA has accepted other advertisements that appear to violate the "public

debate" prohibition.  For example, SEPTA currently is running an advertising campaign by

Facebook, Inc., with statements such as:  "Fake news is not your friend" and "Clickbait is not your friend."  Ex. 88.

In addition, SEPTA ran an advertisement for the American Friends Service Committee that challenged viewers to engage themselves in the fight for peace.  The advertisement displayed quotes from civil rights leaders, Martin Luther King, Jr., Cesar Chavez, and Lucretia Mott (all of whom SEPTA described as "controversial"), and, expressing the need for the viewer to be an active participant in fights for justice, asked rhetorically, "What will you do for peace?"  Ex. 33; Benedetti Dep. 182:5–14.

SEPTA ran a series of advertisements for Fusion media that posited that people of many races, ethnicities, and religions are "As American As" the viewer's preconceived notions of American-ness.  Ex. 34; Benedetti Dep. 187:5–11.  Each advertisement said "CALLING ALL VOICES" and contained in huge lettering "AS AMERICAN AS" and "#ASAMERICANAS." Ex. 34.  One advertisement showed a split-screen image featuring a woman who appears to be Muslim on one side, and on the other side, a male soldier in camouflage fatigues.  *Id.* at SEPTA_002765; *see also id.* at SEPTA_002759.  Another advertisement in the series showed a split-screen image of a woman of color in boxing gear, in front of an American flag on half of the screen, and draped in the Mexican flag on the other half of the screen.  *Id.* at SEPTA_002752.  Another showed a young Black child wearing a T-shirt that says "MY LIFE MATTERS."  *Id.* at SEPTA_002763, 64.  Others in the series featured children of color standing with their hands across their hearts (*id.* at SEPTA_002753, 61) as well as other images of men and women of color (*id.* at SEPTA_002754–56, 58, 62–63).

SEPTA's acceptance of a PSA promoting the use of Narcan, a drug that reverses opioid overdoses, and a pro-vaccination PSA, and its rejection of an advertisement for a sperm

bank, demonstrate the extent to which application of the Challenged Provisions depends on the

personal experience, media consumption habits, and research and analytical skills of the SEPTA

or Intersection employee applying it at that moment in time.

In determining that there was no public debate about the use of Narcan (*see*

Benedetti Dep. 252:15–253:5), Mr. Benedetti did not appear to be familiar with (or simply did

not credit) the viewpoint expressed by some in the public that the "impulse to help" addicts by

administering life-saving Narcan "is misguided" because it will actually "expand drug use by

providing life preservers[.]"  *E.g.*, Ex. 84 (Stu Bykofsky, *Does anyone care that 'safe injection*

*sites' are neither safe nor legal*?  Phila. Inquirer (Feb. 16, 2018)).

Similarly, Mr. Benedetti explained SEPTA's acceptance of a pro-immunization

advertisement from the federal government by stating, "I don't know whether it rises to the level

of a public debate."  *Id.* 230:19–231:1.  Meanwhile, for nearly two decades, there has been

extensive (albeit misguided) literature, amplified by powerful voices in the public sphere

criticizing vaccinations as harmful to children.  Ex. 85 (Natasha Bach, *Americans Don't Trust*

*Vaccines Like They Used To*, Fortune (May 22, 2018)).[19]

However, Mr. Benedetti did feel, based on his experience and research, that there

was a sufficiently widespread public debate about whether sperm donation was "something we

should be doing as a society," and thus required that an advertisement for the Fairfax Cryobank

with information about how to apply to become a sperm donor taken down from SEPTA's

---

[19]     Likewise, when asked whether he agreed that President Trump's two-day NATO summit
in Brussels, which was featured on a SEPTA digital display, made a lot of headlines and
generated a significant amount of public debate, Mr. Benedetti responded, "I don't really follow
that much on the news that stuff.  So I don't know how many headlines it made or it didn't
make."  Benedetti Dep. 37:19–38:13.

advertising space despite having been previously approved.  *See* Ex. 62; Benedetti Dep. 74:10–76:24; *id.* 279:16–280:12.

Because SEPTA's amorphous standards leave so much room for subjective interpretation and uneven application, SEPTA's deliberative process results in palpable inconsistencies.  Thus, for example, while CIR's advertisement was deemed controversial based on criticism in a single publication by the American Bankers Association, SEPTA either did not look for or did not find criticism regarding Narcan or vaccinations, both of which it determined were permissible topics for advertising.

### 2.     SEPTA's Application of its Advertising Standards is Not Viewpoint Neutral.

"Viewpoint discrimination occurs when the government 'targets not subject matter, but particular views taken by speakers on a subject.'"  *Pittsburgh League of Young Voters Educ. Fund*, 653 F.3d at 296 (quoting *Rosenberger*, 515 U.S. at 829).  "Once the government permits discussion of certain subject matter, it may not impose restrictions that discriminate among viewpoints on those subjects whether a nonpublic forum is involved or not."  *Perry Educ. Assoc.*, 460 U.S. at 61.

