# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

THE CENTER FOR INVESTIGATIVE
REPORTING,

        Plaintiff,

    v.

SOUTHEASTERN PENNSYLVANIA
TRANSPORTATION AUTHORITY,

        Defendant.

Civ. No. 18-01839-MMB

---

**SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY'S
AMENDED MEMORANDUM IN OPPOSITION TO THE CENTER FOR
INVESTIGATIVE REPORTING'S MOTION FOR PRELIMINARY INJUNCTION**

Maryellen Madden
John J. Powell
MONTGOMERY MCCRACKEN WALKER &
    RHOADS LLP
1735 Market Street
Philadelphia, Pennsylvania 19103
(215) 772-1500

*Attorneys for the Southeastern Pennsylvania
Transportation Authority*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... III

GLOSSARY OF ABBREVIATIONS ...................................................................... VIII

PRELIMINARY STATEMENT ....................................................................................... 1

BACKGROUND ............................................................................................................... 3

    A.    Factual Statement ................................................................................ 3

    B.    Prior Litigation ................................................................................... 7

THE LEGAL STANDARD ............................................................................................... 8

ARGUMENT ..................................................................................................................... 9

I.    CIR'S CLAIM IS NOT JUSTICIABLE ................................................................. 9

II.    CIR IS NOT ENTITLED TO RELIEF ................................................................. 12

    A.    The Ad Space in SEPTA Buses Is a Discrete Non-Public Forum ...................... 12

        1.    The Relevant Forum Is the Ad Space in SEPTA Buses, and Nothing Else ................................................................................ 13

        2.    The Forum Is Non-Public by Nature ...................................................... 14

        3.    SEPTA Closed the Forum in 2015 ......................................................... 16

        4.    Since 2015, SEPTA Has Maintained a Closed Forum by Consistently Applying the Advertising Standards ................................. 18

    B.    SEPTA's Advertising Standards Are Reasonable on Their Face ....................... 20

        1.    The Advertising Standards Are Consistent with SEPTA's Purposes for Closing the Forum .............................................................. 20

        2.    The Advertising Standards Are Not Impermissibly Vague .................... 21

    C.    SEPTA Has Reasonably Applied the Advertising Standards ............................ 28

        1.    Accepting Public Service Ads Is Reasonable ......................................... 29

        2.    Accepting Ads Welcoming the DNC to Philadelphia Was Reasonable .............................................................................................. 31

        3.    Accepting a Legal Help Line Ad Was Reasonable ................................. 33

4.     Accepting the Other Ads CIR Identifies Was Reasonable. ..................... 33

D.     The Advertising Standards Are Viewpoint Neutral............................................. 34

E.     CIR Lacks Standing to Challenge the Advertising Standards as Applied to Other Ads............................................................................................................. 40

F.     The Advertising Standards Clearly Prohibit the CIR Ad.................................... 41

1.     Standard 9.b.(iv)(a) Clearly Prohibits the CIR Ad, Which Even CIR Admits Is "Political." ....................................................................... 41

2.     Standard 9.b.(iv)(b) Prohibits the CIR Ad as a Matter of Common Sense. .............................................................................................. 42

G.     CIR Suffered No Injury Because Alterative Forums Are Available to CIR and Its Ad Remains Purely Hypothetical............................................................ 46

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU Found. v. Wash. Metropolitan Area Transit Auth. (WMATA)*,
 303 F. Supp.3d 11 (D.D.C. 2018) ................................................................... *passim*

*AFDI v. King Cnty.*,
 796 F.3d 1165 (9th Cir. 2015) ...................................................................... 1, 45

*AFDI v. Mass. Bay Transp. Auth. (MBTA)*,
 781 F.3d 571 (1st Cir. 2015) ........................................................................ *passim*

*AFDI v. Metro. Transp. Auth. (MTA)*,
 109 F. Supp.3d 626 (S.D.N.Y. 2015) ............................................................ *passim*

*AFDI v. SEPTA*,
 92 F. Supp.3d 314 (E.D. Pa. 2014) ................................................................ 7, 24

*AFDI v. Suburban Mobility Auth. for Reg'l Transp. (SMART)*,
 698 F.3d 885 (6th Cir. 2012) ....................................................................... *passim*

*AFDI v. WMATA*,
 245 F. Supp.3d 205 (D.D.C. 2017), *aff'd in part, rev'd in part*,
 Civ. No. 17-7059, 2018 WL 4000492 (D.C. Cir. Aug. 17, 2018) .................. *passim*

*Aiello v. Wilmington*,
 623 F.2d 845 (3d Cir. 1980) ........................................................................... 40

*Am. Commc'ns Ass'n v. Douds*,
 39 U.S. 382 (1950) .......................................................................................... 26

*Archdiocese of Washington v. WMATA*,
 281 F. Supp.3d 88, 94 (D.D.C. 2017), *aff'd*,
 897 F.3d 314 (D.C. Cir. 2018) ...................................................................... *passim*

*Ark. Educ. Television Comm'n v. Forbes*,
 523 U.S. 666 (1998) ....................................................................................... 16

*Bennington Foods LLC v. St. Croix Renaissance Grp., LLP*,
 528 F.3d 176 (3d Cir. 2008) ............................................................................. 9

*Bryant v. Gates*,
 562 F.3d 888 (D.C. Cir. 2008) ........................................................................ 26

*Children of the Rosary v. City of Phoenix*,
 154 F.3d 972 (9th Cir. 1998) ................................................................... 1, 13, 22

*Christ's Bride Ministries, Inc. v. SEPTA,*
148 F.3d 242 (3d Cir. 1998)...........................................................7, 8

*Christian Legal Soc. Chapter of the Univ. of California v. Martinez,*
561 U.S. 661 (2010)..................................................................12, 47

*Coleman v. Ann Arbor Transp. Auth. (AATA),*
947 F. Supp.2d 777 (E.D. Mich. 2013).........................................1, 23

*Communist Party of Ind. v. Whitcomb,*
409 U.S. 1235 (1972).....................................................................9

*Consolidated Edison Company v. Public Service Commission,*
447 U.S. 530 (1980).....................................................................15

*Cooper v. SEPTA,*
548 F.3d 296 (3d Cir. 2008).............................................................3

*Coover v. Saucon Valley School Dist.,*
955 F. Supp.2d 392 (E.D. Pa. 1997) ................................................22

*Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.,*
473 U.S. 788 (1985)............................................................. *passim*

*Corzine v. Laxalt,*
Civ. No. 17-0052, 2017 WL 3159990 (D. Nev. July 25, 2017), *aff'd in part,*
708 F. App'x 379 (9th Cir. 2017) ....................................................11

*Entm't Software Ass'n v. Chicago Transit Auth. (CTA),*
696 F. Supp.2d 934 (N.D. Ill. 2010) ................................................15

*Erznoznik v. City of Jacksonville,*
422 U.S. 205 (1975).....................................................................15

*Ferring Pharm., Inc. v. Watson Pharm., Inc.,*
Civ. No. 13-2290, 2014 WL 4194094 (3d Cir. Aug. 26, 2014)................8

*Florham Park Chevron, Inc. v. Chevron U.S.A., Inc.,*
680 F. Supp. 159 (D.N.J. 1988) .......................................................8

*Gericke v. Begin,*
753 F.3d 1 (1st Cir. 2014)..............................................................11

*Gregoire v. Centennial Sch. Dist.,*
907 F.2d 1366 (3d Cir. 1990)..........................................................15

*Griffin v. Bryant*,
30 F. Supp.3d 1139 (D.N.M. 2014) .......................................................................12

*Hill v. Colorado*,
530 U.S. 703 (2000) .............................................................................................15

*Hodge v. Talkin*,
799 F.3d 1145 (D.C. Cir. 2015) ...........................................................................45

*Initiative & Referendum Inst. v. U.S. Postal Serv.*,
685 F.3d 1066 (D.C. Cir. 2012) ...........................................................................12

*Kovacs v. Cooper*,
336 U.S. 77 (1949) ..............................................................................................12

*Lebron v. AMTRAK*,
69 F.3d 650 (2d Cir. 1995) ...............................................................................1, 23

*Lebron v. WMATA*,
749 F.2d 893 (D.C. Cir. 1984) ..........................................................................1, 22

*Lehman v. City of Shaker Heights*,
418 U.S. 298 (1974) ...................................................................................... *passim*

*Meghrig v. KFC Western, Inc.*,
516 U.S. 479 (1996) ...............................................................................................8

*Metromedia, Inc. v. City of San Diego*,
453 U.S. 490 (1981) ........................................................................................12, 15

*Minn. Voters Alliance v. Mansky*,
138 S. Ct. 1876 (2018) ................................................................................. *passim*

*Munaf v. Geren*,
553 U.S. 674 (2008) ...............................................................................................8

*NAACP v. City of Philadelphia*,
39 F. Supp.3d 611 (E.D. Pa. 2014), *aff'd*,
834 F.3d 435 (3d Cir. 2016) ........................................................................12, 20, 38

*NAACP v. City of Philadelphia*,
Civ. No. 11-6533, 2014 WL 4099327 (E.D. Pa. Dec. 19, 2014), *aff'd*,
No. 15-1002 (3d Cir. Jan. 5, 2015) .......................................................................16

*Northeastern Pa. Freethought Soc'y v. Cnty. of Lackawanna Transit Sys. (COLTS)*,
Civ. No. 15-833, 2018 WL 3344910 (M.D. Pa. July 9, 2018) ......................... *passim*

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,
　460 U.S. 37 (1983).................................................................12, 13, 15

*Phila. Fed. of Teachers v. Ridge*,
　150 F.3d 319 (3d Cir. 1998)..............................................................9

*Pittsburgh League of Young Voters Educ. Fund v. Port Auth. of Allegheny Cnty. (PAAC)*,
　Civ. No. 06-1064, 2008 WL 4965855 (W.D. Pa. Aug. 14, 2008) ..........................................31

*Planned Parenthood of South Carolina Inc. v. Rose*,
　361 F.3d 786 (4th Cir. 2004) ............................................................30

*Pleasant Grove v. Summum*,
　555 U.S. 460 (2009)..................................................................13, 31

*Preiser v. Newkirk*,
　422 U.S. 395 (1975)......................................................................10

*Renne v. Geary*,
　501 U.S. 312 (1991).......................................................................9

*Ridley v. MBTA*,
　390 F.3d 65 (1st Cir. 2004)........................................................16, 19, 28

*Rosenberger v. Rector and Visitors of University of Virginia*,
　515 U.S. 819 (1995)..................................................................29, 30

*Seattle Mideast Awareness Campaign v. King Cnty.*,
　781 F.3d 489 (9th Cir. 2015) .........................................................17, 19

*Storti v. SEPTA*,
　Civ. No. 99-2159, 1999 WL 729266 (E.D. Pa. 1999) .................................13, 16, 17

*Southern Nev., Inc. v. Clark County Sch. Dist.*,
　941 F.2d 817 (9th Cir. 1991) ........................................................20, 37

*Trinity Indus., Inc. v. Chi. Bridge & Iron Co.*,
　735 F.3d 131 (3d Cir. 2013)...............................................................9

*U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns*,
　453 U.S. 114 (1981)..................................................................12, 15

*United States v. Kokinda*,
　497 U.S. 720 (1990)................................................................15, 20, 27

*URL Pharma, Inc. v. Reckitt Benckiser, Inc.*,
 Civ. No. 15-0505, 2016 WL 1592695 (E.D. Pa. April 20, 2016)............................................44

*Vaguely Qualified Productions LLC v. MTA*,
 Civ. No. 15-4952, 2015 WL 5916699 (S.D.N.Y. Oct. 07, 2015),
 *app. dismissed*, No. 15-3695 (2d Cir. Feb 18, 2016)......................................................1, 31, 32

*Walker v. Texas*, 135 S. Ct. 2239 (2015) .....................................................................................31

*Wesley v. Sec'y Pa. Dep't of Corr.*,
 569 F. App'x 123 (3d Cir. 2014) .............................................................................................8

*Ysursa v. Pocatello Educ. Ass'n*,
 555 U.S. 353 (2009)................................................................................................................15

## Other Authorities

12 C.F.R. § 338.1 ..........................................................................................................................35

12 C.F.R. § 338.3 ..........................................................................................................................35

U.S. Const. Art. III § 2..................................................................................................................9

# GLOSSARY OF ABBREVIATIONS

<u>Transit Authorities</u>

AATA            Ann Arbor Transportation Authority (Ann Arbor)

COLTS           County of Lackawanna Transit System (Scranton)

CTA             Chicago Transit Authority (Chicago)

MBTA            Massachusetts Bay Transportation Authority (Boston)

MTA             Metropolitan Transportation Authority (New York)

PAAC            Port Authority of Allegheny County (Pittsburgh)

SMART           Suburban Mobility Authority for Regional Transport (Detroit)

SEPTA           Southeastern Pennsylvania Transportation Authority (Philadelphia)

WMATA           Washington Metropolitan Area Transit Authority (Washington D.C.)


