# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE CENTER FOR INVESTIGATIVE REPORTING, | : : : : |
| Plaintiff, | : : CIVIL ACTION : |
| v. | : : |
| SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY, | : : NO. 18-cv-01839-MMB : |
| Defendant. | : : : |

## REPLY MEMORANDUM IN SUPPORT OF THE CENTER FOR INVESTIGATIVE REPORTING'S MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

I.     INTRODUCTION ..................................................................................................1

II.    ARGUMENT .......................................................................................................1

    A.    SEPTA's Non-Justiciability Defense Is Meritless. .................................1

    B.    SEPTA's Allowance of "Political" and "Public Debate" Content  Both In and Around Its Advertising Spaces Cannot Be Ignored. ........................2

    C.    CIR Is Likely to Succeed on the Merits Because SEPTA Cannot Meet Its Burden of Demonstrating the Constitutionality of the Challenged Provisions. ..................................................................................................3

        1.    SEPTA Misstates the Law in a Futile Attempt to Escape *Mansky*. .............3

        2.    SEPTA's Allowance of "Political" and "Public Debate" Ads Matters. ...............................................................................................8

        3.    The Challenged Provisions Mask Viewpoint Discrimination. ..................10

        4.    The Challenged Provisions Are Not Reasonably  Related to a Legitimate Government Interest. ...............................................................11

        5.    SEPTA's Desperate Attacks on CIR Are Wrong and Irrelevant. .............12

    D.    CIR Is Suffering Irreparable Harm. .......................................................13

IV.    CONCLUSION ...................................................................................................14

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AFDI v. MBTA*,
   781 F.3d 571 (1st Cir. 2015) ................................................................................. 2

*AFDI v. SEPTA*,
   92 F. Supp. 3d 314 (E.D. Pa. 2015) ....................................................................... 5

*AFDI v. SMART*,
   698 F.3d 885 (6th Cir. 2012) ............................................................................ 7, 11

*AFDI v. WMATA*,
   No. 17-7059, 2018 WL 4000492 (D.C. Cir. Aug. 17, 2018) ........................... 5, 6, 8

*Archdiocese of Washington v. WMATA*,
   281 F. Supp. 3d 88 (D.D.C. 2017), *aff'd*,
   897 F.3d 314 (D.C. Cir. 2018) .............................................................................. 2, 6

*B.H. v. Easton Area School District*,
   725 F.3d 293 (3d Cir. 2013) ................................................................................. 13

*Christ's Bride Ministries v. SEPTA*,
   148 F.3d 242 (3d Cir. 1998) ................................................................................... 5

*Lebron v. National Railroad Passenger Corp. (Amtrak)*,
   69 F.3d 650 (2d Cir. 1995),
   *amended on denial of reh'g*, 89 F.3d 39 (2d Cir. 1995) ..................................... 6, 11

*Lebron v. WMATA*,
   749 F.2d 893 (D.C. Cir. 1984) ............................................................................... 6

*Lehman v. Shaker Heights*,
   418 U.S. 298 (1974) ............................................................................................... 7

*Matal v. Tam*,
   137 S. Ct. 1744 (2017) ........................................................................................... 9

*Meyer v. Grant*,
   486 U.S. 414 (1988) ............................................................................................. 13

*Minnesota Voters Alliance v. Mansky*,
   138 S. Ct. 1876 (2018) ................................................................................. *passim*

*NAACP v. City of Philadelphia*,
   834 F.3d 435 (3d Cir. 2016) ......................................................................... *passim*

*Northeastern Pennsylvania Freethought Society v. COLTS*,
   Civ. No. 15-833, 2018 WL 3344910 (M.D. Pa. July 9, 2018)...................................................6

*Pittsburgh League of Young Voters Education Fund v. Port Authority of*
   *Allegheny County*,
   653 F.3d 290 (3d Cir. 2011)...................................................................................5

*Pittsburgh League of Young Voters Education Fund v. Port Authority of*
   *Allegheny County*,
   Civ. No. 06-1064, 2008 WL 4965855 (W.D. Pa. Aug. 14, 2008)............................9

*Schneider v. New Jersey*,
   308 U.S. 147 (1939)..............................................................................................13

*United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio*
   *Regional Transit Authority*, 163 F.3d 341 (6th Cir. 1998) ....................................5, 7

