# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| THE CENTER FOR INVESTIGATIVE REPORTING<br><br>v.<br><br>SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY | CIVIL ACTION<br><br>NO. 18-1839 |
|---|---|

## MEMORANDUM RE: MOTION FOR PRELIMINARY INJUNCTION

### I. Introduction

Plaintiff, The Center for Investigative Reporting ("CIR"), has moved for a preliminary injunction to enjoin Defendant, the Southeastern Pennsylvania Transportation Authority ("SEPTA"), from enforcing two specific advertising standards. CIR sought to purchase advertising space in and on SEPTA buses to display its journalistic comic strip about disparate lending practices. The advertisement was rejected on the basis of SEPTA's standards at issue—specifically, because it constituted a "political" advertisement and expressed a position on a "matter[] of public debate."

For the following reasons, the motion is denied without prejudice.

### II. Summary of CIR's position

#### a. Facts alleged in the Complaint and/or Motion for a Preliminary Injunction

CIR is a nonprofit investigative news organization that, through its division called "Reveal," investigated and published a report about racial disparities in the conventional home mortgage market. (Pl.'s Memo in Support of Mot., ECF 20-1 at 5, 14) (hereinafter "Mot."). CIR created a ten-panel comic strip based on that report and, in January 2018, applied to have an advertisement derived from the comic placed on the interior advertising spaces of SEPTA buses. (Id. at 14–15). CIR states that it "believed that advertising on SEPTA's vehicles, which move

through many neighborhoods, offered a rare opportunity to reach interested readers all across the city, including but not limited to those affected by the lending disparities its investigation had uncovered." (Id. at 15). After reviewing the comic strip, SEPTA's licensee, Intersection (formerly Titan Outdoor, LLC), which manages SEPTA's advertising program, informed CIR that SEPTA would not accept the advertisement because "disparate lending is a matter of public debate and litigation." (Id. at 8–9, 15; id. Ex. 30, at 1). On February 21, 2018, SEPTA rejected CIR's advertisement under its "2015 Advertising Standards," which read in relevant part:

> <u>Prohibited Advertising Content.</u> Advertising is prohibited on transit facilities, products and vehicles if it or its content falls into one or more of the following categories –
>
> (a) Advertisements promoting or opposing a political party, or promoting or opposing the election of any candidate or group of candidates for federal, state, judicial or local government offices are prohibited. In addition, advertisements that are political in nature or contain political messages, including advertisements involving political or judicial figures and/or advertisements involving an issue that is political in nature in that it directly or indirectly implicates the action, inaction, prospective action or policies of a government entity.
>
> (b) Advertisements expressing or advocating an opinion, position or viewpoint on matters of public debate about economic, political, religious, historical or social issues.[1]

CIR filed its Complaint for a violation of the First Amendment right to freedom of speech on May 2, 2018. (Compl., ECF 1). The Motion for Preliminary Injunction was filed on August 17, 2018. (Pl. Mot. for Prelim. Inj., ECF 20). The Court allowed limited discovery prior to the hearing on the Motion for Preliminary Injunction. During the deposition of Gino Benedetti, Esq., SEPTA's General Counsel and 30(b)(6) witness, Benedetti stated that he had "particular concern" about two of the panels—one that displayed "a white hand handing keys and a stick of

---

[1] Plaintiff's counsel stipulated that CIR has no objection to the first sentence of Subsection (a). (9/14/18 Hearing Tr. at 72:13-15). Plaintiff's counsel has not accepted the Court's invitation to propose alternative language for the remainder of the challenged standard.

2

dynamite to a black hand," and one that displayed "African-Americans holding signs protesting . . . and a white guy not part of the protest." (Benedetti Dep. 156:9-158:3). CIR claims that in response to these statements, it "drafted an additional proposed advertisement without these design elements," but that SEPTA would not consider this proposal because of pending litigation. (Mot. at 17).

### b. Gino Benedetti, Esq. Deposition

In support of its motion, CIR attached the July 18, 2018 deposition of Gino Benedetti, Esq. Benedetti stated that SEPTA has a license with an advertising company, "Intersection," "to go out and get the advertising for us, to submit advertising to our advertising department, to—if approved, to install the advertising wherever it needs to be and interact with the customers that it's serving." (Benedetti Dep. at 20:13-23). Intersection is the "predominant" way SEPTA obtains advertisements. (Id. at 60:14-61:5). The purposes for leasing advertising space are "to raise revenue independent of the farebox and taxpayer subsidies and to do so in a manner that provides for the safety, efficiency and comfort of our passengers." (Id. at 17:5-10). Benedetti stated that SEPTA "generally" does not own bus shelters, but that at transportation hubs such as 69th Street Station and Frankford Transportation Center, SEPTA does lease space for newsstands. (Id. at 39:4-42:16). The newsstands, according to Benedetti, are not able to sell "some risqué-type periodicals" but otherwise, the content of materials sold or programs shown on televisions within those stands is unrestricted. (Id.).

