## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE CENTER FOR INVESTIGATIVE REPORTING, | : <br> : <br> : <br> : |
| Plaintiff, | : <br> : CIVIL ACTION <br> : |
| v. | : <br> : |
| SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY, | : <br> : NO. 18-cv-01839-MMB <br> : |
| Defendant. | : <br> : |

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW OF PLAINTIFF THE CENTER FOR INVESTIGATIVE REPORTING

## TABLE OF CONTENTS

I.    FINDINGS OF FACT ........................................................................................... 1

     A.    SEPTA Advertising Opportunities .......................................................... 1

     B.    SEPTA's Advertising Standards ............................................................. 2

     C.    SEPTA'S Response to AFDI Ad ........................................................... 5

     D.    SEPTA's Digital Displays ..................................................................... 6

     E.    SEPTA's Process for Reviewing Proposed Advertising ........................ 9

     F.    SEPTA Has Accepted "Political" and "Public Debate" Advertising ................... 13

     G.    SEPTA Has Permitted Banks to Advertise that They Do Not Discriminate in Lending ............................................................................................. 18

     H.    SEPTA's Denial of CIR's Proposed Advertisement ............................ 20

II.   CONCLUSIONS OF LAW ............................................................................ 22

     A.    Forum Definitions and Applicable Standards ....................................... 22

     B.    The Challenged Provisions Are "Not Capable of Reasoned Application" and Confer Unbridled Discretion to Censor Speech ............................ 26

          1.    The Challenged Provisions Have the Same Fatal Flaws as the Provisions Struck Down in Mansky ........................................... 29

          2.    SEPTA's Inconsistent Application of the Challenged Provisions Underscores the Conclusion That They are Vague and Unworkable ........ 32

     C.    SEPTA's Characterization of Non-SEPTA Government Advertisements as Irrelevant to the Court's Analysis Because They are "Government Speech" Is Wrong ................................................................................ 33

     D.    The Challenged Provisions Are Not Viewpoint Neutral on Their Face or as SEPTA Applies Them ..................................................................... 34

          1.    Accepting "Equal Housing Lender" Bank Ads While Rejecting CIR's Ad Is Viewpoint Discrimination .................................... 35

          2.    SEPTA's Interpretation of subsection (a) as Permitting Ads Promoting Government Programs and Policies but Prohibiting Ads Seeking to Change Government Programs or Policies Is Viewpoint Discrimination ............................................................................. 36

3.      A Ban on "Matters of Public Debate" Is Indistinguishable from a Ban on Controversial Speech and Is Facially Viewpoint Discriminatory ............................................................37

E.      The Challenged Provisions Are Not "Reasonable" in Light of the Revenue-Generating Purpose of the Forum...........................................................37

F.      SEPTA's Advertising Space Is a Designated Public Forum, and the Challenged Provisions Do Not Satisfy Strict Scrutiny .........................................43

1.      SEPTA's Advertising Space Is Still a Designated Public Forum.............43

2.      The Challenged Provisions Fail Strict Scrutiny........................................44

Specific Responses to the Court's Letter of October 3, 2018.......................................Appendix A

# I.    FINDINGS OF FACT[1]

## A.    SEPTA Advertising Opportunities

1.      To generate revenue, SEPTA decided to lease space for conventional print advertising on the exterior and/or interior of many of the Authority's over 2,500 vehicles (including buses, trolleys, and trains) and in more than 200 stations and facilities.  Benedetti Dep. 15:21–16:6, 17:5–10; 18:6–10; Ex. 21; Trial Transcript ("Tr.") 67:7–10; Tr. 67:18–25 (confirming that SEPTA does not have to lease ad space and does so "for revenue reasons").[2]

2.      According to its own website, SEPTA provides "various ways for advertisers to effectively communicate with the approximately 1 million commuters that ride SEPTA each day."  Ex. 21.

3.      SEPTA contracts with Intersection, (formerly Titan Outdoor LLC), an independent, non-governmental entity, to sell advertising space on SEPTA vehicles and in SEPTA stations on SEPTA's behalf.  Benedetti Dep. 20:13–20.

4.      Generally, at any given time, some of SEPTA's advertisement space is empty or not leased.  Kelly Dep. 15:20–16:1.

---

[1]     Specific responses to questions posed in the Court's letter of October 3, 2018 appear at Appendix A, attached.  CIR incorporates the stipulated facts contained in ECF No. 37 and ECF No. 41.

[2]     The transcript of the deposition of SEPTA's Rule 30(b)(6) designee, Mr. Gino Benedetti ("Benedetti Dep.") appears at Ex. 111; the transcript of the deposition of SEPTA's Rule 30(b)(6) designee, Mr. Thomas Kelly ("Kelly Dep.") appears at Ex. 112; and the transcript of the deposition of CIR's Rule 30(b)(6) designee, Ms. Victoria Baranetsky ("Baranetsky Dep.") appears at Ex. 115.

**B.     SEPTA's Advertising Standards**

5.      SEPTA applies the same advertising standards (the "Advertising Standards") to all of its advertising spaces in and on all SEPTA vehicles and facilities.  Tr. 65:19–23.

6.      Any person or group may seek to advertise on SEPTA's advertising spaces, and SEPTA accepts both commercial and non-commercial advertisements.  Benedetti Dep. 19:14–20:9; Tr. 70:6–8.

7.      The Advertising Standards, which are contained in the contract between SEPTA and Intersection, currently list 22 categories of prohibited advertisements.  Ex. 22, §§ II.A.9(b)(iv)(a)–(v).

8.      The standards at issue in this case provide:

> Prohibited Advertising Content.  Advertising is prohibited on transit facilities, products and vehicles if it or its content falls into one or more of the following categories –
>
> (a)      Advertisements promoting or opposing a political party, or promoting or opposing the election of any candidate or group of candidates for federal, state, judicial or local government offices are prohibited. In addition, advertisements that are political in nature or contain political messages, including advertisements involving political or judicial figures and/or advertisements involving an issue that is political in nature in that it directly or indirectly implicates the action, inaction, prospective action or policies of a government entity.
>
> (b)      Advertisements expressing or advocating an opinion, position or viewpoint on matters of public debate about economic, political, religious, historical or social issues.

Ex. 22, at §§ II.A.9(b)(iv)(a)–(b).  The second sentence of subparagraph (a) and subparagraph (b) are collectively referred to as the "Challenged Provisions."

9.      SEPTA interprets the terms "political," "political in nature," "political message," and political "issues" as used in the Challenged Provisions as having the same meaning.  Benedetti Dep. 105:8–106:1.  When asked to define these terms, SEPTA's designee testified that

they mean "Of politics. It could mean—it does mean anything that deals with things that are political in nature. . . . Anything that one party may support and another doesn't. I don't mean any political party, but I mean individuals or groups." *Id.* 100:22–101:5. At trial, Mr. Benedetti testified that "political in nature" refers to something that "concerns or is about politics." Tr. 57:9–10. He also testified that something could "involve politics" and not violate the Advertising Standards. *Id.* 60:13–15.

10. Subparagraph (a) specifies that the political prohibition "includes"—but is not limited to—ads that "directly or indirectly implicate[] the action, inaction, prospective action, or policies of a government entity." Mr. Benedetti interprets this language as referring to ads that ask for or advocate for a government entity to take some action or change its policy (or refrain from taking some action or changing its policy). Benedetti Dep. 109:3–110:15; Tr. 85:6–19, 88:4–15.

11. The term "political" as used in subparagraph (a) has the same meaning as used in subparagraph (b). Benedetti Dep. 122:3–6.

12. When asked for his view of what constitutes a "government policy," SEPTA's designee responded, "it's hard for me to answer that answer abstractly." *Id.* 232:13–16.

13. When asked how an Intersection official was supposed to determine whether a particular advertisement or topic is "political in nature," SEPTA's designee responded, "Based upon the conversations I've had with him, Mr. Goldsmith has had with him, his lawyers have had with him, his understanding of the industry, his understanding of what's going on in the world." *Id.* 104:1–10. When asked if he could shed any light on where he gets his understanding of the term "political," SEPTA's general counsel responded, "I'm 56 years old. I've had some schooling. I've had some experience. Practiced law for a long time. Try to stay

up to date on things, talking to other people, you know, seeing what they think, getting their opinions. Any number of those kinds of things." *Id.* 117:20–118:4. He testified that other SEPTA and Intersection employees would interpret the term "political" in light of their own common sense, backgrounds, training, and discussions. Tr. 90:11–91:9.

14.     SEPTA also could not provide any clarity about what qualifies as an "issue" or when a topic rises to the level of being a "matter of public debate." *See* Benedetti Dep. 119:24– 120:7 (testifying that something becomes a "matter of public debate" when "I think if there's a— if it's something that's sort of got society's attention, it's not necessarily something that's parochial, local or, you know, what sports team you want to root for necessarily, but something that's reached the level that's being debated in the public."); Benedetti Dep. 120:13–16 (testifying that he couldn't determine whether an ad violated standard (b) if it didn't have a viewpoint and only concerned a "matter of public debate," unless he saw the ad); Tr. 91:23– 92:21. SEPTA also conceded that every ad has a "viewpoint." Benedetti Dep. 126:19–23.

15.     Although at trial Mr. Benedetti described the process of deciding whether something constitutes a "matter of public debate" as "mechanical," Tr. 57:19–22, neither his deposition testimony nor his trial testimony sheds any light on what that "mechanical" process consists of.

16.     The Advertising Standards do not have any separate rules that define or apply to "public service ads" or "PSAs." If SEPTA receives a proposal for a PSA, it reviews that advertisement against the same advertising standards as all other advertisements. *Id.* 64:21–24.

17.     If any aspect of a proposed advertisement violates the Advertising Standards, SEPTA's policy is to reject the advertisement. *Id.* 58:7–10.

## C.     **SEPTA'S Response to AFDI Ad**

18.     SEPTA adopted the Advertising Standards in May 2015, following this Court's decision in *AFDI v. SEPTA*, 92 F. Supp. 3d 314 (E.D. Pa., 2015), which declared that SEPTA's advertising spaces were a designated public forum and ordered SEPTA to allow AFDI's anti-Islamic advertisement to run on SEPTA's buses, *id.* at 327, 329.

19.     The AFDI advertisement is the only advertisement SEPTA was able to identify as having been vandalized due to the advertisement's content, although SEPTA's vehicles are often vandalized with graffiti, such as moustaches on the figures featured in advertisement artwork. Benedetti Dep. 160:6–8, 161:13–14; Tr. 96:13–97:6.

20.     In the 2015 amendment, SEPTA added prefatory language that stated that the express purpose of the Advertising Standards was "to accept such forms of advertising as will enhance the generation of revenues . . . without adversely affecting the patronage of passengers." Ex. 22 (section entitled "Non-Public Forum Status"). The amendment further stated that "SEPTA will retain strict control over the nature of the advertisements accepted for posting on or in its transit facilities, products, and vehicles and will maintain its advertising space strictly as a non-public forum." *Id.* In addition, the amendment added new categories of prohibited content, including the Challenged Provisions.

21.     SEPTA hoped that adding the new restrictions and prefatory language would turn its advertising spaces into a nonpublic forum, subject to lesser judicial scrutiny, and that it could thereby avoid having to run controversial advertisements like AFDI's that might prompt a negative response from riders, employees, or the media. Benedetti Dep. 54:12–55:9, 58:2–59:2; Tr. 45:6–15, 46:23–47:17, 68:1–3, 69:12–17; *see also* Benedetti Dep. 54:12–18 (when asked whether SEPTA analyzed the impact of the proposed 2015 Advertising Standards on riders' experience, responding, "I mean, we were adopting the standards to improve our riders'

experience."); Tr. 68:24–69:3 ("we want [ads] to fit within the standards and it's our belief that that will keep our riders safe, happy and not detract from our core mission of moving them around safely"); *id.* 69:8–11 (Advertising Standards represent an attempt to balance SEPTA's "revenue-generating goals for the ad space against the customer experience").