SEPTA's Challenged Provisions also are unconstitutional because SEPTA has applied them in a viewpoint-discriminatory manner in at least two ways.  First, although SEPTA rejected CIR's advertisement based on a determination that the issue of discriminatory lending is a "political" issue and a "matter of public debate," SEPTA has accepted advertising from others on that same purportedly controversial subject matter.  Specifically, SEPTA routinely allows financial institutions to advertise that they do not discriminate in lending.  Second, in a variety of other contexts, SEPTA engages in viewpoint discrimination by applying the Challenged

Provisions to exclude speech by speakers SEPTA considers controversial while allowing speech on the same topics by speakers SEPTA does not deem to be controversial.

**(a)    SEPTA Regularly Accepts Advertisements from Financial Institutions on the Subject of "Discriminatory Lending."**

SEPTA has allowed numerous advertisements that directly and indirectly promoted the message that financial institutions do not discriminate based on race, particularly in mortgage lending.  *See, e.g.*, Ex. 36; Ex. 37; Ex. 38; Ex. 39.  At the same time, SEPTA refuses to run CIR's advertisement on that topic.

SEPTA has accepted numerous home loan-related advertisements identifying the advertiser as an "Equal Opportunity Lender" or "Equal Housing Lender."  *See, e.g.*, Ex. 35; Ex. 36; Ex. 38; Ex. 39.  These shorthand terms represent that the financial institution "makes such loans without regard to race, color, religion, national origin, sex, handicap, or familial status." 12 C.F.R. § 338.3(a) ("Nondiscriminatory advertising").  Many of these advertisements feature African-American models.  *E.g.*, Ex. 36; Ex. 38; Ex. 39; *see also* Ex. 37 (featuring African-American couple in apparent new home with slogan "Bank here to get there.  FINANCIAL SOLUTIONS FOR YOUR LIFE.").

For example, an advertisement from Tompkins VIST Bank shows an image of an African-American couple and child in front of a stack of moving boxes and says "Making your dream of home ownership a reality," and bears the Equal Housing Lender language and logo. *See* Ex. 38; Benedetti Dep. 200:1–7.  This advertisement is a near perfect inverse of the panel in CIR's proposed advertisement stating, "Today in America people of color are regularly being denied the dream of home ownership."  Ex. 24.  Yet, SEPTA accepted Tompkins VIST Bank's advertisement while rejecting CIR's.

- 33 -

A Wells Fargo advertisement proclaims the virtues of Wells Fargo's "NeighborhoodLIFT program," which provides down payment assistance and financial education to homebuyers of modest income.  Ex. 39; Ex. 40.  Both the advertisement and the website prominently featured in the advertisement show various African-American individuals. *Id.*  Wells Fargo's website further displays a video and transcript, in which Wells Fargo is praised for giving people "faith in banks."  Ex. 40.[20]

Regardless of whether SEPTA could constitutionally have excluded all advertisements regarding the subject of "discriminatory lending," the record is clear that SEPTA has in fact allowed numerous advertisements addressing that subject by members of the banking industry, while rejecting CIR's advertisement because the advertisement has been the target of criticism by the same industry SEPTA has permitted to speak on the topic.  This is a paradigmatic example of viewpoint discrimination.  *See Pittsburgh League of Young Voters Educ. Fund*, 653 F.3d at 297–98 (fact that advertising policy treats similarly situated advertisements differently is evidence of viewpoint discrimination).

> **(b)     Excluding Speakers that SEPTA Views as Controversial or Offensive is a Form of Viewpoint Discrimination.**

SEPTA's rejection of CIR's advertisement while at the same time accepting advertisements by home mortgage lenders is consistent with SEPTA's broader practice of

---

[20]     Wells Fargo is a defendant in litigation regarding alleged discriminatory lending practices, including alleged reverse redlining.  *City of Philadelphia v Wells Fargo & Co., et al*, Civ. A. No. 17-02203 (E.D. Pa. 2017).  One of SEPTA's letters rejecting CIR's advertisement noted that "The subject of the proposed advertisement is disputed in class action litigation pending in the courts."  Ex. 19 (Mar. 29, 2018 ltr. from G. Benedetti to V. Baranetsky).  Thus, SEPTA has allowed the lead defendant in that litigation to advertise programs directly related to the subject matter of the litigation, but has—in part based on the pendency of the litigation—denied CIR the right to speak on the same topic.

excluding speakers that SEPTA views as controversial or offensive while allowing speech on the same topics by other speakers.

As the Supreme Court held last year, censoring speech because it is offensive constitutes viewpoint discrimination because "[g]iving offense is a viewpoint." *Matal*, 137 S. Ct. at 1763 (holding that the Lanham Act's nondisparagement clause is facially viewpoint discriminatory). Likewise, "to exclude a group simply because it is controversial or divisive is viewpoint discrimination. A group is controversial or divisive because some take issue with its viewpoint." *Child Evangelism Fellowship*, 386 F.3d at 527 (citing *Cornelius*, 473 U.S. at 812). As Justice Kennedy warned in his concurrence in *Matal*, government rules effectively "mandating positivity" will ultimately "silence dissent" and "distort the marketplace of ideas." *Matal*, 137 S. Ct. at 1766.

That is precisely what appears to be happening here. Although SEPTA claims to evenhandedly screen "political" speech or speech on "matters of public debate," it routinely rejects advertisements based on paternalistic and subjective determinations about what SEPTA riders are likely to consider controversial, while allowing other speakers to communicate "noncontroversial" messages on precisely the same topics.