<u>Other Litigants</u>

AFDI            American Freedom Defense Initiative

ACLU            American Civil Liberties Union

NAACP           National Association for the Advancement of Colored People Legal Defense and
                Educational Fund

Defendant Southeastern Pennsylvania Transportation Authority ("SEPTA") respectfully submits this amended brief in opposition to Plaintiff the Center for Investigative Reporting's ("CIR" or "Plaintiff") motion for a preliminary injunction.

## PRELIMINARY STATEMENT

CIR seeks to have this Court issue an order requiring SEPTA to place an advertisement, the contents of which are still in draft form, on an unspecified number of its buses although the ad clearly violates SEPTA's Advertising Standards. The legal landscape governing SEPTA's right to control which advertisements appear in and on its buses includes a well-developed body of law defining the discretion transit authorities have to regulate speech on modes of public transportation. All but a few of these cases affirm the right of a transit authority to regulate the kinds of advertisements that appear on its vehicles through the use of advertising standards very much like the standards used by SEPTA that CIR challenges here.

Astonishingly, in seeking an affirmative injunction from this Court, CIR ignores this extensive body of law, including the controlling Supreme Court precedent, *Lehman v. City of Shaker Heights*, 418 U.S. 298 (1974).[1] These cases treat the advertising forum afforded by transit vehicles as unique, reflecting a concern for the captive audience of passengers on transit

---

[1] In addition to *Lehman*, *see, e.g.*, *AFDI v. Mass. Bay Transp. Auth. (MBTA)*, 781 F.3d 571 (1st Cir. 2015); *AFDI v. King Cnty.*, 796 F.3d 1165 (9th Cir. 2015); *AFDI v. Suburban Mobility Auth. for Reg'l Transp. (SMART)*, 698 F.3d 885 (6th Cir. 2012); *Children of the Rosary v. City of Phoenix*, 154 F.3d 972 (9th Cir. 1998); *Lebron v. AMTRAK*, 69 F.3d 650, 658 (2d Cir. 1995); *ACLU Found. v. Wash. Metropolitan Area Transit Auth. (WMATA)*, 303 F. Supp.3d 11 (D.D.C. 2018); *Northeastern Pa. Freethought Soc'y v. Cnty. of Lackawanna Transit Sys. (COLTS)*, 2018 WL 3344910 (M.D. Pa. July 9, 2018); *Archdiocese of Washington v. WMATA*, 261 F. Supp.3d 88 (D.D.C. 2017); *AFDI v. Metro. Transp. Auth. (MTA)*, 109 F. Supp.3d 626 (S.D.N.Y. 2015); *Vaguely Qualified Productions LLC v. MTA*, 2015 WL 5916699 (S.D.N.Y. Oct. 07, 2015), *app. dismissed*, No. 15-3695 (2d Cir. Feb. 18, 2016); *Coleman v. Ann Arbor Transp. Auth. (AATA)*, 947 F. Supp.2d 777 (E.D. Mich. 2013); *Lebron v. WMATA*, 749 F.2d 893 (D.C. Cir. 1984), *AFDI v. WMATA*, No. 17-7059, 2018 WL 4000492, at *5 (D.C. Cir. Aug. 17, 2018).

vehicles and recognizing that transit managers must have discretion to control the transit

environment for the protection of passengers.  Using language CIR ignores, the Supreme Court

spoke clearly on this issue:

> In much the same way that a newspaper or periodical, or even a
> radio or television station, need not accept every proffer of
> advertising from the general public, a city transit system has
> discretion to develop and make reasonable choices concerning the
> type of advertising that may be displayed in its vehicles.

*Lehman*, 418 U.S. at 303.  Indeed, as the Court of Appeals for the District of Columbia Circuit

concluded just two weeks ago:  "Given the holding in *Lehman*, it is no surprise that other circuits

have turned away first amendment challenges to bans on political or noncommercial

advertising."  *AFDI v. WMATA*, Civ. No. 17-7059, 2018 WL 4000492, at *8 (D.C. Cir. Aug. 17,

2018).

　　　In labeling SEPTA's Advertising Standards "not capable of reasoned application," CIR

nowhere acknowledges the discretion courts have consistently afforded to transit managers, or

the court decisions finding advertising decisions like those made by SEPTA here to be

reasonable in light of that discretion.  Instead, CIR offers as its legal standard an alternate reality,

devoid of the most relevant cases and composed largely of cases applying the first amendment in

dissimilar contexts in which the government's discretion is minimal and in which (plainly

distinguishable) governmental restrictions on speech are found to be impermissively vague.  CIR

does not explain its avoidance of transit cases.  CIR also fails to mention, as would seem

obligatory, that in several instances the non-transit cases CIR cites refer to transit cases as an

exception to the principle for which the non-transit cases are cited.  Thus, although CIR

showcases the Supreme Court's decision in *Minn. Voters Alliance v. Mansky*, 138 S. Ct. 1876

(2018), for the proposition that terms like "political" are too vague to permit reasoned

application, CIR fails to mention that *Mansky* expressly endorsed the restriction on political ads that the Court, in *Lehman*, approved in the context of transit vehicles.

Because CIR ignores the cases most relevant to its claim and fails to show how SEPTA's conduct or advertising guidelines run afoul of those cases, CIR has not provided this Court with good grounds for its motion.

## BACKGROUND

### A.    Factual Statement

SEPTA, a metropolitan transportation authority created by the Commonwealth of Pennsylvania, operates a mass-transit system, including buses, in Philadelphia, its surrounding counties, and parts of New Jersey. *See Cooper v. SEPTA*, 548 F.3d 296, 297-98 (3d Cir. 2008). SEPTA contracts with an advertising entity, Intersection, which places ads on SEPTA's facilities subject to contractual advertising standards and prohibitions. *See* CIR's Compl. ¶¶ 22-24. SEPTA's Board amended the advertising standards and prohibitions in SEPTA's contract with Intersection on May 28, 2015. Ex. 22 (the "Amendment"); Transcript of Deposition of Gino Benedetti, Esq., ECF No. 20-4 ("Benedetti Dep."), 50:11-51:13.[2] The amendment expressed SEPTA's intention that the property SEPTA allocates for advertising is a nonpublic forum. Ex. 22 at Recitals p. 1 & Standard II.A.9.(b)(ii). As pertinent here, the amendment added two paragraphs under the heading "Prohibited Advertising Content," as follows:

> 9.b.(iv)(a)    Advertisements promoting or opposing a political party, or promoting or opposing the election of any candidate or group of candidates for federal, state, judicial or local government offices are prohibited. In addition, advertisements that are political

---

[2] To avoid overburdening the Court with duplicative exhibits, citations herein to Exhibits 1 through 88 will refer to the corresponding exhibits attached to the Declaration of John Stapleton filed with CIR's motion at ECF No. 20. All exhibits cited herein that have not already been filed of record are attached to the accompanying Declaration of Maryellen Madden dated August 31, 2018 (the "Madden Decl.").

in nature or contain political messages, including advertisements
involving an issue that is political in nature in that it directly or
indirectly implicates the action or inaction, prospective action or
policies of a government entity.

9.b.(iv)(b)     Advertisements expressing or advertising an
opinion, position or viewpoint on matters of public debate about
economic, political, religious, historical or social issues.

Ex. 22 at Standard 9.b.(iv)(a) & Standard 9.b.(iv)(b) (together, the "Advertising Standards").

SEPTA adopted the amended Advertising Standards to avoid a recurrence of operating

issues, safety concerns, and adverse customer reactions arising from a public-issue advertisement

SEPTA was ordered to run on its buses in 2014 (as discussed in the next section below).  In

deposition, SEPTA explained its decision to amend the Advertising Standards as follows:

Well, what we faced with the AFDI case we wanted to avoid
facing again.  And what we faced was a public outcry, an outcry
from our employees who had to operate the buses, vandalism to
certain of the buses that ran the ads and a barrage of reporters
wanting to know what we were going to do about all of that.  So
we determined we didn't want to go through with that again.  We
didn't want our customers to face that, nor our employees So,
yeah, that's why we did it, to improve the customer experience, the
employee experience and the safety of both.

Q.     In what way would improving that experience impact
SEPTA's revenue?

A.     When you have happy and pleased customers, they're
going to use the system again.

Benedetti Dep. 54-55.  To ensure compliance with the Advertising Standards, both Intersection

and advertising personnel at SEPTA review incoming advertisements and advertising proposals

and refer ads or proposals that appear to address prohibited subject matter to SEPTA's General

Counsel for decision.  Benedetti Dep. 61:6-64:17.

This lawsuit arises out of SEPTA's decision to reject an advertising proposal that CIR

submitted to SEPTA through Intersection.  CIR is a unique, hybrid organization.  Although CIR

describes itself in the Complaint as simply a news organization or an investigative news organization (Compl. ¶¶ 1, 12), CIR is more than that. CIR's stated business mission is to motivate and assist CIR's audience in remedying societal ills that are highlighted by CIR's investigative reporting. In expansively describing its business, CIR explains that it:

> engage[s] and empowers the public through investigative journalism and groundbreaking storytelling in order to spark action, improve lives and protect our democracy. . . .
>
> CIR's reporting ignites real world change as evidenced by civil and criminal investigations, new laws and policies, the instigation of public discourse and solution-oriented community action.

Ex. 2 (CIR Financial Statements for 2015 & 2016), at 2; *see also* Transcript of Deposition of Victoria Baranetsky, Esq., ECF No. 20-4 ("Baranetsky Dep."), 10:7-11:7.

To measure whether it has "ignite[d] real world change," CIR deploys an interactive computer program for tracking changes that CIR attributes to its work, including laws enacted and lawsuits filed. And CIR does not leave the social, political and economic impact of its "storytelling" to chance—it organizes community action, enlists lawyers, contacts possible victims and engages in a host of other endeavors in an effort to right the wrongs its reporters believe they have uncovered. *See* Baranetsky Dep. 56:4-57:19.

On January 17, 2018, CIR inquired with Intersection about buying out the entire interior advertising space of an unspecified number of SEPTA buses for an "informative comic" about race inequality in mortgage lending (the "Ad" or the "CIR Ad"). *See* Ex. 30 at CIR0000094. CIR sent Intersection a link to the content it wanted to include in its proposed Ad. *Id.* at CIR0000099. Almost immediately, Intersection advised CIR that the proposed Ad would violate SEPTA's prohibition on "issue ads." *Id.* When CIR persisted, SEPTA's General Counsel investigated the Ad and the issues it raised, confirming that the Ad violated the Advertising Standards both because it was political and because it offered a viewpoint as to matters of public

debate on economic, political and social issues.  Benedetti Dep. 12:2-13:14.  Subsequent correspondence between in-house counsel for CIR and SEPTA altered the position of neither side.  *See* Exs. 16-19. Apparently to protect against the possibility that its Ad could not be placed on SEPTA buses, CIR reached agreement with the City of Philadelphia to place the CIR Ad on bus shelters and newsstands controlled by the City.  Compl. ¶ 40.

The CIR Ad told a story based in part on a review conducted by two CIR journalists of publicly available data on mortgage lending.  From that review, the CIR journalists concluded that minority borrowers were far more likely than white borrowers to be turned down for mortgage loans, and that the conventional home loan market "is still a deck stacked against [minorities]."  Ex. 7.  Portions of the proposed Ad draw upon a CIR feature story and a White Paper, which both appeared on CIR's website in February 2018.  *See* Compl. ¶¶ 15-16; Baranetsky Dep. 16:12-17.  As reported in the White Paper, CIR's investigators found that some mortgage lenders "dramatically favor white borrowers and others do not."  Ex. 4 at CIR0000229.  But much of the proposed Ad—at least four of the ten panels—was a polemic against "sordid" banking practices of some lenders in past eras.  *See* Ex. 7 at Panels 6-9.

In tandem with its proposed publication of the Ad, CIR devised programs to accomplish its stated mission.  Specifically, CIR held a community organizing meeting in Camden, New Jersey attended by CIR staff and also planned another community meeting in Philadelphia.  CIR also outlined plans to work with attorneys to spur "Fair housing lawsuits brought in Philly," to "infiltrate" Facebook groups for housing advocates, conduct direct mail campaigns, and generally to precipitate an "impact" through community action.  *See* Ex. 13, CIR0000279; *see also id.* at CIR0000274-81; Baranetsky Dep. 67:24-68:24 (calling these actions "a game plan of possibilities").  Some or all of these plans were carried out, but CIR was unable to say how many

or which ones, except to confirm that CIR's Camden meeting took place (although CIR was unable to provide any further details about that meeting). *See id.* at 67:12-20 (answering the Rule 30(b)(6) query "did any of this, in fact, happen" with "I actually don't know").