## Statutes & Rules

12 C.F.R. § 338.3(a)..................................................................................................10

Minn. Stat. § 211B.11(1) (2017)................................................................................4

## I.     INTRODUCTION

SEPTA's Amended Memorandum in Opposition to CIR's Motion for Preliminary Injunction (Dkt. 23) ("SEPTA's Brief") makes clear that SEPTA cannot carry SEPTA's burden of demonstrating the constitutionality of the Challenged Provisions.  SEPTA bookends its brief with two arguments that defy law and logic:  that this controversy is not justiciable, despite SEPTA's unequivocal rejection of CIR's advertising proposal *three times* for violating the Challenged Provisions, and that CIR is not suffering irreparable harm, as though the City of Philadelphia's decision to allow CIR to advertise on the City's properties grants SEPTA a license to violate CIR's rights.  In between, SEPTA's Brief offers a series of misrepresentations of the law and the factual record.  The Challenged Provisions are unconstitutional for each of the four independent reasons explained at length in CIR's Brief.  CIR is likely to succeed on the merits of its claim, and it is suffering irreparable harm now.  The Court should grant CIR's Motion.

## II.    ARGUMENT

### A.     SEPTA's Non-Justiciability Defense Is Meritless.

There is no question that CIR's claim is justiciable.  SEPTA definitively denied CIR's proposal on at least three occasions prior to this litigation.  *See* Ex. 30; Ex. 17; Ex. 19. Mr. Benedetti testified that when he rejects an advertisement and won't change his mind, the advertiser's only option for redress is to "sue" SEPTA.  Benedetti Dep. 78:17–79:16, 115:17–116:1.  CIR was unsuccessful in changing his mind, Ex. 16; Ex. 18, so it filed this suit.[1]

CIR's ad was not too "indefinite" or "hypothetical," SEPTA Br. 10–11, for SEPTA to categorically reject it.  To the extent CIR's advertisement is not finalized for

---

[1]     After Mr. Benedetti testified in this case that certain design elements of CIR's comic caused him more concern than others, CIR submitted an additional proposal to SEPTA that omitted those elements.  CIR Br. 17.  SEPTA has not allowed that advertisement either.

publication, it is because SEPTA refused to provide necessary logistical information about formatting and pricing.  Ex. 30 (Intersection failing to respond to CIR's logistical questions); Ex. 83 (CIR's request for "pricing options and any other steps to publish").

SEPTA's cited cases are woefully inapplicable.  Indeed, most do not concern justiciability at all and, instead, address the substantive merits of the questions presented while noting that a party's offer of a "hypothetical" was of insufficient evidentiary value.[2]  SEPTA did not "hypothetically" apply the two Challenged Provisions to reject CIR's ad.  It in fact did so. *See* Ex. 17; Ex. 19; Ex. 30.

**B.      SEPTA's Allowance of "Political" and "Public Debate" Content Both In and Around Its Advertising Spaces Cannot Be Ignored.**

SEPTA argues that the Court should ignore much of the "political" and "public debate" content SEPTA allows and consider only speech permitted in the "advertising space on SEPTA buses."  SEPTA Br. 13.  This is wrong.  First, all of SEPTA's stations and vehicles are subject to the same standards.  Ex. 22.  The Challenged Provisions are just as expansive, murky, and subjective regarding speech in buses as they are regarding speech anywhere else.

Second, SEPTA elides the facts that its digital displays in its buses are themselves "advertising space on SEPTA buses," and, within that space, SEPTA intentionally exposes its bus riders to "political" and "public debate" content through news feeds from the Associated Press and Reuters.  CIR Br. 7–8 (addressing news and advertising in SEPTA's digital displays).

---

[2]      *See, e.g.*, *Archdiocese of Washington v. WMATA*, 281 F. Supp. 3d 88, 94 (D.D.C. 2017) (considering merits of motion but finding plaintiff's "description of both sides of this hypothetical conversation" to be insufficient proof of viewpoint discrimination); *aff'd*, 897 F.3d 314 (D.C. Cir. 2018); *AFDI v. MBTA*, 781 F.3d 571, 583 (1st Cir. 2015) (discounting MBTA's counsel's description of how MBTA would apply standard in "hypothetical situation" because "there is no evidence in the record that the MBTA in fact construes the guideline as counsel suggested that it might").