Benedetti described the digital displays or "infotainment systems" on the new fleet of city buses as including advertisements, news headlines,[2] and information about the time and location

---

[2] In its supplemental brief, SEPTA represents that, as of September 21, 2018, SEPTA has directed Intersection to terminate newsfeeds on buses "as soon as possible." (Def.'s Suppl. Br., ECF 32 at 2).

of the stops on each bus route. (Id. at 24:20-30:12). According to Benedetti, Intersection subscribes to a service provided by Screenfeed, a company which curates news information from Reuters and the Associated Press. (Id. at 30:13-22). This information is then "pushed" onto SEPTA's panels and digital displays in two different formats—90 or 180 second loops. (Id.). Benedetti explained that neither Screenfeed nor Intersection determines what news to put onto the system, but rather "Reuters and Associated Press puts out whatever they put out." (Id. at 31:23-32:17). Although he could not say whether Intersection reviews the content before it is posted, Benedetti did state that SEPTA had not given any direction or guidance to Intersection regarding the content of the news feed. (Id. at 32:18-22). Benedetti explained that the purpose of the newsfeed on the infotainment system is "[t]o keep eyes on the screens, because that enhances the value of the advertising, and it draws people's attention to the system information as well." (Id. at 42:21-24).

Benedetti spoke at length about SEPTA's reasoning for amending its Advertising Standards in 2015. He stated:

> After the American Freedom Defense Initiative ["AFDI"] sued us sometime in 2014, I don't remember when the complaint was filed, we made an initial amendment to the advertising standards that was designed to address the concerns that were raised by that lawsuit.
>
> And really what we're trying to do was state very clearly our intention to be a nonpublic forum, and that's what that amendment did.
>
> We went through the lawsuit. We lost the lawsuit. Judge Goldberg wrote a decision about why he gave the relief to AFDI that he gave.
>
> And we then studied that decision and made further changes to the policy . . . . That was a process that included legal counsel. I certainly was at the center of that process.

(Id. at 47:14-48:10). Benedetti proceeded to explain the process by which SEPTA's board adopted the 2015 Advertising Standards. (Id. at 48:11-52:16). In formulating these standards, Benedetti said that he reviewed transit authority policies in other cities, including Seattle. (Id. at 52:20-53:13). Benedetti also explained that he considered riders' experiences when adopting the 2015 Advertising Standards, and that he was concerned about "public outcry," discontent from employees, and potential vandalism. (Id. at 54:21-6).

Benedetti described the process by which SEPTA determines that an advertisement violates its 2015 Advertising Standards as follows. (Id. at 61:6-68:5). Intersection's sales representatives, with direction from Intersection employee Jon Roche, identify advertisements that they believe might violate the 2015 Advertising Standards. Roche then sends that advertisement via email to Benedetti. (Id.). Jim Dellispriscolli, a SEPTA employee, also reviews potential advertisements for compliance with the 2015 Advertising Standards. Benedetti provides an additional review as he rides SEPTA every day on his way in to work. (Id.). Aside from these three rounds of review, Benedetti stated that there is no written guidance aside from the 2015 Advertising Standards themselves. (Id.). Benedetti did not know if SEPTA posted its 2015 Advertising Standards to its website, and although he provided his own interpretation of the language used in the standards,[3] it is unclear whether the public has access to any guidelines regarding their application. (Id. at 19:11-13.).

---

[3]   Benedetti explained that he interprets the terminology in the standards as follows: "political in nature" means "of politics . . . anything that deals with things that are political in nature… [a]nything that one party may support and another doesn't. I don't mean any political party, but I mean individuals or groups. You know, things that are subject to debate; elections of officials, those kinds of things . . . ." (Id. at 100:20-101:7); "opinion, position, or viewpoint" describe "express[ing] an opinion about something or . . . advocat[ing] an opinion about something…" (Id. at 119:2-18); "action, inaction, prospective action or policies of a government entity" means "the ad is pushing some view on the government to take some action or no action"

5

When asked about the contents of the proposed SEPTA advertisement specifically, Benedetti stated that he and his team had "particular concern" about two images—one of "a white hand handing keys and a stick of dynamite to a black hand" and another of "African-Americans holding signs protesting against—the white—and a white guy not being part of the protest." (Id. at 156:9-258:3).