22.     SEPTA never analyzed whether amending the Advertising Standards would or did affect SEPTA's revenue or ridership.  Benedetti Dep. 54:5–11; Kelly Dep. 8:2–9:3.  At trial, Mr. Benedetti declined to say that he had any expectation that the Advertising Standards would have a positive impact on SEPTA's revenues.  *See* Tr. 52:8–12 ("Q: By improving the passenger experience, did you have an expectation in passing these standards, whether that would have a positive impact on passenger revenues?  A: Well, we passed it because we thought it would have a positive impact on our passengers.").

## D.     SEPTA's Digital Displays

23.     In addition to print advertising, the available advertising spaces on many SEPTA vehicles also include digital displays.  In SEPTA's newest line of buses, which are progressively replacing SEPTA's older vehicles, these displays are called "infotainment" systems.  The digital displays show a rotating selection of paid advertisements accepted by SEPTA interspersed with transit route information.  Ex. 27; Benedetti Dep. 18:24–19:4 (digital advertising currently available on trains and "a lot of" SEPTA buses); *id.* 24:20–25:24, 34:18–35:4; Tr. 73:18–76:11.

24.     From the time of CIR's first communication with SEPTA about possible advertising through at least the date of trial in this case, these digital displays also contained news headlines from the Associated Press and Reuters, interspersed with the digital ads and system information.  *Id.* 30:9–31:5 (screens show advertisements and news from Reuters and Associated Press and other information); *id.* 34:18–35:4 (digital displays have a 90- or 180-

second loop that contains news headlines from Associated Press or Reuters, advertisements, and SEPTA system information); ECF No. 41 ¶ 14.

25.     The news headlines shown to passengers on these digital displays could include anything that appears on the front page of a newspaper, including news about current events and political figures. Benedetti Dep. 31:23–33:22. For example, SEPTA confirmed that the headlines "U.S. Navy now allowing ponytails and other hairstyles for women, reversing policy that long forbade them to let their hair down" and "First Lady [Melania Trump] mingles with spouses of U.S. allies during two-day NATO summit in Brussels," both of which appeared on a digital display aboard a SEPTA vehicle, were representative of the type of news headlines that would appear on the digital displays. *Id.* 36:10–38:17; *see* Ex. 28.

26.     The website of Screenfeed, the company that supplied SEPTA buses with news feed content through a contract with Intersection, touts customers' ability to pre-approve the specific pieces of content that appear in its news feeds (or any other package of curated content) or to delete specific items after they appear in response to complaints. Exs. 110, 114.

27.     SEPTA did not review the content of the newsfeeds before the content was run in SEPTA's digital displays and has never exercised the option to refuse to run or take down any particular news items. *See* Tr. 79:15–18, 80:5–11; Ex. 110.

28.     Prior to this litigation, SEPTA never attempted to impose any restrictions or limits on the news content that might be displayed on the digital displays. Benedetti Dep. 32:18–33:22, 45:4–20, 139:12–16; Tr. 79:11–14.

29.     SEPTA's view is that the news content on its digital displays promote safety, efficiency, and comfort for passengers, because the infotainment "provides our customers with

information" and "gives them something to see while they're riding."  Benedetti Dep. 43:1–15; *see also* Tr. 78:9–79:10.

30.     After the preliminary injunction hearing in this matter, on September 21, 2018, SEPTA represented that it had directed Intersection to remove news headlines from the digital displays in SEPTA's buses and trains.  Tr. 62:22–64:14.  On October 1, 2018, Mr. Benedetti testified that it was his understanding that the newsfeeds were down, Tr. 64:12-14; however, he was incorrect.

31.     As of October 2, 2018, the newsfeeds were still running in SEPTA buses. ECF No. 41 ¶ 14.

32.     Mr. Benedetti testified at trial that running the newsfeeds in SEPTA's vehicles may be "incompatible with the forum being closed to political speech and speech on matters of public debate."  Tr. 80:20–23.

33.     At some SEPTA stations, SEPTA leases space for newsstands where SEPTA patrons can buy newspapers, magazines, and other periodicals.  Benedetti Dep. 40:1–41:1.  In response to a customer complaint, SEPTA asked its vendors not to display risqué periodicals, but SEPTA has never attempted to impose any other limits on the type of content that newsstands are allowed to sell or show to patrons.  *Id.* 41:2–17; Tr. 72:12–73:9.[3]

34.     SEPTA also leases space to other retailers within SEPTA stations and does not prohibit such retailers from having televisions or monitors showing the news, which some of them do.  Benedetti Dep. 41:18–42:16 (confirming that a store leasing space from SEPTA may

---

[3]     Bus shelters where SEPTA buses stop and some stations where SEPTA trains stop have advertising spaces owned by the City of Philadelphia or Amtrak, respectively, which are not subject to SEPTA's 2015 Advertising Standards.  Benedetti Dep. 39:10–22; Tr. 71:5–72:11.  The City of Philadelphia accepted CIR's proposed advertisement to run on City-owned bus shelters and newsstands.  *See* Baranetsky Dep. 77:23–78:22.

tune a television to Fox News, MSNBC, CNN or any other channel of the store's choosing);

Tr. 73:10–17. SEPTA passengers can generally see everything visible through the window of

SEPTA vehicles, and SEPTA stations and vehicles expose riders and employees to "the basic

onslaught of information that anyone experiences in the urban environment." Benedetti Dep.

43:16–44:17.

E.     **SEPTA's Process for Reviewing Proposed Advertising**

35.    All advertisements running on SEPTA's advertising spaces are reviewed by

Intersection and at least one SEPTA employee. *See* Benedetti Dep. 60:5–61:5, 64:13–17. If

Intersection deems an advertisement acceptable, the advertisement is relayed to at least one

SEPTA employee through a copy receipt. Among other tasks, the SEPTA employee is supposed

to ensure that the advertisement does not violate the Advertising Standards. *Id.* 63:24–65:3,

168:12–170:5. Advertisements that Intersection deems compliant, and that are not rejected or

removed by SEPTA's employee, run in SEPTA's advertising spaces. *Id.* 167:9–169:6.

36.    If Intersection receives a proposed advertisement that it believes may violate the

Advertising Standards, it must alert SEPTA's advertising department for review and approval.

Ex. 22, § II(A)(9)(a). Advertisements that Intersection and the reviewing SEPTA employee

believe fall in a "gray area" and may not comply with the Advertising Standards are elevated to

SEPTA's General Counsel, Mr. Benedetti, for further review. Benedetti Dep. 168:12–21.

37.    Mr. Benedetti is the final arbiter regarding whether an advertisement complies

with SEPTA's Advertising Standards. *Id.* 79:17–21; Tr. 81:2–5.

38.    SEPTA intentionally has not published any guidelines or written documents to aid

Intersection or SEPTA officials in interpreting the Advertising Standards. Benedetti Dep. 66:8–

68:5. There is no "written guidance that SEPTA has provided anywhere regarding how it

interprets the term political in nature." *Id.* 101:8–11. SEPTA explained that "[w]e purposely

don't do that because we want to evaluate each proposed ad against the standards and then engage in the process we engage in to determine whether or not it matches our standards or doesn't." *Id.* 69:3–18. Even after learning that ads had appeared on SEPTA vehicles that SEPTA believed violated the Challenged Provisions, SEPTA still did not draft any documents to explain what the Challenged Provisions prohibit. Tr. 83:18–84:1.

39.     SEPTA's designee testified that "everything related to our measuring whether or not a particular ad meets or doesn't meet the standards and our review of those ads is – comes from [the Advertising Standards]." Benedetti Dep. 66:19–24. And, "the only standard that SEPTA has in writing about what constitutes an ad that is political or not is in [the Advertising Standards]." *Id.* 116:2–6.

40.     The Advertising Standards are not available on SEPTA's website, and SEPTA does not offer the public any written guidance about how to determine whether or not an advertisement involves a "political issue" or a "matter of public debate." *Id.* 115:17–116:6; Tr. 81:6–83:17.

41.     Mr. Benedetti described his own personal process for determining whether a proposed advertisement elevated to his level of review violates the Challenged Provisions as follows:

> Q.     How do you go about determining whether something is subject to debate?
> A:     That's a good question.
>         What I do, generally speaking, is I look at the ad first, and I just kind of absorb it, for lack of a better word. I think about it.
>         And then I go on the internet and I Google various phrases about, you know, what the advertisement is projecting, what message it is, and I see what comes up, and I see if there's a meaningful debate about the issue that the advertisement is promoting.

Benedetti Dep. 102:13–24.

42.     Mr. Benedetti's process also may involve reviewing case law that he deems relevant. *Id.* 101:8–16, 126:8–12.  SEPTA's interpretation of its Advertising Standards may evolve over time because "[c]ase law can change how those standards are reviewed." *Id.* 277:1– 20; *see also* Tr. 70:9–71:4 (SEPTA is more likely to run public service announcements now than immediately after the *AFDI v. SEPTA* ruling).  There is no case law interpreting SEPTA's current Advertising Standards. *Id.* 89:21–25.

43.     Mr. Benedetti's process may also include discussing the advertisement with other SEPTA or Intersection employees or in-house or outside counsel. *E.g.*, Benedetti Dep. 183:4– 185:13 (testifying that he could not answer questions about whether a particular ad would be permissible "because I have to consult with counsel for sure on something like that and I would have to sit down with [in-house counsel] and talk it through and do searches and – it's not something I can do in a couple of minutes with you"); Tr. 55:3–17.

44.     SEPTA's designee testified that he cannot tell whether any advertisement concept or specific advertisement violates the Challenged Provisions without engaging in this amorphous deliberative process.[4]

---

[4]     Benedetti Dep. 106:24–107:22 (when asked whether an image of a political figure could appear on an advertisement without violating (a), responding, "It's hard for me to answer questions like that in a vacuum.  I don't do that.  I look at the ads and we go through kind of a complete process to really understand it."); *id.* 110:1–15 (when asked whether the government could advertise without violating (a), responding "It's really hard for me to do this in a vacuum . . . I do this with the documents, the ads in front of me, with a dialogue with folks, with some research and some thinking."); *id.* 114:18–115:16 (when asked to confirm that an advertisement that merely involves a political issue violates (a), responding, "I'd have to see the advertisement and [make a] judgment about the advertisement.  I can't just rule out anything without seeing it, being deliberative about it, applying the standards, looking at case law.  There's a process here that I undergo."); *id.* 125:8–126:7 (when asked to confirm that an advertisement would violate the "public debate" prohibition if it expressed an opinion, position or viewpoint on a matter that involves a social issue, as defined by SEPTA to mean a matter that involves society at large, responding, "It could or it could not.  I'd have to see the ad.  These are not abstract academic

45. For example, when asked whether an advertisement that said "Thank you, Mayor Kenney" would be permissible, SEPTA's designee responded, "I can't answer that without sitting down, going through the process, talking to [in-house counsel] Mr. Smith, reading the standards, understanding the context." Benedetti Dep. 108:1–9, 128:23–129:4.

46. SEPTA's designee also testified that he could not determine whether any of the following text would violate the Challenged Provisions:

- "Happy July Fourth"

- "Happy Ramadan"

- "Vote on Election Day"

- "You Have a Right to Vote"

- "Join the Boy Scouts"

- "Join the Military"

- "Do Not Join the Military"

- "U.S. Military: Defending Freedom"

- "ACLU: Defending Freedom"

- "AFDI: Defending Freedom"

- "Life, Liberty, and the Pursuit of Happiness"

- the text of the First Amendment

- "Don't Litter"

- "Only You Can Prevent Forest Fires"

- the text of the Fourteenth Amendment

_____

decisions. . . I need to see it and go through my process with the folks I talk to to make that determination.").

*Id.* 131:17–134:7.  He further testified that he was uncertain whether the nomination of Hillary Clinton was a "matter of public debate" without further research.  *Id.* 177:4–178:11.