For example, SEPTA rejected an advertisement by Bethany Christian Services on the basis of the advertiser's views on abortion, even though the ad itself did not mention abortion. Benedetti Dep. 263:18–265:15. The advertisement said, "Unplanned pregnancy? Now what?," "consider adoption as an option," and offered free and confidential pregnancy counseling and expectant parent support and contact information for the organization, including the website ImPregnant.org. Ex. 55. Likewise, SEPTA rejected advertisements for counseling and health care services at Planned Parenthood in part because of the advertisers' controversial

- 35 -

views on abortion.[21]  None of Planned Parenthood's rejected advertisements mentioned or implied anything about abortion.  *See* Ex. 61.  They said:

- "Everybody deserves expert care," "Never wait weeks for an appointment" (SEPTA_000292)

- "Everybody deserves expert care," "Insured or uninsured, we've got you covered," and listed the organization's website (SEPTA_000293)

- "Talk to the birth control experts" (SEPTA_000326)

- "Ask the Women's Health Care Experts," "Birth Control at Planned Parenthood," "Walk-ins Welcome" (SEPTA_000327)

Exhibit 61.  Yet, SEPTA rejected these advertisements, reasoning that "they are strong advocates for abortion rights," which is "a matter of public debate."  Benedetti Dep. 278:15–278:21.

SEPTA routinely has accepted advertisements for other healthcare services, including services for pregnant women, from speakers it deems less controversial.  *E.g.*, Ex. 71 (advertisements for Einstein Medical Center Maternity Care, stating "Private rooms for tender moments," and "Nine month journey.  Short ride home."); *see also* Benedetti Dep. 229:1–24 (testifying that the vaccination PSA was acceptable in his view because "I view it as a health ad.").

SEPTA also rejected an advertisement that suggested that prayer can cure illness because it deemed the advertiser's views to be controversial.  The advertisement said "Fight for Bean," "#STORMTHEHEAVENS," "22 Bean," and from communications with the advertiser, SEPTA understood the advertisement to be asking people to pray to help a sick child, "Bean,"

---

[21]     Mr. Benedetti testified that he rejected the advertisements because "one of the—or maybe the whole thing mentions birth control, which is a matter of public debate.  And when you go to the Planned Parenthood website, they are strong advocates for abortion rights.  That's also a matter of public debate," though he conceded that "[t]he Planned Parenthood ad doesn't direct people to Planned Parenthood's website."  Benedetti Dep. 278:6–24.

overcome her illness.  *See* Ex. 64; Benedetti Dep. 283:9–285:1.  SEPTA rejected the

advertisement, notwithstanding that SEPTA regularly accepts advertisements promoting

medicine as a means of curing illness.  *Id.* at 284:24–285:1.

SEPTA also rejected an education-related advertisement because of the

advertiser's views, notwithstanding its acceptance of other education-related advertisements with

similar language.  SEPTA testified that it declined to run an advertisement that stated,

"Education isn't a problem.  It's a solution," "#RethinkHighSchool," and listed a website,

XQsuperschool.org, because, through SEPTA's research, it learned that the advertiser, XQ, the

Super School Project, was pro-school choice, which SEPTA interpreted as being anti-public

education.  Ex. 65; Benedetti Dep. 285:19–286:16.  At the same time, SEPTA has run many

other advertisements on the topic of education, including advertisements for public and private

schools and educational programs, many of which likewise promote education as an important

choice and a solution to life's problems.[22]

---

[22]     *E.g.*, Ex. 72 (ad for Graduate! Philadelphia, stating "Be a comebacker… Back in college. Ahead in life."); Ex. 73 (ad for the New York Code + Design Academy stating, "This changes how you see the world," "This changes everything."); Ex. 74 (ad for Holy Family University, stating "Transfer to a Path of Success."); Ex. 75 (ad for Youth Build Philly, stating "Are you 18-20 and dropped out of school?," "Change Your Future"); Ex. 76 (ad for PA529 College Savings Program stating "Help your child reach their full potential"); Ex. 77 (ad for Xprize Adult Education stating "You can: Learn More.  Earn More.  Read more.  Do more."); Ex. 78 (ad for Notre Dame High School stating "Succeed"); Ex. 79 (ad for McAndrew Law Offices, stating "Is your child struggling in school?  Did the summer set them back?  Let us help your child get back on track!").

The First Amendment does not permit the government to silence speakers based on the government's determination that their views are outside the mainstream or that others may dislike their speech.[23]  As Justice Kennedy observed in *Matal*:

> [A] speech burden based on audience reactions is simply government hostility and intervention in a different guise.  The speech is targeted, after all, based on the government's disapproval of the speaker's choice of message.  And it is the government itself that is attempting in this case to decide whether the relevant audience would find the speech offensive.

137 S. Ct. at 1767 (Kennedy, J., concurring in part and concurring in the judgment).

It does not help SEPTA that it sometimes censors "controversial" speakers on opposing sides of a specific issue—for example, by prohibiting both Planned Parenthood and Bethany Christian Services from advertising.  *See* Ex. 55 (rejected Bethany ad); Ex. 61 (rejected Planned Parenthood ad).  Restrictions on speech can be viewpoint-discriminatory even if they apply "evenhandedly" to speakers on various sides of an issue.  *Matal*, 137 S. Ct. at 1763 (striking down disparagement clause that "evenhandedly prohibits disparagement of all groups").  "The . . . declaration that debate is not skewed so long as multiple voices are silenced is simply wrong; the debate is skewed in multiple ways."  *Rosenberger*, 515 U.S. at 831–32.