### B. Prior Litigation

This case reflects an evolution of SEPTA's policies and practices for the allowance of advertising on SEPTA buses. Twenty years ago, when *Christ's Bride Ministries, Inc. v. SEPTA*, 148 F.3d 242 (3d Cir. 1998), was decided, SEPTA had few written advertising standards and actually encouraged advertising on matters of public concern by donating its excess advertising space for use as public issue ads. *Id.* at 249. Because SEPTA's written policies excluded only a very narrow category of ads and SEPTA therefore permitted "virtually unlimited access to the forum," the court in *Christ's Bride* determined that SEPTA's bus advertising space was a designated public forum. *Id.* at 252.

The forum issue arose again in 2014 as the result of SEPTA's decision to reject an ad portraying Muslims as Jew-haters. *See AFDI v. SEPTA*, 92 F. Supp.3d 314 (E.D. Pa. 2014) (Goldberg, J.). There, this Court considered whether SEPTA's policies and practices had changed enough to shed the public-forum label that the Third Circuit assigned to SEPTA's bus advertising space years earlier in *Christ's Bride* and convert that space into a nonpublic forum. Ultimately, the Court concluded that SEPTA had not closed the forum, principally because SEPTA had, despite starting to restrict its ad space, had failed to adopted a policy prohibiting all *"political,"* " *public issue,"* and *"controversial"* ads from its buses. *Id.* at 372 (emphasis added). The Court explained:

> SEPTA no longer participates in a program to donate unused advertising space to 'issues of public concern.' SEPTA's current policies also prohibit additional categories of advertising that were not prohibited under its prior contract. Despite these differences,

> neither set of policies prohibits political, public issue or
> controversial advertisements.

*Id.* at 327; *see also* 325 n.5 (describing lack of policy banning "political" and "controversial" speech" as the "most important[]" reason for the Court's decision that SEPTA had not closed the forum).

Although Judge Goldberg applauded SEPTA's "principled attempt to limit hurtful, disparaging advertisements" as "laudable," *id.* at 331, the Court found the ad space on SEPTA buses to be a designated public forum, because SEPTA continued to accept political and public issue ads and did not "have an official policy which prohibits political or public issue advertising from appearing on the property." *Id.* at 326. As a result, SEPTA was ordered to accept and display ads that, the Court acknowledged, were hurtful and disparaging.

This case is unlike those two prior adjudications of the forum presented by the advertising space on SEPTA buses. This case is different because SEPTA now has exactly what this Court found was missing before: an official and rigorously enforced policy that prohibits political and public issue advertising.

## THE LEGAL STANDARD

CIR's motion for a preliminary injunction must be denied unless CIR establishes (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to SEPTA; and (4) that the public interest favors such relief. *Wesley v. Sec'y Pa. Dep't of Corr.*, 569 F. App'x 123, 125 (3d Cir. 2014). The Third Circuit and the Supreme Court have both described a preliminary injunction as an "extraordinary remedy." *Id.* (citations omitted); *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) ("[a] preliminary injunction is an extraordinary and drastic remedy . . . it is never awarded as of right") (internal citations omitted). Because of the unusual nature of

the relief, a preliminary injunction "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Ferring Pharm., Inc. v. Watson Pharm., Inc.*, Civ. No. 13-2290, 2014 WL 4194094, at *7 (3d Cir. Aug. 26, 2014) (internal citations omitted).

Courts are especially wary of ordering preliminary relief that includes a mandatory injunction, "*i.e.*, one that orders a responsible party to 'take action.'" *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 484 (1996). A mandatory injunction is "'looked upon disfavorably and [is] generally only granted in compelling circumstances.'" *Florham Park Chevron, Inc. v. Chevron U.S.A., Inc.*, 680 F. Supp. 159, 166 (D.N.J. 1988). Because a mandatory injunction "will alter the status quo, the party seeking the injunction must meet a higher standard of showing irreparable harm in the absence of an injunction." *Bennington Foods LLC v. St. Croix Renaissance Grp., LLP*, 528 F.3d 176, 179 (3d Cir. 2008). Accordingly, the Court may only grant a mandatory injunction if the movant's "'right to relief [is] indisputably clear.'" *Trinity Indus., Inc. v. Chi. Bridge & Iron Co.*, 735 F.3d 131, 139 (3d Cir. 2013) (quoting *Communist Party of Ind. v. Whitcomb*, 409 U.S. 1235, 1235 (1972)).

## ARGUMENT

## I.    CIR'S CLAIM IS NOT JUSTICIABLE.

The existence of a "case and controversy" is a prerequisite to every federal cause of action. U.S. Const. Art. III § 2; *see also Phila. Fed. of Teachers v. Ridge*, 150 F.3d 319, 322 (3d Cir. 1998). Justiciability goes to the power of the federal courts to entertain disputes, and to the wisdom of their doing so. *Renne v. Geary*, 501 U.S. 312, 316 (1991). Typically, district courts presume that they lack jurisdiction unless the contrary appears affirmatively on the record. *Id.*

For reasons not fully clear, CIR brought this lawsuit before it finalized the Ad or the plans for its distribution. Thus, basic facts such as the content of the final Ad and the details of its proposed publication cannot be known with any precision. CIR contends in its Complaint, for

instance, that it must still spend "significant time editing and finalizing the advertisement." Compl. ¶ 42. In deposition, CIR referred to the ad content shown to SEPTA as "just a draft." Baranetsky Dep. 93:7. The artwork shown to SEPTA was no further along. *Id.* at 33:7-11 ("[t]here was no final artwork").

CIR's publication intentions were likewise still only in the formative stages when it submitted its advertising proposal to SEPTA. Although CIR contends that it wanted its Ad to be seen in the neighborhoods most affected by lending practices it investigated (Compl. ¶ 17), CIR denied in deposition that it wanted to place its advertisement on any particular routes. Baranetsky Dep. 77:14-17. In fact, CIR never knew how many buses it wanted to use (*id.* at 77:18-20 ("I don't think we got that far")), or how much money CIR had to spend on the advertising it proposed to SEPTA (*id.* at 77:22 ("I don't think we got that far either")). Likewise, details as to CIR's placement of the Ad on newsstands and bus shelters are still unknown (*id.* at 77:20-78:22), although CIR alleges that the City of Philadelphia, which controls these fora, has agreed to such placement. Compl. ¶ 40.

After discovery for CIR's Preliminary Injunction Motion closed, on August 6, CIR sent a second version of its proposed ad to SEPTA for consideration. *See* Ex. 83 (includes letter from J. Stapleton to M. Madden dated Aug. 6, 2018, attaching second proposed ad).

SEPTA confirmed with CIR's counsel that this second ad was submitted in addition to and not in place of CIR's first proposed Ad. SEPTA has declined to consider that Ad while this litigation is pending. The submission of a second ad alongside the first only heightens the uncertainty attending the issues CIR is presenting to the Court.

Both the contemplated Ad itself and CIR's intended use of it were so indefinite that CIR's current legal action seeking to force SEPTA to accept the Ad amounts to nothing more

than a hypothetical dispute of the type this Court need not and should not consider. *See Preiser v. Newkirk*, 422 U.S. 395, 401 (1975) (the Court's "judgments must resolve a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts") (internal citations omitted). Moreover, under the controlling legal standard, the reasonableness SEPTA's application of its guidelines "must be assessed in the light of the purpose of the forum and all the surrounding circumstances," including the nature of the restrained speech. *See Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 809 (1985). Here, the actual content of the speech at issue is scarcely more definite than CIR's litany of purely hypothetical ads (*see* Mem. 13), and thus the record does not and could not yet fully present the "surrounding circumstances" necessary for the Court to properly assess CIR's constitutional challenge.

Courts have repeatedly declined to rely on hypothetical facts in resolving First Amendment challenges. *See, e.g.*, *Archdiocese v. WMATA*, 281 F. Supp.3d 88, 94 (D.D.C. 2017) (plaintiff's reliance on "hypothetical conversation" between potential competing viewpoints were "not persuasive"), *aff'd*, 897 F.3d 314, 319 (D.C. Cir. 2018) (rejecting constitutional challenge to ad restriction where plaintiff's "claim of discriminatory treatment is based on hypothesis"); *AFDI v. MBTA*, 781 F.3d 571, 583 (1st Cir. 2015) ("we are not bound to accept counsel's guess about how the agency would apply the guideline in hypothetical cases"); *accord Gericke v. Begin*, 753 F.3d 1, 9 (1st Cir. 2014) (refusing to entertain a "hypothetical scenario involving a possible restriction on the right to film," finding it "irrelevant to this . . . appeal"); *Corzine v. Laxalt*, Civ. No. 17-0052, 2017 WL 3159990, at *4 (D. Nev. July 25, 2017), *aff'd in part*, 708 F. App'x 379 (9th Cir. 2017) (rejecting First Amendment claim that was "premised on

hypothetical conditions that could have been imposed"). As such, this Court would be well within its discretion in denying CIR's instant motion for preliminary injunction as premature and as yet unjusticiable.

## II.   CIR IS NOT ENTITLED TO RELIEF.

### A.   The Ad Space in SEPTA Buses Is a Discrete Non-Public Forum.

The Supreme Court has long recognized that even protected speech is not equally permissible in all places and at all times. *See Archdiocese*, 897 F.3d at 318. Thus, the starting point in analyzing any challenge to a regulation of speech on government property is the nature of the forum—identifying the type of forum at issue and the rules and standards applicable in that forum. *See, e.g.*, *Cornelius v. NAACP*, 473 U.S. 788, 800-04 (1985); *AFDI v. WMATA*, 245 F. Supp.3d 205, 210 (D.D.C. 2017).[3] The controlling cases recognize three types of fora: the traditional public forum, the designated public forum, and the nonpublic forum. *Christian Legal Soc. Chapter of the Univ. of California v. Martinez*, 561 U.S. 661, 679 n.11 (2010).

> The Supreme Court has determined that this tripartite framework is necessary, because '[t]he First Amendment does not guarantee access to property simply because it is owned or controlled by the government.' *Cornelius*, 473 U.S. at 803. The Supreme Court has explained that 'the State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated.' *Perry Educ. Ass'n*, 460 U.S. at 46 (quoting *U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 129-30 (1981)).

---

[3] For decades, the Supreme Court has made a "frequent refrain" stressing the importance of assessing restrictions on speech in the context of the specific forum at issue, *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 501 (1981), observing repeatedly that each communicative context creates "'a law unto itself'" for first amendment purposes. *Id.* (quoting *Kovacs v. Cooper*, 336 U.S. 77, 97 (1949)). Similarly, *Lehman* stressed that public places differ widely in character and "before you could say whether a certain thing could be done in a certain place you would have to know the history of the particular place." *Lehman*, 418 U.S. at 302 (1974) (citation omitted). Against this backdrop, CIR's omission of transit cases is especially inapt. Here, to an unusual degree, those are the only cases that count.

*Griffin v. Bryant*, 30 F. Supp.3d 1139, 1162 (D.N.M. 2014). Courts have used the term "limited public forum" interchangeably with "nonpublic forum." *See NAACP v. City of Philadelphia*, 834 F.3d 435, 441 n.2 (3d Cir. 2016).

The type of forum dictates the level of scrutiny that courts apply to advertising restrictions on government property. *See Cornelius*, 473 U.S. at 800. So-called "limited" or "nonpublic" fora refer to government property that is "not by tradition or designation a forum for public communication." *Initiative & Referendum Inst. v. U.S. Postal Serv.*, 685 F.3d 1066, 1070 (D.C. Cir. 2012) (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983)). In contrast to traditional or designated public fora, in which courts apply strict scrutiny to any subject-matter restrictions, *see Pleasant Grove v. Summum*, 555 U.S. 460, 469-70 (2009), in a nonpublic forum subject matter restrictions need only be viewpoint neutral and reasonable in light of the forum's purposes. *Id*. at 470.

Inherent in the concept of a nonpublic forum is the government's right to make distinctions in access on the basis of subject matter and speaker identity. The government may, by definition, impose restrictions based on subject matter and speaker identify in a nonpublic forum, so long as they are reasonable in light of the purpose the forum serves. *Perry*, 460 U.S. at 49; *Children of the Rosary v. City of Phoenix*, 154 F.3d 972, 978 (9th Cir. 1998).