Finally, speech the government allows to be published around the forum is indeed relevant, particularly when the government contends that the restriction on speech is necessary to avoid controversy. *NAACP v. City of Phila.*, 834 F.3d 435, 447 (3d Cir. 2016) (striking ban on noncommercial speech in part because "the Airport exposes [travelers] to an onslaught of noncommercial content outside of its advertising space without any suggestion that doing so is inconsistent with the environment it seeks to foster."). In addition to the digital displays, SEPTA allows proprietors in its stations to expose patrons to newspapers and televisions—which may be tuned to any station including MSNBC, CNN, and Fox News—and does not contest that bus riders generally are exposed to "the basic onslaught of information that anyone experiences in the urban environment." Benedetti Dep. 43:16–44:17; CIR Br. 8, 43–44. These uncontested facts go directly to whether SEPTA has carried its burden to justify its restrictions.

## C. CIR Is Likely to Succeed on the Merits Because SEPTA Cannot Meet Its Burden of Demonstrating the Constitutionality of the Challenged Provisions.

### 1. SEPTA Misstates the Law in a Futile Attempt to Escape *Mansky*.

SEPTA's Brief finds no escape from the fact that the Challenged Provisions are plainly unconstitutional under *Minnesota Voters Alliance v. Mansky*, 138 S. Ct. 1876 (2018). First, SEPTA declares that, "in contrast to *Mansky*, SEPTA's Advertising Standards do not employ the term 'political' without context." SEPTA Br. 25. But, neither SEPTA's Brief nor, more importantly, its designee, can define that so-called "context."[3] Moreover, SEPTA ignores that the Supreme Court reviewed not merely the text of Minnesota's statute but also dictionary

---

[3] SEPTA's Brief states "political in nature" is an "additional prohibition," SEPTA Br. 25, but its designee testified that "political," "political in nature," "political message," and an "issue that is political in nature" all mean the "same thing," Benedetti Dep. 105:8–106:3. They mean: "Of politics. It could mean—it does mean anything that deals with things that are political in nature. . . . Anything that one party may support and another doesn't. I don't mean any political party, but I mean individuals or groups." *Id.* 100:22–101:4. He also couldn't define the concept of government policy: "[I]t's hard for me to answer that answer abstractly." *Id.* 232:13–16.

definitions of "political" and Minnesota's official guidance.  Placing the *Mansky* restrictions side by side with the Challenged Provisions puts their striking similarity in "context" and, if anything, the restrictions in *Manksy* "employ" more "context" than SEPTA's:

| *Mansky* | Challenged Provisions |
|---|---|
| <ul><li>"Any item including the name of a political party in Minnesota, such as the Republican, [Democratic–Farmer–Labor], Independence, Green or Libertarian parties."  138 S. Ct. at 1884 (quoting Minnesota official policy).</li><li>"Any item including the name of a candidate at any election."  *Id.*</li><li>"Any item in support of or opposition to a ballot question at any election."  *Id.*</li></ul> | <ul><li>"Advertisements promoting or opposing a political party, or promoting or opposing the election of any candidate or group of candidates for federal, state, judicial or local government offices are prohibited."  Ex. 22, at § II.A.9(b)(iv)(a).[4]</li></ul> |
| <ul><li>"[P]olitical badge, political button, or other political insignia," *Id.* at 1883 (quoting Minn. Stat. § 211B.11(1) (2017)</li></ul> | <ul><li>"In addition, advertisements that are political in nature or contain political messages . . ."  *Id.*</li></ul> |
| <ul><li>"[A]nything 'of or relating to government, a government, or the conduct of governmental affairs,'" *id.* at 1888 (quoting Webster's Third New International Dictionary 1755 (2002));</li><li>"[A]nything '[o]f, relating to, or dealing with the structure or affairs of government, politics, or the state,'" *id.* (quoting American Heritage Dictionary 1401 (3d ed. 1996))</li></ul> | <ul><li>… including advertisements involving political or judicial figures and/or advertisements involving an issue that is political in nature in that it directly or indirectly implicates the action, inaction, prospective action or policies of a government entity.  *Id.*</li></ul> |
| <ul><li>"Issue oriented material designed to influence or impact voting (including specifically the 'Please I.D. Me' buttons)."  *Id.* at 1884 (quoting Minnesota official policy).</li><li>"Material promoting a group with recognizable political views (such as the Tea Party, MoveOn.org, and so on)."  *Id.*</li></ul> | <ul><li>Advertisements expressing or advocating an opinion, position or viewpoint on matters of public debate about economic, political, religious, historical or social issues.  *Id.* at § II A.9(b)(iv)(b).</li></ul> |

The only portion of the restrictions the Court found "clear enough" were the bans on specific political parties, candidates, and initiatives identified in the upper left box.  *Mansky*, 138 S. Ct. at 1889.  It found the other variations of the term "political" "not capable of reasoned application," *id.* at 1892, and struck the statute.  The same result should be reached here.