Benedetti also discussed many other advertisements, some of which were run by SEPTA and some of which were hypotheticals proposed by CIR's attorney.

### c. Victoria Baranetsky, Esq. Deposition

The parties' briefing also cites to the deposition transcript of Victoria Baranetsky, Esq., General Counsel of CIR, who was deposed as CIR's 30(b)(6) designee on July 12, 2018. Baranetsky testified that the comic strip advertisement at issue was based on an investigation and report by two journalists employed by CIR, supported by an entire "data team" with extensive training in statistical analysis. (Baranetsky Dep. at 11:8-12:11).[4] Baranetsky explained that there was no final artwork created for the bus advertisement because SEPTA would need to "spend significant time editing and finalizing the advertisement." (Id. at 33:4-34:18). Although CIR never submitted a hard copy of the comic to SEPTA, it did send a hyperlink through which SEPTA could view it. (Id. at 35:8-23). Baranetsky testified that CIR was drawn to advertising on SEPTA buses because each comic strip panel could be placed on a separate advertising panel,

---

(Id. at 110:17-21); and "matter of public debate" means "something that's being debated about in the public arena" (Id. at 119:19-22).

[4] A good portion of Baranetsky's deposition was spent questioning the methods and sources CIR relied on in its investigation. Baranetsky did not testify about the reason CIR took on this investigation, nor did she identify with specificity the types of information, sources, or statistical analysis the report relied on. (Id. at 13:1-27:14, 44:10-19). She did, however, explain that the report was not created through any "specific funding" stream, and that credit scores were not included in CIR's analysis. (Id. at 15:11-15, 20:11-21:16, 26:23-27:14, 30:7-31:20).

6

filling the ten total advertising panels on each bus. (Id. at 49:4-23). Despite testifying about CIR's desire to advertise on SEPTA buses, Baranetsky did not know which bus routes CIR aimed to target, how many buses CIR wished to advertise on, or what the budget was for CIR's advertising campaign. (Id. at 77:13-22).

CIR had planned outreach events in Camden and Philadelphia to "kick off" its advertising campaign about the disparate lending report. (Id. at 61:23-62:3). Baranetsky explained that the event in Camden already took place, but the event in Philadelphia had to be moved to the fall. (Id. at 62:5-63:9). Baranetsky did not testify about the details of the outreach events. (Id. at 63:10-69:17).[5] Although the proposed advertisement was rejected by SEPTA, Baranetsky testified that the City of Philadelphia agreed to post the comic strip on bus shelters and newsstands. (Id. at 77:23-78:22). At the time of her deposition, Baranetsky stated that the advertisements had yet to be posted by the City, and she did not know how many advertisements would be posted. (Id.). It is unclear whether the City imposes restrictions on those advertising spaces, and neither party has addressed why the advertisement has yet to run in those spaces.

### d. Oral Argument and Supplemental Briefing

We held oral argument on September 14, 2018, and counsel was asked a series of questions regarding outstanding factual and legal issues. CIR stated that there were no outstanding factual issues with respect to the motion for preliminary injunction. (9/14/18 Hearing Tr. at 6:11-14). CIR explained that it accepts Benedetti's testimony regarding his decision-making process, but that it challenges whether his interpretation and application of

---

[5] CIR purports to have experienced immediate and irreparable harm because the comic advertisement has not been allowed to run on SEPTA buses prior to its panel discussion, "Unpacking the Trap," on October 1, 2018. (See Pl.'s Suppl. Br., ECF 31 at 1 n.1). It is unclear whether this event, which is to take place at "421 North 7th Street" in Philadelphia, is the same event that Baranetsky testified about rescheduling for "the fall."

7

SEPTA's 2015 Advertising Standards are constitutional and consistent. (Id. at 9:24-10:4). CIR asserted that it had met all the requirements for a preliminary injunction in its written submissions and that no further testimony was necessary.

SEPTA disagreed that there were no factual disputes at issue. According to SEPTA, questions remain about whether CIR's advertisement is an advocacy piece or "just straight news"; whether CIR is an advocacy or reporting agency; what reasons SEPTA had to amend its standards; and how SEPTA controls information on its infotainment systems.[6] (Id. at 12:21-13:22).