47.     At trial, Mr. Benedetti was unable to identify whether a non-partisan advertisement encouraging people to register to vote would violate the Challenged Provisions. Tr. 105:9–106:16.

48.     SEPTA has no formal appeal process following SEPTA's denial of an advertisement.  Benedetti Dep. 78:17–79:16.  Sometimes, after deciding that a proposed advertisement violates the Advertising Standards, Mr. Benedetti will discuss the decision with the advertiser, and Mr. Benedetti might change his mind.  If Mr. Benedetti does not change his mind, the advertiser's only recourse is to file a lawsuit.  *Id.* 78:17–79:16, 115:17–116:1.

### F.    <u>SEPTA Has Accepted "Political" and "Public Debate" Advertising</u>

49.     Intersection has received and accepted at least 2,736 unique proposals for contracts to advertise in SEPTA advertising spaces since SEPTA implemented its 2015 Advertising Standards.  SEPTA has identified only 12 advertisements that it rejected in whole or in part,[5] as well as two additional advertisements that SEPTA initially accepted, but which Mr. Benedetti personally observed on SEPTA vehicles and ordered to be taken down because he

---

[5]     At trial, when asked on direct, "How many proposals has SEPTA actually rejected since the new standards come into effect in 2015?," Mr. Benedetti responded, "Not many."  Tr. 55:25–56:2.

thought they did not comply with SEPTA's Advertising Standards. Ex. 53 (July 17, 2018 email from J. Powell to Counsel);[6] Benedetti Dep. 74:10–20.[7]

50.     SEPTA has accepted and run numerous advertisements for governmental entities promoting government programs and policy, including the following:

       a.    SEPTA ran a pro-immunization advertisement for the federal Centers for Disease Control proclaiming "Help him fight measles with the most powerful defense. Vaccines." Ex. 43.

       b.    SEPTA ran an advertisement by the City of Philadelphia stating: "Your landlord must ensure your home is safe. . . If your landlord has not given you lead paint safety information, Call 311 or Visit Phila.Gov/LeadHealthyHomes." Ex. 44.

       c.    SEPTA ran an advertisement for the Philadelphia Department of Labor stating: "Employee or Contractor. Knowing the difference benefits you," and promoting a government website that helps the public learn about their legal rights. Ex. 45; Benedetti Dep. 236:19–238:2.

       d.    SEPTA ran an advertisement for the Montgomery County Health Department stating: "[e]mployers must provide a reasonable break time

---

[6]     At trial, Mr. Benedetti confirmed that Exhibit 53 and the pretrial stipulated facts erroneously list the "Safe Sleep" ad campaign (Ex. 58) as having been rejected, when in fact it was accepted. Tr. 88:20–89:8. And he could not say whether or not the Department of Homeland Security sex trafficking ad campaign (Ex. 56) was rejected, but he could not offer any explanation as to why it would have been rejected. Tr. 89:9–20; Benedetti Dep. 266:1–267:11.

[7]     SEPTA also rejected an advertisement for the Housing Equality Center. *See* Ex. 66. Although it does not appear on SEPTA's counsel's list of rejected ads, neither does it appear in any of SEPTA's records as an ad that was accepted. Mr. Benedetti testified that he remembered the ad submission, and could not explain why SEPTA would have rejected it. Benedetti Dep. 287:15–288:12.

for an employee to express breast milk for her nursing child for one year after the child's birth, as well as a private place to do so." Ex. 46. The advertisement directed readers in search of more information to a government website. *Id.*

e. SEPTA ran an advertisement for the Commonwealth of Pennsylvania stating: "Wanted by law enforcement? Tired of running? Surrender & see favorable considerations. SAFE RETURN." Ex. 47.

f. SEPTA ran an advertisement for the City of Philadelphia proclaiming the City's "bold goal of becoming a 90% zero waste AND litter-free City by 2035" and prompting residents to take specific steps to advance those goals. Ex. 49.

g. SEPTA ran an advertisement for the City of Philadelphia Department of Public Health stating: "Saving a Life Can Be This Easy," "Carry Naloxone (Narcan)," and "Prevent Opioid Overdose." Ex. 50.

h. SEPTA ran an advertisement from the Philadelphia Department of Health with the caption "Same Room. Different Beds. Better Rest for All." The advertisement directed people to a website at "SafeSleepPhilly.org." Ex. 58; Benedetti Dep. 269:1–15.

i. SEPTA may have run an advertisement from the federal Department of Homeland Security regarding sex trafficking, forced labor, and domestic servitude. Ex. 56; Benedetti Dep. 287:15-288:12.

j. SEPTA also ran advertisements by the Philadelphia FIGHT Community Health Center stating "Have you or someone you know been impacted by

mass incarceration?  Find out how to fight for your rights, and for the rights of your family, friends and community members."  Ex. 51.  The advertisement features drawings of wrists in handcuffs behind bars, a heart behind bars, and two people speaking on a telephone in a prison's visitation room.  *Id.*  At deposition, SEPTA's designee testified that he was unsure whether this advertisement was consistent with the Advertising Standards.  Benedetti Dep. 255:11–257:4.  Thereafter, in response to CIR's Motion for Preliminary Injunction, SEPTA argued that CIR was correct to allow this advertisement, although it did so without a supporting affidavit or testimony.  SEPTA Opposition (ECF No. 23) at 33.

51.     Each of these advertisements is "political in nature."  Each of these advertisements also "involv[es] an issue that . . . directly or indirectly implicates the action, inaction, prospective action or policies of a government entity."

52.     In addition, many of these advertisements involve issues that are controversial and matters of public debate.  *See, e.g.*, Exs. 84–85, 99–109.

53.     SEPTA has run ads on other controversial topics and matters of public debate, including the following:

a.     SEPTA ran an advertising campaign by Facebook, Inc., with statements such as:  "Fake news is not your friend" and "Clickbait is not your friend."  Ex. 113.  This campaign generated more than $250,000 in revenue for SEPTA in just three months.  Ex. 70 at 65 (showing revenue in May, June, and July 2018 pursuant to contract 21821349).

b.     SEPTA ran an advertisement for the American Friends Service Committee that challenged viewers to engage themselves in the fight for peace.  The advertisement displayed quotes from civil rights leaders, Martin Luther King, Jr., Cesar Chavez, and Lucretia Mott (all of whom SEPTA described as "controversial"), and, expressing the need for the viewer to be an active participant in fights for justice, asked rhetorically, "What will you do for peace?"  Ex. 33; Benedetti Dep. 182:5–14.

c.     SEPTA ran a series of advertisements for Fusion media that posited that people of many races, ethnicities, and religions are "As American As" the viewer's preconceived notions of American-ness.  Ex. 34; Benedetti Dep. 187:5–11.  Each advertisement said "CALLING ALL VOICES" and contained in huge lettering "AS AMERICAN AS" and "#ASAMERICANAS."  Ex. 34.  One advertisement showed a split-screen image featuring a woman who appears to be Muslim on one side, and on the other side, a male soldier in camouflage fatigues.  *Id.* at SEPTA_002765; *see also id.* at SEPTA_002759.  Another advertisement in the series showed a split-screen image of a woman of color in boxing gear, in front of an American flag on half of the screen, and draped in the Mexican flag on the other half of the screen.  *Id.* at SEPTA_002752.  Another showed a young Black child wearing a T-shirt that says "MY LIFE MATTERS."  *Id.* at SEPTA_002763, 64.  Others in the series featured children of color standing with their hands across their hearts (*id.*

at SEPTA_002753, 61) as well as other images of men and women of color (*id.* at SEPTA_002754–56, 58, 62–63).

54. SEPTA also accepted two ads welcoming members of the Democratic National Committee to the Democratic National Convention held in Philadelphia in 2016. Exs. 31–32; Benedetti Dep. 171:11–174:18. These ads generated more than $140,000 in revenue. Ex. 70 at 37 (showing revenue in July 2016 pursuant to contract 21629078). Mr. Benedetti testified that, in hindsight, he thinks some of these ads are acceptable, but that others violated the Challenged Provisions. Tr. 60:13–61:20; Benedetti Dep. 170:6–177:18.

### G. SEPTA Has Permitted Banks to Advertise that They Do Not Discriminate in Lending

55. SEPTA has allowed numerous advertisements that included the message that financial institutions do not discriminate based on race, including in mortgage lending. *See, e.g.*, Exs. 36–39. At the same time, SEPTA refuses to run CIR's advertisement on that same topic.

56. SEPTA has accepted numerous home loan-related advertisements identifying the advertiser as an "Equal Opportunity Lender" or "Equal Housing Lender." *See, e.g.*, Ex. 35; Ex. 36; Ex. 38; Ex. 39. Pursuant to federal law, the inclusion of those phrases or the equal housing lender logo is a representation that the lender makes home loans "without regard to race, color, religion, national origin, sex, handicap, or familial status." 12 C.F.R. § 338.3(a) ("Nondiscriminatory advertising"). All advertising regarding home loans must "prominently indicate" that the lender does not discriminate on the basis of any of these protected characteristics. *Id.*

57. Many of these advertisements feature African-American models. *E.g.*, Ex. 36; Ex. 38; Ex. 39; *see also* Ex. 37 (featuring African-American couple in apparent new home with slogan "Bank here to get there. FINANCIAL SOLUTIONS FOR YOUR LIFE.").

58.     For example, an advertisement from Tompkins VIST Bank shows an image of an African-American couple and child in front of a stack of moving boxes and says "Making your dream of home ownership a reality," and bears the Equal Housing Lender language and logo. *See* Ex. 38; Benedetti Dep. 200:1–7.  This advertisement is a near perfect inverse of the panel in CIR's proposed advertisement stating, "Today in America people of color are regularly being denied the dream of home ownership."  Ex. 24.  Yet, SEPTA accepted Tompkins VIST Bank's advertisement while rejecting CIR's.

59.     A Wells Fargo advertisement proclaims the virtues of Wells Fargo's "NeighborhoodLIFT program," which provides down payment assistance and financial education to homebuyers of modest income.  Ex. 39; Ex. 40.  Both the advertisement and the website prominently featured in the advertisement show various African-American individuals. *Id.*  Wells Fargo's website further displays a video and transcript, in which Wells Fargo is praised for giving people "faith in banks."  Ex. 40.

60.     SEPTA's designee testified that Wells Fargo was one of the parties to litigation concerning discriminatory lending, but he could not specifically recall if the litigation he reviewed was the high-profile litigation in the Eastern District of Pennsylvania.  Benedetti Dep. 12:22–13:14.

61.     Wells Fargo is a defendant in litigation regarding alleged discriminatory lending practices, including alleged reverse redlining.  *City of Philadelphia v. Wells Fargo & Co., et al*, Civ. A. No. 17-02203 (E.D. Pa. 2017).  The CIR ad specifically discusses this very practice.  Ex. 7 (discussing "reverse redlining" and noting that "[l]enders flooded communities of color with inferior loan products AND limited access to conventional lines of credit"); Ex. 83 (same).

62. One of SEPTA's letters rejecting CIR's advertisement noted that "The subject of the proposed advertisement is disputed in class action litigation pending in the courts." Ex. 19 (Mar. 29, 2018 ltr. from G. Benedetti to V. Baranetsky). Thus, SEPTA has allowed the lead defendant in that litigation to advertise programs directly related to the subject matter of the litigation, but has—in part based on the pendency of the litigation—denied CIR the right to speak on the same topic.

## H. SEPTA's Denial of CIR's Proposed Advertisement

63. In January 2018, CIR applied to place a paid advertisement on the interior of SEPTA buses. Ex. 30. CIR wanted to post a journalistic graphic derived from the 10-panel comic appearing on Reveal's website. *See* Ex. 81 (Gabriel Hongsdusit and Cristina Kim, *A Stacked Deck: A visual look at discriminatory lending in the U.S.,* Reveal, (Feb. 21, 2018), *available at* https://www.revealnews.org/article/a-stacked-deck-a-visual-look-at-discriminatory-lending-in-the-u-s/); Ex. 10. The comic and advertisement arose out of CIR's reporting about racial disparities in mortgage lending—reporting that was confirmed by the Associated Press. Ex. 16.