---

[23]     Indeed, it would be dangerous if the government had the power to censor speakers—including journalists—any time anyone took issue with a speaker's views or cried "fake news."  The First Amendment contains an explicit protection for the freedom of the press in recognition of journalists' "essential role in our democracy," *N.Y. Times Co. v. Sullivan*, 403 U.S. 713, 717 (1971) (Black, J., concurring), and of the press' vital role as a critical check on government wrongdoing.  *E.g.*, *Mills v. Alabama*, 384 U.S. 214, 219 (1966) ("[T]he press serves and was designed to serve as a powerful antidote to any abuses of power by government officials and as a constitutionally chosen means for keeping officials elected by the people responsible to all the people whom they were selected to serve.").  It would turn the First Amendment on its head if the government were permitted to silence journalists whenever anyone questioned their reporting.

### 3.    The Challenged Provisions Are Not "Reasonable."

The Challenged Provisions also are unconstitutional because they are "unreasonable." For the government to meet its burden of demonstrating that a restriction on speech in a non-public forum is "reasonable," the restriction must advance the purpose served by the forum. *Cornelius*, 473 U.S. at 809; *see also Rosenberger*, 515 U.S. at 829.

For several reasons, the Challenged Provisions are not "reasonable" in light of the purpose of the forum. To the extent that the Challenged Provisions are intended to serve the ultimate goal of protecting SEPTA riders from potentially controversial or offensive speech, they are aimed at an illegitimate government interest. Time and again, the Supreme Court has rejected the notion that the government has any interest in preventing speech expressing ideas that offend, describing this as an idea that "strikes at the heart of the First Amendment." *Matal*, 137 S. Ct. at 1764. To the extent that SEPTA's interest in censoring controversial or offensive speech is merely a means of advancing the government's interest in raising revenue, the Challenged Provisions are not reasonable because they do not actually advance that goal.

### (a)    SEPTA Has No Legitimate Interest in Shielding Its Riders from Controversial or Offensive Speech.

The first step in assessing reasonableness is to consider whether the government is "pursuing a permissible objective" in seeking to regulate speech. *Mansky*, 138 S. Ct. at 1886; *see also NAACP*, 834 F.3d at 441 ("[T]he government's asserted interest in drawing content-based distinctions [in a nonpublic forum] must be valid, but it does not have to be compelling.") (*citing K.A. v. Pocono Mt. Sch. Dist.*, 710 F.3d 99, 106 (3d Cir. 2013)).

The primary expressed purpose of SEPTA's advertising space is to raise revenue. Benedetti Dep. 17:5–10. However, the Challenged Provisions restricting the advertisements that can be posted in SEPTA's advertising space appear to be aimed at fulfilling a different (and

illegitimate) ultimate goal: allowing SEPTA to shield riders and employees from offensive or controversial speech. *See id.* 54:12–55:9 (testifying that SEPTA adopted the Challenged Provisions because it didn't want its customers or employees to have to face advertisements that might provoke a "public outcry").

To the extent that protecting people from controversial or offensive speech is an end goal in and of itself, SEPTA is pursuing an illegitimate objective. The Supreme Court has made clear that the government does not have a legitimate interest in protecting the sensibilities of recipients of the speech or avoiding disagreement. *E.g.*, *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 118 (1991) (citations omitted). As the Court recently observed: "We have said time and again that 'the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers.'" *Matal*, 137 S. Ct. at 1763 (quoting *Street v. New York*, 394 U.S. 576, 592 (1969)).[24] No facially-neutral justification can save a content-based regulation "that is in fact based on the desire to suppress a particular point of view." *Cornelius*, 473 U.S. at 812; *see also Perry*, 460 U.S. at 46 (emphasizing that a regulation must not be "an effort to suppress expression merely because public officials oppose the speaker's view").

The First Amendment violation that results when the government censors speech in order to shield people from controversial or offensive ideas is all the more apparent when the speech that the government seeks to exclude deals with political matters or other issues of public

---

[24]     *See also Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."); *FCC v. Pacifica Found.*, 438 U.S. 726, 745 (1978) ("[T]he fact that society may find speech offensive is not a sufficient reason for suppressing it. Indeed, if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection.").

importance.  Discussion of government and debate about public issues are core activities that the First Amendment is designed to protect.  *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270–71 (1964); *see also Pickering v. Bd. of Educ.*, 391 U.S. 563, 573 (1968) ("The public interest in having free and unhindered debate on matters of public importance [is] the core value of the Free Speech Clause of the First Amendment[.]"); *Connick v. Myers*, 461 U.S. 138, 145 (1983) ("Speech concerning public affairs is more than self-expression; it is the essence of self-government." (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964))); *id.* (the Supreme Court "has frequently reaffirmed that speech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection.").[25]

Thus, to the extent that the Challenged Provisions are designed to suppress controversy and offensive ideas, they are unconstitutional.[26]

> **(b)    The Challenged Provisions Are Not Reasonable in Light of SEPTA's Purpose for Its Advertising Spaces.**

Even if the purpose of the Challenged Provisions is not to censor controversial speech, SEPTA bears the burden of proving that they are "reasonable" in light of the purpose of SEPTA's advertising space.  *NAACP*, 834 F.3d at 443.  This requires a demonstration that the prohibited speech is inconsistent with the intended use of the forum.  *Id.* (citing *Int'l Soc'y for*

---

[25]    Indeed, the First Amendment explicitly protects the press because of its vital role in covering these issues.  *See supra* n.23.