### 1. The Relevant Forum Is the Ad Space in SEPTA Buses, and Nothing Else.

Here, the relevant forum is the advertising space on SEPTA buses, since that is the property CIR seeks to access. *Lehman v. City of Shaker Heights*, 418 U.S. 298, 303 (1974); *Northeastern Pa. Freethought Soc'y*, 2018 WL 3344910, at *7 n.7 (collecting cases). CIR suggests that the relevant forum is much broader, extending to all SEPTA advertising space, Mem. 6-7, but this is incorrect. Because CIR has only sought to access and SEPTA has only

refused CIR access to ad space on the inside of SEPTA buses, only that advertising space comprises the relevant forum. *Id.*; *see also Storti v. SEPTA*, Civ. No. 99-2159, 1999 WL 729266, *7-*8 (E.D. Pa. 1999) (leafleting restrictions analyzed using narrowly defined forum including SEPTA train platforms and certain pay areas that plaintiff's sought to use, not entire stations or vehicles). CIR only sought to access ad space inside SEPTA buses. Accordingly, that is the only forum at issue here.

### 2. The Forum Is Non-Public by Nature.

Supreme Court jurisprudence teaches that the advertising space on buses constitutes a unique forum in which the government, which is here engaged in commerce, has a great deal of freedom to reject controversial advertising in order to protect the "captive audience" of bus passengers. On a city bus:

> we have no open spaces, no meeting hall, park, street corner, or other public thoroughfare. Instead, the city is engaged in commerce. It must provide rapid, convenient, pleasant, and inexpensive service to the commuters of [the city]. The [internal advertising] space, although incidental to the provision of public transportation, is a part of the commercial venture. . . .

> The radio can be turned off, but not so the billboard or street car placard. The streetcar audience is a captive audience. It is there as a matter of necessity, not of choice. In such situations, the legislature may recognize degrees of evil and adapt its legislation accordingly.

*Lehman*, 418 U.S. at 302 (internal citations and quotations omitted); *see also id.* at 308 (Douglas, J., concurring) (explaining that buses are "are a practical necessity for millions in our urban centers," and that there is no constitutional right to address the "captive audience" on a bus).

To protect "captive" bus passengers, the Supreme Court determined that transit systems may exercise managerial discretion to "make reasonable choices concerning the type of advertising that will be displayed on its vehicles." *Lehman*, 418 U.S. at 303. Analyzing bus

advertising space to newspapers, periodicals and radio/television providers, the Supreme Court

opined that bus systems have discretion as to what can be displayed in advertising space. *Id.*

Thus, the Supreme Court reasoned that a bus system's ban on political advertisements was a

permissible "managerial decision to limit [advertising] space to innocuous and less controversial

commercial and service oriented advertising," and therefore "does not rise to the dignity of a

First Amendment violation." *Id.* at 304. The fact that the Shaker Heights bus system accepted a

wide mix of ads, including noncommercial ads from "churches, and civic and public-service

oriented groups" was not deemed to be inconsistent with a ban on political ads. *See id.* at 300.

Although *Lehman* was a plurality decision, majority rulings of the Supreme Court have

repeatedly and consistently embraced all of its significant holdings in later decisions. *See, e.g.*,

*Minn. Voters Alliance v. Mansky*, 138 S. Ct. 1876, 1886 (2018) ("long recognized"); *Ysursa v.*

*Pocatello Educ. Ass'n*, 555 U.S. 353, 376 (2009) (citing *Lehman* for the proposition that

government may choose to manage its own affairs in ways that draw reasonable subject-matter

lines affecting speech); *Hill v. Colorad*o, 530 U.S. 703, 718 (2000) ("our cases have repeatedly

recognized the interests of unwilling listeners," citing *Lehman*); *United States v. Kokinda*, 497

U.S. 720, 725-26 (1990); *U.S. Postal Service v. Greenburgh Civic Assns.*, 453 U.S. 114, 130 n.6

(1981); *Perry Educ. Ass'n*, 460 U.S. at 37 (explaining that *Lehman* involved an "unusual forum,"

buses; recognizing that *Greenburgh* "reaffirmed" *Lehman*); *Cornelius*, 473 U.S. at 801 (relying

on *Lehman*); *see also Consolidated Edison Company v. Public Service Commission*, 447 U.S.

530, 539–540 (1980) *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 514, n.19 (1981)

(plurality opinion); *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 209 (1975); *accord Entm't*

*Software Ass'n v. Chicago Transit Auth. (CTA)*, 696 F. Supp.2d 934, 943 (N.D. Ill. 2010). Thus,

there appears to be no serious question that *Lehman* remains good law.

The principles articulated in *Lehman* apply with equal force here and compel the conclusion that ad space in SEPTA buses plainly comprises a nonpublic forum, and the discretion *Lehman* allotted to transit systems to regulate ads appearing in a city bus is equally vested in SEPTA here. *See Gregoire v. Centennial Sch. Dist.*, 907 F.2d 1366, 1388 (3d Cir. 1990); *see also Northeastern Pa. Freethought Soc'y*, 2018 WL 3344910, at *7 (ad space in buses were non-public forum, following *Lehman*).

### 3.    SEPTA Closed the Forum in 2015.

In distinguishing designated public and nonpublic forums, courts focus on whether the government intentionally opened the forum for public discourse. *SMART*, 698 F.3d at 890. Designated public forums are not the default condition of government fora; to the contrary, the government must embrace an affirmative intention to open the forum for it to be other than nonpublic.

> The Supreme Court has repeatedly held that the government must have an affirmative intent to create a public forum in order for a designated public forum to arise. "The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." *Cornelius*, 473 U.S. at 802. To determine that intent, courts must consider both explicit expressions about intent and "the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum." *Id.*

*Ridley v. MBTA*, 390 F.3d 65, 76 (1st Cir. 2004). Likewise, where a government has created a public forum, it can later decide to close the forum. The forum question is not a static one, *AFDI v. MBTA*, 781 F.3d at 578, and a transit authority "is not required to indefinitely retain the open character of its property." *AFDI v. MTA*, 109 F. Supp.3d at 632.

The two earlier judicial rulings on the nature of the forum afforded by ad space on SEPTA buses before SEPTA adopted its current standards are therefore neither binding nor

especially relevant. Instead, courts agree that a transit authority can convert advertising space from a public or designated public forum into a nonpublic forum. *See, e.g.*, *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 680 (1998); *AFDI v. WMATA*, 245 F. Supp.3d at 214; *Northeastern Pa. Freethought Soc'y*, 2018 WL 3344910 , at *9 n.10; *NAACP v. City of Philadelphia*, Civ. No. 11-6533, 2014 WL 4099327, at *5 (E.D. Pa. Dec. 19, 2014), *affirmed*, 834 F.3d 435 (3d Cir. 2016). "[J]ust as the government may create public forums by intentional designation, so may it close them." *Storti v. SEPTA*, Civ. No. 99-2159, 1999 WL 729266, at *4 (E.D. Pa. 1999). SEPTA did just that when it adopted its current Advertising Standards in 2015.

Transit authorities that have combined written policies with practices that demonstrate an intention to limit a forum will generally avoid being found to have created a designated public forum. *See id.* Courts therefore look to the practices of transit authorities under their written policies to ascertain their intention as to the type of forum created by their facilities. This was the analytical path the Middle District of Pennsylvania recently followed in determining that the advertising space on the buses of the Scranton transit authority was a nonpublic fora.

> To gauge COLTS' intent, the court looks to the terms of any policy COLTS has enacted to govern access to the forum. Moreover, if COLTS requires potential advertisers to obtain permission, under pre-established guidelines that impose speaker-based or subject-matter limitations, it will generally be found that COLTS intended to create a limited, rather than designated, public forum.

*Northeastern Pa. Freethought Soc'y*, 2018 WL 3344910, at *8. The denial of proposed advertisements that do not qualify under the advertising guidelines of a transit authority is evidence of the authority's intention to maintain a nonpublic forum. *See Seattle Mideast Awareness Campaign v. King Cnty.*, 781 F.3d 489, 498 (9th Cir. 2015); *AFDI v. MTA*, 109 F. Supp.3d 626, 632 (S.D.N.Y. 2015) ("the Supreme Court and several courts of appeals have made

clear that public authorities are not required to accept political advertisements, and when they exclude such ads, they create a limited public or nonpublic forum").

SEPTA's 2015 Advertising Standards explicitly state SEPTA's intention to operate its advertising space as a nonpublic forum. *See* Ex. 22 at Standard 9.b.(ii) ("It is the express intention of these advertising standards to further confirm SEPTA's intention that property allocated for advertising be a non-public forum"). SEPTA repeated that intention in its deposition. Benedetti Dep. 47:20-22. Unlike SEPTA's prior advertising standards, which barred relatively few categories of advertisements and allowed advertisement on public issues, SEPTA's 2015 Advertising Standards list 22 categories of banned or restricted subject matter. Those categories include political advertisements (Standard 9.b.(iv)(a)) and public issue advertisements (Standard 9.b.(iv)(b)). SEPTA's intention to close the forum is unmistakable.

4. **Since 2015, SEPTA Has Maintained a Closed Forum by Consistently Applying the Advertising Standards.**

When it adopted the current Advertising Standards, SEPTA also created a system to enforce them. In particular, SEPTA met with and trained its contractor, Intersection, to review ads for compliance with the new policy. *See* Benedetti Dep. 60:5-71:21. SEPTA also tasked two different SEPTA employees with reviewing ads for compliance with the Standards; the General Counsel, who reviews an ad when Intersection identifies it as apparently prohibited (*id.* at 62:15-18), and a SEPTA advertising employee who reviews all ads for compliance, whether or not flagged by Intersection, before the ads are run (*id.* at 63:4-64:7). An additional check, which has occasionally prompted a rejection, is provided by SEPTA's general counsel's regularly inspecting the ads as the appear on actual SEPTA vehicles, and, is necessary ordering that non-conforming ads be taken down. *Id.* at 65:4-12. During SEPTA's regular compliance review process, SEPTA also maintains a collaborative dialogue with Intersection, SEPTA's Advertising

Department, and its Office of General Counsel, regarding how the Standards are applied.  If

SEPTA believes a revised version of an ad may be compliant with its advertising standards,

SEPTA and/or Intersection may engage with that party to discuss potential revisions.  Benedetti

Dep. 167:12-169:24.

Based on that process, SEPTA has rejected at least 11 advertising proposals since 2015,

and has caused others ads to be revised or re-written.[4]  Since amending its standards, SEPTA has

rejected ads on such topics as:

- the release of Meek Mill from prison (Ex. 57, Benedetti Dep. 268:13-18);

- promotion of or opposition to birth control or abortion (Ex. 55 & Benedetti Dep. 264:1-15 (Bethany Christian), Ex. 61 & Benedetti Dep. 278:16-79:9 (Planned Parenthood), Ex. 60 & Benedetti Dep. 275:4-24 (proposed public ad concerning condom use));

- promoting activism on climate change (Ex. 52, Benedetti Dep. 75:8-14, 259:17-20);

- criticism of traditional public education and advocating for "school choice" (Ex. 65, Benedetti Dep. 286:1-287:8);

- criticism of the tobacco industry (Ex. 59, Benedetti Dep. 271:1-273:5);

- demeaning employer in labor dispute (Ex. 54, Benedetti Dep. 262:4-263:3);

- Promoting sperm bank use (Ex. 62, Benedetti Dep. 279:17-280:1-12);

- promoting prayer (Ex. 64, Benedetti Dep. 284:-12); and

- the CIR Ad (Ex. 6; Ex. 7; Benedetti Dep. 11:2-131),

Other advertisements were only run on SEPTA buses after changes brought them into

conformity with the Advertising Standards.  *See, e.g.*, Benedetti Dep. 78:22-79:7, 187:9-89:158,

---

[4] The precise number of rejected ads depends on how one chooses to count them.  For example, SEPTA rejected at least 11 distinct ad proposals relating to the forum since 2015, but those 11 proposals included more than 32 distinct images that the advertisers sought to place in ad space in the forum.  At those 32 rejected images do not include any iterations of ads or ad copy that SEPTA initially rejects but later agrees to accept after one or more revisions.  (*See*, e.g., the "Fusion" ad discussed *infra*.)

286:17-286:8.  SEPTA's restrictive Advertising Standards, combined with rigorous enforcement of those Standards, more than suffices to evidence SEPTA's intention to be a nonpublic forum.[5]

**B.      SEPTA's Advertising Standards Are Reasonable on Their Face.**

In a nonpublic forum, the government may enforce content-based restrictions on speech so long as they are reasonable and not made to suppress the speaker's point of view.  *Minn. Voters' Alliance*, 138 S. Ct. at 1885.  Because the forum afforded by SEPTA buses is nonpublic, the question is merely whether the restriction is "reasonable in light of the purpose served by the forum."  *Id.* at 1886; *see also Cornelius*, 473 U.S. at 806; *NAACP*, 834 F.3d at 442.  The courts may use their "common-sense" to uphold a regulation under reasonableness review.  *See United States v. Kokinda*, 497 U.S. 720, 725-26 (1990); *NAACP*, 834 F.3d at 445.