---

[4]      SEPTA expressly does not rely upon this portion of section 9(a) to deny CIR's ad. Benedetti Dep. at 99:24–100:3.

Second, because *Mansky* concerned a polling place, SEPTA invites the Court to ignore *Mansky* and forge a new First Amendment jurisprudence specially favoring transit authorities.  Obviously, numerous First Amendment cases concern restrictions on speech imposed by transit authorities, and CIR's Motion addresses many of them.[5]  However, there is no independent body of case law stating that a transit authority's restrictions are entitled to a different First Amendment analysis than that employed by the Court in any other physical forum.

SEPTA not only relies upon a series of cases from outside the Third Circuit, but misrepresents their pertinent holdings and ignores key portions of the opinions that demonstrate the unconstitutionality of the Challenged Provisions.  For example, claiming that *Mansky* is irrelevant to transit cases, SEPTA cites *AFDI v. WMATA*, No. 17-7059, 2018 WL 4000492 (D.C. Cir. Aug. 17, 2018), which was issued on the same day that CIR filed is Motion, for the proposition that restrictions similar to SEPTA's have been "deemed reasonable and viewpoint neutral."  SEPTA Br.  22–23.  That is not what the opinion holds.  The D.C. Circuit did find that WMATA's restrictions were viewpoint neutral and bore a relationship to WMATA's goal, but it then reversed and remanded for further consideration of whether WMATA's restrictions were "reasonable . . . in light of [*Mansky*]."  *Id.* at *4.  The court explained:

---

[5]      SEPTA's oft-repeated accusation that CIR ignored First Amendment cases concerning transit authorities is baseless.  CIR's Motion discusses numerous such cases, including *Pittsburgh League of Young Voters Educ. Fund v. Port Auth. of Allegheny Cnty.*, 653 F.3d 290 (3d Cir. 2011); *Christ's Bride Ministries v. SEPTA,* 148 F.3d 242 (3d Cir. 1998); *United Food & Comm'l Workers Un., Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341 (6th Cir. 1998); *AFDI v. SEPTA,* 92 F. Supp. 3d 314 (E.D. Pa. 2015); *see also NAACP*, 834 F.3d at 435 (airport); *see generally* CIR Br. (Table of Authorities).

> *Mansky* invites arguments about whether Guideline 9 is capable of reasoned application.  Moreover, WMATA's defense of the Guidelines against AFDI's unbridled discretion/vagueness challenge was that it banned AFDI's advertisements as "political" speech, which is not unconstitutional.  That argument might be unavailing in light of *Mansky*. . . .  Guideline 9 has been in place for nearly three years, and information on how it has been applied would certainly be information as to whether it is capable of reasoned application.

*Id.* at *12.  The record here—confirmed by testimony of SEPTA's designee—demonstrates the

glaring inconsistency and want of reasoned application of the Challenged Provisions.[6]

SEPTA's Brief misrepresents *Lebron v. WMATA*, 749 F.2d 893, 896 (D.C. Cir.

1984), as upholding a ban on political speech as "viewpoint neutral and reasonable."  SEPTA Br.

22–23.  Quite to the contrary, it found that WMATA's restriction was an unconstitutional prior

restraint.  Even worse, SEPTA purports to quote the opinion as concerning a "categorical ban on

political advertising even when inartfully phrased," SEPTA Br. 23, but the quote doesn't exist.[7]

---

[6]      The other post-*Mansky* cases SEPTA cites do not support any notion that *Mansky* may be ignored in transit cases.  For example, *Archdiocese of Washington v. WMATA*, 897 F.3d 314 (D.C. Cir. 2018), liberally cites to *Mansky* but, as explained in a concurrence, the court viewed WMATA's restriction on certain religious speech to be different than the general ban on "political" speech in *Mansky* and found no "conflicting or confusing" guidance as in *Mansky*.  *Id.* at 340 (Wilkins, J., concurring).  Of course, the "conflicting or confusing guidance" in *Mansky* included the Minnesota policies that so closely resemble SEPTA's Challenged Provisions.  *Northeastern Pennsylvania Freethought Society v. COLTS*, Civ. No. 15-833, 2018 WL 3344910 (M.D. Pa. July 9, 2018), is on appeal to the Third Circuit.