In addition to—and more concerning than—the outstanding factual issues identified by SEPTA, SEPTA's purposes for and administration of its amended standards deserve, or require, additional explanation. CIR contends that SEPTA's reasoning for implementing its policies prohibiting speech on "matters of public debate" is "just a euphemism for a ban on speech that SEPTA deems 'controversial.'" (Pl.'s Suppl. Br. at 4). SEPTA countered at oral argument that it has "a list of reasons" for adopting the 2015 Advertising Standards, but we are unable to glean anything further from the evidence presented by SEPTA, including Benedetti's deposition.

There was a question discussed at oral argument as to whether CIR submitted a final advertisement to SEPTA for approval, and whether the second proposal submitted by CIR had been reviewed and responded to by SEPTA. Counsel for CIR asserted at the hearing that its Motion would cover both advertisements, and that "if SEPTA would prefer the second rather than the first, as we believe it would, the Center would be happy to just go along with the second one." (9/14/18 Hearing Tr. at 19:19-25). The Court directed SEPTA to include in its

---

[6] As explained above, SEPTA has represented to this Court that it "directed Intersection to terminate the newsfeeds on the SEPTA buses as soon as possible." (Def.'s Suppl. Br. at 4). Accordingly, SEPTA's control or lack of control over the newsfeeds on these systems may no longer be relevant to this Court's analysis.

supplemental briefing a response to this second advertisement, and SEPTA did so, concluding that "the second ad submission is also barred by the same advertising standards as the first." (Def.'s Suppl. Br., Ex. A at 2). This exchange, coupled with Benedetti's deposition testimony, has illuminated for the Court a discrepancy in the manner in which SEPTA reviews proposed advertisements. Although Benedetti has testified that he and his colleagues at Intersection and SEPTA considered particular factors, the reasoning SEPTA employed to reject CIR's advertisement and the process it employs generally to accept or reject advertisements remain unclear.[7]

Relatedly, SEPTA states in its supplemental memorandum that it does not consider whether advertisements are "controversial." (Def.'s Suppl. Br. at 7). But Benedetti testified specifically that he "research[ed] the controversy" surrounding Narcan when reviewing that ad for its compliance with the advertising standards. (Benedetti Dep. at 252:15-253:5). As noted above, Benedetti explained that he considers something as being "debated in the public arena" if "it's something that's sort of got society's attention." (Id. at 120:2-3).

Moreover, it is worth noting that although the 2015 Advertising Standards prohibit advertising that "express[es] or advocate[s] an opinion, position, or viewpoint on matters of public debate," when Benedetti was asked whether an advertisement "merely involving the matter of public debate without expressing or advocating an opinion" would violate Substandard (b), Benedetti responded "I don't know without seeing it." (Id. at 120:13-16).

---

[7] For example, are all proposed advertisements reviewed in a piecemeal or "holistic" manner? What percentage of the material in a particular ad must be violative of the policy? Are proposals permitted to be reviewed? Are the same standards applied to revised proposed advertisements? Is any guidance generally provided for how violative advertisements may come into compliance?

Given these various discrepancies, it remains unclear whether SEPTA's policy is in fact targeted toward controversial speech and, if not, how SEPTA could explain the difference between controversial speech and matters of public debate. Similarly, we question whether SEPTA prohibits advertisements that have as their subject issues of public debate, or rather prohibits only those advertisements that express opinions. We expect these issues to be clarified at trial.

### III. Previous litigation involving limitations on SEPTA's advertising space

This is not the first time SEPTA's advertising policies have been the subject of a lawsuit before this Court. Although SEPTA contends that the previous decisions involved outdated policies, no longer in effect since the adoption of the 2015 Advertising Standards, a brief review of the prior cases is relevant to the Court's analysis here.

In Christ's Bride Ministries v. SEPTA, 148 F.3d 242, 245 (3d Cir. 1998), the Third Circuit held that SEPTA's removal of an advertisement violated the First Amendment because SEPTA had created a public forum in its advertising space and the removal of the advertisement in question did not survive strict scrutiny, nor was it reasonable even if the forum were nonpublic. Although SEPTA originally agreed to display the advertisement at issue, which stated that "Women Who Choose Abortion Suffer More & Deadlier Breast Cancer," SEPTA removed the poster from various stations and transit stops after receiving a letter from the U.S. Department of Health and Human Services calling its accuracy into question. Id. at 245-46. In holding that the forum was a designated public forum, the Third Circuit focused on SEPTA's intent by examining its policies and practices and the nature of the property. Because SEPTA's policies were aimed at generating revenue and promoting awareness of social issues, the forum was intended to be partly commercial and partly expressive. Id. at 250. The fact that SEPTA