64. Intersection informed CIR that SEPTA would not accept CIR's proposed advertisement because, according to SEPTA's legal department, "[d]isparate lending is a matter of public debate and litigation." Ex. 30. CIR and SEPTA then exchanged four letters between March 2 and March 29, 2018. *See* Exs. 16–19. Ultimately, SEPTA reiterated its position that CIR's proposed advertisement is prohibited by the Advertising Standards because the advertisement "takes a position on issues that are matters of political, economic, and social debate" and "indirectly implicates the action, inaction, prospective action or policies of a government entity," in violation of the Challenged Provisions. Ex. 17; Ex. 19.

65.     Other than supposedly violating the Challenged Provisions, SEPTA has disclaimed any other justification for rejecting CIR's ad.  Ex. 24 at 5, 7 (SEPTA Resps. to Interrog. Nos. 1 & 3); Benedetti Dep. 83:2–85:17, 98:1–5.

66.     If CIR had proposed the advertisement for display in spaces other than inside SEPTA's buses, SEPTA would have rejected the advertisement for the same grounds.  Tr. 95:6–21.

67.     Prior to this litigation, SEPTA never identified specific panels or aspects of the proposed advertisement that concerned SEPTA, stating only that, in SEPTA's view, CIR's advertisement addressed the subject of "disparate lending."  SEPTA did not invite CIR to amend its proposal in any manner before rejecting it.  *See* Exs. 16–19.  However, during his deposition, Mr. Benedetti identified two images in CIR's advertisement that personally stood out to him as violative of SEPTA's Advertising Standards: an image showing keys attached to sticks of dynamite handed from a white hand to a black hand, and an image Mr. Benedetti interpreted as showing protesters yelling at a white banker.  Benedetti Dep. 156:9–12; 157:17–158:3.

68.     To address Mr. Benedetti's stated concerns, CIR drafted an additional proposed advertisement without those design elements, which it submitted to Intersection and SEPTA on August 6, 2018.  Ex. 83 (Aug. 6, 2018 email from G. Hongsdusit to J. Roche); *id.* (Aug. 6, 2018 ltr. from J. Stapleton to M. Madden, et al.).

69.     On September 21, 2018, after being directed by the Court to formally respond to CIR's additional proposed advertisement, SEPTA rejected the proposal.

## II.     CONCLUSIONS OF LAW

The Challenged Provisions are unconstitutional regardless of whether the Court determines that SEPTA's advertising space is a designated public forum or a nonpublic forum. If the space is analyzed as a designated public forum, they are unconstitutional because they fail strict scrutiny. If the space is analyzed as a nonpublic forum, they are unconstitutional because: (1) they are unconstitutionally vague and not capable of reasoned application; (2) they are not viewpoint neutral; and (3) they are not "reasonable" attempts to preserve the forum for its intended purpose. *See Christ's Bride Ministries, Inc. v. SEPTA*, 148 F.3d 242, 255 (3d Cir. 1998) (ruling in the alternative that SEPTA's advertising space was a designated public forum and its restrictions on speech were unconstitutional because they did not meet strict scrutiny, and also that, even assuming a nonpublic forum, SEPTA's restrictions were also not "reasonable").

In fact, because the Challenged Provisions are unconstitutional either way, the Court need not even reach the issue of determining the legal status of the forum. *See, e.g., NAACP v. City of Phila.*, 834 F.3d 435, 442 (3d Cir. 2016) (assuming, without deciding, that the district court was correct that the airport advertising space was a nonpublic forum); *Pittsburgh League of Young Voters Educ. Fund v. Port Auth. of Allegheny County*, 653 F.3d 290, 296 (3d Cir. 2011) (noting that courts "need not tackle the forum-selection question" when the regulation would be invalid in any type of forum).

### A.     Forum Definitions and Applicable Standards

1.     The relevant "forum" in this case is all of SEPTA's advertising space. In *Christ's Bride*, SEPTA rejected an ad that the plaintiff had proposed to run in select SEPTA stations (not on vehicles). The Third Circuit held that the relevant forum was "SEPTA's advertising space" and that advertisements running on SEPTA's buses were relevant to the court's determination because such advertisements were governed by the same standards as advertisements in

SEPTA's stations. *Christ's Bride*, 148 F.3d at 248, 251-52. Today, the same Advertising Standards govern all of SEPTA's ad space, so under *Christ's Bride*, the forum is all SEPTA advertising space.

2.     Government-owned property that does not qualify as a traditional public forum (such as public streets and parks) is characterized either as a "designated public forum" or a "nonpublic forum" (also sometimes called a "limited public forum"). *NAACP*, 834 F.3d at 441.

3.     A designated public forum is government-owned property that the government has "opened up for use by the public as a place for expressive activity." *Pittsburgh League of Young Voters*, 653 F.3d at 296.

4.     A nonpublic forum is government property that has been opened up for speech dedicated to certain narrow purposes. *See*, *e.g. Rosenberger v. Record & Visitors of the Univ. of Va.*, 515 U.S. 819 (1995) (government could create student activities fund as a nonpublic forum restricted to student groups meeting certain criteria); *Eichenlaub v. Twp. of Indiana*, 385 F.3d 274 (3d Cir. 2004) (township could create nonpublic "citizen's forum" at town government meeting and restrict comment to only issues germane to town government); *Pleasant Grove City, Utah v. Summum,* 129 S. Ct. 1125, 1127 (2009) (government creates a nonpublic forum when it provides for "a forum that is limited to use by certain groups or dedicated solely to the discussion of certain subjects"); *Kreimer v. Bureau of Police*, 958 F.2d 1242, 1261 (3d Cir. 1992) (government could restrict use of public library as a nonpublic forum for "reading, writing and quiet contemplation" but not for "oral and interactive" First Amendment activities).

5.     The Challenged Provisions are content-based restrictions on speech. A restriction on speech is "content-based" if the court must look to the speaker's topic, message, or words in order to determine its permissibility. *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015)

("Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed . . . .").

6. When the government restricts speech based on its content, the restriction is presumptively invalid, and the government bears the burden to rebut that presumption. *E.g., United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 816–17 (2000) (citations omitted). The Third Circuit explained in *NAACP* that, even in a nonpublic forum, the government bears the burden to justify its restrictions under the applicable standards. *NAACP*, 834 F.3d at 443.

7. In a designated public forum, content-based restrictions on speech are subject to strict scrutiny. In order to justify a content-based restriction on speech in a designated public forum, the government must show that the restrictions are "narrowly tailored" to a "compelling governmental interest." *Pittsburgh League of Young Voters*, 653 F.3d at 295 (citation omitted); *see also NAACP*, 834 F.3d at 441 (strict scrutiny requires narrow tailoring and the absence of less restrictive alternatives).

8. A "compelling governmental interest" is an interest "of the highest order," which is "unusually important" and weightier than a "significant" or "substantial" interest. *United States v. Marcavage*, 609 F.3d 286–87 (3d Cir. 2010) (collecting cases).

9. A restriction on speech is not "narrowly tailored" if it is not necessary to achieve the government's claimed interest, *see Globe Newspaper Co. v. Super. Ct. for Norfolk Cnty.*, 457 U.S. 596, 609–10 (1982), if it is over- or under-inclusive, *see First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 793–95 (1978); or if it is not the least restrictive means of achieving the government's asserted interest, *see Sable Communications v. FCC*, 492 U.S. 115, 126–31 (1989).

10.     In any forum, a restriction on speech is unconstitutional if it is so vague that it

gives officials virtually unbridled discretion to censor speech.  *See infra* ¶ 16 (collecting cases).

11.     In a nonpublic forum, content-based restrictions are permitted only if they are

"reasonable" attempts to preserve the forum for its intended purpose, which means that they

must be "designed to confine the 'forum to the limited and legitimate purposes for which it was

created.'"  *Eichenlaub*, 385 F.3d at 280 (quoting *Rosenberger*, 515 U.S. at 829); *see also*

*Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985) (government

can restrict speech in a nonpublic forum to "preserve the property under its control for the use to

which it is lawfully dedicated." (quoting *Greer v. Spock*, 424 U.S. 828, 836 (1976)); *Christ's*

*Bride*, 148 F.3d at 255 (in a nonpublic forum, the reasonableness of restrictions on speech is

analyzed by reference to the nature and purpose of the forum).

12.     In addition, content-based restrictions on speech in a nonpublic forum are

unconstitutional if the government was motivated by "the nature of the message rather than the

limitations of the forum."  *Sammartano v. First Judicial Dist. Ct.*, 303 F.3d 959, 970–71 (9th Cir.

2002).

13.     Content-based restrictions on speech in a nonpublic forum must be viewpoint

neutral.  *E.g.*, *NAACP*, 834 F.3d at 441; *Pittsburgh League of Young Voters*, 653 F.3d at 296

(citing *Cornelius*, 473 U.S. at 800).

14.     For the reasons set forth below, *see infra* § II.D.1, SEPTA's advertising space

remains a designated public forum.  SEPTA still accepts the vast majority of proposed

advertisements, including ads from both commercial and non-commercial entities on a wide

range of topics.  And, critically, SEPTA continues to accept advertisements promoting

government programs and policies and advertisements addressing topics about which there are

demonstrable public debates. SEPTA has also intentionally exposed riders to news headlines similar to the kind of content that SEPTA purports to prohibit in advertisements.

15. However, even if SEPTA's advertising space were a nonpublic forum, the Challenged Provisions are still unconstitutional for three independent reasons. First, the Challenged Provisions are unconstitutionally vague and not capable of reasoned application. Second, the Challenged Provisions are not viewpoint neutral on their face or as SEPTA has applied them. Third, the Challenged Provisions are not "reasonable" in light of the purpose of the forum, *i.e.*, revenue-generation.

### B. The Challenged Provisions Are "Not Capable of Reasoned Application" and Confer Unbridled Discretion to Censor Speech

16. Long before *Minnesota Votes Alliance v. Mansky*, it was settled law that restrictions on speech violate the First Amendment if they are so vague that they do not meaningfully constrain officials' discretion. *E.g.*, *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 537–38 (1981) (Brennan, J., concurring) (observing that "[a]ccording such wide discretion to city officials to control the free exercise of First Amendment rights is precisely what has consistently troubled this Court in a long line of cases") (collecting cases); *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975) ("the danger of censorship and of abridgement of our precious First Amendment freedoms is too great where officials have unbridled discretion over a forum's use."); *Sypniewski v. Warren Hills Regional Bd. of Educ.*, 307 F.3d 243, 266 (3d Cir. 2002) (indeterminate, content-based regulation of speech "'may authorize and even encourage arbitrary and discriminatory enforcement' by failing to 'establish minimal guidelines to govern . . . enforcement.'" (quoting *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999); *Kolender v. Lawson*, 461 U.S. 352, 358 (1983))); *Kalman v. Cortes*, 723 F. Supp. 2d 766, 803 (E.D. Pa. 2010) (Baylson, J.) (invalidating state Blasphemy Statute as

unconstitutional because, among other reasons, "Bureau employees are left with 'unbridled discretion' to determine, in the absence of any standards, training, education, or guidance, which corporate names survive or fail the Blasphemy Statute, and thus 'who may speak and who may not based upon the content of the speech or the viewpoint of the speaker.'" (quoting *City of Lakewood v. Plain Dealer Publ'g*, 486 U.S. 750, 763 (1988))); *Child Evangelism Fellowship of N.J., Inc. v. Stafford Twp. Sch. Dist.*, 233 F. Supp. 2d 647, 666 (D.N.J. 2002), *aff'd*, 386 F.3d 514 (3d Cir. 2004).

17.     First Amendment challenges to laws that vest officials with unbridled discretion to censor speech can be brought as facial challenges. *City of Lakewood*, 486 U.S. at 758.