[26]    *E.g.*, *Planned Parenthood v. Chicago Transit Auth.*, 767 F.2d 1225, 1230 (7th Cir. 1985) ("We question whether a regulation of speech that has as its touchstone a government official's subjective view that the speech is 'controversial' could ever pass constitutional muster." (citations omitted)); *Ridley v. MBTA*, 390 F.3d 65, 87 (1st Cir. 2004) (transit agency's rejection of marijuana advertisement was unconstitutional, even in a non-public forum, in part because of officials' improper motive); *Sammartano v. First Judicial Dist. Ct.*, 303 F.3d 959, 970–71 (9th Cir. 2002) (restrictions in any forum are unconstitutional if government was motivated by "the nature of the message rather than the limitations of the forum").

*Krishna Consciousness v. Lee*, 505 U.S. 672, 691–92 (1992) (O'Connor, J., concurring)).

SEPTA cannot meet that burden because the record is rife with evidence that speech on

"political" issues and "matters of public debate" are perfectly compatible with SEPTA's

advertising spaces, and Challenged Provisions do not advance SEPTA's goal of enhancing

revenue.

> **(i)    SEPTA's Advertising Space Is Not Incompatible With Speech on "Political" Issues or "Matters of Public Debate."**

Even assuming that shielding riders from "political" content and "matters of

public debate" were a legitimate government objective to pursue, the Challenged Provisions are

unreasonable because SEPTA cannot meet its burden of demonstrating that such speech is

incompatible with the forum.

In *NAACP*, the Third Circuit concluded that the Philadelphia Airport's restriction

on non-commercial speech was unreasonable because the airport could not offer any credible

explanation as to why non-commercial speech was incompatible with the forum.  The Third

Circuit observed that "the Airport exposes [travelers] to an onslaught of non-commercial content

outside of its advertising space without any suggestion that doing so is inconsistent with the

environment it seeks to foster."  834 F.3d at 477.  The court noted:

> Elsewhere in the Airport, travelers have frequent exposure to
> televisions broadcasting shows and commercials containing a wide
> variety of non-commercial content.  For instance, the NAACP
> submitted pictures of the Airport's televisions that show content
> related to a gubernatorial election in Virginia, the war on drugs, the
> Confederate flag, and a piece of anti-discrimination legislation.
> And as they pass by newsstands, travelers can see magazines and
> newspapers displaying the very types of non-commercial
> information that the City seeks to exclude from its advertising
> space.

*Id.* at 447.

SEPTA likewise exposes its riders to "political" and "public debate" content in the environment "outside of its advertising space," *NAACP*, 834 F.3d at 447. SEPTA leases space for newsstands where SEPTA patrons can buy newspapers, magazines, and other periodicals, and does not limit the type of news that newsstands are allowed to sell or show to patrons. Benedetti Dep. 40:1–41:17. SEPTA also leases space to retailers within SEPTA stations, and allows them to have televisions or monitors showing any channel of the retailer's choosing, including Fox News, MSNBC, and CNN. *Id.* 41:18–42:16. All of this is against the backdrop that passengers on SEPTA vehicles can look out windows, see billboards, storefronts, and residences all around the City and are constantly exposed to "the basic onslaught of information that anyone experiences in the urban environment." *Id.* 43:16–44:17; *see also NAACP*, 834 F.3d at 447 ("[T]he Airport exposes [travelers] to an onslaught of non-commercial content outside of its advertising space without any suggestion that doing so is inconsistent with the environment it seeks to foster.").

In addition, even more powerfully than in *NAACP*, the record in this action demonstrates that messages with purported "political" content and "matters of public debate" are perfectly compatible with the government's advertising spaces because SEPTA regularly exposes its riders to such content *inside* the advertising space. SEPTA displays news headlines from the Associated Press (a regular partner of CIR) and Reuters on SEPTA's infotainment systems and digital displays, right alongside the advertisements. Benedetti Dep. 32:18–33:22, 45:4–20, 139:12–16; Ex. 28 (example of news headlines on SEPTA digital displays). By SEPTA's own design, on the very same digital screens SEPTA leases for advertising, SEPTA displays that quite clearly would come within the umbrella of the Challenged Provisions if they were to appear on an advertisement. Indeed, SEPTA testified that this potentially political and

controversial news content helped improve the effectiveness of the advertising by encouraging riders to watch the screens. Benedetti Dep. 43:17–24 (testifying that newsfeeds on digital displays "keep eyes on the screen" and "draws people's attention"). In addition, in practice and notwithstanding the Challenged Provisions, SEPTA permits a wide variety digital and print advertising of topics that apparently are "political" and address "matters of public debate." *See supra* § III.A.1.(c). These advertisements likewise demonstrate that such speech is not incompatible with SEPTA's purpose in operating a forum for advertising content.