**1.      The Advertising Standards Are Consistent with SEPTA's Purposes for Closing the Forum.**

SEPTA's Advertising Standards traverse familiar terrain.  The advertising restrictions in Standard 9.b.(iv)(a) and Standard 9.b.(iv)(b) echo concerns that courts have consistently found to be reasonable in light of the purpose served by the forum, including (i) the avoidance of such negative business events as public and employee complaints, vandalism, stirring unrest on buses, the administrative burden of dealing with controversial public issue advertising, and (ii) improving the commuting experience and thereby increasing ridership and revenues.  Benedetti Dep. 54:16-55:13; 85:23-86:15; 158:6-161:12.  Thus, courts have found restrictions reasonable as a matter of law and commonsense where the restrictions are consistent with and appear to be

---

[5] CIR argues both that SEPTA "routinely rejects ads" (Mem. 35), and conversely that SEPTA rejects too few.  Mem. 48.  What a reasonable number would be is left to CIR's conjecture because it failed to inform the Court of the information available from the transit cases it ignored.  In fact, SEPTA's rejection numbers (15 ads) compare favorably to other transit systems deemed nonpublic forums.  *See, e.g.*, *Seattle Mideast Awareness Campaign*, 781 F.3d at 498 (only one ad excluded); *Ridley v. MBTA*, 390 F.3d at 78 (17 ads excluded); *SMART*, 698 F.3d at 890 (3 ads excluded).

motivated by concerns for the convenience and comfort of bus passengers, *see Lehman*, 418 U.S. at 303-04, and related concerns that revenue losses that could result from heated debates on buses over controversial ads, *see, e.g.*, *SMART*, 698 F.3d at 892; *Southern Nev., Inc. v. Clark County Sch. Dist.*, 941 F.2d 817 (9th Cir. 1991) (*en banc*) ("avoidance of controversy" constitutes a reasonable justification for refusing plaintiff's potentially controversial advertisement"); *Northeastern Pa. Freethought Soc'y*, 2018 WL 3344910, at *11-*12; *Archdiocese*, 261 F. Supp.3d at 107, and concerns that such ads generate vandalism and administrative burdens, *see, e.g.*, *AFDI v. WMATA*, 245 F. Supp.3d at 213; *ACLU Found.*, 303 F. Supp.3d at 19.

### 2. The Advertising Standards Are Not Impermissibly Vague.

CIR contends that the Advertising Standard's restriction on political ads is impermissibly vague and unconstitutionally affords SEPTA unfettered discretion. The Court should reject this argument for three reasons. First, CIR's position would demand of transit authority a degree of clarity and certainty that is neither possible nor required here. Second, cases upholding restrictions on "political" advertisements form a pillar of first amendment jurisprudence that has not been overruled. And, third, CIR's argument misapprehends *Minnesota voters' Alliance v. Manksy*, which cannot reasonably be interpreted as invalidating SEPTA's advertising standards barring political ads from inside a city bus.

### a. Perfect Clarity and Precise Guidance Are Not Required of SEPTA's Advertising Standards.

The Supreme Court's recent opinion in *Minnesota Voters Alliance v. Mansky* expressly reiterates the principle that "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." 2018 WL 2973746, at 1891 (June 14, 2018). Thus, the Middle District of Pennsylvania has, since the decision in *Mansky*, rejected a similar

vagueness challenge, explaining that "some degree of interpretation" is "necessary" and "inevitable" whenever restrictions are imposed. *Northeastern Pa. Freethought Soc'y*, 2018 WL 3344910, at \*13. "No policy can be so specific as to cover every conceivable situation and to disallow all discretion or interpretation in its application." *Id.* (citations omitted). As the *COLTS* opinion explains, the question is whether the challenged restriction is actually "indeterminate," or if it is constrained on its face or in its application in a manner that makes it reasonably—but not perfectly—workable. *Id.* (policy allowed for "leeway in its interpretation," but was not indeterminate).

### b. Courts Have Consistently Upheld Similar Restrictions Imposed in Transit Vehicles.

Near the outset of this dispute, CIR admitted in writing that its proposed ad is "political." *See* Ex. 16, at SEPTA_000286 (discussed further *infra*, Part F.1). Notwithstanding CIR's admission that the CIR ad "political," CIR also contends that SEPTA's Advertising Standards are overly vague[6] and invite arbitrary enforcement. But the federal courts have repeatedly found the same or very similarly worded restrictions to be reasonable, and therefor valid. For example, similar restrictions deemed reasonable and viewpoint neutral include:

- **United States Supreme Court:** "political copy" or "political advertising." *Lehman*, 418 U.S. at 300, 303.

---

[6] The "void-for-vagueness" doctrine was originally used in the criminal law arena, it has been "transplanted into a First Amendment setting." Although a challenge can be made in a civil context, a lesser degree of specificity is required in the civil context because the penalties are less severe. *See Coover v. Saucon Valley School Dist.*, 955 F. Supp.2d 392, 401 (E.D. Pa. 1997). "It is not entirely clear that the vagueness doctrine applies to the Guidelines, which do not, of course, impose criminal penalties on those whose advertisements are denied." *AFDI v. Washington Metro. Transit Auth.*, 2018 WL 4000492, at \*11.

- **Sixth Circuit:** political or political campaign advertising (where "political" was not defined). *SMART*, 698 F.3d at 890 ("there is no question that a person of ordinary intelligence can identify what is or is not political").

- **Ninth Circuit:** advertising "supporting or opposing a candidate, issue or cause or which advocates or opposes a religion or belief." *Children of the Rosary*, 154 F.3d at 975.

- **D.C. Circuit:** "categorical ban on political advertising even when inartfully phrased." *Lebron v. WMATA*, 749 F.2d 893, 896 (D.C. Cir. 1984).

- **D.C. Circuit:** "advertisements intended to influence the public on an issue on which there are varying opinions." *AFDI v. Washington Metro. Transit Auth.*, No. 17-7059, 2018 WL 4000492, at *11 (D.C. Cir. Aug. 17, 2018).

- **Second Circuit:** "political" advertising. *Lebron v. AMTRAK*, 69 F.3d 650, 658 (2d Cir. 1995).

- **District D.C.:** advertising "intended to influence members of the public regarding an issue on which there are varying opinions" and advertising "intended to influence public policy." *ACLU Found.*, 303 F. Supp.3d at 13-14.

- **Southern District N.Y.:** advertising that is "political in nature, including but not limited to advertisements that either are addressed to the action, inaction, prospective action or policies of a governmental body . . . or prominently or predominantly advocate or express a political message, including but not limited to an opinion, position, or viewpoint regarding disputed economic, political, moral, religious or social issues or related matters, or support for or opposition to disputed issues or cause." *AFDI v. MTA*, 109 F. Supp.3d at 629.

- **Eastern District Michigan:** prohibiting "political" ads. *Coleman*, 947 F. Supp.2d at 787.

The embrace of the term "political" to delineate a type of speech that may be restricted on government property has become a fundamental part of First Amendment jurisprudence. For example, Judge Goldberg ruled that SEPTA continued to host a designated public forum because it did not have an official policy that prohibited "political or public issue advertising" and that SEPTA's acceptance of "political and public issue speech" indicated an intention to open the forum for expression." *AFDI v. SEPTA*, 92 F. Supp.3d at 326. Indeed, speaking out of both sides of its mouth, CIR contends both (i) that the term "political" is too vague and indeterminate to be used to identify prohibited ads, *and* (ii) that SEPTA has continued to accept political and public issue ads as such, and has therefore failed to close the forum. Mem. 48. According to CIR, SEPTA's Standards fail when they do not exclude political and public issue ads (because this opens the forum and leads to strict scrutiny), but are impermissively vague when they do address those kinds of ads. CIR cannot have it both ways.

> **c.      In Practice, the Advertising Standards Provide an Adequate, Workable Guide.**

CIR contends that the United States Supreme Court in *Mansky* found the term "political," which also appears in SEPTA's Advertising Standards, too vague to supply a government decision maker with a reasonable, non-arbitrary, and determinate guide for regulating speech. But properly understood, *Minnesota Voters' Alliance* does nothing to undermine the longstanding and controlling principles that the Supreme Court articulated in *Lehman.*

*Mansky* involved restrictions on voters wearing items with "political insignia" at the polls. In the context of the polling place, the Supreme Court found that the use of the term "political" combined with the State's haphazard interpretations of the term rendered the restriction unreasonable. 138 S. Ct. at 1880. *Mansky* provides few if any lessons for bus advertising in general or SEPTA in particular, however. In explaining the legal landscape

applicable to speech restrictions in nonpublic forums, the Supreme Court expressly embraced the

settled notion that political advocacy could be restricted by the government in nonpublic forums,

citing to both the *Lehman* plurality and to Justice Douglas's separate concurrence:

> [O]ur decisions have long recognized that the government may
> impose some content-based restrictions on speech in nonpublic
> forums, including restrictions that exclude political advocates and
> forms of political advocacy.

*Minn. Voters Alliance*, 138 S. Ct. at 1885-86.

Moreover, in contrast to *Mansky*, SEPTA's Advertising Standards do not employ the

term "political" without context. Rather, the prohibition in Standard 9.b.(iv)(a) specifies action-

specific content such as promoting or opposing political parties or the election of candidates.

The additional prohibition of issues that are "political in nature" is illuminated by the

accompanying illustration of what political in nature means; *i.e.,* advertisements that involve or

directly or indirectly implicate the action, inaction, prospective action or policies of a

government entity.

The prohibition of so-called issue ads in the Advertising Standard 9.b.(iv)(b) also has

guiding content not present in *Mansky*. Exclusion under that provision requires a confluence of

three factors: (1) an issue, (2) that is publicly debated, and (3) on which the ad has taken a

position. The CIR Ad shows the ease with which this standard can be applied. As described in

more detail below, the public sphere was rich in articles and lawsuits exploring the subject matter

of the Ad; there was also the back and forth of conflicting views, and CIR staked a position on

one side of the debate.

As applied in practice, the language of the Advertising Standards here have provided an

adequate and determinate guide for assessing and rejecting CIR's Ad, without needing to look

outside the Advertising Standards themselves.  Mr. Benedetti explained his reasoning as to

Standard 9.b.(iv)(a), for instance, was as CIR as follows:

> Further, the advertisements topic is the subject of government
> regulation.  The very purpose of the advertisement is to change
> regulation.  And that is consistent with your organization's claim
> on its website that its reporting "ignites real world change."  Thus
> the proposed advertisement ". . . implicates the action, inaction,
> prospective action or policies of a government entity within the
> meaning of the guidelines.

Ex. 19 (Letter from Gino Benedetti to Victoria Baranetsky dated Mar. 29, 2018).  The

Advertising Standards therefore provide a workable framework for rational and consistent

decision-making.

     *Mansky* contains no hint that the Court considered its ruling to abrogate any part of

*Lehman*, a case on which the majority repeatedly relied.  Likewise, other courts faced with

analogous first amendment challenges to speech restrictions on buses have not found *Minnesota*

*Voters' Alliance to* dampen the force of *Lehman* in defining a transit authority's ability to restrict

political ads on city buses.  *See Northeastern Pa. Freethought Soc'y*, 2018 WL 3344910, at *13;

*Archdiocese*, 281 F. Supp.3d at 103.

     SEPTA's ability to navigate what ads are out and what ads are in differs between the bus

forum and the polling place.  There is a great deal of difference between a city bus and a polling

place on Election Day.  For one, among many other distinctions, the deliberative decision-

making process of advertising personnel at a transit authority is nothing like the rapid-fire

decisions that the regulation in *Mansky* required of election judges in real time as voters enter a

polling place garbed in attire imprinted with possible political content.  *See Mansky*, 138 S. Ct. at

1889-90.  The Court was especially concerned with the State's fluid interpretation of the

Minnesota statute that construed the term *political* to include messages that might influence

voting on a panoply of issues raised in each election contest being decided, requiring election

judges to maintain and apply a mental index of the platforms and positions of what could be a large number of election protagonists. *Id.* These issues are unique to the polling place forum under consideration in *Mansky* and have no counterpart in the dispute before this court involving the unique forum afforded by buses.[7]

Because SEPTA's Advertising Standards have been in effect several years, it is relevant whether SEPTA has been able to reasonably apply the standards to the thousands of ad proposals that were submitted to it. *See AFDI v. WMATA,* 2018 WL 4000492 at *12. CIR's team of experienced counsel and its staff of investigative reporters have had free rein to sift through SEPTA's ad files and to point to any instances of arbitrary or inconsistent applications of the standards. Other than the handful of painfully-construed ads listed in CIR's Memorandum, it was unable to come up with examples that meet this standard.