[7]      SEPTA appears to have confused *Lebron v. WMATA* with another case cited in SEPTA's same bullet point list, *Lebron v. National Railroad Passenger Corp. (Amtrak)*, 69 F.3d 650, 658 (2d Cir. 1995), *amended on denial of reh'g*, 89 F.3d 39 (2d Cir. 1995), which states, "Of course, if such a policy were used to screen out only controversial political advertisements—that is, political advertisements distasteful to the majority—it would be void for viewpoint bias.  On the other hand, it seems more sensible to read the language as a justification, however inartfully phrased, for a categorical ban against political advertising."  Significant portions of *Lebron v. Amtrak* were later amended and rescinded by the court, which SEPTA does not acknowledge, 89 F.3d 39, and the Third Circuit declined to follow the opinion's reasonableness analysis.  *NAACP*, 834 F.3d at 448.  If *Lebron v. Amtrak* has any application here, it is that SEPTA's attempt to ban "controversial" speech under the guise of "matters of public debate," is unconstitutional.

The statement in *AFDI v. SMART*, 698 F.3d 885, 893 (6th Cir. 2012), that "there is no question that a person of ordinary intelligence can identify what is or is not political," has no value in light of *Mansky*.  SEPTA Br. 23.  *SMART* does, however, succinctly demonstrate why SEPTA's ban on "matters of public debate" is unconstitutional.  Explaining that restricting speech regarding "controversial public issues" is too inherently subjective, the Sixth Circuit stated:  "We found unbridled discretion had been vested in the decisionmakers because there was no articulated definitive standard to determine what was 'controversial.'  This discretion allowed for the arbitrary rejection of advertisements based on viewpoint."  698 F.3d at 894 (discussing *United Food & Comm'l Workers Union, Local 1099*, 163 F.3d at 352).

Finally, *Mansky*'s citation to the plurality opinion in *Lehman v. Shaker Heights*, 418 U.S. 298 (1974), does not mean that the Court approves of every indistinct and capacious political speech ban by a transit authority.  *Lehman*, which was decided prior to the Court's modern elaboration of forum analysis, considered whether Shaker Heights' acceptance of ads on its limited spaces on 55 cars obligated it to accept "paid political advertising on behalf of a candidate for public office."  *Id.* at 299.  Prohibiting such campaign speech is the narrow and definable ban that *Mansky* indicates might be clear and workable.[8]  However, *Mansky*'s 7-2 decision[9] makes abundantly clear that amorphous "political" bans such as in Minnesota—or

---

[8]     The *Lehman* plurality also emphasized that Shaker Heights' limited ad space meant that accepting short-term campaign ads with short-term leases could jeopardize the city's ability to secure long-term lease revenue from commercial ads, and that it would be difficult to find equal space for all candidates who would seek to advertise.  *Id.* at 304.  CIR's ad is not a campaign ad, and SEPTA has no concerns of finite advertising space.  Kelly Dep. 15:20–16:1; CIR Br. 6–7.
[9]     Even Justice Sotomayor's dissent did not assert that Minnesota's statute and policies were facially specific and objective; rather, she would have certified statutory construction questions to the Minnesota Supreme Court.  *Id.* at *1893 (Sotomayor, J., dissenting).

SEPTA's Challenged Provisions—are unconstitutional.  And, for good reason.  Such nebulous criteria enable government officials to unevenly apply the standard, as was the case here.

### 2.     SEPTA's Allowance of "Political" and "Public Debate" Ads Matters.

CIR's Brief identifies numerous advertisements that SEPTA has allowed that appear to violate either or both of the Challenged Provisions, thus providing further evidence of the unworkability of the Challenge Provisions.  CIR Br. 27–32.  SEPTA offers two responses: (a) CIR lacks standing to challenge decisions regarding those advertisements, SEPTA Br. 40–41, and (b) SEPTA supposedly correctly applied its standards in allowing those advertisements and rejecting others.  *Id.* 28–34.