had discretion to reject advertisements for any reason did not render the forum "not public"—if anything, the government's reserved right to control speech without any particular standards or goals called for closer scrutiny. Id. at 251. Moreover, the record revealed no policy or practice demonstrating that SEPTA intended the forum be closed to speech on the issue of abortion. Id. at 253. Rather, "[i]n its efforts to generate advertising revenues, SEPTA permitted abortion-related and other controversial advertisements concerning sexuality." Id. at 254. Even if the forum was closed, the Third Circuit held that SEPTA's actions were unreasonable because SEPTA did not ask the advertiser to clarify the basis for its contention after receiving the letter calling the poster into question, could not explain how its decision was related to preserving the advertising space for its intended use, and failed to implement an official policy governing the display of advertisements making contested claims. Id. at 257.

More recently, in American Freedom Defense Initiative ["AFDI"] v. SEPTA, 92 F. Supp. 3d 314, 326, 331 (E.D. Pa. 2015), Judge Goldberg granted a motion for a preliminary injunction because SEPTA had created a designated public forum through its advertising space on buses, and its restriction on certain "disparaging" advertisements was impermissibly content-based, discriminatory as to viewpoint, and not necessary to serve a compelling state interest. SEPTA had rejected a proposed advertisement about "Islamic Jew–Hatred" because it violated the following anti-disparagement standard: "Advertising that tends to disparage or ridicule any person or group of person on the basis of race, religious belief, age, sex, alienage, national origin, sickness or disability." Id. at 320.

Despite SEPTA's testimony that it did not intend to create a public forum, Judge Goldberg found that it had done so through policies and practices that failed to proscribe "political or public issue advertising" and did not limit advertisements to "commercial or

uncontroversial speech." Id. at 326. Further, SEPTA's policy did not survive strict scrutiny because it was not necessary to serve a compelling state interest—indeed, it would have had the same "beneficial effect" even if the prohibition was not limited to specific enumerated groups. Id. at 328 (citation omitted).

The parties dispute the relevance of Christ's Bride Ministries and AFDI to this case, considering the fact that SEPTA's adoption of the 2015 Advertising Standards was an express attempt at closing its advertising forum.

**IV. Legal Standard**

A preliminary injunction is "an extraordinary remedy never awarded as of right." Groupe SEB USA, Inc. v. Euro-Pro Operating LLC, 774 F.3d 192, 197 (3d Cir. 2014) (citing Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24 (2008)). When determining whether to grant injunctive relief, "the Court must consider whether: (1) Plaintiffs have demonstrated a likelihood of success on the merits; (2) Plaintiffs will be irreparably harmed by the denial of injunctive relief; (3) the balance of equities favors Plaintiffs; and (4) the public interest favors granting the injunction." Fulton v. City of Philadelphia, No. 187-2075, 2018 WL 3416393, at *7 (E.D. Pa. July 13, 2018).

The first two of these factors—likelihood of success on the merits and irreparable harm— are to act as "gateway factors." Id. at *8 (citing Reilly v. City of Harrisburg, 858 F.3d 173, 180 (3d Cir. 2017)). "Accordingly, when confronted by a motion for preliminary injunctive relief, a court must first determine whether the movant has met these two gateway factors before considering the remaining two factors—balance of harms, and public interest." Fulton, 2018 WL 3416393, at *8.

## V. Discussion

### a. Likelihood of success on the merits

#### i. Forum analysis

SEPTA begins its argument by asserting that the advertising space on its buses is a nonpublic forum. (Def.'s Resp. to Pl.'s Mot., ECF 21 at 21). CIR, on the other hand, argues that the space is a designated public forum. (Mot. at 45). At the September 14, 2018 hearing, CIR stipulated that it would accept that SEPTA's advertising space is a nonpublic or limited public forum, such that the proper guidelines for evaluating the 2015 Advertising Standards are whether SEPTA's limitations are reasonable.[8] (9/14/18 Hearing Tr. at 83:5-8). Accordingly, we proceed using that standard.[9]

#### ii. Whether SEPTA's 2015 Advertising Standards are reasonable in light of the purpose of the forum

CIR relies extensively on <u>Minnesota Voters Alliance v. Mansky</u>, 138 S. Ct. 1876 (2018) to support its proposition that the 2015 Advertising Standards "fail to 'articulate some sensible basis for distinguishing what may come in from what must stay out' . . . and are 'not capable of reasoned application.'" (Mot. at 21) (citing <u>Mansky</u>, 138 S. Ct. at 1888, 1892). In <u>Mansky</u>, the