18.     *Mansky* considered a content-based restriction on "political" speech in a nonpublic forum and analyzed various definitions of the term "political," determining which definitions were sufficient to survive constitutional scrutiny and which were not. *Minn. Voters Alliance v. Mansky*, 138 S. Ct. 1876 (2018).

19.     *Mansky* determined that the following definitions of "political" that were all tied to campaign-specific speech were "clear enough," *id.* at 1889:

- "Any item including the name of a political party in Minnesota, such as the Republican, [Democratic–Farmer–Labor], Independence, Green or Libertarian parties." *Id.* at 1884 (quoting Minnesota official policy).

- "Any item including the name of a candidate at any election." *Id.*

- "Any item in support of or opposition to a ballot question at any election." *Id.*

20.     *Mansky* determined that the following definitions of "political" were too vague and not capable of reasoned application, and vested unbridled discretion in the government:

- "[P]olitical badge, political button, or other political insignia," *id.* at 1883 (quoting Minn. Stat. § 211B.11(1) (2017)).

- "[A]nything 'of or relating to government, a government, or the conduct of governmental affairs,'" *id.* at 1888 (quoting Webster's Third New International Dictionary 1755 (2002)).

- "[A]nything '[o]f, relating to, or dealing with the structure or affairs of government, politics, or the state,'" *id.* (quoting American Heritage Dictionary 1401 (3d ed. 1996)).

- "Issue oriented material designed to influence or impact voting (including specifically the 'Please I.D. Me' buttons)," *id.* at 1884 (quoting Minnesota official policy).

- "Material promoting a group with recognizable political views (such as the Tea Party, MoveOn.org, and so on)," *id.*

21.    *Mansky* held that those definitions of "political" that were incapable of reasoned application were not "reasonable." Previously, some courts had analyzed vagueness and unbridled discretion as a wholly separate question from whether a restriction is "reasonable," but *Mansky* makes clear that vagueness and unworkability is part of a "reasonableness" analysis.

22.    SEPTA interprets *Lehman v. City of Shaker Heights*, 418 U.S. 298 (1974), as standing for the proposition that any definition of the term "political" in a transit authority's restriction on speech is automatically constitutional, but that is not what *Lehman* held. *Lehman* concerned the very specific question of "whether a city which operates a public rapid transit system and sells advertising space for car cards on its vehicles is required by the First and Fourteenth Amendments to accept paid political advertising *on behalf of a candidate for public*

*office*." *Id.* at 299 (emphasis added). The Court answered that specific question "No," but that question is very different than the question presented by CIR's challenge. *Mansky* recognized that a restriction on campaign-specific political speech could be constitutional, 138 S. Ct. at 1886, but struck down a broader ban on political speech, *id.* at 1890–91. CIR's advertisement was not campaign-specific and the Challenged Provisions go far beyond campaign-specific speech.

23.    Nothing about *Mansky*'s rationale for invalidating Minnesota's restrictions is limited to polling places; the unconstitutionality of the restrictions stemmed from the text of the restrictions, not from the physical location. Contrary to SEPTA's contention that *Mansky* is irrelevant to transit cases, the D.C. Circuit specifically reversed and remanded the district court's grant of summary judgment in favor of the transit authority, which justified its restriction on speech as a "political" prohibition, for consideration of whether WMATA's restrictions were "reasonable . . . in light of [*Mansky*]." *AFDI v. WMATA*, 901 F.3d 356, 363 (D.C. Cir. 2018). The court explained:

> *Mansky* invites arguments about whether Guideline 9 is capable of reasoned application. Moreover, WMATA's defense of the Guidelines against AFDI's unbridled discretion/vagueness challenge was that it banned AFDI's advertisements as "political" speech, which is not unconstitutional. That argument might be unavailing in light of *Mansky*.

*Id.* at 373.

### 1.    The Challenged Provisions Have the Same Fatal Flaws as the Provisions Struck Down in Mansky

24.    The language of the Challenged Provisions and the statute and policy at issue in *Mansky* are exceptionally similar. The second sentence of SEPTA's subsection (a) is nearly identical to the common dictionary definitions of the word "political" that the Court deemed too

"expansive" in *Mansky*. *Mansky*, 138 S. Ct. at 1888 (defining "political" as "of or relating to government, a government, or the conduct of governmental affairs," or anything "[o]f, relating to, or dealing with the structure or affairs of government, politics, or the state"). Findings of Fact, *supra*, ("FOF") ¶ 8 (citing Ex. 22). Indeed, at trial, Mr. Benedetti defined "political in nature" as something that "concerns or is about politics." FOF ¶ 9.

25.     SEPTA's ban on "matters of public debate" is similar to—but even broader and even more amorphous than—Minnesota's prohibition on "[i]ssue-oriented material" regarding political matters. Whereas the statute struck down in *Mansky* dealt only with political issues, SEPTA's subsection (b) extends to "matters of public debate about economic, political, religious, historical or social issues." FOF ¶ 8 (citing Ex. 22). As in *Mansky*, SEPTA has not provided any clarity about when a topic rises to the level of being a "matter of public debate." FOF ¶ 14. Likewise, SEPTA has provided no "articulated definitive standard" for what constitutes a matter of public debate. *See AFDI v. SMART*, 698 F.3d 885, 894 (6th Cir. 2012). Rather, SEPTA's designee testified that he made these determinations subjectively based on amorphous research on the Internet. FOF ¶ 41.

26.     In addition, SEPTA's own cited authority demonstrates that banning speech because it is subject to debate is unconstitutionally vague. The Sixth Circuit opinion in *AFDI v. SMART*, 698 F.3d at 893—which SEPTA itself has relied upon—explains that restricting speech regarding "controversial public issues" is too inherently subjective. In that case, the Sixth Circuit stated: "We found unbridled discretion had been vested in the decisionmakers because there was no articulated definitive standard to determine what was 'controversial.' This discretion allowed for the arbitrary rejection of advertisements based on viewpoint." 698 F.3d at 894 (discussing *United Food & Comm'l Workers Un., Local 1099 v. Sw. Ohio Reg'l Transit*

*Auth.*, 163 F.3d 341, 352 (6th Cir. 1998)); *see also United Food & Comm'l Workers*, 163 F.3d at 359 ("We have no doubt that standing alone, the term 'controversial' vests the decision-maker with an impermissible degree of discretion.").

27.     The very definition of "controversy" *is* a "matter of public debate." Ex. 97, "Controversy," YourDictionary.com, www.yourdictionary.com ("The definition of a controversy is a *public* disagreement with two sides openly *debating*.") (emphasis added);[8] Ex. 98, "Controversy," Dictionary.com, www.dictionary.com (defining "controversy" as a "prolonged *public* dispute, *debate*, or contention; disputation concerning a matter of opinion") (emphasis added). Thus, SEPTA's ban on "matters of public debate" is a grant of unbridled discretion no different from the bans on "controversial" ads discussed in *AFDI v. SMART* and *United Food & Commercial Workers*.

28.     SEPTA's "public debate" prohibition is not narrowed meaningfully by the requirement that the advertisement "express[] or advocate[e] an opinion, position or viewpoint" on the matter of public debate. The Third Circuit, in striking down a restriction on "all speech that promotes any point of view, whether 'religious, commercial or secular,'" observed that "[a]ll community-group speech promotes a point of view. All of the specifically approved groups, including such familiar and well-regarded groups as the PTA and the 4-H Club, have a point of view. Thus, this criterion is devoid of meaning." *Child Evangelism Fellowship*, 386 F.3d at 528. SEPTA conceded that every advertisement offers a viewpoint. FOF ¶ 14 (citing Benedetti Dep. 126:19–23).

---

[8]     SEPTA relied upon www.yourdictionary.com to interpret CIR's advertisement. *See* SEPTA Opp. (ECF No. 23) 43.

29.     As in *Mansky*, how an official applies the Challenged Provisions "may turn in significant part on the background knowledge and media consumption of the particular [person] applying it." *Mansky*, 123 S. Ct. at 1890; FOF ¶ 13.

30.     Moreover, while Minnesota at least attempted (albeit unsuccessfully) to cure the vagueness of its prohibitions by promulgating official, clarifying guidance, SEPTA has not even attempted to cure the facial vagueness of the Challenged Provisions. SEPTA "purposely" chose not to promulgate any guidelines to clarify what constitutes a "political" issue or a "matter of public debate." FOF ¶ 38 (citing Benedetti Dep. 66:8–69:18, 101:8–13). And even after learning that SEPTA had erroneously accepted ads that violated the Challenged Provisions, SEPTA still did not draft any documents to help explain what the Challenged Provisions prohibit. FOF ¶ 38 (citing Tr. 83:18–84:1).

### 2.     SEPTA's Inconsistent Application of the Challenged Provisions Underscores the Conclusion That They are Vague and Unworkable

31.     The Court need not examine how SEPTA has applied the Challenged Provisions in order to conclude that they are vague, unworkable, and not capable of reasoned application. As discussed above, their inherent vagueness and unbridled discretion are evident merely from reading the Challenged Provisions and comparing them to the prohibitions at issue in *Mansky*.

32.     However, SEPTA's inconsistent interpretation and application of the Challenged Provisions further illustrates the vagueness of these provisions. *E.g.*, *AFDI v. WMATA*, 901 F.3d at 373 ("Guideline 9 has been in place for nearly three years, and information on how it has been applied would certainly be information as to whether it is capable of reasoned application.").

33.     SEPTA has accepted many ads promoting government programs or policies, as well as others that are "political" as SEPTA has defined that term, and others that address "matters of public debate" as SEPTA has defined that term. FOF ¶¶ 49–54.

34.     And SEPTA's understanding of what the Challenged Provisions mean has changed over time with developments in case law.  FOF ¶ 42.

35.     SEPTA's General Counsel has also changed his mind about whether some of the ads SEPTA accepted comport with the Challenged Provisions, including an ad welcoming the Democratic National Convention and an ad directed at victims of "mass incarceration."  FOF ¶¶ 50(j), 54.

36.     SEPTA's inability to consistently apply the Challenged Provisions or to offer an interpretation of them that explains their past conduct further demonstrates that broad restrictions on "political" speech and "public debate" are inherently subjective and incapable of reasoned application.  As a result, as the Supreme Court held in *Mansky*, they are necessarily "unreasonable" and unconstitutional.

**C.      SEPTA's Characterization of Non-SEPTA Government Advertisements as Irrelevant to the Court's Analysis Because They are "Government Speech" Is Wrong**

37.     SEPTA has argued that numerous non-SEPTA-sponsored government advertisements in Exhibits 43–50 are irrelevant to this Court's review because they are "government speech."  SEPTA Opp. (ECF No. 23) 29–31.  This is incorrect and a distortion of the government speech doctrine.  *See Matal v. Tam*, 137 S. Ct. 1744, 1758 (2017) (cautioning that the doctrine "is susceptible to dangerous misuse").

38.     The government speech doctrine stands for the uncontroversial proposition that, in certain circumstances, when the government is acting as a speaker, rather than as a censor, it has the same right to speak freely as private entities, and is not required to maintain viewpoint neutrality in its own speech.  *E.g.*, *id. at* 1757.

39. However, the government speech doctrine does not make irrelevant in this case SEPTA's decision to provide a forum for *other* governments to speak, which is what SEPTA did in the ads in Exhibits 43–50.

40. SEPTA's reliance on *Pittsburgh League of Young Voters Education Fund v. Port Authority of Allegheny County*, Civ. No. 06-1064, 2008 WL 4965855, *14–15 (W.D. Pa. Aug. 14, 2008), quoted in SEPTA's Opposition at 30-31, is wholly misplaced. In that action, the Western District of Pennsylvania held the government speech doctrine did ***not*** render even advertisements the defendant Port Authority had co-sponsored with other government bodies irrelevant to the court's forum analysis. 2008 WL 4965855, at *14. The court explained that these co-sponsored government ads were relevant because "[t]o refuse to consider an advertisement sponsored by another agency when reviewing Port Authority's actions would allow Port Authority to shield viewpoint-based decisions by asking another government agency to co-sponsor a message." *Id.* at *15. SEPTA is not a co-sponsor of the government advertisements identified in this action, and so, *a fortiori*, they are relevant to the forum analysis here.