### (ii) Revenue Generation.

As to any assertion the Challenge Provisions are related to SEPTA's goal of raising revenue, there is, at best, only a speculative and connection between the Challenged Provisions and the revenue-generating purpose of SEPTA's advertising space. If anything, the Challenged Provisions are at least as likely to run counter to the goal of revenue generation.

SEPTA conceded that it never made any attempt to actually analyze the impact the Challenged Provisions would have on revenue or ridership. Benedetti Dep. 54:6–11; Kelly Dep. 8:2–9:3. Instead, it has simply speculated that advertisements dealing with "political" content and matters of "public debate" might affect riders' experiences, which might in turn affect revenue. Benedetti Dep. 55:10–13 ("When you have happy and pleased customers, they're going to use the system again.").

In fact, the Challenged Provisions all but guarantee that they will reduce SEPTA's advertisement revenue. SEPTA testified that, typically, not all of its advertising space is occupied. Kelly Dep. 15:20–16:1. Thus, turning away any given advertisement likely results in lost advertising revenue for SEPTA because SEPTA foregoes an opportunity to fill that space.

Moreover, the array of advertisements that SEPTA has run since the 2015 Advertising Standards were adopted demonstrates that *accepting* "political" content and "matters

- 44 -

of public debate" advertisements is important to SEPTA's advertising revenue, and that rejecting

such advertisements would force SEPTA to lose substantial revenue.  SEPTA has arbitrarily

enforced the Challenged Provisions to reject or take down only approximately 15 advertisements

out of the roughly 2,750 that were submitted.  However, far more advertisements that SEPTA

has allowed to run actually appear to fall within the breathtaking range of the Challenged

Provisions' prohibitions.  *See supra* § III.A.1.(c) (identifying numerous examples of apparent

"political" and "public debate" advertisements).  Exclusion of these and all other advertisements

that fall within the extraordinary breadth of the Challenged Provisions necessarily would reduce

SEPTA's advertising revenue; SEPTA has simply chosen to accept them notwithstanding the

Challenged Provisions.[27]

 In sum, SEPTA cannot carry its burden of demonstrating that the Challenged

Provisions are reasonable in light of the purpose of the forum.

  **4.** **SEPTA's Advertising Spaces are a Designated Public Forum, and the Challenged Provisions Fail Strict Scrutiny.**

   **(a)** **SEPTA's Advertisement Spaces are a Designated Public Forum.**

 CIR also is likely to succeed on the merits of its claim for violation of its First

Amendment rights for the additional reason that SEPTA's advertising spaces are a designated

public forum, subjecting SEPTA's content-based restrictions to strict scrutiny.

---

[27] By way of example, the Facebook advertising campaign regarding fake news and similar concepts generated more than $250,000 in revenue in just three months.  Ex. 70 at 65 (showing revenue in May, June, and July 2018 pursuant to contract 21821349).  Likewise the advertisements run by the host committee of the 2016 Democratic National Convention generated more than $140,000 in revenue.  *Id.* at 37 (showing revenue in July 2016 pursuant to contract 21629078).

To decide what level of scrutiny applies to a restriction of speech on government property, a court must define the relevant "forum" by looking at "the access sought by the speaker." *Cornelius*, 473 U.S. at 797, 801.  Here, the relevant forum consists of the advertising space that SEPTA makes available to the public. *See supra* pp. 18–20 (describing the different types of fora).

To properly classify the forum, the court must examine the government's "policies and practices in using the space and also the nature of the property and its compatibility with expressive activity." *Christ's Bride Ministries*, 148 F.3d at 249.  The Court also must examine the government's intent in establishing and maintaining the forum. *Cornelius*, 473 U.S. at 802.  But the government's "own statement of its intent . . . does not resolve the public forum question." *Christ's Bride Ministries*, 148 F.3d at 251.[28]

This Court's review of SEPTA's forum does not begin with a blank slate.  Twice before, SEPTA's advertising spaces were found to be a designated public forum.  In 1998, the Third Circuit Court of Appeals held that the nature of paid advertising "suggests that the forum may be open to those who pay the requisite fee" and concluded that SEPTA's advertising space in its stations was a designated public forum, notwithstanding SEPTA's protests that it intended such space to be a nonpublic forum. *Christ's Bride Ministries*, 148 F.3d at 256.  The Third Circuit also observed that "at least 99% of all advertisements are posted without objection by SEPTA." *Id.* at 251–52.

---

[28]     *See also Gregoire v. Centennial Sch. Dist.*, 907 F.2d 1366, 1374 (3d Cir. 1990) ("To allow . . . the government's statements of intent to end rather than to begin the inquiry into the character of the forum would effectively eviscerate the public forum doctrine; the scope of [F]irst [A]mendment rights would be determined by the government rather than by the Constitution.").