The five advertisers whose ads were rejected as political—CIR, XQ, Meek Mill, Planned Parenthood, and Bethany Christian Services—all sought governmental or judicial changes. The comparator ads offered up by CIR did not: ads for women's medical services, educational institutions and banks, for instance, were altogether different and simply tried to sell services. Thus, in practice SEPTA's Advertising Standards prove capable of reasoned application because they articulate "a sensible basis for what may come in and what must stay out" and do not create "so many marginal cases that it cannot be fairly administered." *Archdiocese*, 897 F.3d at 330.

---

[7] *See Bryant v. Gates*, 562 F.3d 888, 894 (D.C. Cir. 2008) (citing *Am. Commc'ns Ass'n v. Douds*, 39 U.S. 382, 412 (1950)) (in assessing whether a term is vague, the "particular context is all important").

**C.      SEPTA Has Reasonably Applied the Advertising Standards.**

CIR is quick to second guess SEPTA's judgments in accepting and rejecting ads, but in doing so gives short shrift to the latitude afforded SEPTA in these circumstances.  The government's action when acting in a proprietary capacity:

> is valid in these circumstances unless it is unreasonable, or, as was said in *Lehman*, 'arbitrary, capricious, or invidious.'

*Kokinda*, 497 U.S. at 725-26.  In applying that liberal standard, courts have taken account of the real-world environment in which transit authorities operate.  When construing any advertising restrictions there will, of necessity, be an element of discretion and on the margins there may be difficult decisions.  *See SMART*, 698 F.3d at 893; *Northeastern Pa. Freethought Soc'y*, 2018 WL 3344910, at *13.  But selectivity and discretionary access are defining characteristics of nonpublic fora.  *See Ridley*, 390 F.3d at 95.  Thus, the government's decisions to restrict access to a nonpublic forum "need only be reasonable; it need not be the most reasonable or the only reasonable limitation."  *Cornelius*, 473 U.S. at 808; *see also AFDI v. MBTA*, 781 F.3d at 581 (the fact that a transit system runs some controversial ads does not mean that its advertising program becomes a designated public forum); *SMART*, 698 F.3d at 893 (that a transit authority may at times make an incorrect determination in a close case does not invalidate the exclusion of political ads).  SEPTA operated well within the latitude afforded by the courts in making these decisions.

These generous standards do not guide CIR's commentary on SEPTA's application of its Advertising Standards.  Instead, borrowing from the playbook unsuccessfully used by CIR's ACLU co-counsel in trying to open the forums of other transit authorities (*see, e.g.*, *Archdiocese*, 281 F. Supp.3d at 108-12; *ACLU Found.*, 303 F. Supp. at 21-27), CIR takes a microscope to the several thousand advertising decisions made by SEPTA under its amended Advertising

Standards in an effort to show that perhaps a few of them suggest inconsistent application of SEPTA's Advertising Standards.  In fact, SEPTA operated well within its zone of permissible discretion as an examination of CIR's critique makes clear.

### 1.    Accepting Public Service Ads Is Reasonable.

SEPTA accepted ads from government agencies that made the public aware of services and benefits available or communicated public health messages.  Mem. 28-30.  These ads involve enrollment in the Affordable Care Act (Ex. 42), vaccinations (Ex. 43),[8] lead paint (Ex. 44), a Department of Labor Help Line (Ex. 45), littering (Ex. 49), surrender options for criminal offenders (Ex. 47), availability of a product to prevent drug overdoses (Ex. 50),[9] and work-break regulations (Ex. 46).  These cannot propyl be found to create a public forum for at least three reasons.  First, the courts have generally allowed transit authorities to display public service ads without jeopardizing their nonpublic status.  *See Lehman*, 418 U.S. at 300-01, 304

---

[8] The measles vaccine ad SEPTA accepted (Ex. 43) referred to the vaccine as a powerful defense against measles; it did not address safety though it referenced the CDC website that describes side effects.  The debate, if it is that, is not over the data and it is not over whether the vaccine works, the subject matter if the ad.  *See* Declaration of Maryellen Madden dated August 31, 2018 ("Madden Decl."), at Ex. A (Aaron E. Carroll, *Not Up for Debate: The Science Behind* Vaccination, N.Y. Times, Sep 17, 2015, https://www.nytimes.com/2015/09/18/upshot/not-up-for-debate-the-science-behind-vaccination.html).

[9] The ad touted the efficacy of Narcan in saving lives from drug overdoses.  Mr. Benedetti testified that the controversy over the drug was "outdated" and that the product was widely endorsed.  Benedetti Dep. 252:18-253:5.  There is good basis for Mr. Benedetti's conclusion.  A bipartisan effort in the Pennsylvania legislature produced Act 139, which facilitates the use of Narcan with provisions for Good Samaritan protections, conferral of immunities and intergovernmental cooperation.  Madden Decl. Ex. B (Network for Public Health Law, Act 139 Fact Sheet, https://www.networkforphl.org/_asset/9r6xcz/PA-overdose-prevention.pdf.)  The product has universal approval from major health organizations.  *See* Madden Decl. Ex. C (Jared S Hopkins, *Trump Gives Surprise Plug to Opioid Overdose Antidote Company*, Bloomberg Business, March 20, 2018) (Presidential Com. on Opioids, CDC).  CIR points to a newspaper article that in an op-ed piece criticizes the concept of Safe Injection Sites (Ex. 84), a different issue.  The article mentions Narcan only once.  Despite CIR's use of quotations, what the author finds "misguided" are the safe injection sites, not Narcan.  SEPTA's position was clearly reasonable.

(transit system accepted commercial advertising, advertising from churches, and advertising from "civic and public-service oriented groups," but not "political or public issue advertising"); *Archdiocese*, 897 F.3d at 318 (following *Lehman*); *SMART*, 698 F.3d at 892-93 ("it was generally permissible . . . for SMART to permit commercial and public service ads, but to turn down political ads"); *AFDI v. MTA*, 109 F. Supp.3d at 632-33 (citing cases). This Court should follow suit and decline to equate public service ads with an open, public forum.

Second, the several public service submitted by government agencies are consistent with SEPTA's Advertising Standards. None of those public service ads addresses the types of issues ads SEPTA prohibits, much less advocate a strong viewpoint on such issues. Nor do the public services ads seek any changes in public programs or policies. Rather, they address services and programs afforded by government entities under existing law. For instance, the Philadelphia Department of Labor ad (Ex. 45), regarding the "employee or contactor" distinction, merely offers the agency's assistance in determining a worker's status. It does not address either the virtues or consequences of the distinction itself, or take any position on the propriety of the existing rules or suggest any alternative. For this reason too, the public service ads do not open a public forum on SEPTA buses.

Third, although the public service ads here are consistent with SEPTA's Advertising Standards and for that reason alone are reasonable, these ads also bear another characteristic that makes them unique: they are placed by government entities and constitute government speech. As government speech, the ads enjoy a different status than private speech—

> When the government speaks "different principles" apply than those involving government regulation of private speech. *Rosenberger v. Rector and Visitors of University of Virginia*, 515 U.S. 819, 834 (1995). When the government "is the speaker or when it enlists private entities to convey its own message" it is entitled to make "content-based choices," *id.* at 833, and may

discriminate based on viewpoint.  *Planned Parenthood of South Carolina Inc. v. Rose*, 361 F.3d 786, 792 (4th Cir. 2004).

*Pittsburgh League Voters Educ. Fund v. Port Auth. of Allegheny Cnty. (PAAC)*, Civ. No. 06-1064, 2008 WL 4965855, at *6 (W.D. Pa. Aug. 14, 2008).  "When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says," *Walker v. Texas*, 135 S. Ct. 2239, 2245 (2015), and "government statements (and government actions and programs that take the form of speech) do not normally trigger the First Amendment rules designed to protect the marketplace of ideas."  *Id.* (citations omitted).  The government "may exercise [its] freedom to express its views" even "when it receives assistance from private sources for the purpose of delivering a government-controlled message." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 468 (2009).  Under these principles, courts have held speech in government controlled fora exempt from the typical public forum analysis where an observer could form a "reasonable interpretation" that the speech in question was meant to "convey[] a government message." *Walker*, 135 S. Ct. at 2251.  Thus, even if the public service ads amounted to the kind of political or public issue ads barred in SEPTA's Advertising Standards—and, again, they do not—the public service ads still cannot fairly be used as comparator ads for purposes of determining whether SEPTA consistently applied its Advertising Standards.  Instead, insofar as the public service ads could reasonable be interpreted as conveying a government message, those ads are immune from the typical forum analysis, as explained in *Walker. See also Pittsburgh League Voters Educ. Fund*, 2008 WL 4965855, at *6 ("use of the [government speech] doctrine is reasonable in" the transit context).

### 2. Accepting Ads Welcoming the DNC to Philadelphia Was Reasonable.

SEPTA accepted a number of ads welcoming conventioneers to Philadelphia.  It was reasonable for SEPTA to treat those ads as it would ads that welcomed conventioneers for any

other convention.  CIR does not fairly report SEPTA's position as to these ads, however.  It reports, for instance, that SEPTA "conceded" the Convention was political in nature.  Mem. 27.  Of course it was.  But CIR fails to mention that when he was shown one of the ads, Mr. Benedetti testified "I don't think this is a political ad" and that SEPTA accepted these ads because it viewed them as welcoming visitors to Philadelphia.  Benedetti Dep. 173:24-174:2.[10]

       Mr. Benedetti's response echoes the sentiments of advertisers at other political conventions where they are considered to be reflective of civic pride, not political advocacy.  *See*, *e.g.*, Madden Decl. Ex. D (Twist Creative, *Cleveland Agency, Twist, Builds an Open Source System of Visuals and Content to Welcome RNC Visitors and Leverages Partnerships to Promote the Personality and Pride of Clevelanders*, July 8, 2016, https://twist-creative.com/agency-content-strategy-to-welcome-rnc-visitors/) (Cleveland advertiser explaining similar ads for the RNC held there and deeming them nonpartisan).  The fact that the DNC ads touch on politics or a political issue does not erase their nonpolitical purpose and render them political in nature.  *See Vaguely Qualified Productions LLC v. Metropolitan Transp. Auth.*, No. 15 Civ. 04952, 2015 WL 5916699 at *9-*10 (S.D.N.Y. Oct. 7, 2015), *app. dismissed*, (2d Cir. Feb 18, 2016).  Like at any other convention, the host community wants conventioneers to spend money, not engage in politics. *See, e.g.*, Philadelphia Magazine's advice to DNC attendees:

> The actual convention is hardly the most exciting thing happening in town.  So whether you're here for her or here to drink, there's an event, festival or shindig for you.

Madden Decl. Ex. E (Ashley Primis, *DNC Guide: The Parties and Events*, Philadelphia Magazine, July 23, 2016, https://www.phillymag.com/citified/2016/07/23/dnc-guide-the-parties-

---

[10] Mr. Benedetti did not testify that he would have to research whether the nomination of Hillary Clinton was a matter of public debate.  Mem. 28.  The question he was asked was the academic query whether the "historic issue" of her being the first woman nominee for President was a debated issue.  Benedetti Dep. 178:4-11.

and-events/).  The ads were accepted in light of that commonsense objective.  The DNC ads are therefore insufficient to show that SEPTA intended to open the forum or that it acted unreasonably.

### 3.    Accepting a Legal Help Line Ad Was Reasonable.

CIR contends that an advertisement placed by Philadelphia Fight (Ex. 51), an AIDS service organization, listing among many topics a legal help line for people who may be victims of mass incarceration is either classified as a political or an issue ad.  *See* Mem. 29.  CIR's reasoning is not set forth.  The ad is no different than an ad by a criminal defense attorney and it neither addresses nor argues for any change in law or policies.  SEPTA would have had no basis for rejecting this ad.

### 4.    Accepting the Other Ads CIR Identifies Was Reasonable.

SEPTA accepted a few other ads that CIR concludes are inconsistent with SEPTA's standards but for which it does no more than describe the ads without explaining why the ads are in conflict with the standards.  Mem. 30-31.  One such ad by Fusion include imagery of flags and ethnicity.  The Copy Receipts that evidence the Fusion ads (*see* Ex. 34) make clear that these ads were for Suburban Station, not buses, so they are not relevant to the issue before the court.  Nevertheless, CIR does not speculate what political message or issue of public debate it believes to be implicit in the ads which don't even contain a complete sentence of ad content.  Fusion's obvious intention is to sell television programming and the fact that to do so it may include imagery that touches on a political issue does not convert the ad into a political ad.  *See Vaguely Qualified Productions*, 2015 WL 5916699, at *9-*10.