First, SEPTA's standing argument is meritless.  CIR does not seek relief regarding other advertisements.  However, SEPTA's acceptance of ads that appear to violate the Challenged Provisions is evidence both of the vagueness of the Challenged Provisions and that such speech is compatible with the forum.  *E.g.*, *Mansky*, 138 S. Ct. at 1892; *AFDI v. WMATA*, 2018 WL 4000492, at *12.  SEPTA's acceptance of advertisements violating its own standards is also relevant to the fact that SEPTA did not close the forum after 2015.  *See* SEPTA Br. 19 (claiming SEPTA's denial of certain ads shows the forum is closed).[10]

Second, SEPTA serves up thin gruel to explain why various advertisements were accepted or rejected by SEPTA.  Below, CIR responds to only some of SEPTA's most egregious descriptions and explanations.

---

[10]     SEPTA's advertising space remains a designated public forum.  CIR Br. 45–49. SEPTA's self-serving statement of its intention and its incorrect characterization that it "rigorous[ly]" enforces its guidelines to prohibit all content that is "political" or a "matter of public debate," SEPTA Br. 20, are insufficient to demonstrate that SEPTA has closed the forum.

SEPTA's argument that the numerous government advertisements in Exhibits 43–50 are mere public service announcements (which would still violate SEPTA's "political" ban) or protected government speech shielded from this Court's review, SEPTA Br. 29–31, wholly misapprehends the law.  The government speech doctrine, in certain circumstances, protects a government's own speech from First Amendment scrutiny.  *E.g.*, *Matal v. Tam*, 137 S. Ct. 1744, 1758 (2017) (cautioning that the doctrine "is susceptible to dangerous misuse").  However, it does not protect from scrutiny SEPTA's decision to provide a forum for another government to speak, which is what SEPTA did in the ads in Exhibits 43–50.  SEPTA's own lead case makes that clear.  In *Pittsburgh League of Young Voters Education Fund v. Port Authority of Allegheny County*, Civ. No. 06-1064, 2008 WL 4965855, *14–15 (W.D. Pa. Aug. 14, 2008), quoted in SEPTA's Brief at 30-31, the court expressly held the government speech doctrine did not render irrelevant to the court's forum analysis advertisements the Port Authority had co-sponsored with other government bodies because "[t]o refuse to consider an advertisement sponsored by another agency when reviewing Port Authority's actions would allow Port Authority to shield viewpoint-based decisions by asking another government agency to co-sponsor a message."

SEPTA's alternative explanation that the government ads comply with the Challenged Provisions because they do not "seek any changes in public programs or policies," SEPTA Br. 30; *see also id.* at 27 ("all sought governmental or judicial changes"), is plainly inconsistent with the Challenged Provisions, which prohibit "any advertisement" that "directly or indirectly implicates the action, inaction, prospective action or policies of a government entity." Ex. 22, § II.A.9(b)(iv)(a).[11]

---

[11]     SEPTA's statement that Exhibit 42, regarding the Affordable Care Act, is by a "government agenc[y]," SEPTA Br. 29, is not only irrelevant, but appears to be factually false. The ad states it was "Paid for by Intersection."

Despite a lengthy discussion of the DNC ads in Exhibits 31 and 32, SEPTA Br. 31–33, SEPTA's Brief ignores that Mr. Benedetti testified that even he thought SEPTA might have "failed" when it allowed some DNC ads.  Benedetti Dep. 175:22–177:3.

Characterizing Exhibit 51 as concerning "victims of mass incarceration," SEPTA Br. 33, shows that it is a "political" or "public debate" ad.

As a final example, SEPTA's explanation regarding Exhibit 43 is nonsensical. SEPTA Br. 29 n.8.  Certainly those who believe vaccines cause behavioral health conditions— whether they are correct or not—debate whether vaccines work.

### 3. The Challenged Provisions Mask Viewpoint Discrimination.

SEPTA's allowance of bank advertisements while rejecting CIR's ad constitutes clear viewpoint discrimination.  As an initial matter, SEPTA apparently (and finally) admits that discriminatory lending is an actual reality in the world, and it goes so far as to state that it is rational for banks to exploit it in their advertising as a business opportunity to "seek minority applicants more aggressively than others."  SEPTA Br. 37.  Thus, SEPTA admits that discriminatory lending is at least an implicit topic of some of the bank ads.