---

[8] CIR cites two cases where the Third Circuit struck down a government actor's advertising restrictions without requiring a forum analysis. In <u>Pittsburgh League of Young Voters Educ. Fund v. Port Auth.</u>, 653 F.3d 290 (3d Cir. 2011), the Third Circuit expressly refrained from undertaking a forum analysis because there was sufficient evidence of viewpoint discrimination in the defendant transit authority's advertising restrictions. <u>Id.</u> at 296. More recently, in <u>Nat'l Ass'n for Advancement of Colored People v. City of Philadelphia</u>, 834 F.3d 435 (3d Cir. 2016) ("<u>NAACP</u>"), the Third Circuit acknowledged the district court's forum analysis but then decided such an analysis was irrelevant because the plaintiff met its burden of showing that the City owned airport's advertising restrictions were unreasonable. In so deciding, the Third Circuit explained that while "[s]ome types of forums require more than reasonableness, [] none allow less." <u>Id.</u> at 442.

[9] We also note that although SEPTA is not a publicly owned entity, no party has raised a concern that it should not be treated as such within this analysis.

Supreme Court held that Minnesota's statutory prohibition on any person wearing a political badge, button, or other form of insignia inside a polling place on Election Day was not capable of reasoned application and thus violated the First Amendment. County officials distributed an "Election Day Policy" to provide polling-place staffers guidance on the enforcement of the regulation, which specified that examples of apparel falling within the ban should "include, but [were] not limited to":

- Any item including the name of a political party in Minnesota, such as the Republican, [Democratic–Farmer–Labor], Independence, Green or Libertarian parties.
- Any item including the name of a candidate at any election.
- Any item in support of or opposition to a ballot question at any election.
- Issue oriented material designed to influence or impact voting (including specifically the 'Please I.D. Me' buttons).
- Material promoting a group with recognizable political views (such as the Tea Party, MoveOn.org, and so on).

Mansky, 138 S. Ct. at 1884.

In striking down the policy, the Supreme Court first held that a polling place is a nonpublic forum. Id. at 1886. Because Plaintiffs had made no argument that the policy was viewpoint discriminatory, the Court evaluated solely whether the state's ban was "'reasonable in light of the purpose served by the forum': voting." Id. at 1886 (citing Cornelius v. NAACP, 473 U.S. 788, 806 (1985)). The first three examples enumerated above constituted appropriate guidance on the policy, but the last two—issue oriented material and material promoting a group with recognizable political views—provided unreasonable discretion to the state's actors. Although "precise guidance has never been required," Ward v. Rock Against Racism, 491 U.S. 781, 794 (1989), an "indeterminate prohibition carries with it 'the opportunity for abuse, especially where it has received a virtually open-ended interpretation.'" Mansky, 138 S. Ct. at 1891 (quoting Bd. of Airport Comm'rs of City of Los Angeles v. Jews for Jesus, Inc., 482 U.S. 569, 576 (1987)). The "discretion must be guided by objective, workable standards." Id.

In <u>Mansky</u>, the Court highlighted various questions raised at oral argument that showed the final two guidelines were unclear: Was a t-shirt with a rainbow flag on it "issue oriented material designed to influence or impact voting?" <u>Mansky</u>, 138 S. Ct. at 1891. Was insignia from the AARP or Ben & Jerry's "material promoting a group with recognizable political views?" <u>Id.</u> at 1890.

Plaintiff contends that <u>Mansky</u> has fundamentally changed the law regarding analysis of content-based restrictions in a nonpublic forum such that the 2015 Advertising Standards are facially unconstitutional. SEPTA responds that the holding in <u>Mansky</u> is limited to polling places and did not disrupt the holding of a plurality of the Supreme Court in <u>Lehman v. City of Shaker Heights</u>, 418 U.S. 298 (1974).

In <u>Lehman</u>, a plurality of the Supreme Court affirmed the decision of the Ohio Supreme Court that a city policy prohibiting political advertisements in city bus advertising space did not violate the First Amendment because there was no public forum. 418 U.S. at 304. Justice Douglas concurred in the judgment.