### D. The Challenged Provisions Are Not Viewpoint Neutral on Their Face or as SEPTA Applies Them

41. "Viewpoint discrimination" occurs when the government "'targets not subject matter, but particular views taken by speakers on a subject.'" *Pittsburgh League of Young Voters*, 653 F.3d at 296 (quoting *Rosenberger*, 515 U.S. at 831). "Once the government permits discussion of certain subject matter, it may not impose restrictions that discriminate among viewpoints on those subjects whether a nonpublic forum is involved or not." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 61 (1983).

42.     Courts should be skeptical of any claim that censorship is justified by the goal of avoiding controversy; this argument is frequently pretext for viewpoint discrimination.  *NAACP*, 834 F.3d at 446 (citing *Cornelius*, 473 U.S. at 812; *Metromedia*, 453 U.S. at 510).

### 1.     Accepting "Equal Housing Lender" Bank Ads While Rejecting CIR's Ad Is Viewpoint Discrimination

43.     SEPTA allows lenders to speak on the topic of "discriminatory lending" but has denied CIR the right to speak on the same topic.  FOF ¶¶ 55–62.  SEPTA cannot allow the banks to offer one point of view on "discriminatory lending" but deny CIR the opportunity to offer its point of view.

44.     It does not matter that each bank ad's message concerning discriminatory lending is not the sole message of the bank ad.  Indeed, Mr. Benedetti testified that if any part of an ad violates the Advertising Standards, the ad should be rejected.  FOF ¶ 17.

45.     It is rare that a debate or a topic has two clear polar opposites, and showing such "bipolar" disputes is not required.  Here, however, the debate that SEPTA has identified as violative of the Challenged Provisions is indeed "bipolar," and excluding just one side is viewpoint discrimination in its purest form.  *See Rosenberger*, 515 U.S. at 831 ("The dissent's assertion that no viewpoint discrimination occurs because the Guidelines discriminate against an entire class of viewpoints reflects an insupportable assumption that all debate is bipolar…. If the topic of debate is, for example, racism, then exclusion of several views on that problem is just as offensive to the First Amendment as the exclusion of only one.").

2. **SEPTA's Interpretation of subsection (a) as Permitting Ads Promoting Government Programs and Policies but Prohibiting Ads Seeking to Change Government Programs or Policies Is Viewpoint Discrimination**

46.     During litigation, it became clear that SEPTA interprets the second sentence of subsection (a) to *prohibit* ads that ask for some change with respect to governmental policy or program, but to *allow* ads for governmental policies and programs.  FOF ¶¶ 10, 12, 50.

47.     This interpretation is not supported by the text.  It appears to be based on Mr. Benedetti's misunderstanding of the definition of the word "implicates" and related belief that this provision applies only to advertisements that request that the government take some action.  FOF ¶ 10 (citing Tr. 88:4–15).

48.     But even if SEPTA's interpretation of the word "implicates" found any support in that word's common usage, SEPTA's misguided application of its policy to allow only the government side of any debate about governmental policies and programs is another clear form of viewpoint discrimination.  *See*, *e.g.*, *Matal*, 137 S. Ct. at 1766 (Kennedy, J., concurring in part and concurring in the judgment) (rejecting the government's argument "that a law would be viewpoint neutral even if it provided that public officials could be praised but not condemned," explaining that "[t]he First Amendment's viewpoint neutrality principle protects more than the right to identify with a particular side"); *Lebron v. Amtrak*, 69 F.3d 650, 658 (2d Cir. 1995) (observing that an advertising standard that did not explicitly favor one side of a debate would "of course" be "void for viewpoint bias" if it were applied selectively and had the effect of censoring one side of a debate).

### 3. A Ban on "Matters of Public Debate" Is Indistinguishable from a Ban on Controversial Speech and Is Facially Viewpoint Discriminatory

49.     As addressed in COL ¶ 27, banning speech "expressing or advocating an opinion, position or viewpoint on matters of public debate" is simply another way of describing speech that is controversial.   "Controversy" means "a matter of public debate."

50.     As the Third Circuit explained, speech "is controversial or divisive because some take issue with its viewpoint." *Child Evangelism Fellowship*, 386 F.3d at 527.  Thus, censoring speech "simply because it is controversial or divisive is viewpoint discrimination." *Id.*; *see also United Food & Comm'l Workers*, 163 F.3d at 361 ("We believe any prohibition against 'controversial' advertisements unquestionably allows for viewpoint discrimination.  A controversy arises where there exists a 'disputation concerning a matter of opinion.'") (citations omitted); *Matal*, 137 S. Ct. at 1764–65 ("The Government [argues that it] has an interest in preventing speech expressing ideas that offend.  And, as we have explained, that idea strikes at the heart of the First Amendment.").

51.     Therefore, subsection (b) is unconstitutional on its face because it is facially viewpoint discriminatory.

52.     It does not help SEPTA that subsection (b) on its face applies to all points of view on controversial topics, rather than censoring only particular viewpoints on controversial topics. The Supreme Court struck down an anti-disparagement clause that "evenhandedly prohibits disparagement of all groups," explaining that censoring speakers on more than one side of an issue can still be viewpoint discrimination.  *Matal,* 137 S. Ct. at 1763.

### E. The Challenged Provisions Are Not "Reasonable" in Light of the Revenue-Generating Purpose of the Forum

53.     Whether a content-based restriction is "reasonable" has a specific, legal meaning: restrictions on speech that are not connected to the purpose for which the forum was created are

not "reasonable" within the meaning of First Amendment doctrine and are not permissible, even in a nonpublic forum. *E.g.*, *Mansky*, 138 S. Ct. at 1885 (citing *Perry Educ. Ass'n*, 460 U.S. at 46); *Eichenlaub*, 385 F.3d at 279; *Cornelius*, 473 U.S. at 800; *Christ's Bride*, 148 F.3d at 255.

54. The "reasonableness" standard in First Amendment jurisprudence is a higher bar than ordinary rational basis review. *NAACP*, 834 F.3d at 443.

55. Rather than simply deferring the government's legislative judgments so long as they are rational, when analyzing a government policy that restricts speech, the court must conduct a "more exacting review." *Id.*

56. The government bears the burden to justify its restriction on speech by "record evidence" or "common sense inferences" demonstrating that the restriction is connected to the purpose to which the government has devoted the forum. *Id.* at 445.

57. To determine whether the government has met its burden of justifying the reasonableness of its restrictions, the court must first determine the purpose to which the government has devoted the forum. *Id.*

58. After the court has determined the purpose to which the government has devoted the forum, it must analyze whether the record evidence or commonsense inferences therefrom "provide a way of tying the limitation on speech to the forum's purpose." *Id.*

59. Here, SEPTA leases ad space for the purpose of generating revenue. FOF ¶ 1. This is a typical justification for government ad spaces. *See*, *e.g.*, *NAACP*, 834 F.3d at 445 (observing that the defendant's witness's testimony established that "the City allows advertising in order to make money, and there is nothing to suggest otherwise."); *Christ's Bride*, 148 F.3d at 251 (concluding that SEPTA had a "goal of generating income by leasing ad space" which suggested that the forum was "open to those who pay the requisite fee").

60.     However, SEPTA has offered no basis for the court to conclude that the Challenged Provisions are actually designed to advance that goal or that they do in fact advance that goal.  FOF ¶¶ 18–22.

61.     Although SEPTA's purpose in leasing advertising space is to earn revenue, SEPTA's Advertising Standards were aimed at a different purpose.  FOF ¶¶ 1, 18–22.  SEPTA revised its Advertising Standards, including adding the Challenged Provisions "to improve [their] riders' experience" and generally to prevent another AFDI situation.  FOF ¶ 21 (citing Benedetti Dep. 54:12–55:9; Tr. 69:8–11).

62.     There is no evidence that the Challenged Provisions were intended to advance SEPTA's stated goal of revenue generation.  SEPTA never analyzed whether the Challenged Provisions would have any impact on revenue.  FOF ¶ 22.  And when asked on direct examination at trial whether the Advertising Standards were aimed at revenue-related goals, Mr. Benedetti declined to say that they were.  FOF ¶ 22 (citing Tr. 52:8–12).

63.     Indeed, the Challenged Provisions actually diminish the amount of advertising revenue that SEPTA can generate.  Because SEPTA almost always has some unused advertising space, SEPTA loses revenue by rejecting proposals to advertise.  FOF ¶ 4; *see also NAACP*, 834 F.3d at 446 (City's witness testified that the restriction on issue ads was unrelated to revenue and arguably costs the City money).

64.     Moreover, the array of advertisements that SEPTA has run since the Advertising Standards were adopted in 2015 demonstrates that *accepting* "political" content and "matters of public debate" advertisements is important to SEPTA's advertising revenue, and that rejecting such advertisements would force SEPTA to lose substantial revenue.  SEPTA has arbitrarily enforced the Challenged Provisions to reject or take down only approximately 15 advertisements

out of the almost 2,750 that were submitted.  FOF ¶ 49.  However, far more advertisements that SEPTA has allowed to run actually appear to fall within the breathtaking range of the Challenged Provisions' prohibitions.  *See supra* § III.A.1.(c) (identifying numerous examples of apparent "political" and "public debate" advertisements); FOF ¶¶ 50-54.  Exclusion of these and all other advertisements that fall within the extraordinary breadth of the Challenged Provisions necessarily would reduce SEPTA's advertising revenue; SEPTA has simply chosen to accept them notwithstanding the Challenged Provisions.

65.	By way of example, the Facebook advertising campaign regarding fake news and similar concepts generated more than $250,000 in revenue in just three months.  FOF ¶ 53(a) (citing Ex. 70 at 65).  Likewise the advertisements run by the host committee of the 2016 Democratic National Convention generated more than $140,000 in revenue.  FOF ¶ 54 (citing Ex. 70 at 37.

66.	Nor can the Challenged Provisions be justified in light of SEPTA's interest in keeping riders and employees comfortable.  Any claim that SEPTA has an interest in shielding riders and employees from political speech and speech on matters of public debate—specifically news, like CIR's reporting—is undermined by SEPTA's decision to expose riders and employees to the same kind of content on the newsfeeds on SEPTA's digital displays and infotainment systems.[9]  FOF ¶¶ 24–32.  Even during this litigation, SEPTA praised the newsfeeds as a valuable way to keep attention on SEPTA's digital displays.  FOF ¶ 29.  SEPTA's lack of any concern prior to litigation regarding the type of news items that would appear and its failure to investigate or take advantage of mechanisms available to control that content indicate that

---

[9]	The content of the newsfeeds was drawn from news items published by the Associated Press and Reuters.  FOF ¶ 24.  CIR's reporting—on which its advertisement was based—was confirmed by the Associated Press.  FOF ¶ 63.

SEPTA was not concerned about this type of content. FOF ¶¶ 26–28. SEPTA's actions with respect to the newsfeeds are incompatible with a genuine concern about the effects of news reporting on SEPTA's riders and customers. *See* FOF ¶¶ 23–32. The fact that—after the Court conducted the hearing of CIR's motion for preliminary injunction—SEPTA decided to terminate the newsfeeds does not erase the facts regarding SEPTA's earlier actions or negate their significance to analyzing the reasonableness of the Challenged Provisions. In any event, the termination of the newsfeeds would not be effective until after trial. FOF ¶ 31.