After *Christ's Bride Ministries*, SEPTA created new advertising standards and sought to make itself a nonpublic forum.  However, in 2015, this Court again found that SEPTA's advertising spaces were a designated public forum, notwithstanding SEPTA's protests that SEPTA intended to be a nonpublic forum.  *AFDI*, 92 F. Supp. 3d at 326.  The Court observed that SEPTA had accepted "a number of concededly public issue advertisements on such topics as teacher seniority, fracking, and contraceptive use."  *Id.* at 326.  It concluded that, "although the standards are more numerous than they were at the time *Christ's Bride Ministries* was decided, SEPTA's current policies and practices demonstrate that the forum in question remains open to and suitable for speech concerning public issues."  *Id.*  SEPTA did not appeal Judge Goldberg's decision.

The question is whether SEPTA successfully closed its forum since this Court's 2015 decision in *AFDI*.  Despite adding to its Advertising Standards the Challenged Provisions and a statement that SEPTA wants to be considered a nonpublic forum, the record as a whole establishes that SEPTA did not close the forum.

To begin, as in *Christ's Bride Ministries* and *AFDI*, SEPTA's professed desire for its advertising space to be viewed as a nonpublic forum is not controlling.  Courts have not hesitated to reject similar boilerplate in other government policies where the government's actual practice was consistent with the operation of a designated public forum.  *E.g.*, *United Food & Commercial Workers Union*, 163 F.3d at 352 (finding that transit agency had created a designated public forum, despite policy's statement that "It is SORTA's policy that its buses, bus shelters and billboards are not public forums"); *AIDS Action Comm. of Mass., Inc. v. MBTA*, 42 F.3d 1, 10 (1st Cir. 1994) (in determining whether transit agency has created a designated public forum, "actual practice speaks louder than words").

- 47 -

In addition, SEPTA's practice of accepting virtually every advertisement proposed, on a wide range of topics spanning the range of human experience, is not significantly different from its practices at the time that *Christ's Bride Ministries* and *AFDI* were decided. Under every version of its advertising policy, including the 2015 Advertising Standards, SEPTA has accepted both commercial and non-commercial advertisements, from both for-profit and nonprofit entities.  Benedetti Dep. 19:18–20:9.  And the record shows that, since enacting the 2015 Advertising Standards, SEPTA has continued its decades-long practice of accepting advertisements addressing nearly every topic under the sun, including topics that are arguably "political" and "matters of public debate."  *See AFDI*, 92 F. Supp. 3d at 326; *see supra* § III.A.1.(c) (describing advertisements accepted by SEPTA in apparent violation of the Challenged Provisions).  In fact, since it appears that SEPTA has apparently rejected or taken down only 15 of the approximately 2,750 advertisements submitted under the current Advertising Standards, SEPTA's acceptance and rejection rates appear to not be substantially different than they were in 1998 when the Third Circuit found SEPTA's advertising space to be a designated public forum in part because "at least 99% of all ads are posted without objection by SEPTA."  *Christ's Bride Ministries*, 148 F.3d at 251–52.

Moreover, the record reveals that SEPTA now intentionally chooses to display headlines from the Associated Press and Reuters concerning political issues and matters of public debate to its riders on the very same screens on which SEPTA displays digital advertising. Benedetti Dep. 34:18–35:3.  This is not reflective of a "closing" of the forum; if anything, it suggests SEPTA has only further opened the forum—at least for some speakers—to the kind of speech it claims to want to exclude.

In sum, SEPTA's practice is still to permit "virtually unlimited access to the forum[.]" *Christ's Bride Ministries*, 148 F.3d at 252.  This is not a forum over which SEPTA asserts tight control and sets clear boundaries for the public; rather, this is a forum in which SEPTA allows extensive amounts of expressive conduct to generate substantial revenue.  Adopting the indeterminate Challenged Provisions is not enough to convert SEPTA's advertising space into a nonpublic forum.

### (b)    SEPTA's Content-Based Restrictions Fail Strict Scrutiny.

Because SEPTA's advertising space constitutes a designated public forum, any content-based restriction on speech is subject to strict scrutiny.  *See Widmar v. Vincent*, 454 U.S. 263, 270 (1981).

To survive strict scrutiny, SEPTA must show that its restrictions on speech are narrowly tailored to achieve a compelling state interest.  *Pittsburgh League of Young Voters Educ. Fund*, 653 F.3d at 295 (citation omitted).  A restriction on speech is not "narrowly tailored" if it is not necessary to achieve the government's claimed interest.  *See Globe Newspaper Co. v. Super. Ct. for the Cnty. of Norfolk*, 457 U.S. 596, 609–10 (1982).  Nor is a restriction on speech "narrowly tailored" if it is over- or under-inclusive.  *See First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 793–95 (1978).

SEPTA cannot identify any "compelling" government interest motivating the Challenged Provisions.  *United States v. Marcavage*, 609 F.3d 264, 288 (3d Cir. 2010) (collecting cases defining "compelling interest" as an interest "of the highest order," "unusually important," and weightier than a "significant" or "substantial" interest) (citations omitted).  Moreover, even assuming any of its interests qualified as "compelling," SEPTA cannot meet its burden to show that its Advertising Standards are "narrowly tailored" to any of these interests as they are overly expansive and not capable of reasoned application, *see supra* § III.A.1, are not

viewpoint neutral, *see supra* § III.A.2, and are not even "reasonably related" to SEPTA's objectives, *see supra* § III.A.3.

Because SEPTA's advertising space is a designated public forum and SEPTA's restrictions on speech are not narrowly tailored to achieve any compelling state interest, the Challenged Provisions are unconstitutional.