CIR's discussion of the American Friends Service Committee ad (Ex. 33) is similar.  CIR does no more than describe the ad which contains an amorphous call for people to get involved in bringing about peace but references no policies, programs or actions for doing so.  As such,

the ad is not fairly classified as either political or a participant in any issue debate. It would not be possible to define those issues other than by speculation. CIR does no better, and perhaps worse, with the Facebook ad (Ex. 88), which contains short, unexplained phrases such as "Fake news is not your friend," generally disassociating Facebook from such abuses. CIR neither explains the cryptic ads nor ties them to any prohibition in SEPTA's Advertising Standards. Advertisements that no more than tout a company's own products are not deemed political even if there may be collateral debates about the product. *See ACLU Found*, 303 F. Supp.3d at 26.

### D. The Advertising Standards Are Viewpoint Neutral.

There is no evidence that SEPTA has engaged in viewpoint discrimination. Although CIR accuses SEPTA of viewpoint bias, CIR never attributes a particular point of view to SEPTA. CIR does label SEPTA "paternalistic" (Mem. 35), but that is the role the Supreme Court in *Lehman* vested in it in order to protect its passengers. In general, SEPTA has silenced the entire debate on the mortgage redlining dispute CIR wanted to address, not just the position CIR espouses. *See id.* at 632. "The essence of viewpoint discrimination is not that the government incidentally prevents certain viewpoints from being heard in the course of suppressing certain general topics of speech, rather, it is a governmental intent to intervene in a way that prefers one particular viewpoint in speech over other perspectives on the same topic." *AFDI v. MBTA*, 781 F.3d at 586.

CIR cannot possibly show viewpoint discrimination here. Most obviously, nothing about SEPTA's Advertising Standards or their adoption (3 years before CIR's articulated any viewpoint on the subject of the CIR Ad at issue) suggests SEPTA imposed those restrictions merely to preclude ads accusing banks of disparate or discriminatory lending. On the contrary, where a government prohibits broad categories of speech such as issue oriented ads rather than tailoring the prohibition to a particular speaker that "strongly suggests it was not discriminating

against the views of [the speaker]." *AFDI v. WMATA*, No. 17-7059, 2018 WL 4000492, at *7

(D.C. Cir. Aug. 17, 2018). Here, the restrictions are much broader than CIR's viewpoint, which

SEPTA has no special or invidious desire to exclude.

Second, CIR contends that SEPTA has discriminated against CIR's viewpoint by

allowing individual banks to advertise their services, and therefore, according to CIR, allowing

the banks to weigh-in on the issue of discriminatory lending while denying CIR the same

opportunity. But this argument plainly fails, since nothing in any of the sample bank ads CIR

refers to—most of which come from small community banks—stakes out a position contrary (or

even remotely related) to CIR comic strip accusing the banking industry of systematically

disadvantaging minorities, as even a cursory review of the identified bank ads makes clear. For

instance, those ads include the following images:



Ex. 35



Ex. 36.



Ex. 37.



Ex. 38.

CIR's argument imputes to these innocuous bank ads volumes more than they actually say. Just because an advertisement mentions a lenders' loan services does not mean that the ad addresses discriminatory lending the issues raised by the CIR investigation. *See Archdiocese*, 281 F. Supp.3d at 94-95 (debate about a product is irrelevant where an advertisement of the product does not take a position in the debate).[11] The bank ads do not acknowledge any debate on discriminatory lending, they do not present any data, and they do not address the loan applications and dispositions by race, neighborhood or on any other basis. In fact, all of these ads look forward, not back. The ads are designed to foster future borrowing; they do not address past lending practices.

In an effort to link ads that say nothing about discriminatory lending to CIR's ad which says little else, CIR points to the inclusion in the ads of the phrase "Equal Opportunity Lender"

---

[11] Likewise, ads for medical services are not issue ads because they simply tout a service. The rejection of a single ad for healing prayer (Mem. 36) is different because it advocates others join in the endeavor.

or similar verbiage.  Mem. 33.  But this language is a required display under the Federal Housing Act so that borrowers understand that it is illegal for mortgage lenders to discriminate against them on the basis of race, color, religion, national origin, sex or marital status.  12 C.F.R. §§ 338.1, 338.3.  It is not a statement of position by the advertiser.  Nor does the nondiscriminatory inclusion of people of color in the ads make an argument about the lending practices of the advertiser,[12] though it does suggest that the Bank is soliciting minority loan applicants.  Inasmuch as CIR's White Paper, though not its ad, cautioned that not all banks discriminate, Ex. 4 at CIR0000229, it makes sense that some lenders would seek minority applicants more aggressively than others.  The "debate" which CIR's ad addresses is based on aggregate data; it is not about any particular lender.

If CIR's association of the above ads with the debate over discriminatory lending requires a leap of logic, its contention that the "Wells Fargo" ad (Ex. 39) impacts that debate must span a chasm.  Mem. 34.  The ad touts the Lift Program, a collaboration between Wells Fargo, the Wells Fargo Foundation and NeighborWorks America, a community housing nonprofit, that provides down-payment assistance to qualifying borrowers.  Under the Lift Program, Wells Fargo need not be the lender, and the Lift Program ad offers no information as to the numbers or percentages of assistance packages given to minority or white applicants.  CIR's contention is that by publicizing its participation in a program to give away money to low-income borrowers

---

[12] There is no evidence to support CIR's suggestion that the banks advertisers use minority faces in their ads to promote "the message that financial institutions do not discriminate."  Mem. 33.  The only evidence is that the advertisers are trying to boost borrowings from their own institutions, not attempting to improve perceptions of the equal lending status of the banking industry.

($290 million so far, Ex. 40), Wells Fargo somehow addresses the debate on disparate lending laid out in the CIR Ad. That makes no sense.[13]

In perhaps an even less plausible attack, CIR also argues that SEPTA engaged in viewpoint discrimination by rejecting ads from both Planned Parenthood and Bethany Christian Services, antagonists on opposite sides of the abortion debate. Both sides are denied access to the forum. Courts have recognized that in a nonpublic forum government does not have to allow a debate on family planning, whether it is specific to abortion or not. *See Planned Parenthood of Southern Nevada, Inc. v. Clark County School Dist.*, 941 F.2d 817, 829-30 (9th Cir. 1991) (policy of avoiding the heated debate on these issues deemed reasonable).[14] The Planned Parenthood ads refer to women's health services generally and to birth control. Upon navigating to Planned Parenthood's website, www.plannedprenthood.org, to find out what those services are, a reader is immediately confronted by a large banner reading "Protect Abortion at the Supreme Court":

---

[13] In a footnote, CIR contends Wells Fargo is being afforded a chance to address reverse redlining allegations in pending class action litigation while CIR is not. Mem. 34 n.20. Of course, Well Fargo's ad says nothing about the litigation or redlining. It is also notable, however, that the class action lawsuit CIR mentions is actually the reverse of the CIR reporting presented in the CIR Ad. CIR contends minorities are denied loans disproportionally. The suit against Wells Fargo is the opposite: alleging too many loans were made to minorities resulting in foreclosures. *Compare* Ex. 7 at Panel 4 (listing minority groups "more likely to be denied a conventional home loan") *with* Madden Decl. Ex. F (Complaint in *City of Philadelphia v Wells Fargo & Co.*, Civ. No. 17-02203 (E.D. Pa. 2017)), at ¶ 7 ("In the late 1990s, Wells Fargo adapted to changing market conditions and began to flood historically underserved minority communities with mortgage loans . . . .").

[14] The advertisement at issue in *Clark* was much like the ad SEPTA rejected, touting Planned Parenthood's services in women's health and birth control. *Compare* Ex. 61 with *id.* at n.2.



*See* Madden Decl. Ex. G (Screenshots from [www.plannedprenthood.org](http://www.plannedprenthood.org). visited August 31, 2018, at homepage.)  This is the rare instance where the advertiser is "so closely connected to their political views and advocacy that any mention or feature of the advertiser inserted a political dimension into the advertisement."  *ACLU Found.*, 303 F. Supp. at 19.  SEPTA therefore reasonably construed the ad to take a position on a matter of public debate.

SEPTA also rejected an advertisement of Bethany Christian Services (Ex. 55) following the same reasoning.  Benedetti Dep. 263-264:24.  Bethany has been labeled "a well-connected powerhouse of the anti-choice movement."  Madden Decl. Ex. H (Amy Littlefield & Tina Vasquez, *Bethany Christian Services Is Fostering Migrant Kids. It Also Has a History of Coercive Adoptions*, Rewire News, June 27, 2018, [https://rewire.news/article/2018/06/27/christian-group-fostering-migrant-kids-history-coercive-adoptions/](https://rewire.news/article/2018/06/27/christian-group-fostering-migrant-kids-history-coercive-adoptions/)).  SEPTA's treatment of these ads was well within the reasonable exercise of its discretion.

At the end of Mr. Benedetti's day-long deposition, CIR inquired about the XQ Superschool ad (Ex. 65), and Mr. Benedetti stated that, while he did not recall the details, he did remember that he researched the ad—which refers readers to XQ's website—and talked with its

representatives, and ultimately discerned that the ad was intended to advance positions that were pro school choice and anti-public education. Benedetti Dep. 285:22-286:16. On its website, XQ calls itself a "movement" and encourages adherents to run for school board positions. XQ even supplies "how to" kits to persons willing to run for office. *See* https://xqsuperschool.org/. It is difficult not to call this political issue advocacy, and this content is plainly very different from the other education ads SEPTA accepted, as for example, ads for individual schools and universities, and other educational programs and college financing. *See* Mem. 37 & n.22. Indeed, the Washington Post has reported that XQ describes its mission as to "disrupt" the American high school and redesign it.[15] Regardless of any merit the programs of XQ may have, this ad, like the others, was properly rejected.

### E. CIR Lacks Standing to Challenge the Advertising Standards as Applied to Other Ads.

CIR contends that SEPTA's Advertising Standards are unconstitutionally vague. Compl. ¶ 48; Mem. 24-27. A constitutionality challenge based on vagueness is different than a challenge for over-breadth. In order to challenge for vagueness, CIR must demonstrate that the Advertising Standards are vague as to it. *See NAACP v. City of Philadelphia*, 39 F. Supp.3d 611, 616 (E.D. Pa. 2014) ("the litigant must demonstrate that the statute under attack is vague as applied to his own conduct, regardless of its potentially vague application to others").

> In asserting claims of unconstitutional overbreadth, a litigant whose speech or conduct may not itself be constitutionally protected may assert the rights of hypothetical third parties whose protected activities might be chilled by the statute. When raising a claim of unconstitutional vagueness, however, the rule is otherwise. In the latter instance, the litigant must demonstrate that

---

[15]Madden Decl. Ex. I (Valerie Strauss, The false narrative behind a glitzy live television show about school reform, The Washington Post, Sep. 7, 2017, https://www.washingtonpost.com/news/answer-sheet/wp/2017/09/07/the-false-narrative-behind-a-glitzy-live-television-show-about-school-reform/?utm_term=.a64d61774711).

> the statute under attack is vague as applied to his own conduct, regardless of its potentially vague application to others.  Thus, when a litigant's conduct clearly falls within the permissible purview of a statute, such an individual lacks standing to challenge the statute for vagueness, even though the statute may well be vague as applied to others.

*Aiello v. Wilmington*, 623 F.2d 845, 850 (3d Cir. 1980).  This Court should not, therefore engage in mini-trials as to whether SEPTA's Advertising Standards were reasonably applied in rejecting the proposals of other applicants; the focus must be on the CIR proposal and whether the standards are vague as to it.

### F.       The Advertising Standards Clearly Prohibit the CIR Ad.

It required little if any discretion to conclude that SEPTA's Advertising Standards prohibited the CIR Ad.  The version of CIR's Ad that CIR proposed to SEPTA was clearly prohibited by both Standard 9.b.(iv)(a) and Standard 9.b.(iv)(b) of SEPTA's Amended Advertising Standards.  Thus, Intersection advised CIR of the prohibition the same day it applied.  *See* Ex. 19.  A review of the Ad and the circumstances of its submission makes clear why the Ad transgressed those Standards.