Discriminatory lending also is an express topic of the bank advertisements. Contrary to SEPTA's Brief, the statement "Equal Housing Lender" and similar language is indeed a "statement of position by the advertiser."  SEPTA Br. 36-37.  It does not merely convey that discrimination in mortgage lending generally is an illegal act but, rather, is an express statement that the advertiser does not engage in discriminatory lending.  12 C.F.R. § 338.3(a) (requiring banks advertising home loan mortgage services to "*prominently* indicate in such advertisement . . . that *the bank* makes such loans without regard to race, color, religion, national origin, sex, handicap, or familial status") (emphasis added).  Thus, discriminatory lending—or lack thereof—is a "prominent" feature of the bank ads SEPTA allows.

To the extent SEPTA views the topic of discriminatory lending as acceptable but CIR's investigation based on public records as too "controversial," SEPTA's own cited cases demonstrate that this is viewpoint discrimination.  *See Lebron v. Amtrak*, 69 F.3d at 658 ("Of course, if such a policy were used to screen out only controversial political advertisements—that is, political advertisements distasteful to the majority—it would be void for viewpoint bias."); *AFDI v. SMART,* 698 F.3d at 894 (explaining that ban on "controversial public issues" is unconstitutional for vesting unbridled discretion in decisionmaker to determine what is "controversial"); *see also* CIR Br. 34–35.[12]

### 4.    The Challenged Provisions Are Not Reasonably Related to a Legitimate Government Interest.

SEPTA's Brief offers a kitchen sink of government interests that supposedly are furthered by the Challenged Provisions, including avoiding controversy and improving the consumer experience to increase ridership and revenues.  SEPTA Br. 20.  SEPTA's conjecture and speculative testimony is insufficient to carry its burden.  *See, e.g.*, *NAACP*, 834 F.3d at 446 (controversy avoidance as an "objective is nebulous and not susceptible to objective verification" and, "[a]s a result, Supreme Court guidance cautions against readily drawing inferences, in the absence of evidence, that controversy avoidance renders the ban constitutional").

SEPTA conducted no analysis of the impact of the Challenged Provisions, including on ridership or revenue.  In fact, if it had, the evidence indicates that the Challenged Provisions cost SEPTA revenue.  CIR Br. 44–45.  In addition, SEPTA ignores that if "political" issues and "matters of public debate" are such a blare for the average Philadelphian, SEPTA

---

[12]    SEPTA's explanation that it rejected ads from other speakers, such as a sperm bank, XQ, and Planned Parenthood, because SEPTA views the speakers themselves or their ads as addressing controversial health issues (while allowing ads about other health issues) or controversial educational issues (while allowing ads about other educational issues), SEPTA Br. 27, also further proves obvious viewpoint discrimination.

actively *increases* that blare.  CIR Br. 42–44 (discussing SEPTA's newsfeeds, SEPTA's

proprietors in its stations, and SEPTA's acceptance of numerous advertisements that appear to be

political and concern public issues).  SEPTA riders also are subject to the same "onslaught" of

information that anybody is subjected to in an urban environment.  *Id.*  SEPTA fails to carry its

burden of demonstrating a reasonable relationship between its bans and its goals, just as the

Philadelphia Airport failed in *NAACP* to demonstrate a relationship between its noncommercial

speech ban and the same goals.

### 5.   SEPTA's Desperate Attacks on CIR Are Wrong and Irrelevant.

SEPTA's arguments that CIR is a "hybrid organization" that uses "adversarial

rhetoric, inflammatory images and biased factual reporting," SEPTA Br. 4, 43, and "plays to race

stereotypes to sway readers," *id.* 44, are wrong and irrelevant.  To be clear:  CIR, a forty-year-

old, award-winning investigative news organization, vehemently disputes SEPTA's accusations.

CIR proudly stands by its reporting, which was based on a lengthy investigation employing

techniques used by leading academics and government officials and was independently

corroborated by the Associated Press.

However, in rejecting CIR's proposed advertising, SEPTA expressly did not

invoke its prohibitions against false, misleading, disparaging, degrading, or insulting

advertisements, or advertisements that might result in harm to the transportation system.  Ex. 24

at 5, 7 (SEPTA Resps. to Interrog. Nos. 1 & 3); Benedetti Dep. 83:2–85:17, 98:1–5; Ex. 22,

§§ II.A.9(b)(iv)(c)–(f).