The case involved a candidate for the Ohio General Assembly who wanted to place campaign advertisements on the Shaker Heights Rapid Transit System during the months leading up to an election. <u>Id.</u> at 299. The company who managed the advertising space for the City rejected the advertisement under the policy prohibiting political advertisements, which was imposed in order to "minimize chances of abuse, the appearance of favoritism, and the risk of imposing upon a captive audience." <u>Id.</u> at 304. In the twenty six years that the city had operated the transit company, it had not accepted or permitted any "political or public issue advertising" on its vehicles. <u>Id.</u> at 300-301. However, the City had accepted advertisements from "churches, and civic and public-service oriented groups." <u>Id.</u> at 300. The Supreme Court focused on the

15

nature of the contested forum—the advertising space on a public bus—and noted that the "streetcar audience is a captive audience. It is there as a matter of necessity, not of choice." Id. at 302 (citing Public Utilities Comm'n v. Pollak, 343 U.S. 451, 468 (1952) (Douglas, J., dissenting)). The plurality held that "a city transit system has discretion to develop and make reasonable choices concerning the type of advertising that may be displayed in its vehicles." Id. at 303.

Although Lehman was decided before the Supreme Court articulated its current standard for forum analysis in Perry Educ. Assn. v. Perry Local Educator's Assn., 46 U.S. 37, 46 (1983), this Court concludes that Lehman is strong precedent for "reasonable" speech restrictions in the context of public transit. SEPTA notes Mansky's citation to Lehman as support for its statement that "our decisions have long recognized that the government may impose some content-based restrictions on speech in nonpublic forums, including restrictions that exclude political advocates and forms of political advocacy." 138 S. Ct. at 1885-86. CIR urges us to limit our reading of Lehman, contending that SEPTA has "overstated the significance of Mansky's citation to Lehman." (Pl.'s Suppl. Br. at 4).

Even if the 2015 Advertising Standards are not intended to censor controversial speech, CIR argues that SEPTA bears the burden of proving that they are "reasonable" in light of the purpose of its advertising space. (Mot. at 41) (citing NAACP, 834 F.3d at 443). In NAACP, the Third Circuit held that the City's ban on non-commercial ads at the Philadelphia Airport was unreasonable, in violation of the First Amendment, after the City rejected a proposed advertisement regarding its high incarceration rates.[10] The City could satisfy its burden to show

---

[10] As explained above, the Third Circuit noted that a forum analysis was unnecessary, although it accepted the district court's conclusion that the airport advertising space was a limited or nonpublic forum. Id. at 442.

reasonableness using record evidence or commonsense inferences, and had to satisfy a two-step test:

1. Given that reasonableness "must be assessed in the light of the purpose of the forum and all the surrounding circumstances," id. at 445 (citing Cornelius, 473 U.S. at 809), the evidence or inferences must allow the Court to grasp the purpose to which the City has devoted the forum; and

2. The evidence or inferences also must provide a way of tying the limitation on speech to the forum's purpose. Id. at 445.

The City argued that the advertising space had two objectives: revenue maximization and controversy avoidance. Because the record contained no legitimate evidence that the ban was related to, or would further the goals of, revenue maximization or controversy avoidance,[11] and because commonsense inferences could not be drawn, the Third Circuit held the policy unreasonable in violation of the First Amendment. Id. at 448.

In light of the record evidence, in particular the lack of clarity surrounding SEPTA's reasons for and procedures in implementing the 2015 Advertising Standards, we are unable to make a determination about whether SEPTA can meet its burden. As Lehman makes clear, SEPTA has the discretion to develop and adopt reasonable choices concerning its advertising spaces. Without more evidence, we cannot say whether SEPTA's 2015 Advertising Standards

---

[11] Regarding the City's purported purpose of using the airport's advertising space for "controversy avoidance," the Third Circuit also noted that the Supreme Court "cautions against readily drawing inferences, in the absence of evidence, that controversy avoidance renders the ban constitutional." Id. at 446.

are reasonable, and thus cannot say whether CIR has shown a likelihood of success on the merits.[12]

b. **Irreparable Harm**

CIR argues that ongoing loss of First Amendment freedoms constitutes "irreparable injury" warranting a preliminary injunction. (Mot. at 50) (citing Elrod v. Burns, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time,

---

[12] SEPTA asserts that it adopted language from other transit advertising policies when formulating its own in 2015. Notably, the challenged portions of the 2015 Advertising Standards mirror the language used in New York's Metropolitan Transportation Authority policy, which prohibits advertisements "directed or addressed to the action, inaction, prospective action, or policies of a governmental entity" and those that "[p]rominently or predominately advocate or express a political message, including but not limited to an opinion, position, or viewpoint regarding disputed economic, political, moral, religious or social issues or related matters, or support for or opposition to disputed issues or causes." Vaguely Qualified Prods. LLC v. Metro. Transp. Auth., No. 15 CIV. 04952 CM, 2015 WL 5916699, at *3 (S.D.N.Y. Oct. 7, 2015) (granting a preliminary injunction in favor of Plaintiff organization where MTA held that advertisement for a documentary entitled "The Muslims Are Coming!" was in violation of its policy).