67. At any rate, SEPTA's testimony demonstrates that keeping riders and employees comfortable and safe was a purpose of the Challenged Provisions—and a general interest of SEPTA's—rather than the purpose of SEPTA's advertising space. FOF ¶¶ 1, 20–22; *see NAACP*, 834 F.3d at 447 ("the City asks us to draw an inference that its asserted justification— preventing exposure to potentially offensive messages—is consistent with a purpose of the advertising space. But if the City seeks to justify its regulation of the advertising space by reference to its goals for the entire airport, then we should consider whether the atmosphere in the rest of the Airport supports such an inference.").

68. Beyond SEPTA's advertising space, SEPTA knowingly exposes its riders to the very content that SEPTA professes must be excluded from its advertising space in order to protect its riders and employees from discomfort.

69. As did the City in *NAACP*, SEPTA leases space in its stations to vendors who sell periodicals with content that unquestionably addresses "political" issues and "matters of public debate." *See NAACP*, 834 F.3d at 447. And, despite having asked its newsstands to refrain from displaying certain risqué periodicals, SEPTA never made a similar request that the newsstands refrain from exposing passengers to "political" content or "matters of public debate." FOF ¶ 33.

70.     Likewise, vendors in SEPTA stations are permitted to entertain their customers with TV broadcasts, and SEPTA has not attempted to prevent vendors from tuning their TVs to news broadcasts or other television programming on "political" matters or "matters of public debate." *See NAACP*, 834 F.3d at 447; FOF ¶ 34.

71.     SEPTA also makes no effort to shield its riders or employees from exposure to speech on "political" issues and "matters of public debate" that they may be exposed to as SEPTA vehicles travel through the City and beyond. SEPTA riders and employees can see everything that is visible through the windows of SEPTA's vehicles, and passengers may wait for SEPTA vehicles at bus shelters or train stations that contain other ad spaces that are not owned by SEPTA and are not subject to the same restrictions on "political" content or "matters of public debate." FOF ¶ 34. The City of Philadelphia accepted CIR's proposed advertisement—the ad that SEPTA rejected—to run on bus shelters where SEPTA buses stop. FOF ¶ 33 & n.2.

72.     In other words, as was true in *NAACP*, outside of its advertising spaces, SEPTA exposes riders and employees to an "onslaught" of the type of content that it prohibits in advertisements, "without any suggestion that doing so is inconsistent with the environment it seeks to foster." *NAACP,* 834 F.3d at 477; FOF ¶ 34 (citing Benedetti Dep. 43:16–44:17).

73.     For all of these reasons, SEPTA has failed to meet its burden of showing that the Challenged Provisions are "reasonable" in light of any purpose of SEPTA's advertising space.

**F.** **SEPTA's Advertising Space Is a Designated Public Forum, and the Challenged Provisions Do Not Satisfy Strict Scrutiny**

**1.** **SEPTA's Advertising Space Is Still a Designated Public Forum**

74.     SEPTA has twice previously argued that it intended to create a nonpublic forum, only to have courts conclude that it had in fact created a designated public forum. *Christ's Bride*, 148 F.3d at 256; *AFDI v. SEPTA*, 92 F. Supp. 3d at 326.

75.     In light of these precedents, the question is whether SEPTA has provided the court with a sufficient reason to analyze the same advertising space differently now. It has not.

76.     In determining whether the government has created a designated public forum for speech, courts look to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum. *Cornelius,* 473 U.S. at 802. Courts also examine the nature of the property and its compatibility with expressive activity to discern the government's intent. *Id.*

77.     SEPTA's goal in leasing advertising space is to generate revenue, which suggests that the forum is generally open to the paying public. *Christ's Bride*, 148 F.3d at 251 ("The goal of generating income by leasing ad space suggests that the forum may be open to those who pay the requisite fee.").

78.     Courts have analyzed other government-owned advertising spaces as designated public forums. *Id.* at 248 (finding SEPTA's advertising space to be designated public forum); *Hopper v. City of Pasco*, 241 F.3d 1067, 1074–81 (9th Cir. 2001) (finding city hall advertising space to be designated public forum); *United Food & Commercial Workers*, 163 F.3d at 355 (finding city bus advertising space to be designated public forum).

79.     In determining whether SEPTA intended to create a designated public forum, the Third Circuit held that SEPTA's "own statement of its intent" to be a nonpublic forum "does not

resolve the public forum question." *Christ's Bride*, 148 F.3d at 251. Courts have rejected language similar to SEPTA's statement of intent in other government policies and seemed to give it no weight at all. *See*, *e.g.*, *United Food & Commercial Workers*, 163 F.3d at 352 (finding that transit agency had created a designated public forum despite policy's statement that "It is SORTA's policy that its buses, bus shelters, and billboards are not public forums"); *AIDS Action Committee of Mass., Inc. v. MBTA*, 42 F.3d 1, 10 (1st Cir. 1994) (observing that, in determining whether transit agency has created a designated public forum, "actual practice speaks louder than words"); *Gregoire v. Centennial Sch. Dist.*, 907 F.2d 1366, 1374 (3d Cir. 1990).

80. As was true at the time the Third Circuit declared SEPTA's advertising space to be a designated public forum, it remains the case that "at least 99% of all ads are posted without objection by SEPTA." *Christ's Bride*, 148 F.3d at 251–52; FOF ¶ 49 & n.3; ECF No. 37 ¶¶ 2–7. And rather than closing the forum to news stories like CIR's, SEPTA intentionally placed such news items onto the very screens where it displays digital ads, without any attempt to review or control the type of news content that would appear there. FOF ¶¶ 23–34. SEPTA admitted that stories and images about political figures and government policies were "typical" of the types of news items that would appear on these newsfeeds, FOF ¶ 25, and that such newsfeeds may be "incompatible with the forum being closed to political speech and speech on matters of public debate." FOF ¶ 32 (citing Tr. 80:20–23).

81. Accordingly, SEPTA's advertising space remains a public forum.

### 2. The Challenged Provisions Fail Strict Scrutiny

82. Because SEPTA's ad spaces are a designated public forum, to survive strict scrutiny, SEPTA has to prove that its restrictions are "narrowly tailored" to a compelling government interest that could not be achieved through a less restrictive alternative. *E.g.*,

*NAACP*, 834 F.3d at 441 (strict scrutiny requires narrow tailoring and the absence of less restrictive alternatives).

83.     SEPTA has not even attempted to justify the Challenged Provisions under strict scrutiny. *See Christ's Bride*, 148 F.3d at 255 ("SEPTA has not argued that its action survive strict scrutiny.").  Accordingly, it cannot meet its burden.

<br>

Respectfully submitted,

Dated:  October 8, 2018

HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER

By:  */s/ John S. Stapleton*
    John S. Stapleton (PA ID No. 200872)
    Dylan J. Steinberg (PA ID No. 203222)
    Rebecca S. Melley (PA ID No. 206210)
One Logan Square, 27th Floor
Philadelphia, PA 19103
(215) 568-6200
jstapleton@hangley.com
dsteinberg@hangley.com
rmelley@hangley.com

ACLU OF PENNSYLVANIA

By:  */s/ Molly Tack-Hooper*
    Molly Tack-Hooper (PA ID No. 307828)
    Mary Catherine Roper (PA ID No. 71107)
P.O. Box 60173
Philadelphia, PA 19102
(215) 592-1513
mroper@aclupa.org
mtack-hooper@aclupa.org

Brian Hauss, *pro hac vice*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 548-2500
bhauss@aclu.org

Seth Kreimer (PA ID No. 26102)
3400 Chestnut Street
Philadelphia, PA 19104
(215) 898-7447
skreimer@law.upenn.edu

D. Victoria Baranetsky, *pro hac vice*
THE CENTER FOR INVESTIGATIVE
REPORTING
1400 65th Street, Suite 200
Emeryville, CA 94608
(510) 982-2890 ext. 390
vbaranetsky@revealnews.org

1.      **Does Mansky change the law, or is it just an application of settled principles to election sites?**

**RESPONSE**:

CIR does not view either as an accurate characterization of *Mansky.*

*Mansky* did not "change the law."  Long before *Mansky*, it was settled law that restrictions on speech violate the First Amendment if they are so vague that they do not meaningfully constrain officials' discretion.  *See* COL ¶ 16 (collecting cases).  It was also well established prior to *Mansky* that content-based restrictions on speech in a nonpublic forum must be reasonable and viewpoint neutral.  *See* COL ¶¶ 10–13, 21.  SEPTA has misinterpreted precedent prior to *Mansky*, particularly *Lehman v. City of Shaker Heights,* 418 U.S. 298 (1974). *See* COL 22.

However, *Mansky* is more than "just an application of settled principles *to election sites*." Nothing about *Mansky*'s rationale for invalidating Minnesota's restrictions is limited to election sites; the unconstitutionality of the restrictions stemmed from their text, not their physical location.  Contrary to SEPTA's contention that *Mansky* is irrelevant to transit cases, the D.C. Circuit specifically reversed and remanded the district court's grant of summary judgment in favor of the transit authority, which justified its restriction on speech as a "political" prohibition for consideration of whether WMATA's restrictions were "reasonable . . . in light of [*Mansky*]." *AFDI v. WMATA*, No. 17-7059, 2018 WL 4000492 (D.C. Cir. Aug. 17, 2018) at *4.  The court explained:

> *Mansky* invites arguments about whether Guideline 9 is capable of
> reasoned application.  Moreover, WMATA's defense of the
> Guidelines against AFDI's unbridled discretion/vagueness
> challenge was that it banned AFDI's advertisements as "political"
> speech, which is not unconstitutional.  That argument might be
> unavailing in light of *Mansky*. . . .  Guideline 9 has been in place

for nearly three years, and information on how it has been applied
would certainly be information as to whether it is capable of
reasoned application.

*Id.* at *12. *See* COL ¶ 23. The record here—confirmed by SEPTA's testimony—demonstrates the glaring inconsistency and want of reasoned application of the Challenged Provisions.

**2. Do any cases you have cited determine the burden of proof? Are cases which require strict scrutiny and place the burden of proving "narrow tailoring" on a government agency, applicable to SEPTA? See Free Speech Coalition, Inc., et al. v. Sessions, 2018 WL 3730473 (Aug. 3, 2018).**

**RESPONSE:**

Yes, CIR has cited numerous cases making clear that the burden of proof of demonstrating the constitutionality of the Challenged Provisions is on SEPTA. *See* CIR Br. Supp. Mot. for Preliminary Injunction 18–20; COL ¶¶ 6, 56. When the government restricts speech based on its content, the restriction is presumptively invalid, and the government bears the burden to rebut that presumption. *E.g., United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 816–17 (2000) (citations omitted); *NAACP v. City of Philadelphia*, 834 F.3d 435, 441 (3d Cir. 2016). The government's burden to demonstrate the reasonableness of a content-based restriction in a non-public forum standard is "more exacting" than ordinary rational basis review. *Id.* (citations omitted).

Yes, cases that place the burden of proving 'narrow tailoring' on the government are applicable to SEPTA. *See* CIR Br. Supp. Mot. for Preliminary Injunction 49; COL ¶ 82; *Christ's Bride Ministries, Inc. v. SEPTA*, 148 F.3d 242, 255 (3d Cir. 1998) (finding that SEPTA's restrictions could not survive strict scrutiny); *AFDI v. SEPTA*, 92 F. Supp. 3d 314, 328 (E.D. Pa. 2015) (same).

To survive strict scrutiny, SEPTA must show that its restrictions on speech are narrowly tailored to achieve a compelling state interest. *E.g.*, *Pittsburgh League of Young Voters Educ. Fund*, 653 F.3d at 295 (citation omitted). A restriction on speech is not "narrowly tailored" if it

is not necessary to achieve the government's claimed interest, *see Globe Newspaper Co. v. Super. Ct. for the Cnty. of Norfolk*, 457 U.S. 596, 609–10 (1982), if it is over- or under-inclusive, *see First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 793–95 (1978), or if it is not the least restrictive means of achieving the government's asserted interest, *see Sable Communications v. FCC,* 492 U.S. 115, 126-31 (1989).