**B.      CIR's Ongoing Loss of First Amendment Freedoms Constitutes "Irreparable Injury" Warranting a Preliminary Injunction.**

In a First Amendment case, "a plaintiff who meets the first prong of the test for a preliminary injunction will almost certainly meet the second, since irreparable injury normally arises out of the deprivation of speech rights." *Am. Civil Liberties Union v. Reno*, 929 F. Supp. 824, 866 (E.D. Pa. 1996), *aff'd*, 521 U.S. 844 (1997). This is because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Because CIR is likely to succeed on the merits of its First Amendment challenge to the Challenged Provisions, irreparable injury to CIR should be presumed. *See AFDI*, 92 F. Supp. 3d at 330 (concluding that SEPTA's application of its Advertising Standards to censor a proposed advertisement in violation of the First Amendment constituted irreparable injury within the meaning of *Elrod*).

Further, CIR intends to hold an event about the investigation in collaboration with local media partners in Philadelphia on or about the first week of October and seeks to publish its proposed advertisement on SEPTA buses in the weeks leading up to that project. Ex. 87 (CIR Resp. to Interrog. No. 4). Therefore, the harm to CIR also is immediate as SEPTA is stymying CIR from coordinating the outreach and advertising connected with its event.

C.      **An Injunction Will Not Harm SEPTA Nor Impair the Public Interest.**

"In the absence of legitimate countervailing concerns, the public interest clearly favors the protection of constitutional rights." *Council of Alternative Political Parties v. Hooks*, 121 F.3d 876, 884 (3d Cir. 1997).  Neither the government nor the public can claim an interest in the continued enforcement of an unconstitutional policy.  *ACLU v. Ashcroft*, 322 F.3d 240, 251 n.11 (3d Cir. 2003); *accord AFDI*, 92 F. Supp. 3d 314, 330 (E.D. Pa. 2015).  Moreover, there is a significant public interest in upholding First Amendment principles.  *AFDI*, 92 F. Supp. 3d at 330–31 (collecting cases).  Accordingly, the public interest and the balance of hardships favor CIR.

D.      **The Court Should Waive the Bond Requirement.**

Typically, a party seeking a preliminary injunction is required to post a bond sufficient to cover the damages inflicted on a party found to have been wrongly enjoined.  Fed. R. Civ. P. 65(c).  However, "[w]here the balance of the[] equities weighs overwhelmingly in favor of the party seeking the injunction, the district court has the discretion to waive the Rule 65(c) bond requirement." *Elliott v. Kiesewetter*, 98 F.3d 47, 60 (3d Cir. 1996).  Courts in this Circuit accordingly have waived the bond requirement in non-commercial First Amendment cases.  *E.g., Mullin v. Sussex Cnty.*, 861 F. Supp. 2d 411, 428 (D. Del. 2012); *B.H. v. Easton Area Sch. Dist.*, 827 F. Supp. 2d 392, 409 (E.D. Pa. 2011), *aff'd*, 725 F.3d 293 (3d Cir. 2013); *Bella Vista United v. City of Philadelphia*, Civ. No. 04-1014, 2004 U.S. Dist. LEXIS 6771, *37 n.11, 2004 WL 825311 (E.D. Pa. Apr. 15, 2004).  Because SEPTA will suffer no damages as a result of the preliminary injunction requested by CIR, and the balance of harms strongly favors CIR, the Court should waive the bond requirement.

## IV.    CONCLUSION

For all the reasons set forth above, subsections (a) and (b) of SEPTA's Advertising Standards violate the First Amendment.  Because Plaintiff CIR is likely to succeed on the merits of its First Amendment claim and the balance of hardships favors CIR, the Court should enter a preliminary injunction prohibiting SEPTA from enforcing its unconstitutional Advertising Standards and enjoining SEPTA from rejecting CIR's proposed advertisements.

Respectfully submitted,

August 17, 2018                          HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER

By: *John S. Stapleton*
     John S. Stapleton (PA ID No. 200872)
     Dylan J. Steinberg (PA ID No. 203222)
     Rebecca S. Melley (PA ID No. 206210)
One Logan Square, 27th Floor
Philadelphia, PA 19103
(215) 568-6200
jstapleton@hangley.com
dsteinberg@hangley.com
rmelley@hangley.com

ACLU OF PENNSYLVANIA

By: *Molly Tack-Hooper*
     Molly Tack-Hooper (PA ID No. 307828)
     Mary Catherine Roper (PA ID No. 71107)
P.O. Box 60173
Philadelphia, PA 19102
(215) 592-1513
mroper@aclupa.org
mtack-hooper@aclupa.org

Brian Hauss, *pro hac vice*
Jacob Hutt, *pro hac vice*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 548-2500
bhauss@aclu.org
jhutt@aclu.org

Seth Kreimer (PA ID No. 26102)
3400 Chestnut Street
Philadelphia, PA 19104
(215) 898-7447
skreimer@law.upenn.edu

D. Victoria Baranetsky, *pro hac vice*
THE CENTER FOR INVESTIGATIVE
REPORTING
1400 65th Street, Suite 200
Emeryville, CA 94608
(510) 982-2890 ext. 390
vbaranetsky@revealnews.org