### 1.       Standard 9.b.(iv)(a) Clearly Prohibits the CIR Ad, Which Even CIR Admits Is "Political."

The Court should have no difficulty determining that the CIR Ad is "political in nature," and therefore that the Ad is barred by Standard 9.b.(iv)(a) of SEPTA's Advertising Standards. CIR admitted the Ad addressed political issues in CIR General Counsel Victoria Baranetsky's March 2, 2018 letter to John Roche, an employee with Intersection, SEPTA's advertising contractor.  In that letter, CIR emphasized the political nature of its ad in an effort to invoke the First Amendment's protections, stating, "first and foremost," that "it is indisputable that *CIR's animation including facts and statistics **on a political issue** is protected speech . . . ."  Ex. 16 at SEPTA_000286 (emphasis added).

CIR has never denied, explained, or contradicted this concession. Nevertheless, Ms. Baranetsky concluded that the Standards 9.b.(iv)(a) and 9.b.(iv)(b) did not apply to CIR, based on a case in which a bar on political ads was deemed inapplicable to an ad containing political satire. *Id.* at 186. Here, SEPTA agrees that it is "indisputable" that the CIR Ad addresses political issues, and that it is not political satire. Thus, the Ad is clearly "political in nature" and therefore prohibited under Advertising Standard 9.b.(iv)(a).[16]

### 2. Standard 9.b.(iv)(b) Prohibits the CIR Ad as a Matter of Common Sense.

The content of the proposed CIR Ad compels the conclusion that the Ad runs afoul of Standard 9.b.(iv)(b) because the Ad plainly expresses and advocates "an opinion, position or viewpoint on matters of public debate about economic, political . . . or social issues."

### a. The Ad Addresses a Matter of Public Debate.

SEPTA's rejection of CIR's Ad was the result of a studied examination of the issues raised in the Ad. Mr. Benedetti's examination revealed that the issues raised by the Ad were a subject of widespread public debate. Mr. Benedetti reviewed numerous articles on the topic, a public rebuttal of CIR's report by the American Bankers Association, and lawsuits on redlining sufficient to demonstrate that a public debate was in process. Benedetti Dep. 12:2-13:14. There was not just one article as CIR erroneously suggests. Mem. 32. The internet evidences a vigorous debate on the topics raised in CIR's Ad.

---

[16] Although CIR contends SEPTA's Advertising Standards are vague, it has no difficulty construing them. In paragraph 4 of its Complaint, CIR predicts that because of the way in which it conducts its business, CIR anticipates that future ads it will want to place with SEPTA "are likely to be deemed by SEPTA to be "political" and to touch on matters of "public debate." Such allegations wage war on CIR's claim that the Advertising Standards are so vague as to provide no basis for clear and consistent application. Compl. ¶ 48; Mem. 17-18. The Advertising Standards are so clear that CIR is comfortable predicting their application.

Two academic researchers, for instance, reported the existence of "considerable literature, which [was] far too extensive to explore," as to just a single investigational report of disparate mortgage lending, as well as "numerous" class action and regulatory proceedings. Madden Dec. Ex. J (M.J. Courchanea and S.L. Ross, *Evidence and Actions on Mortgage Market Disparities: Research, Fair Lending Enforcement and Consumer Protection*, Working papers 2018-14, U. Conn. Dep't Economics, Aug. 2018, https://econresearch.uchicago.edu/ sites/econresearch.uchicago.edu/files/Courchane_Ross_2018_evidence-actions-mortgage-market.pdf), at 3, 13. *See also* Madden Decl. Ex. K (American Bankers Association, *Fair Lending Fighting Illegal Discrimination: Promoting Growth for the Whole Community*, April 2017, https://www.aba.com/Compliance/Documents/FairLendingWhitePaper2017Apr.pdf ) (addressing claims of disparate lending and redlining); Madden Decl. Ex. L (N.Y. Times, *The Race-Based Mortgage Penalty*, March 7, 2018) (editorializing CIR's report); *see also* Ex. 5 (Fed Notes paper addressing discriminatory lending).

It is, therefore, not debatable that the CIR Ad addresses a matter of public debate, on economic and other issues.

> **b.** **The Ad Uses Adversarial Rhetoric that Advocates an Opinion, Position, or Viewpoint.**

The CIR Ad is very much a position paper advocating a point of view on the issues it addresses and therefore falls within the proscription in Standard 9.b.(iv)(b). Its use of adversarial rhetoric, inflammatory images and biased factual reporting is conclusive evidence of its advocacy. Using examples drawn from the numbered panels of the CIR Ad (Ex. 7), it is clear from CIR's choice of words that it is being an advocate, not a dispassionate dispenser of facts.

- The title of the Ad, displayed in Panel 1, is "**A Stacked Deck**" in large, bold type. That phrase means *to cheat or to fix something so a desired outcome is achieved*.  *See* www.yourdictionary.com/stack-the-deck.  This phrase is repeated in Panel 10.

- Panel 6 uses the word "Sordid" in large type to describe historical lending practices in minority communities.  Merriam-Webster defines sordid as marked by baseness or grossness: dirty, filthy, wretched, squalid.  Large or bold type is used in many panels of the CIR Ad for emphasis.  *See, e.g.*, Ex. 7 (Panels 2-4).

c.        **The Ad Uses Inflammatory Images that Express an Opinion, Position, or Viewpoint.**

CIR was not content to let the data speak for itself.  The Ad plays to race stereotypes to sway readers.  Images in the Ad appear to portray people of color as victims of white bankers although the race of potentially culpable individuals at lending institutions was not part of CIR's investigation.

- Panel 9 depicts a white hand offering to a black hand a set of keys attached to a stick of dynamite with a lit fuse.  In its editorial process, CIR manipulated the comic artwork of its Ad to make the explosive device clearer.  *See* Ex. 7.

- Panel 7 appears to depict black protesters in the background and a white businessman in the foreground beneath a description of discriminatory lending practices.

Both Panels were omitted from the revised Ad.  In their place is a depiction either of a house falling on a black male or him falling out of the house with an accompanying a narrative asserting that people of color were disproportionately victims of subprime lending practices.  The new panel still appeals to prejudice rather than logic.  For example, Panel 10 in both versions of the Ad appears to depict a white banker denying a loan to a person of color.

### d. The Ad Is Biased.

CIR seeks to publish the results of its investigation in the CIR Ad notwithstanding its concession that the data it reports is not reliable.

- The Ad reports that as part of the "stacked deck" against minority loan applicants, minorities were much more likely to be turned down for mortgage loans than white borrowers although CIR knew that the results of its regression analysis of its data source was flawed and misleading in that it did not account for important explanatory variables such as credit scores and debt to income ratios. *See* Ex. 4, CIR Whitepaper, at CIR000231 ("as important these two data points are, we couldn't control for them"); Baranetsky Dep. at 27:9-10 ("We understood credit scores to be an important data point"). CIR opted not to mention the omission of this important data in its one-sided Ad, although it admits that "it was important to highlight that lack of access in our reporting." Baranetsky Dep. 31:13-20. The CIR Ad made no mention of contrary data and CIR purported to be unfamiliar with important publicly available findings of the Federal Reserve Bank attributing the decline in mortgage lending to minority borrowers to a general reduction in lending to borrowers with low credit scores, "regardless of race or ethnicity." *See* Ex. 5 (Bhutta and Ringo, "Credit Availability and the Decline in Mortgage Lending to Minorities after the Housing Boom," FEDS Notes: Board of Governors of the Federal Reserve System, September 29, 2016), at 1, 5; Baranetsky Dep. 28:3-20, 30:20-24 (conceding the Fed might be a logical place to look for data).

- Although CIR's study investigated mortgage rejections only for a period immediately preceding the proposal to SEPTA, half of the panels, Panels 6-10, of CIR's Ad suggests that

current lending practices are a continuation of discriminatory lending practices[17] of the past such as flooding minority communities with inferior and subprime loan products. This broadside against the banking industry appears designed to make a weak case of mortgage redlining more credible by "poisoning the well" as to the banking industry in general. CIR's deposition witness could not describe what inferior loan products were referred to in the Ad and there is no evidence that any lenders guilty of these past abuses are among lenders that CIR contends are engaging in mortgage redlining today. Baranetsky Dep. 90:23-92:18.

Because it uses an array of rhetorical devices to persuade its audience, the Ad can fairly be called a position paper because "[l]ike a debate . . . [it] presents one side of an arguable opinion about an issue. The goal of a position paper is to convince the audience that your opinion is valid and defensible." *See* San Francisco Univ. Instructional Materials on Writing, https://www.sfu.ca/cmns/130d1/WritingaPositionPaper.htm. The adversarial nature of CIR's presentation is powerful evidence it was intended to weigh-in on one side of a public issue and that the Ad was correctly rejected on that basis.

### G. CIR Suffered No Injury Because Alterative Forums Are Available to CIR and Its Ad Remains Purely Hypothetical.

CIR's claim is based on SEPTA's rejection of a proposed advertisement it was still developing. While negotiating with SEPTA, CIR reached agreement with the operators of other advertising venues to place the CIR Ad on their structures (bus shelters and newsstands). (Compl. ¶ 40.) CIR cannot show that these alternative fora are inadequate in light of its

---

[17] CIR chides SEPTA for conflating disparate lending and discriminatory lending. Mem. 1 n.2 ("CIR describes its report as dealing with the topic of racially 'disparate' lending"). But CIR appears to use these words interchangeably as well. For example, the title of its Ad is "A Stacked Deck: A visual look at *discriminatory* lending in the US." Mem. 14 (emphasis added). *See also* Ex. 19 (Panels 7 & 8), Ex. 13 ("Reach Black and Latino folks . . . so they become aware . . . how lending institutions use numbers to discriminate/awareness that discrimination exists in your neighborhood.").

admissions that it had not determined what bus routes it desired, the number of buses involved or

how much money it had to spend. It would be difficult enough for CIR to prove damages even if

an alternative forum were not available in light of the preliminary nature of the claim it asserts.

CIR has the burden of making a clear showing of immediate irreparable injury. *URL Pharma,*

*Inc. v. Reckitt Benckiser, Inc.*, Civ. No. 15-0505, 2016 WL 1592695, at *8 (E.D. Pa. April 20,

2016). Given the existence of alternative fora cannot be more than conjecture whether SEPTA's

rejection prejudiced CIR at all.

> [T]he district court's denial of a preliminary injunction constrains
> Plaintiffs' speech in only a small way: They cannot express their
> message on the sides of Metro's buses while this case is pending.
> Nothing in the district court's denial of a preliminary injunction
> prevents Plaintiffs from displaying the same ad in many alternative
> fora, for example, on Seattle billboards, in Seattle newspapers, on
> Seattle television stations, on Seattle buses run by companies other
> than Metro, or in many venues in other cities. The availability of
> alternative fora for Plaintiffs' speech weighs against the issuance
> of a preliminary injunction.

*AFDI v. King Cnty.*, 796 F. 3d at 1173; *see also Hodge v. Talkin*, 799 F.3d 1145, 1169 (D.C. Cir.

2015) ("'other available avenues for the . . . exercise [of] First Amendment rights lessen the

burden' of a restriction in a nonpublic forum") (quoting *Christian Legal Soc. Chapter of the*

*Univ. of California*, 561 U.S. at 690).

## CONCLUSION

For the reasons set forth above and for those and other reasons to be presented by SEPTA

during the preliminary injunction hearing, SEPTA respectfully requests that CIR's motion for a

preliminary injunction be denied with prejudice.

Respectfully submitted,

Dated:  September 4, 2018

*/s/ Maryellen Madden*
Maryellen Madden (Pa. ID No. 15855)
John J. Powell (Pa. ID No. 312589)
MONTGOMERY MCCRACKEN WALKER &
    RHOADS LLP
1735 Market Street
Philadelphia, Pennsylvania  19103
Tel:  (215) 772-1500
Fax:  (215) 731-3742
mmadden@mmwr.com
jpowell@mmwr.com

*Attorneys for Southeastern Pennsylvania*
*Transportation Authority*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on September 4, 2018, true and correct copies of the foregoing document were served upon the individuals listed below via electronic mail:

John S. Stapleton, Esq.
Dylan J. Steinberg, Esq.
Rebecca S. Melley, Esq.
HANGLEY ARONCHICK SEGAL
    PUDLIN & SCHILLER PC
One Logan Square, 27th Floor
Philadelphia, PA  19103-6933
jzs@hangley.com
djs@hangley.com
rls@hangley.com

Brian Hauss, Esq.
Jacob Hutt, Esq.
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION
125 Broad Street, 18th Floor
New York NY  10004
bhauss@aclu.org
jhutt@aclu.org

Mary Catherine Roper, Esq.
Molly Tack-Hooper, Esq.
ACLU OF PENNSYLVANIA
PO Box 60173
Philadelphia, PA  19102
mroper@aclupa.org
mtack-hooper@aclupa.org

*Attorneys for The Center for Investigative Reporting*

*/s/ John J. Powell*
John J. Powell