Furthermore, SEPTA's subjective characterizations of CIR's ad as "political" or

concerning a "matter of public debate" are irrelevant in light of the unconstitutionality of the

Challenged Provisions.[13]  Notably, in *Mansky*, the Court focused on how Minnesota did or would actually apply its prohibitions but conspicuously was unconcerned with whether the specific plaintiffs' speech was actually "political."  *Mansky*, 123 S. Ct. at 1884 (mentioning, but not analyzing, the plaintiffs' speech).

### D.   CIR Is Suffering Irreparable Harm.

An unconstitutional ban on speech "unquestionably constitutes irreparable injury."  *E.g.*, *B.H. v. Easton Area Sch. Dist.*, 725 F.3d 293, 323 (3d Cir. 2013) (en banc) (citations omitted).  There is nothing premature or hypothetical about this denial of CIR's rights. *See supra* § II.A.  Moreover, the willingness of the City to display CIR's ad on bus shelters does not make SEPTA's denial of CIR's right to advertise on its own "unique" advertising space, Ex. 21, any less cognizable or irreparable.  *See, e.g.*, *Meyer v. Grant*, 486 U.S. 414, 424 (1988) (First Amendment protects not only the right to speak "but also to select what [plaintiffs] believe to be the most effective means for doing so"); *Schneider v. New Jersey*, 308 U.S. 147, 163 (1939) ("[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.").

---

[13]    Although irrelevant, SEPTA misapprehends Ms. Baranetsky's letter in Exhibit 16.  She stated that CIR's news ad contained "facts and statistics on a political issue," not that the ad itself conveyed a political message.

## IV.     CONCLUSION

For all of the reasons set forth above and those in CIR's Motion, CIR's Motion should be granted.

Respectfully submitted,

September 10, 2018                                HANGLEY ARONCHICK SEGAL PUDLIN
                                                 & SCHILLER

                                                 By: *John S. Stapleton*
                                                      John S. Stapleton (PA ID No. 200872)
                                                      Dylan J. Steinberg (PA ID No. 203222)
                                                      Rebecca S. Melley (PA ID No. 206210)
                                                 One Logan Square, 27th Floor
                                                 Philadelphia, PA 19103
                                                 (215) 568-6200
                                                 jstapleton@hangley.com
                                                 dsteinberg@hangley.com
                                                 rmelley@hangley.com

                                                 ACLU OF PENNSYLVANIA

                                                 By: *Molly Tack-Hooper*
                                                      Molly Tack-Hooper (PA ID No. 307828)
                                                      Mary Catherine Roper (PA ID No. 71107)
                                                 P.O. Box 60173
                                                 Philadelphia, PA 19102
                                                 (215) 592-1513
                                                 mroper@aclupa.org
                                                 mtack-hooper@aclupa.org

                                                 Brian Hauss, *pro hac vice*
                                                 AMERICAN CIVIL LIBERTIES UNION
                                                 FOUNDATION
                                                 125 Broad Street, 18th Floor
                                                 New York, NY 10004
                                                 (212) 548-2500
                                                 bhauss@aclu.org

                                                 Seth Kreimer (PA ID No. 26102)
                                                 3400 Chestnut Street
                                                 Philadelphia, PA 19104
                                                 (215) 898-7447
                                                 skreimer@law.upenn.edu

- 14 -

D. Victoria Baranetsky, *pro hac vice*
THE CENTER FOR INVESTIGATIVE
REPORTING
1400 65th Street, Suite 200
Emeryville, CA 94608
(510) 982-2890 ext. 390
vbaranetsky@revealnews.org

## <u>CERTIFICATE OF SERVICE</u>

I, John S. Stapleton, hereby certify that on September 10, 2018, a true and correct copy of the foregoing document was served upon the individuals listed below via the Court's ECF system:

Maryellen Madden
John J. Powell
MONTGOMERY MCCRACKEN
1735 Market Street
Philadelphia PA 19103-7505
(215) 772-1500
mmadden@mmwr.com
jpowell@mmwr.com

Gregory J. Krock
BUCHANAN INGERSOLL & ROONEY PC
One Oxford Centre
301 Grant Street, 20th Floor
Pittsburgh, PA 15219
(412) 562-3983
gregory.krock@bipc.com

*Counsel for Defendant Southeastern*
*Pennsylvania Transportation Authority*

*John S. Stapleton*
John S. Stapleton