SEPTA's policy is also similar to DC's Washington Metropolitan Area Transit Authority policy which prohibited "advertisements intended to influence members of the public regarding an issue on which there are varying opinions" and "advertisements that are intended to influence public policy." Am. Civil Liberties Union Found. v. Washington Metro. Area Transit Auth., 303 F. Supp. 3d 11, 19, 26 (D.D.C. 2018). In ACLU, the Court denied plaintiff's motion for a preliminary injunction, holding that the WMATA's decision to remove advertisements promoting Milo Yiannopoulos's new book was reasonable and not viewpoint discriminatory, given that the advertisements were "intended to advance a campaign of persuasion on 'contemporary political and social issues.'" Id. at 20. The Court also found that plaintiff had not established a likelihood of success on the merits of his vagueness claim because the "distinctions drawn between the rejected advertisements and the accepted advertisements appear to reflect reasonable and appropriate differentiation between different kinds of advertisements." Id. at 27.

The County of Lackawanna Transit System (COLTS) policy also in relevant part mirrors SEPTA's by stating that "COLTS will not accept advertising… that [is] political in nature or contain[s] political messages, including advertisements involving political figures or candidates for public office, advertisements involving political parties or political affiliations, and/or advertisements involving an issue reasonably deemed by COLTS to be political in nature in that it directly or indirectly implicates the action, inaction, prospective action, or policies of a governmental entity." Northeastern Pa. Freethought Soc'y v. County of Lackawanna Transit System, 2018 WL 3344910 *4-5 (M.D. Pa. 2018)(appeal filed August 8, 2018, Docket 18-2743). This case dealt with a challenge to the portion of the policy regarding advertising speaking to the "existence or nonexistence of a supreme deity, deities, being or beings."

unquestionably constitutes irreparable injury."). CIR also asserts that it is harmed by not being able to display the advertisement in anticipation of an October 1, 2018 panel discussion where a Data Reporter from CIR will serve as a panelist and discuss its reporting. (Pl.'s Suppl. Br. at 3). In light of both of these considerations, CIR has shown irreparable harm, as monetary damages would not suffice to correct its potential injury of a violation of its First Amendment rights. See Reilly, 858 F.3d at 180, n.4.

### c. Balance of Equities and the Public Interest

The public interest does not clearly cut exclusively in favor of CIR in this case. There is an obvious and great public interest in the free exchange of views on political, social, and economic issues that CIR desires. On the other hand, there is a strong public interest in having a viable public transportation system in a large metropolitan area, such as the greater Philadelphia area, which SEPTA serves. As explained in Lehman, advertising space within "public transportation is a part of the commercial venture," and attracting and maintaining riders is a reasonable interest for a transit agency such as SEPTA. 418 U.S. at 303.

Regarding the balance of equities, both sides have presented valid arguments for this Court to consider. Of considerable importance for this decision on the preliminary injunction is the fact that, as illuminated on the September 14, 2018 hearing and explained herein, there remain a number of factual disputes and issues in this case that should be explained, and subjected to cross examination, at trial.

Lastly, this complaint was filed on May 2, 2018, and CIR did not seek a temporary restraining order. The Motion for Preliminary Injunction was filed on August 17, 2018. This is not intended as any criticism, but rather meant to highlight the fact that in moving for a preliminary injunction, some delay was necessitated in having discovery and briefing on the

important issues at stake here. We are in a position where the final trial will begin in less than one week, and will be completed promptly. The Court intends to prioritize the final disposition of this case so the parties can, if they so desire, submit the issues to the Third Circuit on appeal.

### 3. Conclusion

For all of the reasons herein, the Court in its discretion will deny the preliminary injunction without prejudice. Neither CIR nor SEPTA should make any conclusions or predictions as to the Court's final decision. The Court has not relaxed its intention to expand the scope of its analysis with a full trial record and a more detailed consideration of the issues.

An appropriate order follows.

O:\CIVIL 18\18-1839 Ctr for Investig Reporting v SEPTA\18cv1839 Memo on Prelim Inj.docx