**3.      As to the choice of forum, how much weight is the Court obliged to give to SEPTA's statement that the advertising space on its transit vehicles is a "non-public forum?"  Must the Court give at least some weight to SEPTA's designation? Which applicable precedents address this issue?**

**RESPONSE:**

The Court may give some weight to the government's stated intent, but that stated intent is not controlling.  SEPTA's conduct still must be consistent with that stated intent.  The government's "own statement of its intent . . . does not resolve the public forum question." *Christ's Bride Ministries*, 148 F.3d at 251; *Gregoire v. Centennial Sch. Dist.*, 907 F.2d 1366, 1374 (3d Cir. 1990) ("To allow . . . the government's statements of intent to end rather than to begin the inquiry into the character of the forum would effectively eviscerate the public forum doctrine; the scope of [F]irst [A]mendment rights would be determined by the government rather than by the Constitution.").  CIR Br. Supp. Mot. for Preliminary Injunction 46; COL ¶ 79.

**4.      Is SEPTA, in terms of its regulations for ads, similar to an administrative agency receiving deference from a court and, as long as its choice is within its power and is reasonable must a court approve?  Does this relate to SEPTA's argument that the Court should review its restrictions under an "arbitrary and capricious" standard?**

**RESPONSE:**

No.  The concept of agency deference is not applicable to this action.  This case concerns whether SEPTA's standards themselves are constitutional.  SEPTA's view of the constitutionality of its standards is entitled to no deference.

Although *Lehman* used the terms "arbitrary and capricious," this Court correctly noted in the Memorandum denying Plaintiff's motion for preliminary injunction that "*Lehman* was

decided before the Court articulated its current standard for forum analysis in *Perry Educ. Ass'n v. Perry Local Educators Ass'n*, 46 U.S. 37, 46 (1983)." Opinion at 16. The terms "arbitrary" and "capricious" are not part of the modern articulation of the standard for determining whether content-based restrictions in a nonpublic forum are constitutional; rather, the touchstones are "reasonableness" and "viewpoint neutrality." *See* COL ¶¶ 11-13.

**5.      Is the fact that most passengers on SEPTA vehicles have to pay a fare relevant to the choice of forum (seniors go free)?**

**RESPONSE:**

No.

**6.      Are ads on the outside of buses relevant to this case at all?**

**RESPONSE:**

Yes. The relevant forum is all of SEPTA's advertising space. *See* COL ¶ 1. Ads that have appeared anywhere in the forum are relevant to whether the ad space is a designated public forum or a nonpublic forum, whether the Challenged Provisions are "reasonable" and capable of reasoned application, and whether SEPTA has engaged in viewpoint discrimination. *See* COL ¶¶ 33–36, 43, 64–65, 80.

**7.      What is your best case, either Supreme Court or within the Third Circuit, as to the definition of the forum? What is your best case as to whether the forum is public, or a "designated forum," or nonpublic?**

**RESPONSE:**

*Christ's Bride Ministries, Inc. v. SEPTA* is directly controlling in defining the physical forum at issue in this action, and that forum is all of SEPTA's advertising space. 148 F.3d 242, 248 (3d Cir. 1998); *see also id.* at 251–52 & n.2. In *Christ's Bride*, the plaintiff only sought to advertise in SEPTA stations, but the court considered ads on SEPTA buses because they were subject to the same standards as ads in the stations. *See* CIR Suppl. Br. 9-10. The court considered the forum to be all of "SEPTA's advertising space," *id.* at 248, not just those

4

advertising spaces in stations. *See* COL ¶ 1. SEPTA's argument at trial regarding the interpretation of *Christ's Bride* was flatly incorrect. Tr. 24:20–25:9.

*AFDI v. SEPTA*, 92 F. Supp. 3d 314 (E.D. Pa. 2015), likely is the best case as to whether the forum here is a designated forum or nonpublic forum. SEPTA did not appeal that decision, and the facts regarding the forum have not meaningfully changed since the decision. *See* CIR Br. Supp. Mot. for Preliminary Injunction 46–49; CIR Reply Br. 8-10; CIR Suppl. Br. 6–10; *see* COL ¶ 74

**8.     If the forum is non-public, is the only relevant test whether the regulation is "reasonable" in light of the purpose of the forum?**

**RESPONSE:**

No. A content-based restriction must be both reasonable and viewpoint neutral. *NAACP v. City of Philadelphia*, 834 F.3d 435, 441 (3d Cir. 2016).

In addition, it should be noted that the test for reasonableness includes multiple inquiries. One inquiry concerns whether the restriction is vague, vests unbridled discretion, or is incapable of reasoned application. *See*, *e.g.*, *Minn. Voters Alliance v. Mansky*, 138 S. Ct. 1876 (June 14, 2018); COL ¶ 16. Another inquiry of reasonableness reviews the connection of the restriction to the purpose of the forum, requiring that the restriction be reasonable in light of the purposes of the forum. *See* COL ¶ 11. This is a "more exacting" burden for the government to meet than typical rational basis. *NAACP*, 834 F.3d at 441 (finding airport's restrictions unreasonable in light of the airport's state purpose of the forum). COL ¶ 55; *see* PI Hr'g Tr. 81–82 (explaining that both the *Mansky* and *NAACP* lines of arguments fall under the larger heading of "reasonableness").[10]

---

[10]     Although CIR presented the arguments separately in its briefs, they both technically fall under the broader concept of "reasonableness". COL 21.

**9.** **If an ad is rejected because it states a viewpoint, is that a factor in determining whether the restriction is reasonable? If a restriction bans ads that state a viewpoint, does that require a different test than reasonableness?**

**RESPONSE:**

*See* CIR Resp. to Question No. 15, *infra*. Furthermore, all content-based restrictions in a designated public forum must meet strict scrutiny, and all content-based restrictions on speech in a nonpublic forum must be "reasonable" and viewpoint neutral.

**10.** **If SEPTA ad space is a "designated public forum," is Judge Goldberg's analysis the proper one for this Court to follow?**

**RESPONSE:**

Yes. *See also* COL ¶¶ 82–83.

**11.** **Does this Court have the power to require SEPTA to include the words "commercial" or "public service" as necessary for its regulations to be valid on accepted advertisements? Would the parties object to that?**

**RESPONSE:**

No, the Court does not have that power. *See* CIR Suppl. Br. at 5 (noting when courts can and cannot narrow unconstitutional restrictions on speech to bring them into compliance). Regardless, SEPTA's Advertising Standards contain no requirement that all accepted ads be "commercial," and SEPTA has expressly stated that it evaluates "public service" advertisements against the same standards as all other advertisements. There is no legal or factual basis to rewrite SEPTA's standards to require that accepted advertisements be "commercial" or "public service."

CIR would object.

12.     Is the phrase "public debate" in the SEPTA regulations too vague or improper under current legal standards?

**RESPONSE:**

Yes.  It is too vague, vests unbridled discretion to censor advertisements, and creates the opportunity for SEPTA to engage in viewpoint discrimination, which SEPTA does.  *See* COL ¶¶ 24–30, 43–52.

13.     On what basis does CIR rely to contend that the relevant forum is all of SEPTA's advertising space, even though CIR only sought to run its advertisement on the interior of SEPTA buses?  How should the Court's definition of the forum be impacted, if at all, by testimony that the 2015 Advertising Standards apply equally to all of SEPTA's spaces?  Does it matter whether the public can tell the difference between SEPTA's advertising spaces and spaces owned by Amtrak or the City of Philadelphia?

**RESPONSE:**

*See* Response to Question Nos. 6, 7.  That the public cannot tell the difference between SEPTA's advertising spaces and spaces owned by Amtrak or the City of Philadelphia is one of many indicia that SEPTA does not maintain strict control over its advertising spaces as SEPTA apparently does not even clearly delineate its advertisements spaces from others'.  However, the far more significant fact is what speech it allows in the spaces it controls.  And in both SEPTA's advertising spaces themselves and the SEPTA-owned areas around the advertising spaces, SEPTA allows extensive "political" and "public debate" speech.  COL ¶¶ 33–36, 43, 64–65, 68–73, 80.

14.     In light of the two-step burden enunciated in NAACP, what is the purpose (or what are the purposes) to which SEPTA has devoted its advertising space?  Has SEPTA tied the 2015 Advertising Standards to its purpose(s) for the forum?  Please include citations to the record or testimony to support your contentions.

**RESPONSE:**

The purpose of SEPTA's advertising space is to generate revenue, and SEPTA has failed its burden of showing that its standards are reasonable in light of the purpose of the forum.  *See* COL ¶¶ 59–73 (citing proposed findings of fact); CIR Br. Supp. Motion for Preliminary

Injunction 41–45 (providing extensive citations to the record demonstrating that SEPTA has failed its burden).

**15.     Does the language in substandard (b) of the 2015 Advertising Standards, which prohibits ads that express or advocate an opinion, position, or viewpoint on matters of public debate serve to distinguish substandard (b) from the problematic guidelines in Mansky?  Why or why not?**

**<u>RESPONSE:</u>**

No.  SEPTA's "public debate" prohibition is not narrowed meaningfully by the requirement that the advertisement "express[] or advocate[e] an opinion, position or viewpoint" on the matter of public debate.  The Third Circuit, in striking down a restriction on "all speech that promotes any point of view, whether 'religious, commercial or secular,'" observed that "[a]ll community-group speech promotes a point of view.  All of the specifically approved groups, including such familiar and well-regarded groups as the PTA and the 4-H Club, have a point of view.  Thus, this criterion is devoid of meaning." *Child Evangelism Fellowship*, 386 F.3d at 528. SEPTA conceded that every advertisement offers a viewpoint.  FOF ¶ 14 (citing Benedetti Dep. 126:19–23).  *See* COL ¶ 28.  In addition, section (b)'s requirement that the ad concerns a "matter of public debate" is vague and unworkable regardless of whether SEPTA eliminates all ads concerning "matters of public debate" or those ads that SEPTA believes express or advocate a viewpoint concerning "matters of public debate."  COL ¶¶ 25–30; FOF ¶ 14 (Benedetti Dep. at 120:13–16 (SEPTA's designee testifying that he couldn't determine whether an ad violated standard (b) if it didn't have a viewpoint and only concerned a "matter of public debate," unless he saw the ad)).

**16.** **Is the CIR rejected ad "commercial" or "public service?"  What is the proper legal analysis if a commercial or public service advertisement expresses or advocates an opinion, position, or viewpoint on matters of public debate about economic, political, religious, historical or social issues?**

**RESPONSE:**

SEPTA's Advertising Standards do not use the terms "commercial" or "public service" so these terms are not relevant to this action.  *See* Ex. 22; Tr. 101–103 (disavowing any requirement that accepted ads be "commercial"); Tr. 64:21–24 (stating that SEPTA evaluates "public service" ads against the same standards as all other ads).  CIR's ad could conceivably qualify as either, depending on how the terms were defined.

CIR's ad could be "commercial" in the sense that CIR is advertising its product—its investigative journalism—and seeks to encourage those who see its ad to become subscribers and viewers of CIR's product.

CIR's ad could be considered "public service" in the sense that it is an advertisement by a nonprofit organization providing the public with information.

## CERTIFICATE OF SERVICE

I, John S. Stapleton, hereby certify that on October 8, 2018, a true and correct copy of the

foregoing Findings of Fact and Conclusions of Law was served upon the individuals listed below

via the Court's ECF system:


Maryellen Madden
John J. Powell
MONTGOMERY MCCRACKEN
1735 Market Street
Philadelphia PA 19103-7505
(215) 772-1500
mmadden@mmwr.com
jpowell@mmwr.com

Gregory J. Krock
BUCHANAN INGERSOLL & ROONEY PC
One Oxford Centre
301 Grant Street, 20th Floor
Pittsburgh, PA 15219
(412) 562-3983
gregory.krock@bipc.com

*Counsel for Defendant Southeastern*
*Pennsylvania Transportation Authority*


  /s/ *John S. Stapleton*                            
John S. Stapleton