## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| THE CENTER FOR INVESTIGATIVE REPORTING | CIVIL ACTION |
|---|---|
| v. | NO. 18-1839 |
| SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY | |

## MEMORANDUM OPINION

Baylson, J.                                                      November 28, 2018

## TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | FACTUAL BACKGROUND | 1 |
| A. | Initial Proposed CIR Advertisement | 1 |
| B. | SEPTA's Rejection of the Proposed Ad | 4 |
| C. | Revised Advertisement and Second Rejection | 5 |
| III. | PROCEDURAL BACKGROUND | 5 |
| IV. | EVIDENCE | 7 |
| A. | Preliminary Injunction Evidence | 7 |
| B. | Benedetti's Trial Testimony | 7 |
| 1. | Impact of AFDI Litigation | 8 |
| 2. | SEPTA's Application of Standards, Including the Challenged Provisions | 9 |
| 3. | Interpretation of the Challenged Provisions | 12 |
| 4. | Digital Displays/News Feeds | 13 |
| 5. | Asserted Inconsistencies in Benedetti's Testimony and Other Evidence | 14 |
| C. | Other Exhibits and Depositions | 17 |
| D. | Examples of Ads Accepted and Rejected by SEPTA | 18 |
| E. | Advertisements by Banks | 22 |
| V. | PARTIES' CONTENTIONS | 23 |
| A. | CIR's Contentions | 23 |
| 1. | Standards are Not Capable of Reasoned Application | 24 |
| 2. | The Challenged Provisions are Not Viewpoint Neutral on their Face or As Applied | 25 |
| 3. | Standards are Not "Reasonable" in Light of the Purpose of the Forum | 25 |
| 4. | SEPTA's Advertising Space is a Designated Public Forum, and the 2015 Advertising Standards Do Not Satisfy Strict Scrutiny | 26 |

i

B.  SEPTA's Contentions ....................................................................................................... 27

    1.   The Advertising Space on Buses is a Non-Public Forum ........................................... 27

    2.   The Advertising Standards are Reasonable ................................................................. 27

    3.   The Advertising Standards are Viewpoint Neutral...................................................... 30

VI.  FINDINGS OF FACT ................................................................................................................ 32

A.  General ..................................................................................................................................... 32

B.  SEPTA'S Response to AFDI Ad .............................................................................................. 34

C.  SEPTA's Process for Reviewing Proposed Advertising.......................................................... 36

D.  Bank Advertisements ............................................................................................................... 43

E.  SEPTA's Denial of CIR's Proposed Advertisement............................................................. 45

VII.  DISCUSSION OF LAW ........................................................................................................... 49

A.  Forum Analysis ....................................................................................................................... 49

    1.   Defining the Forum and Type of Forum ..................................................................... 49

    2.   The Advertising Space on SEPTA Buses is a Non-Public Forum .............................. 54

B.  The Standards and Burden Applicable in a Non-Public Forum....................................... 57

C.  CIR's Facial Attack on Whether the Challenged Provisions Are Capable of Reasoned
Application Under Mansky.......................................................................................................... 58

    1.   Language That Must be Stricken as Incapable of Reasoned Application ................. 59

    2.   Meet and Confer Requirement ................................................................................... 61

D.  CIR's Facial Attack on the Restrictions (as to be Amended) ........................................... 62

    1.   NAACP v. City of Philadelphia .................................................................................. 62

    2.   Transit Authorities Advertisements as a Subset of First Amendment Jurisprudence 65

    3.   The Special Circumstances of a "Captive Audience" on Transit Vehicles................ 66

    4.   SEPTA as a Government Actor................................................................................... 67

5. Decisions on Transit Authorities' Speech Regulations in the Third Circuit .............. 69

6. Decisions on Transit Authorities' Speech Regulations Outside of the Third Circuit 71

7. SEPTA's Restrictions (as to be Amended) Are Reasonable in Light of the Purpose of the Forum .................................................................................................................. 72

E. Content-Based, Viewpoint Neutral Restrictions of Advertisements in Transit Vehicles Do Not Offend the First Amendment ...................................................................................... 75

1. SEPTA's Restrictions (as to be Amended) Are Viewpoint Neutral on Their Face ... 78

2. SEPTA's Restrictions are Viewpoint Neutral as Applied .......................................... 80

a. SEPTA's Acceptance of Public-Service Advertisements .......................................... 81

b. SEPTA's Acceptance of Bank Advertisements is Not Accepting Viewpoint Advertisements and SEPTA's Rejection of CIR's Advertisements was Reasonable........... 84

VIII. CONCLUSION .............................................................................................................. 88

# I.    INTRODUCTION

Southeastern Pennsylvania Transit Authority ("SEPTA") has been operating the mass transit system in Philadelphia since 1964. It operates bus, subway, commuter rail, light rail, and trolley service to Philadelphia and Delaware, Montgomery, Bucks and Chester counties, with some train service to Wilmington, Delaware and Trenton, New Jersey.

This case concerns the advertising space on the inside of SEPTA buses. SEPTA's bus network serves the many neighborhoods of Philadelphia and suburbs. Many residents of Philadelphia, particularly those for whom private vehicles, taxis or other forms of transportation are inaccessible or too expensive, rely on SEPTA buses, trolleys, and subways for daily transportation. The viability of this public transit system is thus of critical importance in a city of over 1.5 million, where more than 25% of residents live below the poverty rate. QuickFacts: Philadelphia      City,      Pennsylvania,      U.S.      Census      Bureau https://www.census.gov/quickfacts/philadelphiacitypennsylvania (July 1, 2017)

# II.   FACTUAL BACKGROUND

## A. Initial Proposed CIR Advertisement

Plaintiff, The Center for Investigative Reporting ("CIR") is a nonprofit investigative journalism organization based in Emeryville, California. (10/01/18 Trial Ex. 11.) Its mission notes that "Advances in social justice, solutions to pressing problems, and greater accountability in both the public and private sectors all rely on the availability of credible information. Verifiable, nonpartisan facts empower the public to effect positive change, advancing improved outcomes for a broad range of critical issues." (Id.) CIR's reporting is published on its news website Reveal (www.revealnews.org), as well as on its national radio show, podcast, video, and live events. (ECF 1, "Compl." ¶ 11.)

1

On February 15, 2018, CIR published the results of a year-long investigation into disparate lending trends throughout the country. (Trial Ex. 4.) The results of this investigation showed that in 61 metropolitan areas, applicants of color were more likely to be denied conventional home purchase mortgages. (Id.) CIR used the information from this investigation to create a 10-panel comic strip entitled "A Stacked Deck." (Trial Ex. 7.)

In January 2018, a designer from CIR emailed Jon Roche, Vice President at Intersection, the company that manages advertising space for SEPTA, seeking to display the comic on the interior of SEPTA buses. (Trial Ex. 10, Jan. 17, 2018 Email from G. Hongsdusit to J. Roche.) The comic was derived from the following advertisement from Reveal's website:









2

Reveal from The Center for Investigative Reporting analyzed **31 MILLION** mortgage records and found **61** U.S. metro areas where people of color are far more likely to be turned down than whites when applying for a conventional home loan.



The nation's capital is the **ONE METRO AREA** where Native Americans, African Americans, Latinos, and Asians are **ALL** more likely to be denied a conventional home loan.

═══ **IN D.C.** ═══

Native American applicants are **2.3x**

Black applicants are **2.2x**

Latino applicants are **1.9x**

Asian applicants are **1.6x**

as likely to be denied than comparable **WHITE** applicants.



Want to find out if there are lending disparities in your neighborhood and get more updates? Text **"LOAN"** to Reveal and its partners at 202-873-8325.



*(Text STOP or HELP to end or get assistance. Standard rates apply.)*

This is just the latest in the United States' **SORDID HISTORY** of unequal access to owning a home.



In the 1930s, the federal government actually made housing discrimination a state-sponsored enterprise by drawing up maps that strangled investment in areas where immigrants and African Americans lived. This practice is called redlining.



The 1968 Fair Housing Act made redlining illegal, but discriminatory practices continued through predatory lending or "reverse redlining." Lenders flooded communities of color with inferior loan products AND limited access to conventional lines of credit.





Aimed at borrowers who lenders perceive as risky, subprime loans have higher interest rates and are more costly in the long run.

Unsurprisingly, when the subprime mortgage crisis crippled the economy in 2007, people of color were disproportionately affected by the fallout.



Which brings us back to the present. The economy is getting better and conventional mortgages are once again available... but not to the same degree for everybody.

For people of color in 2018 the conventional home loan market is still a deck stacked against them.

(Compl. ¶ 16.)

## B. SEPTA's Rejection of the Proposed Ad

SEPTA rejected CIR's proposed advertisement, noting that "[t]he proposed ad is an issue ad and cannot be accepted. Disparate lending is a matter of public debate and litigation." Ex. 10, Feb. 22, 2018 Email from J. Roche to H. Young.) Included in the email exchange with CIR was a copy of the SEPTA's 2015 Advertising Standards. (Id.)

Following SEPTA's rejection of the ad, Victoria Baranetsky, Esq., General Counsel for CIR, exchanged letters with SEPTA's General Counsel, Gino Benedetti Esq., regarding the stated reason for the rejection. (See Trial Exs. 16–19.) Benedetti explained that SEPTA adopted the 2015 Advertising Standards after previous litigation involving SEPTA's advertising policies. See Am. Freedom Defense Initiative v. SEPTA, 92 F. Supp. 3d 314 (E.D. Pa. 2015) (hereinafter "AFDI") (Goldberg, J.). Benedetti stated that SEPTA rejected CIR's proposed advertisement "under Standards 9(b)(iv)(a) and (b)" of the 2015 Advertising Standards. (Trial Ex. 17.) These standards read:

> Prohibited Advertising Content. Advertising is prohibited on transit facilities, products and vehicles if it or its content falls into one or more of the following categories –

4

(a) Advertisements promoting or opposing a political party, or promoting or opposing the election of any candidate or group of candidates for federal, state, judicial or local government offices are prohibited. In addition, advertisements that are political in nature or contain political messages, including advertisements involving political or judicial figures and/or advertisements involving an issue that is political in nature in that it directly or indirectly implicates the action, inaction, prospective action or policies of a government entity.

(b) Advertisements expressing or advocating an opinion, position or viewpoint on matters of public debate about economic, political, religious, historical or social issues.

(Trial Ex. 22, at ¶¶ II(A)(9)(b)(i)–(ii).)

The second sentence of subparagraph (a) and subparagraph (b) are collectively referred to as the "Challenged Provisions."[1] The 2015 Advertising Standards also include language stating that SEPTA has the "express intention . . . that property allocated for advertising be a non-public forum." (Id. at ¶ II(A)(9)(b)(ii).)

## C. Revised Advertisement and Second Rejection

Benedetti presented testimony as to his objection to two panels which he stated were of "particular concern,"—one showing "a white hand handing keys and stick of dynamite to a black hand," and one that displayed "African-Americans holding signs protesting . . . and a white guy not part of the protest." (Trial Ex. 111, Benedetti Dep. at 156:9–158:3.) CIR proposed a revised advertisement which removed these panels, but SEPTA again rejected that advertisement as being "barred by the same advertising standards as the first." (ECF 32, SEPTA Opp'n to CIR Mot. for Inj. Ex. A, at 1.)

## III. PROCEDURAL BACKGROUND

CIR's May 1, 2018 complaint asserts a single cause of action for a violation of the First and Fourteenth Amendments. (Compl. at 12.) The Complaint sought declaratory and injunctive

---

[1] CIR has no objection to the first sentence of Subsection (a).

relief, as well as costs and attorneys' fees, and any other relief that the Court deems proper. SEPTA answered the Complaint on June 5, 2018. (ECF 10, Answer.)

On August 17, 2018, CIR moved for a preliminary injunction seeking to enjoin SEPTA from administering its 2015 Advertising Standards. (ECF 20, "Mot. for Prelim. Inj.") SEPTA opposed that motion on August 31, 2018 (ECF 21, SEPTA Opp'n; ECF 23, "SEPTA Am. Opp'n"), and CIR replied in support on September 10, 2018 (ECF 24, "SEPTA Rep."). This Court held a hearing on the motion on September 14, 2018, and ordered the parties to file supplemental briefing, with which they complied on September 21, 2018. (ECF 26, 27, 31, 32.) Also on September 14, 2018, while continuing to take the motion for preliminary injunction under advisement, the Court scheduled a final hearing/trial on the merits of CIR's case for October 1, 2018. (ECF 26.) Then, on September 25, 2018, upon consideration of the hearing transcript and all briefing, this Court denied the motion for preliminary injunction without prejudice. (ECF 33, "Sept. 25, 2018 Prelim. Inj. Op.";[2] ECF 34, "Sept. 25, 2018 Prelim. Inj. Order.")

A bench trial took place as scheduled on October 1, 2018 (ECF 39). The trial involved the testimony of just one witness—Mr. Gino Benedetti, General Counsel for SEPTA. By stipulation, SEPTA first questioned Benedetti on direct, followed by cross-examination from counsel for CIR. The parties also submitted stipulations regarding evidence and certain factual matters. (ECF 37). The Court then called for post-trial briefing and sent a letter to all counsel on October 3, 2018, with specific questions for the parties to address. CIR's brief, which included proposed findings of fact and conclusions of law and answers to the Court's specific questions, was submitted on October 8, 2018. (ECF 44, "CIR Post-Trial Br.") SEPTA responded in opposition with its own

---

[2] The Court's September 25, 2018 Opinion denying CIR's Motion for Preliminary Injunction is also available at CIR v. SEPTA, No. 18-1839, 2018 WL 4627619 (E.D. Pa. Sept. 25, 2018) (Baylson, J.).

proposed findings of fact and conclusions of law, as well as its own responses to the Court's specific questions on October 15, 2018. (ECF 47, "SEPTA Post-Trial Br."; ECF 48, Notice of Errata.) CIR replied on October 22, 2018 (ECF 49), and SEPTA filed a Sur-Reply on October 29, 2018 (ECF 50).

The Court held post-trial oral argument on November 1, 2018.

## IV.    EVIDENCE

### A.  Preliminary Injunction Evidence

CIR presented evidence in support of its motion for preliminary injunction, including deposition testimony from Benedetti and Baranetsky. These transcripts were summarized in this Court's September 25, 2018 Memorandum Opinion denying that motion, which we incorporate by reference. (See Sept. 25, 2018 Prelim. Inj. Op.)

### B.  Benedetti's Trial Testimony

Benedetti testified that he has responsibilities including "working with counsel and my client in adopting the amendment to the standards" and "making the final decision about whether or not a proposed ad satisfies our standards." (10/01/18 Trial Tr., at 42:2; 43:4–9) (hereinafter "Trial Tr.") Benedetti testified that his job responsibilities are not "related to revenue maximization." (Id. at 43:10–12.)

Benedetti testified that SEPTA has contracted with Intersection (formerly Titan) to solicit advertising for SEPTA vehicles both through the SEPTA website and the work of local and national salespeople. (Id. at 44:6–16.) Benedetti stated that Intersection sells advertisements for all of SEPTA rails, buses, and trolleys, and that the same advertising standards apply to advertising space on each vehicle. (Id. at 46:16–51:20; 65:19–67:6.) Benedetti confirmed that in total, SEPTA advertises on the interior and exterior of over 2,500 vehicles and 200-plus stations and facilities.

7

(Id. at 67:7–9.) SEPTA has a $1.2 billion operating budget, and advertising revenue is "a very small piece of our revenue." (Id. 52:2–7.)

Benedetti testified about what he thought was the purpose of the advertising space. When asked about the advertisement revenue, Benedetti testified that "we certainly consider this to be a source of revenue, not at the expense of happy customers and safe customers." (Id. at 40:6–8.) According to Benedetti, an advertiser could "specify where he or she would like the ads" but that "[m]echanically, I don't know how that actually happens." (Id. at 49:20–22.) On cross examination, Benedetti stated that the advertisements "are really designed to fit—we want them to fit within the standards and it's our belief that that will keep our riders safe, happy and not detract from our core mission of moving them around safely." (Id. at 68:24–69:3.)

## 1. Impact of AFDI Litigation

Benedetti testified that SEPTA amended its standards after it was sued by AFDI in 2014, and that the SEPTA board approved the standards in October 2014 and revised them again after the AFDI decision with a unanimous vote in 2015. (Id. at 45:10–15; 26:2–6.) These amendments, he said, were made in response to the "public outcry" from the AFDI advertisement that "had reporters swarming SEPTA, it had our employees concerned. We had our customers concerned. So really wanted to avoid that kind of situation where we had—you know, to run that kind of ad on our system." (Id. at 46:24–47:9.) Benedetti additionally testified that there was vandalism on buses that ran the AFDI ad, and that SEPTA had "bus operators who were unwilling to operate the busses on which the ads were placed and so we honored their objections and then had to put someone else on those routes." (Id. at 47:18–48:11.)

In revising the advertisements, Benedetti engaged the help of counsel and "reviewed the cases, reviewed memorandum from [counsel], reviewed standards that other authorities... had

8

used, discussed them with the board, discussed them with the senior executive of SEPTA and came up with what now is embodied in" the 2015 Amendments to the standards. (Id. at 46:9–16.) Benedetti stated that SEPTA wanted to "make sure that the experience of the customer and the experience of the employee, our core mission—you know, safe efficient travel for the public, was maintained and protected." (Id. at 47:14–17.)

## 2. SEPTA's Application of Standards, Including the Challenged Provisions

When asked about whether SEPTA considered including the word "commercial" in its advertising standards, Benedetti stated at trial, "I really don't have a recollection of having that specific conversation with the client," but also noted that he was "certain that I debated that with our counsel." (Id. at 101:24–25, 103:1–2.) He testified that he did not think that they considered using the term "public service" in the revised standards. (Id. at 103:18–21.)

Benedetti stated that SEPTA has multiple "different lines of defense" when reviewing proposed advertisements for compliance with the 2015 Advertising Standards. (Id. at 52:17–18.)

Benedetti explained that the first "line of defense" is through Intersection alerting him to a potentially violative advertisement. Benedetti had "discussions with Intersection about what we think are things that would violate the standard so that they would have enough information to inform me of an ad that, you know, could violate the standards." (Id. at 52:18–21; 54:3–7.)

Benedetti stated that the second "line of defense" involves the following:

SEPTA advertising personnel—actual SEPTA employees, Mr. Jim Dellipriscoli being the primary one—who sees all the ads that before they go on the bus, after they go on the bus, and I've had conversations with him about what are the kind of things he needs to look out for to be able to bring to my attention so I can make a judgement about them.

(Id. at 52:22–53:3.)

Once Benedetti has been alerted about a proposed advertisement that potentially violates

the 2015 Advertising Standards, Benedetti testified that he follows the following process.

> Well, the first thing I do is I look at the ad and I would—depending on the nature
> of the ad, I may get counsel involved. I also more recently—very recently actually
> would confide with one of my colleagues, Billy Smith, who's one of the lawyers
> that works in my office. We look at the ad, we bring out the standards—Exhibit 22,
> and we take a look at it against those standards.

> And then we may, depending on where that takes us, do an… internet search… to
> understand more about the subject matter of the ad and whether or not it violates
> either (a)—standard (a) or standard (b), the political standard or the public speech
> or public debate standard.

(Id. at 55:5–17.)

If Benedetti is on vacation when an issue comes up with an advertisement, he is contacted.

(Id. at 99:10–25.) Benedetti also testified that he may look back at previous decisions about similar

advertisements. (Id. at 55:22–24.) Benedetti stated that he uses common sense, and that his

common-sense determination is based upon his life experiences, legal training, and "discussions

with other people about their opinions." (Id. at 90:11–21.) He said that he does not consider "the

identity of the proposed advertiser, except to the extent that I would visit the advertiser's website."

(Id. at 114:18–20.)

When asked about prior application of the 2015 Advertising Standards, Benedetti stated

that he had a "shift of some sorts on the public service ads because of some confusion I had about

Judge Goldberg's ruling" on the issue of whether public service ads were considered political

speech. (Id. at 70:12–14, 21–23.) He stated that now he does not "consider them to be

automatically political speech. I just judge them against the standard like other ads." (Id. at 71:2–

4.)

When asked how many proposed advertisements SEPTA has rejected since the 2015

Advertising Standards took effect, Benedetti stated it had rejected "not many." (Id. at 55:25–56:2.)

10

Benedetti stated that he has sought advice from counsel regarding a potential advertisement "maybe a half a dozen times" in a year. (Id. at 100:15–17.) He does not routinely offer the opportunity for a rejected advertiser to revise a rejected advertisement, but that it has happened "a couple of times." (Id. at 103:25–105:8.)

Benedetti testified that the process he went through when reviewing the CIR ad under the Advertising Standards was that he first "tried to understand the ad," then he "went to CIR's website and I learned more about what the ad was about, what CIR was about, and what it was trying to accomplish with the ad," and then he did "a more general search beyond CIR's website." (Id. at 118:22–119:6.) While doing this "more general search," Benedetti stated that he found an article from the American Bankers Association ("ABA"), an editorial in the New York Times, lawsuits and settlements about discriminatory lending. (Id. at 119:7–12.) He stated that he found the ABA article "important . . . because it criticized the research upon which the ad CIR proposed was based," and determined that there was a "real live debate" between CIR and the ABA about discriminatory lending. (Id. at 119:13–19.)

### 3. Interpretation of the Challenged Provisions

With regard to Subsection (a) of the 2015 Advertising Standards, Benedetti testified that the words "political" and "political in nature" are "essentially the same to me." (Id. at 57:5–8.) Benedetti explained that the phrase "an issue is political in nature in that it directly or indirectly implicates the action, inaction, prospective action or policies of the government entity" is not separate from the phrase "political in nature," but "further defines or connects with what's political in nature." (Id. at 57:11–18.) On cross examination, he stated that these two phrases have different meanings, and that it is possible for an ad to "violate this provision without implicating directly or indirectly the action, inaction, prospective action or policies of a government entity." (Id. at 87:15–88:3.) When asked if the word "'implicate' means advocates for or calls for," he answered that "it could mean either." (Id. at 88:13–15.)

Regarding Subsection (b), Benedetti testified that a determination of whether something is within the prohibition on "matters of public debate" is "kind of a mechanical type of analysis that we do. We look to see what is being argued, debated in society in general." (Id. at 57:19–22.) Benedetti stated that this evaluation involves "the entire ad and then we also look at holistically about what is the subject matter of that ad being debated in society at large." (Id. at 58:1–4.) Benedetti stated that finding information online about a debate is "not necessarily" enough to make it a public debate. (Id. at 92:22–24.) When asked about the difference between issues of public and private debate, he stated that he uses "common sense and [I] have the discussion and have the conversations." (Id. at 92:20–21.) Benedetti did clarify that a "dispute about which football team you prefer is not a matter of public debate." (Id. at 92:13–17.)

12

Benedetti testified that "sometimes" ads that violate Subsection (b) "could be controversial ads." (Id. at 58:13–15.) He also stated that an ad can involve politics but not violate the Challenged Provisions, such as with the "Welcome, DNC" ads. (Id. at 60:13–17; Trial Ex. 31.)

### 4. Digital Displays/News Feeds

There was extensive testimony that certain SEPTA vehicles now have the ability to display "digital" material, either advertisements or "news feeds," which was sometimes referred to as "infotainment" digital displays on SEPTA vehicles. The news feeds were displayed on the digital displays through an agreement between Intersection and Screenfeed, a company that curates information from Reuters and the Associated Press. (Benedetti Dep. at 30:15–31:5.)

The "infotainment" digital displays on SEPTA vehicles, Benedetti testified that he knew the spaces were to display advertisements and route information, but that his office was "not involved in . . . reviewing or being informed about the news feeds being pushed through the— digital displays." (Trial Tr. at 62:5–16.) He stated that the news feeds were brought to his attention through this case, and that "I was initially of the understanding that the news feeds were there because they added value to the ads and I thought dollars and cents value so that an ad on a digital display would cost more . . . than an ad on a panel on a bus. . . . I learned that that's not true." (Id. at 63:12–19.) He concluded that SEPTA has "eliminated all the feeds at this point" when he "learned that there really wasn't any value being added in terms of the cost of the—the ads themselves." (Id. at 64:5, 12–20.) On cross examination, Benedetti admitted that the content in a news feeds "could be" "compatible with the forum being closed to political speech and speech on matters of public debate." (Id. at 80:20–23.)

Regarding the news feeds on the digital "infotainment" displays, Benedetti noted during his deposition that SEPTA has not given any "guidance or requirements regarding the content of

13

the news items that Intersection allows to be posted on the infotainment systems." (Benedetti Dep. at 32:18–22.) He also stated that neither Screenfeed nor Intersection can "determine what sorts of news to put out on the infotainment system" and that he did not know if Intersection reviewed the news. (Id. at 31:23–32:8.) During trial, after stating that he did not know whether SEPTA "had the option to pre-review or remove certain headlines that would run in the newsfeeds," Plaintiff's counsel presented him with a screenshot from the Screenfeed website permitting review of certain news items. (Trial Tr. at 79:15–80:19; Trial Ex. 110.) Benedetti stated that SEPTA had asked Intersection to look for the contract between itself and Screenfeed but that Intersection was not able to locate it. (Trial Tr. at 79:15–80:19.)

## 5. Asserted Inconsistencies in Benedetti's Testimony and Other Evidence

One of CIR's principal arguments is that Benedetti's testimony was contradictory on some points and inconsistent with other evidence in the case. The Court agrees that Benedetti's testimony was not clear or totally consistent on a few issues. First, Benedetti seems to walk back his answer regarding the reasons for SEPTA's practice of leasing its advertising space. During his deposition, Benedetti stated that SEPTA's purpose for leasing space to advertisers was "[t]o raise revenue independent of the fare box and taxpayer subsidies and to do so in a manner that provides for safety, efficiency and comfort of our passengers." (Benedetti Dep. at 17:5–10.) During trial, however, he notes that "[r]evenue was a consideration" but states that this was "only in so much as this is a small percentage of the money that we raise, aside from the fare box and the taxpayer subsidies, but that revenue—and I think the standard states this—that was going to be balanced against the customer's experience." (Trial Tr. at 48:23–49:2.)

Regarding the process by which SEPTA reviews proposed advertisements, when asked if SEPTA had "come to any clarification with Intersection regarding how the term political is to be

14

interpreted for the purposes of Subsection (a)," Benedetti responded, "We purposely don't do that because we want to evaluate each proposed ad against the standards and then engage in the process we engage in to determine whether or not it matches our standards or doesn't." (Benedetti Dep. at 69:3–18.)

During trial, Benedetti stated that Baranetsky conceded that the advertisement was political in a letter she wrote to SEPTA. (Trial Tr. at 119:23–120:7.) In that March 21, 2018 letter, Baranetsky stated, "CIR's animation including facts and statistics on a political issue is protected speech." (Trial Ex. 16, at 2.) Baranetsky asserted that her March 21, 2018 letter was not an admission that the CIR ad falls within the prohibition on political advertisements. (Trial Ex. 18.)

CIR focuses much of its criticism of SEPTA's policies, and Benedetti's practices, on the issue of what may be "political." Although CIR has made clear that it did not object to the first sentence of Subsection (a) of the Challenged Provisions, relating to advertisements about political parties or political candidates, CIR asserts that in some ads SEPTA ignores that prohibition. CIR also objects strongly to the second sentence of Subsection (a), which has further examples of political content. On one hand, Benedetti fails to see certain advertisements as political or touching on public debate when they are for a commercial service. For example, the ad by the advertiser Fusion depicted people of color and displayed the words, "As American Ads." (Trial Ex. 34.) The ad featured an impact of an African American child wearing a shirt that said, "My Life Matters." (Id.) When discussing this ad, Benedetti testified, "I thought this was an ad promoting services of the sponsor of the ad, which was a television producer or network, I forget which." (Trial Tr. at 92:25–94:21.) He stated that he did not think that this ad was "a message about two things being equally American," or "implicat[ing] any matters of public debate on social issues." (Id.)

15

On the other hand, however, Benedetti did not always draw clear distinctions about certain issues of public debate when the advertisement covered a commercial venture. For example, during trial the undersigned asked Benedetti about a hypothetical advertisement that "didn't say anything about for or against [the Philadelphia soda tax'], but... let's say this was the Norristown local, which went to Montgomery County, all right? So suppose the ad said, do you know you can buy Pepsi Cola cheaper in Norristown than in Philadelphia?" (Id. at 113:21–114:2.) Benedetti responded, "I think that could still be a problem under sub-standard (a) or (b), because— particularly (b) because the notion of the soda tax and everything that surrounds it is being debated in the public." (Id. at 114:6–9.) Despite Benedetti's testimony that he gives commercial advertisements the same treatment as non-commercial advertisements, and the fact that the 2015 Advertising Standards do not draw this commercial/non-commercial distinction, Benedetti apparently considers the commercial nature of certain advertisements.

Benedetti also could not provide clear testimony about the definition of "political in nature" under Subsection (a). During his deposition, when Plaintiff's counsel asked Benedetti, "Simply involving a political issue is not in itself dispositive of whether something violates Substandard (a) or not?" he responded, "It's hard for me to abstractly give you an answer to a question like that." (Benedetti Dep. at 116:15–20.) When asked if "mentioning a law or regulation [is] political," he responded, "I don't know. Could be. Could not be." (Id. at 116:21–23.) At trial, Benedetti stated that an advertisement could be "political in nature" and thus violate the 2015 Advertising Standards without "directly or indirectly implicating the action, inaction, prospective action or policies of a government entity." (Trial Tr. at 86:24–87:2, 24–88:3.)

16

## C. Other Exhibits and Depositions

CIR submitted exhibits in support of its Motion for a Preliminary Injunction and supplemented those exhibits at trial. (See Trial Ex. 20.) Among the 114 trial exhibits are deposition transcripts, articles about CIR's research, comparator advertisements. The Court reviews the exhibits briefly below and considers them in our analysis.

The first set of exhibits can be categorized as CIR's financial information and information related to its report on disparate lending. (Trial Exs. 2–5, 7–9, 11–15, 81, 82.) These documents include, among other things, a summary of the CIR report that was the basis of the contested advertisement. (Trial Ex. 4.) This document stated the findings of the CIR report as being in part:

> We found 61 metro areas out of 409 where applicants of color were more likely to be denied a conventional home purchase mortgage, even after controlling for nine economic and social factors, including the applicants income, the amount of the loan and the neighborhood where they wanted to buy property.

(Id. at 2.)

Among the exhibits are emails between CIR representatives and Roche from Intersection. (Trial Exs. 10, 30, 83.) There are also letters that followed SEPTA's rejection of the CIR ad, including one from Baranetsky to Roche (Trial Ex. 16), from Benedetti to Baranetsky (Trial Ex. 17), and from Baranetsky to Benedetti (Trial Ex. 18).

The record contains documents that pertain to SEPTA's policies–including its prior advertising standards (Trial Ex. 23), its 2015 revised advertising standards (Ex. 22), and a screenshot of portion of SEPTA's website entitled "advertising opportunities." (Trial Ex. 21.) News articles are also included in the record; there are articles about the new fleet of SEPTA hybrid-electric buses (Trial Ex. 26), the upcoming SEPTA video kiosks at bus shelters (Trial Ex. 27), and the fact that SEPTA is to make at least $150 million under their contract with Intersection (Trial Ex. 80). There are also pictures of video "infotainment" systems on the regional rail line

17

(Trial Ex. 28), as well as a screenshot from the Screenfeed website addressing "Options to moderate your feeds." (Trial Ex. 110.) Information about SEPTA's advertising billing, revenue, and spending is also in the record. (Trial Exs. 67–70.)

The record additionally contains deposition transcripts from Benedetti (Trial Ex. 111), Baranetsky (Trial Ex. 115), and Thomas Kelly, SEPTA's Director of Sales. (Trial Ex. 112.)

### D. Examples of Ads Accepted and Rejected by SEPTA

The bulk of exhibits consist of proposed advertisements, most of which have been accepted by SEPTA, though some have been rejected. These are reviewed below. The record contains articles related to what CIR perceives as the issues addressed by specific advertisements SEPTA approved. (Trial Exs. 84, 85, 99–109.)

The advertisements in the file that have been rejected include the following:

**Trial Ex. 54**: An advertisement stating "Dear Art Museum: Art is Expensive! So is constructing new buildings! We totally get why you can't pay all your employees a living wage!"[3];

**Trial Ex. 55**: An advertisement from Bethany Christian Services saying, "Unplanned Pregnancy? Now What? Consider adoption as an option. You don't have to make your decision alone."[4];

---

[3] Benedetti stated during his deposition that SEPTA rejected this advertisement, but that Benedetti could not "recall completely" the reasons it was rejected but that "it had something to do with the issue of living wage being a matter of public debate." (Benedetti Dep. at 262:5–9.) He added, "I don't know if it also had something to do with the content of the ad, the way it's aimed at the Art Museum as violating the law or not. I just don't remember that part." (Id. at 262:11–14.)

[4] Benedetti stated that this advertisement was rejected because "[i]t was taking a position on pro-life, pro choice, pregnancy type issues and one of the options that is available, which I viewed as a debatable item... my view of this ad was Bethany was presenting the Christian position on the issue of choice versus abortion, and there was a debate about that." (Benedetti Dep. at 263:24–264:15.)

18

**Trial Ex. 56**: An advertisement from the U.S. Department of Homeland Security stating, "Sex trafficking, Forced labor, Domestic Servitude. It's happening in our community. Get informed."[5];

**Trial Ex. 57**: An advertisement reading, "Due to the enormously grave miscarriage of justice, we call for the immediate recusal of Judge Genece Brinkley from the case of Meek Mill. Stand with Meek Mill." [6];

**Trial Ex. 59**: An advertisement from the Philadelphia Department of Health saying, "Stop Big Tobacco advertising in our communities. Our children are NOT replacement smokers! Big Tobacco is targeting our kids. Get cigs out of my local stores! Our communities have 3x more tobacco advertising. Break the Cycle! Quit or don't start smoking!"[7];

**Trial Ex. 60**: Another Philadelphia Department of Health ad saying, "Mosquitoes aren't the only ones that spread Zika," and a related advertisement that added to that message, "Love your partner. Wear condoms. Wait to get pregnant. Prevent Zika."[8];

---

[5] Benedetti did not have any recollection as to the reason for this advertisement being rejected. (Benedetti Dep. at 266:11–19.)

[6] Benedetti said that this advertisement was rejected because "I think this was calling for something within the judiciary, some sort of action to recuse the judge involved with that case. And I also think this was a matter that was and is being debated in society about incarceration." (Benedetti Dep. at 268:11–18.)

[7] Benedetti stated that he had a concern that this advertisement was "stoking, you know, an issue that's the subject of—was the subject at the time or just finishing up litigation. You know, the concern was—is—I just thought it concerned an issue that was hotly contested among different groups of people." (Benedetti Dep. at 271:10–272:3.) Benedetti also said that SEPTA had run other antismoking ads, and when asked whether there was anything different about this ad, he stated,

> I don't know if there's anything different. That's why I'm struggling a little bit. If I see those other ads, I—this one sort of put one side against the other. If you look at the panel that talks about Don't be the industry's next replacement, it was a little more than just quit smoking, in our estimate. But the other ads, I think, were—I think they were like University of Pennsylvania advertising a smoking cessation program. That's my recollection. That's how I saw this differently. I'm not so sure that I decided it correctly, now that I look at it in retrospect.

(Id. at 273:8–21.)

[8] Benedetti stated that he and others at SEPTA "thought it took a side on birth control." (Benedetti Dep. at 273:16–18.)

**Trial Ex. 61**: A set of advertisements from Planned Parenthood saying, "Everybody deserves expert care," "Talk to the Birth Control Experts," and "Ask the Women's Health Care Experts. Birth Control at Planned Parenthood"[9];

**Trial Ex. 62**: An advertisement from Fairfax Crybank soliciting sperm bank donors[10];

**Trial Ex. 64**: Advertisements stating, "Fight for Bean" and "#StormtheHeavens"[11]; and

**Trial Ex. 65**: An advertisement from an organization called XQ stating, "Education isn't a problem. It's a solution."[12]

---

[9] Benedetti explained that these advertisements were rejected that they "mention[] birth control, which is a matter of public debate. And when you go to the Planned Parenthood website, they are strong advocates for abortion rights. That's also a matter of public debate." (Benedetti Dep. at 278:15–21.)

[10] Although this advertisement was originally ran, Benedetti testified that it was eventually taken down because it "violated I guess it's (b), advocating a position that's a public or societal issue. It's pro sperm donation. I ran through the process of the ad and I determined that that's an issue that's a matter of debate at the public level." (Benedetti Dep. at 279:23–280:12.) When asked what issue the advertisement addressed specifically, Benedetti stated that it was "[w]hether sperm donation itself, whether it's something we should be doing as a society. People are on both sides of it. And I thought it was—it was rejected for that reason." (Id. at 9–12.)

[11] In the email attached to this proposed advertisement, the advertiser explained that "I have an 8 year old little girl, named Philomena Stenardo, she was diagnosed in September, with grade/stage 4, inoperable, brainstem glioblastoma. She is dying. We know, her only chance of survival, is a miracle. Our local professional sports organizations have reached out, and helped us spread the word, to storm the heavens, and pray for Phil." (Trial Ex. 64. at 2.) Benedetti explained that this ad stated that this advertisement was rejected because "[i]t was advocating prayer as a means to cure her and get a miracle. . . . This ad was asking for God's intervention, in our mind, and that's why it was rejected." (Benedetti Dep. at 283:18–20.)

[12] Benedetti stated that this advertisement was rejected because "[i]t was against public education and for school choice." (Benedetti Dep. at 285:22–286:3.) He explained "Mr. Roche and I went back and forth. And I don't think I talked to the folks at XQ. I may have read some e-mails they sent to Mr. Roche. But just their effort to get me to understand their model, this, this and what the advertisement was trying to do, trying to convince me that I was wrong. And I came to the conclusion that—you know, after looking at everything, the website, they were really taking a position on the school choice issue." (Id. at 286:6–16.)

Some of the accepted advertisements in the record are as follows:

> **Trial Ex. 31**: Advertisements from the Democratic National Convention ("DNC") Host Committee;

> **Trial Ex. 32**: Advertisements from the PHI 2016 Host Committee regarding the DNC, including one from the union SEIU 32BJ reading, "Welcome DNC. We are Philadelphia's: Union Middle Class Jobs, office cleaners, community, neighbors, building service workers, window washers, security officers, families, school district workers. Road out of poverty."[13];

> **Trial Ex. 33**: Advertisements for an event at the African American Museum from the American Friends Service Committee featuring pictures of Martin Luther King, Jr., Cesar Chaves, and Lucretia Mott saying, among other things, "What will you do for Peace?"[14];

> **Trial Ex. 34**: Advertisements from Fusion showing pictures of diverse people, including an African American child with a t-shirt reading "My Life Matters" with the phrase "As American As" in front of them[15]; and

> **Trial Exs. 88, 113**: Advertisements from Facebook stating, "Fake news is not your friend," "Data misuse is not your friend," "Clickbait is not your friend," "Fake accounts are not your friends."

---

[13] Benedetti was asked whether he was satisfied that this advertisement complies with the Advertising Standards, and he stated "I'm not sure that I am, now that I look at it now…. I just don't remember the process I went through. But again, looking at it with you today on the spot, I have some concerns about the ad…. It mentions some issues that are out there. It shows protestors, who I assume are union workers. And there's, you know, union versus nonunion. That's certainly an issue to me. So I don't remember my thought process on this one. I could have been mistaken if I ran it." (Benedetti Dep. at 175:22–176:22.)

[14] Benedetti stated that this complied with the Advertising Standards because "I don't think it's taking a position or asking for action. I think it's saying come to the museum to see our exhibit." (Benedetti Dep. at 181:17–21.)

[15] The Fusion advertisements were the subject of questioning during Benedetti's deposition and at trial. Benedetti explained that an earlier version of these advertisements featured nudity, drugs, and vulgarity and that these elements were removed from the proposal. (Benedetti Dep. at 187:9–188:19.) He stated that he did not know what they were trying to communicate but testified that "this was an ad advertising for this advertiser's services or product, whatever it was. I don't really know. That's what I judged it on, the virtue of the product it was advertising." (Id. at 189:4–190:1.) At trial, when asked whether these advertisements were "designed to invoke any significant debates happening . . . in America right now," Benedetti stated, "I thought this was an ad promoting the services of the sponsor of the ad, which was a television producer or a network, I forget which." (Trial Tr. at 94:16–21.)

SEPTA had also accepted many "public service" advertisements from local, state, and federal agencies, including the Free Public Library of Philadelphia (Trial Ex. 41), Healthcare.gov (Trial Ex. 42), the Public Health Administration (Trial Ex. 43), the Philadelphia Department of Health (Trial Exs. 44, 50, 58), the Philadelphia Department of Labor (Trial Ex. 46), the Montgomery County Health Department (Trial Ex. 46), the Commonwealth of Pennsylvania (Trial Ex. 47), Philadelphia Recycle (Trial Ex. 49), the Mayor's Office of Community (Trial Ex. 94), United States Department of Homeland Security (Trial Ex. 95), the National Guard (Trial Ex. 89), and the Philadelphia Water Department (Trial Ex. 96). The record also included an advertisement from SEPTA itself. (Trial Ex. 48.)

In addition, there are ads from public service organizations and from private organizations, including Philadelphia Fight (Trial Ex. 51), Roosevelt Blvd.com (Trial Ex. 90), the Clean Air Council (Trial Ex. 91), the Pennsylvania Housing Finance Agency (Trial Ex. 92), and PA Able (Trial Ex. 93). There are also advertisements for Einstein Healthcare (Trial Ex. 71) and various educational institutions and organizations. (Trial Exs. 63, 72–79.)

### E. Advertisements by Banks

The record also features advertisements from banks for home loans. When Benedetti was asked about the bank advertisements that SEPTA ran, he stated that he "thought those bank ads were the bank advertising for their services and products it provides. And not making any statement about discrimination or not discriminating." (Trial Tr. at 121:15–17.)

These are discussed in detail below.

The bank ads that have been submitted in this case that inform the Court's conclusions are the following exhibits:

22

**Trial Ex. 35**: First Bank of New Jersey ad with image of Caucasian couple; stating, "A bank should... feel right at home"; and bearing the Member FDIC and Equal Housing Lender logos.

**Trial Ex. 36:** DNB First ad with image of African-American man and Caucasian woman standing next to a moving box; stating, "We've Got the Home Loan You Need[]"; and bearing the Member FDIC and Equal Housing Lender logos.

**Trial Ex. 37:** Univest Bank and Trust Co. ads depicting a male, non-Caucasian construction worker; a female, non-Caucasian chef; a Caucasian couple; an African-American couple sitting next to moving boxes; and a family skiing; stating, "Bank here to get there"; and bearing the Member FDIC logo.

**Trial Ex. 38:** Tompkins VIST Bank ad with image of African-American couple and child in front of a stack of moving boxes; stating, "Making your dream of home ownership a reality"; and bearing the Member FDIC and Equal Housing Lender logos.

**Trial Ex. 39:** Wells Fargo ad with image of African-American mother and child at home; stating, "Up to $7,500 to help you buy a home...See if you qualify at the NeighborhoodLIFT Event April 1–2, 2016"; bearing Equal Housing Lender logo.

Finally, there is an advertisement from the Housing Equality Center stating, "Housing discrimination is illegal. Housing Equality Center can help you understand your rights." (Trial Ex. 66.) Benedetti was asked about this advertisement during his deposition and stated that he could not remember whether this advertisement was rejected or accepted. (Benedetti Dep. at 287:15–24.)

## V.   PARTIES' CONTENTIONS

### A. CIR's Contentions

CIR's case is premised on four arguments:

(1) Subsections (a) and (b) of the 2015 Advertising Standards are unconstitutionally vague and not capable of reasoned application;

(2) The 2015 Advertising Standards are not viewpoint neutral;

(3) The 2015 Advertising Standards are not "reasonable" in light of the purpose of the forum; and

23

(4) SEPTA's advertising space is a designated public forum, and the 2015 Advertising Standards fail strict scrutiny.

Each of these contentions is discussed in more detail below.

## 1. Standards are Not Capable of Reasoned Application

CIR explains that it is settled law that restrictions on speech will violate the First Amendment "if they are so vague that they do not meaningfully constrain officials' discretion." (CIR Post-Trial Br., at 26) (citing Minn. Voters Alliance v. Mansky, 138 S.Ct. 1876 (2018)); Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 537–38 (1981) (Brennan, J., concurring); Se. Promotions, Ltd. v. Conrad, 420 U.S. 546, 553 (1975); Sypniewski v. Warren Hills Reg'l Bd. of Educ., 307 F.3d 243, 266 (3d Cir. 2002); Kalman v. Cortes, 723 F. Supp. 2d 766, 803 (E.D. Pa. 2010) (Baylson, J.). CIR contends that a First Amendment challenge to a law that vests officials with unbridled discretion to censor speech may be brought as a facial challenge. (See CIR Post-Trial Br., at 27.)

According to CIR, the Supreme Court recently placed the question of whether a restriction confers unbridled discretion on a governmental decisionmaker under the umbrella of a First Amendment reasonableness analysis. (Id. at 28) (citing Mansky). Like the restrictions that were found to be too "expansive" in Mansky, CIR argues that the Challenged Provisions are equally, if not more, unconstitutionally vague. (CIR Post-Trial Br., at 28.)

CIR also argues that, to the extent SEPTA relies on the government-speech doctrine to shield other agencies' advertisements from this Court's analysis, that doctrine should not apply. (Id. at 33–34.)

### 2. The Challenged Provisions are Not Viewpoint Neutral on their Face or As Applied

CIR next contends that the Challenged Provisions are viewpoint discriminatory on their face and as applied to CIR's proposed advertisement. (Id. at 34.) To support its argument, CIR compares bank advertisements previously displayed by SEPTA whereby the banks purport to be "equal housing lender[s]" with its own ad reporting on discriminatory lending practices. (Id. at 35.) To allow the bank ads while rejecting CIR's ad is an exercise of viewpoint discrimination, CIR asserts. (Id.)

CIR also explains that, in practice, SEPTA interprets its 2015 Advertising Standards to prohibit ads that ask for changes to governmental policies, and simultaneously to allow ads promoting governmental policies and programs. (Id. at 36.)

Finally, CIR argues that SEPTA's inclusion of the phrase "matters of public debate" in the 2015 Advertising Standards is facially viewpoint discriminatory because the phrase is indistinguishable from a ban on controversial speech. (Id. at 37.) CIR cites various cases that have held that restrictions on "controversial" speech are akin to viewpoint discrimination. (Id.) Likening the word "controversy" to SEPTA's phrase "a matter of public debate," CIR contends the restriction is facially viewpoint discriminatory. (Id.)

### 3. Standards are Not "Reasonable" in Light of the Purpose of the Forum

CIR contends that even if this Court finds SEPTA's advertising space to be a non-public forum, the 2015 Advertising Standards do not satisfy the requirements of the First Amendment. To pass Constitutional muster, CIR argues that SEPTA has not met its burden of showing that its standards are reasonable in light of the purpose of the advertising space. (Id. at 37–38.) SEPTA explained at trial that the purpose of its advertising space is to generate revenue, and CIR avers that there is no evidence that the 2015 Advertising Standards were intended to advance that goal.

(Id. at 38–39.) According to CIR, the standards would actually serve to reduce advertising revenue if they were enforced as written. (Id. at 39–40.) To the extent SEPTA has offered "rider comfort" as a purpose of the advertising space, CIR argues that the standards are not clearly tied to that purpose when SEPTA regularly exposes riders to political speech and matters of public debate through the newsfeeds on its infotainment systems. (Id. at 40.) Moreover, CIR argues that SEPTA does nothing to shield riders from political/public-debate content outside of its advertising spaces. (Id. at 42.)

### 4. SEPTA's Advertising Space is a Designated Public Forum, and the 2015 Advertising Standards Do Not Satisfy Strict Scrutiny

Finally, although CIR conceded during the preliminary injunction proceedings that SEPTA had a limited public forum, it withdrew that agreement for purposes of the trial. CIR argues that SEPTA's advertising space is a designated public forum such that this Court should review the 2015 Advertising Standards under the rigors of strict scrutiny. (Id. at 43.) SEPTA's advertising space has been deemed such a designated public forum in two prior judicial decisions. CIR argues that there is not enough evidence in the record to conclude that SEPTA has successfully closed its forum since those decisions were made. (Id. at 43–44.)

In a designated public forum, all restrictions on speech must survive strict scrutiny. In such a case, SEPTA would have the burden of proving that its restrictions are "narrowly tailored" to a compelling government interest that SEPTA could not achieve through less restrictive means. (Id. at 44.) CIR points out that SEPTA has not attempted to justify the 2015 Advertising Standards under strict scrutiny, and thus has not met its burden. (Id. at 45.)

## B. SEPTA's Contentions

### 1. The Advertising Space on Buses is a Non-Public Forum

SEPTA contends that the relevant forum is the advertising space on SEPTA buses because that is the property to which CIR seeks access for its advertisement. (SEPTA Post-Trial Br., at 25.) That forum, according to SEPTA, is a non-public forum because the 2015 Advertising Standards expressly state that SEPTA intended the advertising space to be a non-public forum, and since enacting these Standards, SEPTA has "operat[ed] such venue as a non-public forum requiring potential advertisers to adhere to SEPTA's Advertising Standards and [has] policed those standards." (Id. at 27.) In other words, SEPTA's policy and practices reflect its intention to close the forum. (See id.)

### 2. The Advertising Standards are Reasonable

Next, SEPTA contends that the restrictions in the Advertising Standards are reasonable, and that SEPTA has reasonably applied the Standards, as required in a non-public forum. (Id. at 29–30.)

First, SEPTA argues that it was within its rights and reasonable to revise its advertising policy and close the forum in light of its legitimate interest in increasing ridership by refraining from offending customers. (Id. at 29–30.)[16] SEPTA also refutes CIR's contention that the Advertising Standards serve no purpose because riders are exposed to newsfeeds on SEPTA buses,

---

[16] SEPTA made a similar argument in its Opposition to CIR's Motion for Preliminary Injunction, in which SEPTA contended that the Challenged Provisions were reasonable in light of several additional purposes of the forum, including avoiding public and employee complaints, vandalism, unrest on buses, and the administrative burden of "dealing with controversial public issue advertising." (SEPTA Opp'n, at 20; SEPTA Am. Opp'n, at 20.)

arguing that newsfeeds do not violate its Standards because there is a difference between "hard news" and prohibited political and issue advertising. (Id. at 36.)[17]

Second, SEPTA contends that it has reasonably and consistently applied the Advertising Standards, explaining why it was reasonable to accept other ads that CIR contends were "political" and concerned "matters of public debate," including the Philadelphia FIGHT Community Health Center ads and the ads about the 2016 DNC in Philadelphia. (Id. at 32.)[18]

With respect to the DNC advertisements, unlike SEPTA's Opposition to CIR's Motion for Preliminary Injunction, SEPTA's Post-Trial Brief concedes that SEPTA made an incorrect determination in allowing one of the ads about the DNC in Philadelphia–the ad proposed by a union. (Id.) Although SEPTA's Opposition to CIR's Motion for Preliminary Injunction acknowledged that the DNC was "political," SEPTA argued that it was reasonable to allow all of the DNC ads. (SEPTA Am. Opp'n, at 31–33.) There, SEPTA contended that the DNC ads did not constitute political advocacy, but rather welcomed visitors to Philadelphia. (Id.) SEPTA

---

[17] SEPTA contends, in the alternative, that the issue of newsfeeds is moot because SEPTA ordered them to cease operation, and even if the issue were not moot, newsfeeds are irrelevant to the Court's determination because the relevant forum is limited to advertising space on buses. (Id. at 36–37.)

[18] SEPTA's Opposition also sets out its reasons for finding that other ads did not violate its Standards, including the American Friends Service Committee ad and the Fusion ads. (See SEPTA Opp'n, at 33; SEPTA Am. Opp'n, at 33–34.) SEPTA argues that that the American Friends Service Committee ad was not "political" and did not reflect a position on a "matter of public debate" because it only called for people to get involved in bringing about peace, but did not reference policies, programs, or actions for doing so. (SEPTA Opp'n, at 33; SEPTA Am. Opp'n, at 33.) With respect to the Fusion ads, which stated that people of many races, ethnicities, and religions are "As American As" viewers' preconceived notions of "Americans," SEPTA contends that it viewed the ads as only reflecting Fusion's intention to sell television programming. (SEPTA Opp'n, at 33; SEPTA Am. Opp'n, at 33; see also CIR Post-Trial Br., at 17–18.) According to SEPTA, the fact that the Fusion ads included imagery that touched on a political issue did not render the ads "political" in violation of the Advertising Standards. (SEPTA Opp'n, at 33; SEPTA Am. Opp'n, at 33.)

reasoned that just because the DNC ads "touch[ed] on politics or a political issue" did not render them "political in nature." (Id. at 32.)

SEPTA goes one step further in its Post-Trial Brief and concedes that it made an incorrect determination in allowing the union ad supporting DNC. (SEPTA Post-Trial Br., at 32.) However, SEPTA argues that its mistake in this "close case" does not render the Advertising Standards' policy on "political" advertisements unconstitutional. (Id.) SEPTA distinguishes the DNC union ad from CIR's ad, arguing that the CIR ad did not present such a close case because CIR's ad would violate "any reasonable interpretation" of Subsections (a) or (b). (Id. at 37.)

SEPTA also contends that the Challenged Provisions are not unconstitutionally vague because they are reasonable and do not allow for arbitrary enforcement. (Id. at 31, 33.) In particular, SEPTA argues that the reference to "political" ads in Section 9(a) of the Advertising Standards does not render the Standards unconstitutionally vague, citing to the Second Circuit. (Id. at 31) (citing Lebron v. Nat'l R.R. Passenger Corp. (Amtrak), 69 F.3d 650, 658 (2d Cir. 1995), opinion amended on denial of reh'g en banc, 89 F.3d 39 (2d Cir. 1995) ("Nor would a policy against 'political' advertising . . . be void for vagueness in light of the Supreme Court's decision in Lehman.").)

Similarly, SEPTA argues that Subsection (b), which prohibits ads on "matters of public debate," is not unconstitutionally vague. (SEPTA Post-Trial Br., at 33.) SEPTA contrasts Subsection (b) with a transit authority advertising policy prohibiting "controversial" ads, which the Sixth Circuit held to be unconstitutional. (Id.) (quoting Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp., 698 F.3d 885, 894 (6th Cir. 2012) (hereinafter "SMART")). According to SEPTA, because its Advertising Standards do not expressly prohibit "controversial ads," but instead ban ads on specific topics, not necessarily because they are

controversial topics, the Standards are not unconstitutionally vague. (SEPTA Post-Trial Br., at 33.)

### 3. The Advertising Standards are Viewpoint Neutral

SEPTA contends that its Advertising Standards are viewpoint neutral both on their face and as applied in rejecting CIR's proposed ad. (Id. at 35.)

First, SEPTA argues that its Standards are viewpoint neutral on their face because even if they "incidentally prevent[] certain viewpoints from being heard in the course of suppressing certain general topics of speech," it is not "[SEPTA's] intent to intervene in a way that prefers one particular viewpoint in speech over other perspectives on the same topic." (Id.) (quoting Am. Freedom Def. Initiative v. Mass. Bay Transp. Auth., 781 F.3d 571, 582 (1st Cir. 2015) (hereinafter "MBTA")). In other words, the Advertising Standards are viewpoint neutral because they restrict all viewpoints on "matters of public debate," not certain viewpoints. (See SEPTA Post-Trial Br., at 35.)[19]

Second, SEPTA contends that it reasonably applied its Advertising Standards in refusing to run CIR's proposed ad. (Id.) SEPTA specifically refutes CIR's contention that by approving ads of "equal housing lender" banks, while rejecting CIR's ad on the same topic of "discriminatory lending," SEPTA engaged in viewpoint discrimination. (See id. at 35; CIR Post-Trial Br. at 35.) SEPTA contends that it was reasonable for SEPTA to conclude that ads from "equal housing

---

[19] In SEPTA's Opposition to CIR's Motion for Preliminary Injunction, SEPTA contends that CIR failed to attribute a particular point of view to SEPTA. (SEPTA Am. Opp'n, at 34.) However, the relevant inquiry is whether SEPTA's Advertising Standards–either on their face or as applied– reject ads based on the particular point of view expressed. See Pittsburgh League of Young Voters Educ. Fund v. Port Auth. of Allegheny Cty., 653 F.3d 290, 296 (3d Cir. 2011) (providing the legal standard for viewpoint discrimination). SEPTA's point of view is not relevant to CIR's viewpoint discrimination claim.

lender" banks did not pertain to the same topic as CIR's ad—discriminatory lending—because the bank ads did not acknowledge a debate or present data on discriminatory lending, nor did they address the disposition of loan applications by race, neighborhood, or otherwise. (SEPTA Post-Trial Br., at 35–36.) Further, the fact that the bank ads indicated that the banks were "equal housing lenders" did not mean that the ads took a position on discriminatory lending; rather, banks are required by law to indicate in their ads that they award loans on a non-discriminatory basis. (Id. at 35) (citing Nondiscriminatory advertising, 12 C.F.R. § 338.3 (2005)). SEPTA also distinguishes the bank ads from CIR's proposed ads by alleging that the bank ads "look forward, not back. The ads are designed to foster future borrowing; they do not address lending practices." (SEPTA Post-Trial Br., at 36.) In SEPTA's Opposition to CIR's Motion for Preliminary Injunction, SEPTA added that CIR's ad and the bank ads do not represent opposite views on discriminatory lending because CIR's ad is based on aggregate data, not on the lending activity of any particular bank. (SEPTA Am. Opp'n, at 37.)

## VI.  FINDINGS OF FACT

### A. General

1.      SEPTA leases space for conventional print  advertising on the exterior and/or interior of many of the Authority's over 2,500 vehicles  (including buses, trolleys, and trains) and in more than 200 stations and facilities. (Benedetti  Dep. at 15:21–16:6, 18:6–10; Trial Ex. 21; Trial Tr. at 67:7–10.)

2.      SEPTA leases its advertising space to generate revenue, but this purpose has been consistently balanced with SEPTA's "core mission" of transporting passengers safely, efficiently, and comfortably.  (Benedetti Dep. at 17:5–10; Trial Tr. at 49:4–8, 67:18–25.)

3.      According to SEPTA's website, it provides "various ways for advertisers to effectively communicate with the approximately 1 million commuters that ride SEPTA each day." (Trial Ex. 21.)

4.      SEPTA contracts with Intersection, (formerly Titan Outdoor LLC), an  independent, non-governmental entity, to sell advertising space on SEPTA vehicles and in  SEPTA stations on SEPTA's behalf.  (Benedetti Dep. at 20:13–23.)

5.      Generally, at some times, some of SEPTA's advertisement space is empty or  not leased.  (Kelly Dep. at 15:20–16:1.)

6.      SEPTA applies the same advertising standards (the 2015 Advertising Standards) to all of its advertising spaces in and on all SEPTA vehicles and facilities.   ( Trial Tr. at 65:19–23.) However, the only request for advertising in this case was made for bus advertising. SEPTA agrees that the same SEPTA standards would apply to advertisements inside subway and trolley cars. This Court finds that the other advertising spaces, such as the exterior of a bus or other transit vehicles, stations, platforms, or bus shelters may raise other issues and are outside of the scope of

this opinion.

7.     Any person or group may seek to advertise on SEPTA's advertising spaces, and SEPTA accepts both commercial and non-commercial advertisements. (Benedetti Dep. at 19:14–20:9; Trial Tr. at 70:6–8.)

8.     The Advertising Standards, which are contained in the contract between SEPTA and Intersection, currently list twenty-two categories of prohibited advertisements. (Trial Ex. 22, at ¶¶ II(A)(9)(b)(iv)(a)–(v).)

9.     The Advertising Standards do not have any separate rules that define or apply to "public service ads." If SEPTA receives a proposal for a PSA, it reviews that advertisement against the same advertising standards as all other advertisements. (Trial Tr. at 64:21–24.)

10.    If any aspect of a proposed advertisement violates the Advertising Standards, SEPTA's policy is to reject the advertisement.    (Trial Tr. at 58:7–10.)

11.    There are fifteen members of SEPTA's board. (Benedetti Dep. at 45:16–18.) Two members are appointed from each of the five counties in Pennsylvania that SEPTA serves: Philadelphia, Bucks, Montgomery, Chester and Delaware. The Philadelphia representative is appointed by the Mayor and approved by the City Council, and the Bucks, Montgomery, Chester, and Delaware County representatives are appointed by County Commissioners. The House of Representatives minority and majority party each appoint one member. The Governor appoints the final member. (Id. at 45:18–46:1.)

12.    Of SEPTA's current operating budget of $1.2 billion, approximately half is made up of revenue generating by passenger fares. (Id. at 52:2–5.) SEPTA generates between $12 and $15 million in net revenue from advertisements annually, with approximately $5.2 million from advertisements on buses. (Exs. 68, 69; 11/01/18 Tr. at 6:16–21; 7:12–15; 8:11–14.)

33

## B. SEPTA'S Response to AFDI Ad

13. SEPTA adopted the Advertising Standards in May 2015, following Judge Goldberg's decision in AFDI, which declared that SEPTA's advertising spaces were a designated public forum and ordered SEPTA to allow AFDI's anti-Islamic advertisement to run on SEPTA's buses. 92 F. Supp. 3d 314.

14. In its 2015 amendment, SEPTA added language that stated that the express purpose of the Advertising Standards was "to accept such forms of advertising as will enhance the generation of revenues to support its transit operations without adversely affecting the patronage of passengers." (Trial Ex. 22, at ¶ (II)(A)(9)(b)(ii).) The amendment further stated that "SEPTA will retain strict control over the nature of the advertisements accepted for posting on or in its transit facilities, products, and vehicles and will maintain its advertising space strictly as a non-public forum." ( Id.) In addition, the amendment added new categories of prohibited content, including the Challenged Provisions.

15. By adding the new language, SEPTA intended to turn its advertising spaces into a nonpublic forum, subject to lesser judicial scrutiny, so that it could avoid having to run controversial advertisements like AFDI's that might prompt a negative response from riders, employees, or the media. (Benedetti Dep. at 54:12–55:13 (When asked whether SEPTA analyzed the impact of the proposed 2015 Advertising Standards on riders' experiences, Benedetti answered, "I mean, we were adopting the standards to improve our riders' experience.") (Benedetti Dep. 54:16–18; Trial Tr. 68:24–69:3 ("[W]e want [ads] to fit within the standards and it's our belief that that will keep our riders safe, happy and not detract from our core mission of moving them around safely"); id. at 69:8–11 (The 2015 Advertising Standards represent an attempt to balance SEPTA's "revenue-generating goals for the ad space against the customer experience")); (see also

34

Benedetti Dep. at 58:2–59:2; T r i a l   Tr. at 45:6–15, 46:23–47:17, 68:1–3, 69:12–17.)

16.     This Court finds that SEPTA made a specific effort following the decision in AFDI to promulgate standards/policies/regulations that would qualify the advertising space on the interior of its transit vehicles, including subways, buses, and railroad cars as a non-public forum.

17.     The record supports a finding that SEPTA has been successful in closing the forum and that these advertising spaces are uniquely but correctly designated as non-public.

18.     Although CIR has submitted proposed findings on fact on "SEPTA's digital displays," (CIR Post-Trial Br., at 6–7), the Court finds that SEPTA has effectively terminated the news feeds on those digital displays and therefore there is no issue for the Court to decide concerning this form of media in SEPTA buses.  Digital displays remain showing advertisements and route information.

19.     The Court credits SEPTA's contentions, as supported by the record, that it wants its transit spaces, in buses and subways, to be welcoming and comfortable for passengers.  The Court finds that SEPTA has good and credible reasons to believe that advertisements that state any viewpoint on topics that involve economic, political, religious, historical, or social issues may deter a significant subset of passengers from using SEPTA transit facilities.

20.     Benedetti's testimony that buses that ran the AFDI ad were the subject of vandalism, that "bus operators . . . were unwilling to operate the busses on which the ads were placed and so we honored their objections and then had to put someone else on those routes," and that there were "reporters calling about reactions" "[n]early every day during the course of litigation" and upon the issuance of Judge Goldberg's decision, is credible. (Trial Tr. at 47:18– 20, 48:6–17.)

21.     The concerns expressed by SEPTA executives on these points, based upon their

35

experiences with driver, rider, and public reactions to the AFDI ad, are credible.

22.     In order to test the effectiveness of the advertisements that would arguably be offensive to a certain subset of transit riders, SEPTA would have to actually run those advertisements in a transit space over a significant period of time to determine if ridership declined. SEPTA did not conduct such an analysis. (See Kelly Dep. at 8:19–9:3.) SEPTA's AFDI experience is very probative to the Court's finding that SEPTA had good, rational, and reasonable reasons for its bus advertisement space to become a non-public forum, and to help insure that such experience was not repeated. These reasons, resulting in the Challenged Provisions, were reasonable and based on SEPTA's empirical experience. Under the circumstances, it was not necessary for SEPTA to conduct any specific new tests or experiments and doing so would have been very expensive and of doubtful probative value.

23.     SEPTA accepts ads in general to help its revenue generation, but its advertising revenue is a small portion of its revenue. SEPTA has not submitted any empirical evidence that accepting ads that tend to be more controversial would directly impact its "fare box" revenue, but the Court finds SEPTA's concerns about accepting such ads to be credible. And based on its AFDI experience, SEPTA, with its expertise in transit matters, is entitled to substantial discretion in how it runs its business, including what ads it will accept or reject.

### C. SEPTA's Process for Reviewing Proposed Advertising

24.     All advertisements running on SEPTA's advertising spaces are reviewed by Intersection and at least one SEPTA employee, usually Jim Dellispriscoli. (Benedetti Dep. at 60:5–61:5, 64:13–17.) The Advertising Standards themselves state, "All such advertising shall be submitted to SEPTA for review and written approval prior to display." (Trial Ex. 22, at ¶ II(A)(9)(a).) If Intersection deems an advertisement acceptable, the advertisement is relayed to at

least one SEPTA employee through a copy receipt. Among other tasks, the SEPTA employee is supposed to ensure that the advertisement does not violate the Advertising Standards. (Benedetti Dep. at 63:24–65:3, 168:12–170:5.) Advertisements that Intersection deems compliant, and that are not rejected or removed by SEPTA's employee, run in SEPTA's advertising spaces.

25. When Intersection receives a proposed advertisement that it believes may violate the Advertising Standards, it must alert SEPTA's advertising department for review and approval. (Trial Ex. Ex. 22, at ¶ II(A)(9)(a).) Advertisements that Intersection and the reviewing SEPTA employee believe fall in a "gray area" and may not comply with the Advertising Standards are elevated to SEPTA's General Counsel, Benedetti, for further review. (Benedetti Dep. at 168:12–21.)

26. Benedetti is generally the final arbiter regarding whether an advertisement complies with SEPTA's Advertising Standards. (Id. at 79:17–21; Trial Tr. at 81:2–5.)

27. The Advertising Standards are the only written guidance SEPTA has published about what advertising content is or is not acceptable. Benedetti testified that "everything related to our measuring whether or not a particular ad meets or doesn't meet the standards and our review of those ads is – comes from [the Advertising Standards]." ( Benedetti Dep. at 66:19–22.) And, "the only standard that SEPTA has in writing about what constitutes an ad that is political or not is in [the Advertising Standards]." ( Id. at 116:2–6.)

28. The Advertising Standards are not available on SEPTA's website, and SEPTA does not offer the public any written guidance about how to determine whether or not an advertisement involves a "political issue" or a "matter[] of public debate." ( Id. at 115:17–116:6; Trial Tr. 81:6–16.)

29. Benedetti credibly described his own personal process for determining whether a

37

proposed advertisement elevated to his level of review violates the Challenged Provisions as

follows:

> Q. How do you go about determining whether something is subject to debate?
> A. That's a good question.
> What I do, generally speaking, is I look at the ad first, and I just kind of absorb it, for lack of a better word. I think about it.
> And then I go on the internet and I Google various phrases about, you know, what the advertisement is projecting, what message it is, and I see what comes up, and I see if there's a meaningful debate about the issue that the advertisement is promoting.

(Benedetti Dep. at 102:13–24.)

29.     Benedetti's process also may involve reviewing case law that he deems relevant. (Id. at 101:12–16, 126:8–12.) SEPTA's interpretation of its Advertising Standards may evolve over time because "[c]ase law can change how those standards are reviewed." ( Id. at 277:1–20; see also Trial Tr. at 70:9–71:4.) There is no case law interpreting SEPTA's current Advertising Standards. (Trial Tr. at 89:21–25.)

30.     Benedetti's process may also include discussing the advertisement with other SEPTA or Intersection employees or in-house or outside counsel. (Benedetti Dep. at 183:4–185:13 (testifying that he could not answer questions about whether a particular ad would be permissible "because I have to consult with counsel for sure on something like that and I would have to sit down with [in-house counsel] and talk it through and do searches and – it's not something I can do in a couple of minutes with you"); Trial Tr. at 55:3–17.)

31.     Intersection has received and accepted at least 2,736 unique proposals for contracts to advertise in SEPTA advertising spaces since SEPTA implemented its 2015 Advertising Standards. SEPTA has identified only twelve advertisements that it rejected in whole or in part, as well as two additional advertisements that SEPTA initially accepted, but which Benedetti then personally observed on SEPTA vehicles and ordered be taken down because they did not comply

38

with SEPTA's Advertising Standards. (Trial Ex. 53, July 17, 2018 Email from J. Powell to Counsel; Benedetti Dep. at 74:10–20.)

32. At trial, when asked on direct, "How many proposals has SEPTA actually rejected since the new standards come into effect in 2015?," Benedetti responded, "Not many." (Trial Tr. at 55:25–56:2.)

33. At trial, Benedetti confirmed that Exhibit 53 and the pretrial stipulated facts erroneously list the "Safe Sleep" ad campaign (Trial Ex. 58) as having been rejected, when in fact it was accepted. (Trial Tr. at 88:20–89:8.) And, he could not say whether the Department of Homeland Security sex trafficking ad campaign (Trial Ex. 56) was rejected, but he could not offer any explanation as to why it would have been rejected. (Trial Tr. at 89:9–20; Benedetti Dep. at 266:1–267:11.)

34. SEPTA also rejected an advertisement for the Housing Equality Center. (See Trial Ex. 66.) Although it does not appear on SEPTA's counsel's list of rejected ads, neither does it appear in any of SEPTA's records as an ad that was accepted. Benedetti testified that he remembered the ad submission and could not explain why SEPTA would have rejected it. (Benedetti Dep. at 287:15–288:12.)

35. SEPTA has no formal appeal process following SEPTA's denial of an advertisement. (Benedetti Dep. at 78:17–79:16.) Sometimes, after deciding that a proposed advertisement violates the Advertising Standards, Benedetti will discuss the decision with the advertiser, and Benedetti might change his mind. If Benedetti does not change his mind, the advertiser's only recourse is to file a lawsuit. (Id.)

36. SEPTA has accepted and run numerous advertisements for governmental entities promoting government programs and policy, including the following:

a. SEPTA ran an advertisement for the federal Centers for Disease Control proclaiming, "Help him fight measles with the most powerful defense. Vaccines." (Trial Ex. 43.)

b. SEPTA ran an advertisement by the City of Philadelphia stating, "Your landlord must ensure your home is safe. . . . If your landlord has not given you lead paint safety information, Call 311 or Visit Phila.Gov/LeadHealthyHomes." (Trial Ex. 44.)

c. SEPTA ran an advertisement for the Philadelphia Department of Labor stating, "Employee or Contractor. Knowing the difference benefits you," and promoting a government website that helps the public learn about their legal rights. (Trial Ex. 45; Benedetti Dep. at 236:19–238:2.)

d. SEPTA ran an advertisement for the Montgomery County Health Department stating, "Employers must provide a reasonable break time for an employee to express breast milk for her nursing child for one year after the child's birth, as well as a private place to do so." (Trial Ex. 46.) The advertisement directed readers in search of more information to a government website. (Id.)

e. SEPTA ran an advertisement for the Commonwealth of Pennsylvania stating, "Wanted by law enforcement? Tired of running? Surrender & see favorable considerations. Safe Return." (Trial Ex. 47.)

f. SEPTA ran an advertisement for the City of Philadelphia proclaiming the City's "bold goal of becoming a 90% zero waste AND litter-free City by 2035" and prompting residents to take specific steps to advance those goals. (Trial Ex. 49.)

g. SEPTA ran an advertisement for the City of Philadelphia Department of Public

40

Health stating, "Saving a Life Can Be This Easy," "Carry Naloxone (Narcan)," and "Prevent Opioid Overdose." (Trial Ex. 50.)

h. SEPTA also ran advertisements by the Philadelphia FIGHT Community Health Center stating, "Have you or someone you know been impacted by mass incarceration? Find out how to fight for your rights, and for the rights of your family, friends and community members." (Trial Ex. 51.) The advertisement features drawings of wrists in handcuffs behind bars, a heart behind bars, and two people speaking on a telephone in a prison's visitation room. (Id.) At deposition, Benedetti testified that he was unsure whether this advertisement was consistent with the Advertising Standards. (Benedetti Dep. at 255:11–257:4.)

37. SEPTA has run ads on other controversial topics and matters of public debate, including the following:

a. SEPTA ran an advertising campaign by Facebook, Inc., with statements such as: "Fake news is not your friend" and "Clickbait is not your friend." (Trial Ex. 113.) This campaign generated more than $250,000 in revenue for SEPTA in just three months. (Trial Ex. 70 (showing revenue in May, June, and July 2018 pursuant to contract 21821349).)

b. SEPTA ran an advertisement for the American Friends Service Committee that asked viewers to engage themselves in the fight for peace. The advertisement displayed quotes from civil rights leaders, Martin Luther King, Jr., Cesar Chavez, and Lucretia Mott (all of whom SEPTA described as "controversial"), and, expressing the need for the viewer to be an active participant in fights for justice, asked rhetorically, "What will you do for peace?" (Trial Ex. 33; Benedetti Dep. at

41

182:5–14.)

c.  SEPTA ran a series of advertisements for Fusion media that posited that people of
    many races, ethnicities, and religions are "As American As" the viewer's
    preconceived notions of American-ness. (Trial Ex. 34; Benedetti Dep. a t 187:5–
    11.) Each advertisement stated, "Calling All Voices" and contained in huge
    lettering "As American As." (Trial Ex. 34.) One advertisement showed a split-
    screen image featuring a woman who appears to be Muslim on one side, and on
    the other side, a male soldier in camouflage fatigues. (Id.) Another advertisement
    in the series showed a split-screen image of a woman of color in boxing gear, in
    front of an American flag on half of the screen, and draped in the Mexican flag on
    the other half of the screen. ( Id.) Another showed a young Black child wearing a
    T-shirt that says "My Life Matters." ( Id.) Others in the series featured children of
    color standing with their hands across their hearts (id.) as well as other images of
    men and women of color (id.).

38.  SEPTA also accepted two ads welcoming members of the Democratic National
Committee to the DNC held in Philadelphia in 2016. (Trial Exs. 31, 32; Benedetti Dep. at 171:11–
174:18.) These ads generated more than $140,000 in revenue. (Trial Ex. 70, at 37) (showing
revenue in July 2016 pursuant to contract 21629078)). Benedetti testified that, in hindsight, he
thinks some of these ads are acceptable, but that others violated the Challenged Provisions. (Trial
Tr. at 61:4–20; Benedetti Dep. at 170:6–177:18.)

39.  The Court finds that Benedetti, and the other SEPTA witnesses who testified by
deposition, are credible and their testimony deserves substantial weight. Benedetti impressed the
Court as taking his corporate responsibilities, as the decision maker on advertisements on behalf

42

of SEPTA, very seriously. The fact that he was not always consistent, and indeed was contradictory in some instances and examples, does not require rejecting his testimony or criticizing his performance of his job. Absolute consistency is not the appropriate test. In American corporate life, many companies depend on their general counsel for legal advice, and the application of legal principles to business decision making. Benedetti acted in this role and the Court believes his approach to his job was consistent with constitutional and legal standards. The fact that CIR, and perhaps other SEPTA advertisers, disagreed with Benedetti's exercise of discretion, is not a determinative factor in this case.

40. Plaintiff has shown a number of arguably inconsistent decisions in the rejection and acceptance of certain advertisements. Reasonable individuals can disagree on the decisions made by SEPTA on specific ads, but this does not require the Court to find that SEPTA has acted unreasonably, or in violation of constitutional standards. The Court finds that SEPTA has acted in good faith, and that arguable inconsistencies from time to time do not warrant a finding that SEPTA is unreasonable.

## D. Bank Advertisements

41. SEPTA has accepted numerous home loan-related advertisements identifying each advertiser as an "Equal Opportunity Lender" or "Equal Housing Lender." (See, e.g. Trial Exs. 35, 36, 38, 39.) Pursuant to federal law, the inclusion of those phrases or the equal housing lender logo is a representation that the lender makes home loans "without regard to race, color, religion, national origin, sex, handicap, or familial status." 12 C.F.R. § 338.3(a). Although the regulation states the advertising regarding home loans must "prominently" indicate that the lender does not discriminate on the basis of any of these protected characteristics, the regulations specifically allow a showing of the equal opportunity logotype as satisfying this requirement with respect to written

43

and visual advertisements.[20]

42. The Court finds that SEPTA adhered to this requirement and that all of the bank advertisements in this record carried that logotype, without any additional representations or explanations.

43. Many of these advertisements feature non-white models. (E.g., Trial Exs. 36, 38, 39; see also Trial Ex. 37 (featuring African-American couple in apparent new home with slogan "Bank here to get there. Financial Solutions for Your Life[]").)

44. For example, an advertisement from Tompkins VIST Bank shows an image of an African American couple and child in front of a stack of moving boxes and says, "Making your dream of home ownership a reality," and bears the Equal Housing Lender logo type. (Trial Ex. 38;

---

[20]     Section 338.3(a) provides:

> (a) Any bank which directly or through third parties engages in any form of advertising of any loan for the purpose of purchasing, constructing, improving, repairing, or maintaining a dwelling or any loan secured by a dwelling shall prominently indicate in such advertisement, in a manner appropriate to the advertising medium and format utilized, that the bank makes such loans without regard to race, color, religion, national origin, sex, handicap, or familial status.

> (1) With respect to written and visual advertisements, this requirement may be satisfied by including in the advertisement a copy of the logotype with the Equal Housing Lender legend contained in the Equal Housing Lending poster prescribed in § 338.4(b) of the FDIC's regulations or a copy of the logotype with the Equal Housing Opportunity legend contained in the Equal Housing Opportunity poster prescribed in § 110.25(a) of the United States Department of Housing and Urban Development's regulations (24 CFR 110.25(a)).

(Emphasis added).

Benedetti Dep. at 200:1–7.)

45. A Wells Fargo advertisement proclaims the virtues of Wells Fargo's "NeighborhoodLIFT program," which provides down payment assistance and financial education to homebuyers of modest income. (Trial Exs. 39, 40.) Both the advertisement and the website prominently featured in the advertisement show various non-white individuals. ( Id.)

46. Benedetti testified that Wells Fargo was one of the parties to litigation concerning discriminatory lending, but he could not specifically recall if the litigation he reviewed was the high-profile litigation in the Eastern District of Pennsylvania. (Benedetti Dep. a t 12:22– 13:14.)[21]

47. One of SEPTA's letters rejecting CIR's advertisement noted, "The subject of the proposed advertisement is disputed in class action litigation pending in the courts." (Trial Ex. 19, Mar. 29, 2018 Ltr. from G. Benedetti to V. Baranetsky).

## E. SEPTA's Denial of CIR's Proposed Advertisement

48. In January 2018, CIR applied to place a paid advertisement on the interior of SEPTA buses. (Trial Ex. 30.) CIR wanted to post a journalistic graphic derived from the ten-panel comic appearing on Reveal's website. (See Trial Exs. 81, 10.) The comic and advertisement arose out of CIR's reporting about racial disparities in mortgage lending—reporting that was confirmed by the Associated Press. (Trial Ex. 16.)

49. Intersection informed CIR that SEPTA would not accept CIR's proposed advertisement because, according to SEPTA's legal department, "[d]isparate lending is a matter of public debate and litigation." (Trial Ex. 30.) CIR and SEPTA then exchanged four letters between

---

[21] CIR asserts that Wells Fargo is a defendant in litigation regarding alleged discriminatory lending practices, including alleged reverse redlining. (CIR Post-Tr. Br., at 19) (citing City of Phila. v. Wells Fargo & Co., No. 17-02203 (E.D. Pa. 2017)).

March 2, 2018 and March 29, 2018. (See Trial Exs. 16–19.) Ultimately, SEPTA reiterated its position that CIR's proposed advertisement is prohibited by the Advertising Standards because the advertisement "takes a position on issues that are matters of political, economic, and social debate" and "indirectly implicates the action, inaction, prospective action or policies of a government entity," in violation of the Challenged Provisions. (Trial Exs. 17, 19.)

50. Other than violating the Challenged Provisions, SEPTA has disclaimed any other justification for rejecting CIR's ad. (Trial Ex. 24, Def.'s Resps. to Interrogs. 1, 3, at 5, 7; Benedetti Dep. at 85:8–17.)

51. Prior to this litigation, SEPTA never identified specific panels or aspects of the proposed advertisement that concerned SEPTA, stating only that, in SEPTA's view, CIR's advertisement addressed the subject of "disparate lending." SEPTA did not invite CIR to amend its proposal in any manner before rejecting it. (See Trial Exs. 16–19.) However, during his deposition, Benedetti identified two images in CIR's advertisement that personally stood out to him as violative of SEPTA's Advertising Standards: an image showing keys attached to sticks of dynamite handed from a white hand to a black hand, and an image Benedetti interpreted as showing protesters yelling at a white banker. (Benedetti Dep. at 156:9–12, 157:17–158:3.)

52. To address Benedetti's stated concerns, CIR drafted an additional proposed advertisement without those design elements, which it submitted to Intersection and SEPTA on August 6, 2018. (Trial Ex. 83, Aug. 6, 2018 Email from G. Hongsdusit to J. Roche, Aug. 6, 2018 Ltr. from J. Stapleton to M. Madden, et al.)

53. On September 21, 2018, after being directed by the Court to formally respond to CIR's additional proposed advertisement, SEPTA rejected the proposal. (ECF 32, Ex. A, Ltr. from M. Madden to J. Stapleton.)

54.     Of great concern is the need for a viable public transit system in a large city such as Philadelphia, serving many neighborhoods, some more prosperous than others. It is a commonly accepted fact in Philadelphia that many taxicab drivers, and "transportation network companies," such as Uber and Lyft, do not frequent high crime areas, or areas where there is a significant amount of drug trafficking or drug addicts. Many residents who live in these areas are forced to rely on public transportation to get to and from work, for child care, for school attendance, and many other reasons. This point was made in litigation before the undersigned involving taxi cab drivers alleging the failure of the Philadelphia Parking Authority to regulate transportation network companies. See generally Checker Cab Phila. v. Phila. Parking Auth., No. 16-cv-4669.

55.     The obvious facts of operating a transit system in a big city, as well as specific facts in this record, warrant giving SEPTA considerable discretion in adopting advertising standards that may preclude certain types of advertisements in an effort to avoid offending any particular passenger segment. The Court notes, as expressed in a number of judicial decisions, that passengers on a transit bus or subway are "captive" in the sense that they cannot avoid advertising media. This is opposed to consumers listening to radio or TV stations, or even reading ads in a newspaper, where the consumer can switch the station, turn the newspaper page, not buy the newspaper, or turn off the radio/TV. Advertisements in public transit vehicles are a unique advertising market and courts should refrain from supervision of rejected ads or interference with the business decisions of the transit company managers.

56.     The Court nonetheless recognizes its obligations to adhere to First Amendment jurisprudence and, for these reasons, has determined that certain phrases within SEPTA regulations are overly broad, potentially confusing, and unreasonably infringing on free speech. The Court notes these objectional phrases in the Conclusions of Law, which follow. With these deletions,

the Court finds SEPTA's standards are consistent with First Amendment principles as interpreted by the United States Supreme Court and the Third Circuit and provide a workable and reasonable standard for SEPTA to follow.

57.     The deletion of these phrases will not harm SEPTA or restrict SEPTA from rejecting or accepting advertisements that it believes are consistent with its standards. Rather, the Court believes the deletions of these phrases in the current regulations will make the regulations more consistent with established First Amendment jurisprudence.

58.     The Court also finds that advertisers seeking to place advertisements that SEPTA finds violates its standards have many other outlets in the Philadelphia area for access to the public for their views, such as the internet, billboards, leaflets, sound trucks – in addition to the more obvious advertising outlets mentioned above such as newspapers, radio and TV. Thus, the fact that SEPTA, as a non-public forum, has restrictions, does not deter the public flow of messaging of all types. In fact, the rejected CIR advertisement at issue had been accepted by the City of Philadelphia for placement on their bus shelters and newsstands. (Trial Ex. 10, Feb. 23, 2018 Email from J. Roche to H. Young et al.)

## VII. DISCUSSION OF LAW

Our analysis proceeds as follows. The Court first examines whether the advertising space at issue is a public, designated public, limited public, or non-public forum. The Court then proceeds to evaluate whether, under the recent Supreme Court precedent in Mansky, the Challenged Provisions are so overbroad as to be incapable of reasoned application. Next, the Court discusses CIR's facial attack on the reasonableness of SEPTA's regulations and address the particular circumstances relevant to First Amendment challenges to speech restrictions on public transit. Following this discussion, the Court addresses whether SEPTA's content-based restrictions are viewpoint neutral—both facially and as-applied.

### A. Forum Analysis

#### 1. Defining the Forum and Type of Forum

The forum is defined by the "access sought by the speaker." Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 801 (1985). In Cornelius, a group of legal defense funds brought suit against the federal government after it implemented standards restricting inclusion in the Combined Federal Campaign ("CFC"), an annual charitable giving initiative for federal employees. Id. at 790. The Court concluded that the CFC, rather than the entire federal workplace, was the relevant forum. Id. at 801–02.

We conclude that the relevant forum at issue here is the advertising space on SEPTA buses. Although the Advertising Standards apply to other SEPTA vehicles, as we discussed in the findings of fact above, CIR sought access to the inside of SEPTA buses. In accordance with Cornelius, we focus our analysis on that advertising space.

The Supreme Court articulated the standards that apply to the three different types of free speech forums in Perry Education Association v. Perry Local Educators' Association, 460 U.S.

37, 45–47 (1983). In a traditional or "quintessential" public forum, such as a street or park, "the government may not prohibit all communicative activity." Rather, "[f]or the state to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." Id. at 45. In a designated public forum, defined by "public property which the state has opened for use by the public as a place for expressive activity," the state "is bound by the same standards as apply in a traditional public forum." Id. at 45–46. Finally, in a limited public or non-public forum, which is characterized by "[p]ublic property which is not by tradition or designation a forum for public communication," the State "may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." Id. at 46. The reasonableness of a restriction in a non-public or limited public forum[22] "must be assessed in the light of the purpose of the forum and all the surrounding circumstances." Cornelius, 473 U.S. at 809.

Courts outside this Circuit have explained that "[t]he past history of characterization of a forum may well be relevant; but that does not mean a present characterization about a forum may

---

[22] The Supreme Court has identified limited public forums and non-public forums as distinct categories. See R.A.V. v. City of St. Paul, Minn., 505 U.S. 377, 427 (1992) (identifying limited public and non-public forums as separate "geographic categories of speech"); but see AFDI v. King Cty., Wash., 136 S.Ct. 1022, 1022 (2016) (Mem.) (Thomas, J., dissenting) (stating that a limited public forum is also called a non-public forum). A limited public forum "exists where a government has 'reserv[ed] a forum] for certain groups or for the discussion of certain topics.'" Walker, 135 S.Ct. 2250 (quoting Rosenberger v. Rector Visitors of Univ. of Va., 515 U.S. 819, 829 (1995)). In contrast, a non-public forum is created "'[w]here the government is acting as a proprietor, managing its international operations.'" Walker, 135 S.Ct. at 2251 (quoting Int'l Soc'y for Krishna Consciousness v. Lee, 505 U.S. 672, 678–79 (1992) (hereinafter "ISKCON")). Regardless of whether a forum is identified as non-public or limited public, the same level of scrutiny applies. NAACP v. City of Phila., 834 F.3d 435, 452 (3d Cir. 2016). In both types of forums, restrictions on speech must be reasonable in light of the purpose served by the forum and viewpoint neutral. Id. (citing Rosenberger, 515 U.S. at 829).

50

be disregarded." Ridley v. Mass. Bay Transp. Auth., 390 F.3d 65, 77 (1st Cir. 2004) (discussing changes to a transportation authority's advertising restrictions as if the advertising space had previously been considered a designated public forum). See also American Freedom Defense Initiative v. Metropolitan Transp. Auth., 109 F. Supp. 3d 626, 632–33 (S.D.N.Y. 2015) (Koeltl, J.) (noting that changes made to a transportation authority's advertising restrictions likely "converted its advertising space from a designated public forum to a limited public forum or a nonpublic forum"); Coleman v. Ann Arbor Transp. Auth., 947 F. Supp. 2d 777, 779–80 (E.D. Mich. 2013) (Goldsmith, J.) (finding that revisions to a transportation authority's advertising policy changed the forum from a designated public forum to a limited or non-public forum). Thus, "[t]he government is free to change the nature of any nontraditional forum as it wishes. . . . [I]t would be free to decide in good faith to close the forum at any time." Ridley, 390 F.3d at 77 (emphasis in original).

In prior cases involving SEPTA's restrictions on speech, courts in this Circuit have held that SEPTA's advertising space is a designated public forum. Christ's Bride Ministries, Inc. v. SEPTA, 148 F.3d 242, 252 (3d Cir. 1998); AFDI, 92 F. Supp. 3d at 326.

In Christ's Bride, the Third Circuit held that SEPTA's removal of an advertisement from stations and transit stops violated the First Amendment. 148 F.3d at 244. The Third Circuit reasoned that SEPTA had created a public forum in its advertising space and the removal of the advertisement in question did not survive strict scrutiny, nor was it reasonable even if the forum were non-public. Id. at 244. Although SEPTA originally agreed to display the advertisement at issue, which stated that "Women Who Choose Abortion Suffer More & Deadlier Breast Cancer," SEPTA removed the ad after receiving a letter from the U.S. Department of Health and Human Services calling its accuracy into question. Id. at 245–46.

51

In coming to its decision, the Third Circuit held that the relevant forum was all of SEPTA's advertising space because that was the space to which the advertiser sought access, and that the advertising space was a designated public forum. Id. at 248, 252. The Third Circuit focused on SEPTA's intent by examining its policies and practices and the nature of the property. Id. at 247–55. Because SEPTA's policies were aimed at generating revenue and promoting awareness of social issues, the forum was intended to be partly commercial and partly expressive. Id. at 250. The fact that SEPTA had discretion to reject advertisements for any reason did not render the forum non-public—if anything, the government's reserved right to control speech without any particular standards or goals called for closer scrutiny. Id. at 251. Moreover, the record did not reveal any policy or practice demonstrating that SEPTA intended the forum be closed to speech on the issue of abortion. Id. at 254. Rather, "[i]n its efforts to generate advertising revenues, SEPTA permitted abortion-related and other controversial advertisements concerning sexuality." Id.

Even if the forum had been closed, the Third Circuit found SEPTA's actions unreasonable because SEPTA did not ask the advertiser to clarify the basis for its contention after receiving the letter calling the poster into question, because SEPTA could not explain how its decision was related to preserving the advertising space for its intended use, and because SEPTA failed to implement an official policy governing the display of advertisements making contested claims. Id. at 257.

In AFDI, Judge Goldberg granted the plaintiff's motion for preliminary injunction because SEPTA created a designated public forum through its advertising space, its restriction on "disparaging" ads was unconstitutionally viewpoint-based, and the restriction was not necessary to achieve a compelling state interest. 92 F. Supp. 3d at 326, 327–29. SEPTA rejected a proposed

advertisement about "Islamic Jew–Hatred" because it violated SEPTA's anti-disparagement standard, which prohibited "[a]dvertising that tends to disparage or ridicule any person or group of persons on the basis of race, religious belief, age, sex, alienage, national origin, sickness or disability." Id. at 320–21. The relevant forum was SEPTA's advertising space, the space to which plaintiff sought access. See id. at 327. Despite SEPTA's testimony that it did not intend to create a public forum, Judge Goldberg found that it had done so through policies and practices that failed to proscribe political or public issue advertising and did not limit advertisements to commercial or uncontroversial speech. Id. at 326. Further, SEPTA's policy did not survive strict scrutiny because it was not necessary to serve a compelling state interest—that is, the policy would have had the same "beneficial effect" even if it was not limited to specific enumerated groups. Id. at 328.

In cases involving other transit agencies, however, many courts have found that advertising spaces in public transportation systems were non-public forums. See Lehman v. City of Shaker Heights, 418 U.S. 298, 304 (1974) (plurality) (affirming Ohio Supreme Court holding that advertising space on public transit was a non-public forum because "[t]he city consciously ha[d] limited access to its transit system advertising space in order to minimize chances of abuse, the appearance of favoritism, and the risk of imposing upon a captive audience")[23]; Ridley, 390 F.3d at 81–82 (holding that transit authority advertising program constituted a non-public forum); SMART, 698 F.3d at 890 (concluding that city bus advertising space was a non-public forum and that the transit agency's rejection of an AFDI advertisement as political was reasonable and viewpoint neutral); Archdiocese of Wash. v. Wash. Metro. Area Transit Auth., 897 F.3d 314, 323

---

[23] Although Lehman was decided prior to the Supreme Court's articulation of the public forum doctrine in Perry, the Court's analysis there most closely comports with that of a non-public forum. This Court also recognizes that although Lehman was a plurality opinion, it is the only Supreme Court case about advertising restrictions in public transportation systems. Accordingly, we find it extremely authoritative. For a more fulsome discussion of this case, see infra Part VII.D.3.

(D.C. Cir. 2018) (hereinafter "Archdiocese v. WMATA") (holding that a transit authority had created a non-public forum and that its rejection of a religious advertisement was reasonable because the policy was consistently enforced and tied to the stated purpose of providing reliable, inclusive service); Ne. Pa. Freethought Soc'y v. Cty. of Lackawanna Transit Sys., 327 F. Supp. 3d 767, 771 (M.D. Pa. 2018) (Mannion, J.), appeal filed (No. 18-2743) (3d Cir. August 8, 2018) (finding that advertising space on public transit buses was a "limited forum," and the advertising policy was reasonable in light of the forum and that the plaintiffs had not established viewpoint discrimination).

## 2. The Advertising Space on SEPTA Buses is a Non-Public Forum

To determine whether SEPTA closed the forum of its advertising spaces on buses, the Court must review SEPTA's intent as reflected in its policy and practices. See Cornelius, 473 U.S. at 802 ("The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse. . . . Accordingly, the Court has looked to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum." (citing Perry, 460 U.S. at 47)).

From the face of the 2015 Advertising Standards, it is clear that SEPTA's intent was to create a non-public forum:

> Non-Public Forum Status. It is the express intention of these Advertising Standards to further confirm SEPTA's intention that property allocated for advertising will not provide or create a general or designated public forum for expressive activities. In keeping with its proprietary function as a provider of public transportation, SEPTA does not intend its acceptance of transit advertising to permit its transit facilities, products, or vehicles to be used as open public forums for public discourse and debate. Rather, SEPTA's fundamental purpose and intent is to accept such forms of advertising as will enhance the generation of revenues to support its transit operations without adversely affecting the patronage of passengers. In furtherance of that discreet and limited objective, SEPTA will retain strict control

54

over the nature of the advertisements accepted for posting on or in its transit facilities, products and vehicles and will maintain its advertising space strictly as a non-public forum.

(See Ex. 22.) Benedetti's testimony at trial explaining the process by which SEPTA adopted this Policy affirms the organization's explicit intent to close the forum. (Trial Tr. at 46:17–47:17.) (explaining that the primary objective in adopting the 2015 Advertising Standards was to become a non-public forum).

This inclusion of an express intent to close the forum was apparently missing from SEPTA's earlier advertising standards. (See Trial Ex. 23.) See also Christ's Bride, 148 F.3d at 252; AFDI, 92 F. Supp. 3d at 326. However, the statement of intent is not dispositive. See Christ's Bride, 148 F.3d at 251 ("The authority's own statement of its intent . . . does not resolve the public forum question."). Thus, the Court must review SEPTA's policies and practices to determine whether the forum has been closed.

SEPTA's licensee, Intersection, solicits and places advertisements on SEPTA vehicles. With the assistance of salespeople and managers at Intersection, advertisements that potentially violate SEPTA's Policy are brought to Benedetti's attention. Benedetti testified that he has not rejected many advertisements since the new standards were implemented in 2015. (Trial Tr. at 55:25–56:2.) Of the nearly 2,736 proposed advertisements Intersection has received, SEPTA has rejected or removed between twelve and fourteen advertisements for noncompliance with the standards. (Trial Ex. 53, Pl.'s Br. Stip. 49.)

In practice, SEPTA has accepted a number of advertisements that Benedetti testified it should not have, including, for example, an advertisement from a union expressing support for the Democratic National Convention. (Trial Ex. 32; Trial Tr. at 61:4–20.) The fact that SEPTA's process has missed certain advertisements does not alone demonstrate that SEPTA has created a

public forum. See Ridley, 390 F.3d at 78 ("One or more instances of erratic enforcement of a policy does not itself defeat the government's intent not to create a public forum."). Moreover, Benedetti testified that SEPTA employee Dellispriscoli "sees all the ads . . . before they go on the bus[,]" and that only potentially problematic ads are brought to Benedetti's attention. (Trial Tr. at 52:23–25, 54:13–14.)

This Court concludes that SEPTA's practices and policies have evolved since AFDI such that SEPTA effectively closed the forum to public speech and debate. It is within SEPTA's power to close the forum, and it clearly exerts significant control over the advertising review process.

In finding that SEPTA had failed to create a non-public forum in AFDI, Judge Goldberg noted that SEPTA "does not have an official policy which prohibits political or public issue advertisements to those which contain only commercial or uncontroversial speech." 92 F. Supp. 3d. at 326. As explained at length above, SEPTA has revised this policy to restrict these types of speech.

Judge Goldberg also noted that SEPTA has "accepted a number of concededly public issue advertisements." Id. Although SEPTA has rejected few ads since the 2015 Advertising Standards were adopted, the advertisements that it has accepted and rejected have demonstrated SEPTA's control over the forum. See supra Parts IV.D, E. This is a far cry from SEPTA's practice in AFDI, where they accepted "advertisements on such topics as teacher seniority, fracking and contraceptive use." 92 F. Supp.3d at 326. Although Benedetti has admittedly accepted certain advertisements that may have been violative of the policy, we do not find that these few instances demonstrate an intent on SEPTA's part to maintain a designated public forum. See Ridley, 390 F.3d at 78.

As discussed above, SEPTA had, until midway through this litigation, permitted Screenfeed to publish news feed data onto the digital displays on its buses. Before the news feeds were terminated, SEPTA reviewed the advertisements it published on the digital displays in the same fashion as it did other advertisements. We do not find that the infotainment systems are relevant to this analysis. Even if they were, however, we conclude that SEPTA has not created a public forum by permitting Screenfeed to publish scrolling news headlines on SEPTA buses.

### B. The Standards and Burden Applicable in a Non-Public Forum

Having decided that SEPTA's advertising space on buses is a non-public forum, the Court now moves on to analyzing whether SEPTA's restrictions on speech are constitutional in such a forum. The government may restrict access to a non-public forum "as long as the restrictions are 'reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view.'" Cornelius, 473 U.S. at 800 (quoting Perry, 460 U.S. at 46). The government's restrictions must "articulate some sensible basis for distinguishing what may come in from what must stay out." Mansky, 138 S.Ct. at 1888. They must also be reasonable in light of the purpose of the forum and all the surrounding circumstances. Cornelius, 473 U.S. at 809. Finally, restrictions in a non-public forum must be viewpoint neutral. Id. at 800, 806.

SEPTA carries the burden of establishing that its restrictions meet this criteria. Regardless of the type of forum, in the face of a First Amendment challenge where "the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." United States v. Playboy Entm't Grp., Inc., 529 U.S. 803, 816 (2000); see also NAACP v. City of Phila., 834 F.3d 435, 443–44 (3d Cir. 2016) ("NAACP") (cited by both parties) (concluding that even in a limited public or non-public forum, the government must still prove that its restrictions on speech are reasonable in light of the purpose of the forum and all surrounding circumstances).

57

## C. CIR's Facial Attack on Whether the Challenged Provisions Are Capable of Reasoned Application Under Mansky

As an initial matter, we examine whether the Challenged Provisions are capable of reasoned application. We do so with reliance on Mansky, 138 S.Ct. 1876, where the Supreme Court held that a restriction on speech in a non-public forum is unreasonable if it does not "articulate some sensible basis for distinguishing what may come in from what must stay out." Id. at 1888. CIR correctly points out that Mansky is not the first case to address First Amendment challenges to restrictions on speech that "do not meaningfully constrain officials' discretion." (CIR Post-Trial Br., at 26.) Indeed, the undersigned previously struck down a Pennsylvania statute against "blasphemy" as violative of the First Amendment in part because it gave state officials "unbridled discretion" to determine which speech did or did not fall within its proscription. See Kalman v. Cortes, 723 F. Supp. 2d 766, 803 (E.D. Pa. 2010) (Baylson, J.) (citing City of Lakewood v. Plain Dealer Publ'g Co., 486 U.S. 750, 763 (1988)). However, this Court focuses its analysis on Mansky here because it is the most recent and most robust decision on the subject.

In Mansky, the Supreme Court held that Minnesota's statutory prohibition on any person wearing a political badge, button, or other form of insignia inside a polling place on Election Day was not capable of reasoned application and thus violated the First Amendment. In evaluating the policy, the Supreme Court first held that a polling place is a non-public forum. Id. at 1886. The Court then determined that Minnesota's restrictions on issue-oriented material and material promoting a group with recognizable political views were held to be too broad and thus provided unreasonable discretion to the state's actors. Id. at 1891. Although "precise guidance [has] never been required," Ward v. Rock Against Racism, 491 U.S. 781, 794 (1989), an "indeterminate prohibition carries with it 'the opportunity for abuse, especially where it has received a virtually open-ended interpretation.'" Mansky, 138 S.Ct. at 1891 (quoting Bd. of Airport Comm'rs of L.A.

v. Jews for Jesus, Inc., 482 U.S. 569, 576 (1987)); see also SMART, 698 F.3d at 893 (explaining that "unbridled discretion" challenges should be "concerned with the extent of the discretion and not with decisions made within the bounds of properly vested discretion"). Thus, the government actor's "discretion must be guided by objective, workable standards." Mansky, 138 S.Ct. at 1891.

### 1. Language That Must be Stricken as Incapable of Reasoned Application

CIR has presented a facial challenge to the Challenged Provisions on the basis that the second sentence of Subsection (a) and the entirety of Subsection (b) are incapable of reasoned application.[24]

The first provision, Subsection (a), prohibits "advertisements that are political in nature or contain political messages, including advertisements involving political or judicial figures and/or advertisements involving an issue that is political in nature in that it directly or indirectly implicates the action, inaction, prospective action or policies of a government entity." (Trial Ex. 22, at ¶ II(A)(9)(b)(iv)(a).) Based on the reasoning employed in Mansky, SEPTA's prohibition on advertisements containing political or judicial figures can be applied in a reasoned manner. However, the phrase "political in nature," as well as the latter clause of that sentence which prohibits "advertisements involving an issue that is political in nature in that it directly or indirectly implicates the action, inaction, prospective action or policies of a government entity," are significantly less clear. At oral argument on November 1, 2018, SEPTA indicated to the Court that it would object to this Court requiring it to delete this phrase from its policy. (11/01/18

---

[24] CIR has not objected to the first sentence of paragraph (a). CIR styles its challenge as, in part, a "vagueness" challenge. (See CIR Post-Trial Br., at 26) ("[I]t [i]s settled law that restrictions on speech violate the First Amendment if they are so vague that they do not meaningfully constrain officials' discretion.")). Because Mansky examines the breath of a policy's standards in order to conclude that the policy was not "capable of reasoned application," this Court uses similar language here. Mansky, 138 S.Ct. at 1888–90, 92.

Hearing Tr. at 29:24–30:6.) This Court overrules SEPTA's objection, and in accordance with Mansky, directs SEPTA to strike these phrases from its policy.

The second Challenged Provision, Subsection (b) prohibits "[a]dvertisements expressing or advocating an opinion, position, or viewpoint on matters of public debate about economic, political, religious, historical or social issues." (Trial Ex. 22, at ¶ II(A)(9)(b)(iv)(b).) The Court finds that "economic, political, religious, historical or social issues" are clear and discreet issues, but that the phrase "matters of public debate" is overly broad. When asked at oral argument about this, SEPTA said that it would not object to this Court requiring it to delete the "matters of public debate" language. (11/01/18 Hearing Tr. at 29:13–17.) CIR, however, did object, arguing that the proposed revision would not render the policy any more capable of reasoned application. (Id. at 30:14–31:3.) (arguing that if SEPTA removed the phrase "on matters of public debate," the standard would remain "hopelessly vague and capacious"). The Court likewise overrules these objections. The phrase "matters of public debate" is simply too broad to pass constitutional muster under Mansky. Thus, this Court will require SEPTA to strike the phrase from its policy.

Accordingly, the revised provisions of what is prohibited under SEPTA's policy will read as follows:

(a) Advertisements promoting or opposing a political party, or promoting or opposing the election of any candidate or group of candidates for federal, state, judicial or local government offices are prohibited. In addition, advertisements that are political in nature or contain political messages, including advertisements involving political or judicial figures and/or advertisements involving an issue that is political in nature in that it directly or indirectly implicates the action, inaction, prospective action or policies of a government entity.

(b) Advertisements expressing or advocating an opinion, position or viewpoint on matters of public debate about economic, political, religious, historical or social issues.

For the foregoing reasons, and in light of Mansky, SEPTA has not met its burden of justifying the continuation of the entirety of its advertising restrictions. Considering CIR's facial

60

attack, the overly broad portions of Subsections (a) and (b) must be stricken to nullify the threat of unfettered discretion on the part of SEPTA's decisionmakers. The Court's changes still allow SEPTA to exercise control over its advertising space because the revised provisions make clear that any ads on "political" issues will be rejected.

As a result, because SEPTA is required to revise its overly broad language in the Challenged Provisions, CIR's other challenges to SEPTA's advertising restrictions—both facial and as-applied—must fail.

### 2. Meet and Confer Requirement

In the past, SEPTA has engaged in a deliberative process with certain advertisers whose proposed advertisements were deemed to violate SEPTA's Advertising Standards. Benedetti testified that an advertiser called Fusion once submitted a proposed advertisement that violated SEPTA's Standards. (Trial Tr. at 59:20–60:9.) In response, Intersection and SEPTA "talked direct[ly] to the folks at Fusion" and then "Fusion agreed to eliminate those concerns that [Benedetti] had raised." (Id. at 60:5–8.) SEPTA then ran the finalized advertisement. (Id. at 60:9.)

SEPTA's advertising policy would benefit from a formalized meet-and-confer program similar to the deliberative process it undertook with Fusion. At oral argument on November 1, 2018, SEPTA agreed to add a formal "meet and confer" program to its Advertising Standards. (11/01/18 Hearing Tr. at 27:24–28:8.) Thus, in addition to striking the language the Court has found vulnerable, the Court will also require SEPTA to implement a meet-and-confer program for proposed advertisements that it deems violative of its Standards. The Court will further require SEPTA to post notice of the meet-and-confer program, as well as the rest of its advertising regulations, on its website. Subject to the order accompanying this Memorandum Opinion, the Court will allow time for SEPTA to draft this addition for SEPTA's website and, after any

61

comments by CIR, submit it to this Court along with CIR's comments for final consideration and approval.

### D. CIR's Facial Attack on the Restrictions (as to be Amended)

CIR also argues that the Challenged Provisions are not reasonable in light of the purpose of SEPTA's advertising space. In a non-public forum, the government satisfies its burden of proof by establishing that a restriction on speech is reasonable "in the light of the purpose of the forum and all the surrounding circumstances." Cornelius, 473 U.S. at 809. While this standard is subjected to more "exacting review" than rational-basis scrutiny, NAACP, 834 F.3d at 443, "a finding of strict incompatibility between the nature of the speech or the identity of the speaker and the functioning of the nonpublic forum is not mandated." Cornelius, 473 U.S. at 808. Indeed, a governmental restriction on speech "need not be the most reasonable or the only reasonable limitation" to satisfy constitutional requirements in a non-public forum. Id. Rather, the government's restriction on speech is reasonable if it is consistent with the government's legitimate interest in "preserv[ing] the property under its control for the use to which it is lawfully dedicated." Perry, 460 U.S. at 46 (quoting U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns, 453 U.S. 114, 129–30 (1981)); see also ISKCON, 505 U.S. at 691–92 (O'Connor, J., concurring) ("Although we do not 'requir[e] that . . . proof be present to justify the denial of access to a nonpublic forum on grounds that the proposed use may disrupt the property's intended function,' we have required some explanation as to why certain speech is inconsistent with the intended use of the forum." (quoting Perry, 460 U.S. at 52 n.12)).

### 1. NAACP v. City of Philadelphia

The Third Circuit has discussed this heightened reasonableness test at length in NAACP, 834 F.3d 435. There, the Third Circuit affirmed Judge Rufe's grant of summary judgment in favor

62

of the NAACP because the City of Philadelphia's ban on noncommercial advertisements at the Philadelphia Airport was unreasonable and violated the First Amendment.

The NAACP had submitted an advertisement regarding Philadelphia's high incarceration rates to be displayed at the airport. Id. at 438. The City rejected the advertisement because of an informal practice of only accepting advertisements that proposed a commercial transaction.[25] Id. The NAACP then brought a facial challenge to that policy, arguing that it violated the First Amendment. Id. In support of its case, the NAACP deposed the airport's Deputy Director of Aviation and Property Management/Business Development, pursuant to Federal Rule of Civil Procedure 30(b)(6). Id. The Third Circuit heavily relied on that deposition testimony in its opinion affirming summary judgment.

Before delving into the "reasonableness" of the airport's advertising policy, the Third Circuit addressed the nature of the advertising forum. In the District Court, Judge Rufe concluded that the airport's advertising space was a limited or non-public forum. Assuming that conclusion was correct and applying the burden of proof to the government as this Court does here, the Third Circuit moved on to examine the constitutional requirements for restrictions on speech in a limited or non-public forum. Id. at 444.

The Third Circuit synthesized three Supreme Court opinions—Cornelius, 473 U.S. 788, United States v. Kokinda, 497 U.S. 720 (1990), and ISKCON (O'Connor, J., concurring)—all written by Justice O'Connor, to define the City's burden. NAACP, 834 F.3d at 444–45. Using record evidence or commonsense inferences, the City had to satisfy a two-step test: (1) given that reasonableness "must be assessed in the light of the purpose of the forum and all the surrounding

---

[25] After this suit was filed, the City adopted written policy proscribing ads that do not propose a commercial transaction. Id. at 438.

circumstances," id. at 445 (quoting Cornelius, 473 U.S. at 809), the evidence or inferences must allow the Court to grasp the purpose to which the City has devoted the forum; and (2) the evidence or inferences also must provide a way of tying the limitation on speech to the forum's purpose. Id. at 445.

The Third Circuit then applied the two-step test, noting throughout its analysis the lack of record evidence from the City and its deponent in justifying the restrictions. The City claimed that the advertising space had two purposes: revenue maximization and controversy avoidance. Id. at 448. But because the record contained no legitimate evidence that the ban was related to, or would further the goals of, revenue maximization or controversy avoidance, and because commonsense inferences could not be drawn, the Third Circuit found the policy unreasonable in violation of the First Amendment. Id. at 448. Citing Greer v. Spock, 424 U.S. 828, 836 (1976), the Third Circuit explained that "although reasonableness review gives [the City] the discretion to preserve a forum 'for the use to which it is lawfully dedicated,' this presupposes that [the City] actually has dedicated the property to that particular use, and we have no evidence that this occurred here." NAACP, 834 F.3d at 446. Moreover, "[t]he only possible basis for an inference [was] general testimony about the Airport." Id. at 447. To the extent the City wished to justify its advertising restrictions based on its goals for the entire airport, the Third Circuit explained that it must consider the forum outside the airport's advertising space. Id.

Notable to this case, the Third Circuit expressly held that Lehman did not help the City's argument because the City's deponent disclaimed each of the factors relevant to Lehman's holding—minimizing abuse, avoiding favoritism, not imposing on a captive audience, and maximizing revenue. Id. at 448. The Third Circuit was careful to point out that, while reasonableness requires a case-by-case inquiry, the interests served by the advertising restrictions

64

in Lehman—namely the desire not to impose on a captive audience—were not implicated by the airport's ban. Id. at 448 n.6.

In his dissent, Judge Hardiman said that the record contained sufficient evidence to find the City's restrictions were reasonable. Id. at 449–57. Applying a different burden,[26] Judge Hardiman found that the City's ban on nongovernmental noncommercial speech was reasonable in light of the express purpose of maintaining the airport as a family-friendly or comfortable environment. Id. at 453. Judge Hardiman distinguished his position from the Majority by arguing that the Majority confused the purpose of the forum with the means of achieving that goal. Id. at 453 n.6. Moreover, Judge Hardiman noted that "many courts that have considered similar dilemmas have found prohibitions on public transit like the one here reasonable attempts to keep the peace." Id. at 454 (citing Lehman, 418 U.S. at 304; SMART, 698 F.3d at 892–94; and Children of the Rosary v. Phoenix, 154 F.3d 972, 975, 979 (9th Cir. 1998)). The dissent also disagreed that the "existence of media unconstrained by the Policy" in the airport should render the City's regulation unreasonable. Id. at 454. Judge Hardiman went on to explain that the City's restriction likewise was not viewpoint discriminatory and said that he would have reversed and entered summary judgment for the City. Id. at 455–57.

## 2. Transit Authorities Advertisements as a Subset of First Amendment Jurisprudence

As noted in NAACP, cases addressing restrictions on speech in public transit have made special considerations for the nature of the "captive" transit audience. See, e.g., Lehman, 418 U.S.

---

[26] Judge Hardiman explained that a facial challenge to a governmental policy "is the most difficult challenge to mount successfully," and "affects the burden on [the plaintiff]." Id. at 452 (quoting United States v. Mitchell, 652 F.3d 387, 405 (3d Cir. 2011) (en banc)). To succeed in such a challenge, Judge Hardiman explained that a plaintiff must show "the law is unconstitutional in all of its applications." Id. (quoting Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 449 (2008)).

at 302; id. at 307–08 (Douglas, J., concurring). Indeed, the reasonableness of a restriction on speech in a non-public forum must be analyzed in relation to the purpose of the forum and all the surrounding circumstances. Cornelius, 473 U.S. at 809. The "surrounding circumstances" are especially important in cases involving advertising on public transportation. It is fundamental that the inside of a bus is not the same as the inside of a polling place or even an airport, and cases analyzing restrictions on speech in public transit spaces constitute a distinct subset of First Amendment jurisprudence that gives transit authorities some leeway over their non-public forums. Although this Court's analysis is not limited to such cases, this Court finds them particularly applicable because of their analogous sets of facts. Therefore, a review of such decisions, both precedential and nonprecedential, is warranted before continuing to apply the law to the facts of this case.

### 3. The Special Circumstances of a "Captive Audience" on Transit Vehicles

The plurality opinion in Lehman is the only instance of the Supreme Court addressing advertising restrictions on public transit vehicles. Under Lehman, which continues to be oft-cited authority on speech restrictions on buses despite having been decided before the Supreme Court's articulation of First Amendment forum analysis, a transit authority may limit advertising content on city buses in part to minimize the risk of imposing upon a "captive audience." 418 U.S. at 304; id. at 307–08 (Douglas, J., concurring). The advertisement at issue, which had been rejected under the transit authority's standards, was a campaign advertisement of a candidate for state representative. Id. at 299. The plurality affirmed the decision of the Ohio Supreme Court that the prohibition on political advertisements on city buses did not violate the First Amendment, and a plurality of the Supreme Court affirmed. Id. at 304. The City in charge of the transit system contended that its policy was adopted to "minimize abuse, the appearance of favoritism, and the

66

risk of imposing on a captive audience." Id. at 304. Even though the City relied on its policy to prohibit "political and public issue advertising" on its vehicles, it had allowed advertisements from "churches, and civic and public-service oriented groups." Id. at 300–01.

Focusing on the nature of the contested forum—the advertising space on a public bus—a plurality of the Supreme Court held that "a city transit system has discretion to develop and make reasonable choices concerning the type of advertising that may be displayed in its vehicles." Id. at 303. This holding was premised, at least in part, on the "captive" nature of a "'streetcar audience[, which] is there as a matter of necessity, not of choice,'" id. at 302 (quoting Pub. Utils. Comm'n v. Pollak, 343 U.S. 451, 468 (1952) (Douglas, J., dissenting)), and the fact that the commercial space on a public bus is "part of the [city's] commercial venture." Lehman, 418 U.S. at 303. In his concurrence, Justice Douglas further emphasized the rights of captive commuters. Id. at 307–08 (Douglas, J., concurring). Importantly, Lehman is cited in Mansky with approval. See Mansky, 138 S.Ct. at 1886.

### 4. SEPTA as a Government Actor

The parties do not dispute that SEPTA is a government actor for purposes of a First Amendment challenge, as judges within the Third Circuit have held in previous decisions analyzing SEPTA's restrictions on speech. See, e.g., Christ's Bride, 148 F.3d at 247 (citation omitted) ("SEPTA is an 'agency and instrumentality' of the Commonwealth of Pennsylvania. . . . [T]he parties agree that SEPTA is a state actor, as is its licensee . . . and that their actions are constrained by the First and Fourteenth Amendments."); AFDI, 92 F. Supp. 3d at 323 ("It is undisputed that SEPTA is a state actor.").

The Third Circuit has also confirmed SEPTA's governmental status in the face of constitutional challenges outside of the First Amendment. See, e.g., Ford v. SEPTA, 374 F. App'x

67

325, 326 (3d Cir. 2010) (noting, in a race discrimination suit, that the Third Circuit "ha[s] previously found that SEPTA is a state actor"); Dykes v. SEPTA, 68 F.3d 1564, 1567 (3d Cir. 1995) (analyzing Fourth and Fourteenth Amendment challenges brought against SEPTA as if SEPTA were a government actor).[27]

Moreover, the Supreme Court and courts in other circuits have determined that transit authorities generally qualify as government actors in the context of First Amendment claims. See, e.g., Lebron v. Nat'l R.R. Passenger Corp., 513 U.S. 374, 400 (1995) (holding that Amtrak is a government actor for First Amendment purposes because when "the Government creates a corporation by special law, for the furtherance of governmental objectives, and retains for itself permanent authority to appoint a majority of the directors of that corporation, the corporation is part of the Government for purposes of the First Amendment"); Archdiocese v. WMATA, 897 F.3d at 324–31 (treating the WMATA, which was created by compact between Maryland, Virginia, and the District of Columbia and was governed by a Board of Directors, as a government actor for First Amendment purposes); MBTA, 781 F.3d 571 (defining the MBTA as a government entity for purposes of a First Amendment analysis); Ne. Pa. Freethought Soc'y, 327 F. Supp. 3d at 777–85 (analyzing the County of Lackawanna Transit System's advertising policies as government regulations in the face of a First Amendment challenge).

The Court is therefore satisfied that SEPTA is a government actor for purposes of this First Amendment challenge. Still, this Court recognizes that SEPTA is, in fact, a business that has "bottom line" concerns, which include passenger comfort, driver safety, and creating an

---

[27] While SEPTA qualifies as a government actor for certain constitutional analyses, the Third Circuit has specifically held that the protections of Eleventh Amendment immunity do not extend to SEPTA. See Cooper v. SEPTA, 548 F.3d 296 (3d Cir. 2008); Bolden v. SEPTA, 953 F.2d 807, 832 (3d Cir. 1991) (en banc).

68

environment where the public will want to use SEPTA vehicles as a means of transportation, rather than indoctrination.

## 5. Decisions on Transit Authorities' Speech Regulations in the Third Circuit

Courts in the Third Circuit have previously issued opinions in four cases involving First Amendment challenges to advertising restrictions on public transit. Two of these decisions— Christ's Bride, 148 F.3d 242, and AFDI, 92 F. Supp. 3d 314—involved challenges to SEPTA's advertising restrictions.[28] See supra Part V.A.1 for a robust discussion of these two cases. Two others—Pittsburgh League, 653 F.3d 290, and Ne. Pa. Freethought Soc'y, 327 F. Supp. 3d 767— involved similar challenges to other transit authorities' policies.

As addressed supra in Part V.A.1., the only two cases that have specifically addressed challenges to SEPTA's advertising policies have both found SEPTA's advertising space to be a designated public forum. See Christ's Bride, 148 F.3d at 252; AFDI, 92 F. Supp. 3d at 326.

Not all opinions in this Circuit have found a transit authority's advertising space to be a designated public forum such that strict scrutiny applies to any restrictions on speech. A recent decision by Judge Mannion in the Middle District of Pennsylvania found the advertising space on the County of Lackawanna Transit System ("COLTS") buses to be a limited forum. Ne. Pa. Freethought Soc'y, 327 F. Supp. 3d. at 778.[29] Relying on Lehman, and after a hearing and an assessment of COLTS's stated intent, policy, and practices, Judge Mannion held that COLTS's advertising space was a limited public forum. Id. at 778–81. Judge Mannion gave weight to the existence of the policy, stating that "if COLTS requires potential advertisers to obtain permission,

---

[28] See supra Part V.A.I. for a robust discussion of these cases.

[29] As indicated above, this decision is currently on appeal to the Third Circuit. See supra Part V.A.I.

under pre-established guidelines that impose speaker-based or subject-matter limitations, it will generally be found that COLTS intended to create a limited, rather than designated, public forum." Id. at 778.

Ultimately, Judge Mannion upheld COLTS's restriction on advertisements that were "political or religious in nature" because it was reasonable and tied to the purpose of the forum, and because it was viewpoint neutral. Id. at 782–84. In so concluding, Judge Mannion rejected the plaintiff's arguments that the restriction was unconstitutionally vague and that the restriction was viewpoint discriminatory because it favored non-religious/non-atheist speakers over religious/atheist speakers. Id. at 783–84. Judge Mannion explained that a restriction on all speech related to religion is a content, not viewpoint, based restriction. Id.

Where a court finds a speech restriction to be viewpoint-discriminatory, however, it is unconstitutional regardless of whether the transit authority's advertising space is a public or non-public forum. In Pittsburgh League, the Third Circuit held that the Defendant Port Authority's rejection of a bus advertisement educating former prisoners of their right to vote resulted from an improper exercise of viewpoint discrimination. The Third Circuit expressly refrained from undertaking a forum analysis because it found sufficient evidence for viewpoint discrimination. 653 F.3d at 296. The Port Authority argued that the contested message violated its prohibitions on political and noncommercial advertising. Id. However, the Third Circuit held that the basis for rejection on "political" grounds was a post hoc rationalization and otherwise inapplicable to the advertisement, which did not call on citizens to vote for a specific candidate or publicly support a certain cause. Id. The Court likewise dismissed the Port Authority's "noncommercial" reasoning because the record showed that various community groups were previously allowed to post similar advertisements on the buses. Id. at 297–98.

70

### 6. Decisions on Transit Authorities' Speech Regulations Outside of the Third Circuit

Other circuit courts have likewise addressed transit-agency policies limiting access to advertising spaces within their buses, subways, etc. These cases have consistently held that public transit advertising speech is a non-public forum and that restrictions on speech are reasonable.

Most recently, in <u>Archdiocese v. WMATA</u>, the D.C. Circuit addressed the WMATA's rejection of a proposal from the Archdiocese of Washington to place religious Christmas advertisements on the exterior of WMATA buses because it violated a prohibition on religious advertising. The D.C. Circuit held that the advertising space on the WMATA buses was a non-public forum, citing <u>Lehman</u> and <u>Cornelius</u>. 897 F.3d at 322–24. The D.C. Circuit concluded that the advertisement was not viewpoint discriminatory, and that it was reasonable in light of the forum, and affirmed the district court's denial of a preliminary injunction. <u>Id.</u> at 322–32.

In addition to Judge Goldberg's decision in <u>AFDI v. SEPTA</u>, the Sixth Circuit has also addressed a transit agency's rejection of a proposed advertisement from the organization AFDI. <u>See</u> <u>SMART</u>, 698 F.3d 885. In <u>SMART</u>, AFDI attempted to place an ad stating "Fatwa on your head? Is your family or community threatening you? Leaving Islam? Got Questions? Get Answers! RefugefromIslam.com," but it was rejected by the transit agency under its prohibitions on advertisements that are "political" and are "clearly defamatory or likely to hold up to scorn or ridicule any person or group of persons." <u>Id.</u> at 888–89. The Sixth Circuit held that the advertising space was a non-public forum, and that the restrictions were reasonable. <u>Id.</u> at 890–94. The court additionally held that "[b]ased on recent court cases, legislative actions, and other political speeches, it was reasonable for SMART to conclude that the content of AFDI's advertisement— the purported threat of violence against nonconforming Muslims in America—is, in America

today, decidedly political." Id. at 894. Accordingly, the Circuit Court reversed the District Court's grant of a preliminary injunction. Id. at 895.

Similarly, in Ridley, the First Circuit addressed a consolidated appeal involving two decisions by the Boston public transit agency—one rejecting advertisements about marijuana laws and the other rejecting advertisements from a church. 390 F.3d at 77. The marijuana advertisements were rejected because they promoted the use of marijuana and were "reform" ads intended to legalize marijuana, putting them "in conflict with the MBTA's policies on drugs and alcohol." Id. at 73. The church advertisements were at first accepted, but later rejected after the church revised their language in a way that the transit agency deemed contrary to its prohibition on advertisements denigrating particular religious groups. Id. at 75.

Although the First Circuit did not specifically find that the relevant forum, the advertising space, was a limited or non-public forum, the Court did hold that it was "neither a traditional nor a designated public forum" and evaluated the restrictions for reasonableness in light of the forum and viewpoint neutrality consistent with Cornelius. Id. at 82. Further, the First Circuit held that the regulations were facially valid, but that the transit agency's rejection of the marijuana advertisements was unconstitutionally discriminatory based on viewpoint. Id. at 86–90, 93–96.

### 7. SEPTA's Restrictions (as to be Amended) Are Reasonable in Light of the Purpose of the Forum

Having considered NAACP and the vast body of jurisprudence, both precedential and not, discussing transit authorities' abilities to restrict access to advertising space, the Court finds that CIR's facial attack is valid as to the portions of the existing language that we are striking, for the reasons discussed supra Part VII.C. However, with the stricken language removed, the Court finds that the Challenged Provisions are now facially valid, reasonable, and constitutional.

Applying the two-step test enunciated in NAACP, this Court first finds that SEPTA has shown through record evidence that the purpose of its advertising space is to "raise revenue independent of the farebox and taxpayer subsidies and to do so in a manner that provides for the safety, efficiency and comfort of [its] passengers." (Benedetti Dep. at 17:5–10; Trial Tr. at 48:23–49:8 (testifying that SEPTA considers the importance of advertising revenue as it is balanced against customer experience).) In addition to Benedetti's express statements on the subject, this purpose is evident from SEPTA's efforts to close its advertising forum following Judge Goldberg's AFDI decision. At trial, Benedetti explained that while SEPTA considers the advertising space to be a source of revenue, "not at the expense of happy customers and safe customers." (Trial Tr. at 49:4–8.) Although on cross-examination, Benedetti stated that SEPTA runs advertisements "for revenue reasons," he qualified that by expressing a goal of not "decreas[ing] the value that [SEPTA] bring[s] to the customers in moving them from one place to another," (id. 68:16-18, and of not "detract[ing] from [SEPTA's] core mission of moving them around safely." (Id. at 67:25, 68:16–18, 69:2–3; see also id. at 69: 8–11 (stating on cross-examination that SEPTA was "balancing [its] revenue-generating goals for the ad space against the customer experience").) On this basis, and considering SEPTA's very serious post-AFDI experience, as discussed in this Memorandum, the Court finds sufficient evidence to ascertain that SEPTA has dedicated the

advertising space in its buses to revenue generation within important considerations of a safe, efficient, and comfortable customer experience.[30]

Turning to the second step of the NAACP test, this Court finds that SEPTA has sufficiently shown that the Challenged Provisions (as to be amended) are tied to the purpose of the advertising space. See NAACP, 834 F.3d at 445. The record here does not suffer from the same insufficiencies that the Third Circuit focused on in NAACP. Rather, Benedetti specifically testified that the Standards were adopted largely due to "public outcry" about a problematic advertisement[31] that ran on its buses in 2014. (Trial Tr. at 46:25.) The advertisement caused "concern" among SEPTA's employees and customers, resulted in vandalism on buses, and required SEPTA to rearrange bus operators' schedules after certain drivers objected to operating buses that displayed the advertisement. (Id. at 47:6–9, 47:18–20, 48:6–11.) That situation clearly disrupted SEPTA's ability to provide a safe, comfortable and efficient customer experience, to say nothing of the commonsense inferences that can be drawn from how vandalism, plus customer and employee unrest, could affect SEPTA's ability to attract passengers, advertising revenues, farebox revenues, and overall operating expenditures. After the experience, SEPTA adopted the

---

[30] The Court is satisfied that this is a legitimate goal of SEPTA's advertising program, especially considering that the Lehman plurality upheld similar goals of "minimize[ing] chances of abuse, the appearance of favoritism, and the risk of imposing upon a captive audience." 418 U.S. at 304. Even if the Court were to find—and the Court does not—that SEPTA's purpose, as expressed in the record and above, implicates SEPTA's goals for the operation of its public buses *overall*, see NAACP, 834 F.3d at 447, this Court's reasonableness analysis remains unchanged. There is no evidence in the record, nor can this Court draw any commonsense inferences, that SEPTA allows disruptive speech to go unregulated in the spaces it controls inside its buses.

[31] That advertisement stated, in relevant part, "Islamic Jew–Hatred: It's in the Quran. Two Thirds of All U.S. Aid Goes to Islamic Countries. Stop the Hate. End All Aid to Islamic Countries." AFDI, 92 F. Supp. 3d at 320. "The advertisement also contain[ed] a picture of Adolf Hitler meeting with Haj Amin al-Husseini, with the caption, 'Adolf Hitler and his staunch ally, the leader of the Muslim world, Haj Amin al-Husseini.'" Id. (citation omitted).

Challenged Provisions with advice from counsel and by reference to Judge Goldberg's decision in

AFDI, 92 F. Supp. 3d 314, as well as by reference to standards implemented by other transit

authorities. (Trial Tr. at 45:10–15, 46:9–16.) SEPTA drafted the Standards so as to close the

forum and add "prohibitions on political ads and ads that sought to seek government action of

some sort and ads that were matters of public debate." (Id. at 46:19–22.)[32]

The Challenged Provisions (as to be amended) are thus not only related to the goal of

revenue generation balanced along with the customer experience, but they were also implemented

for the express purpose of remedying a former policy that put that goal in jeopardy. (See Trial Tr.

at 48:14–21 (acknowledging that the advertising restrictions were amended "to avoid a recurrence

of those kinds of episodes").) The First Amendment reasonableness inquiry does not require that

SEPTA's restrictions be "the most reasonable or the only reasonable limitation." Cornelius, 473

U.S. at 808. SEPTA's experience with the AFDI advertisement, as shown through record evidence

and, to a lesser extent, commonsense inferences, provides more than enough justification to tie

SEPTA's implementation of the Challenged Provisions to the lawful purpose of its advertising

forum. In light of the "captive" nature of passengers on a public bus and the narrow body of First

Amendment jurisprudence specific to transit authorities, the Court finds SEPTA's Challenged

Provisions, as to be amended, reasonable.

## E. Content-Based, Viewpoint Neutral Restrictions of Advertisements in Transit Vehicles Do Not Offend the First Amendment

The parties do not dispute that the Challenged Provisions are content-based. The Court

must determine whether these content-based restrictions are viewpoint discriminatory on their

---

[32] Although the Court has stricken certain language for being incapable of reasoned application, see supra Part VII.C, the Court concludes that the remaining language in the Challenged Provisions is tied to SEPTA's purpose of maintaining its advertising space for revenue generation as balanced against customer safety, comfort, and efficiency.

face, or as applied by SEPTA in rejecting CIR's ad. Based on the foregoing discussion, the Court concludes that SEPTA's Challenged Provisions are not viewpoint discriminatory on their face, and that SEPTA did not engage in viewpoint discrimination in rejecting CIR's ad.

Content-based restrictions on speech are constitutional so long as they are reasonable in light of the purpose of the forum and are viewpoint neutral. See NAACP, 834 F.3d 441 ("Content-based restrictions are valid as long as they are reasonable and viewpoint neutral."); see also Cornelius, 473 U.S. at 806 (1985) ("[T]he government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject.").

A restriction is content-based "if a law applies to particular speech because of the topic discussed or the idea or message expressed." Reed v. Town of Gilbert, Ariz., 135 S.Ct. 2218, 2227 (2015).[33] Accordingly, "a speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter." Id. at 2230. "For example, a law banning the use of sound trucks for political speech . . . would be a content-based regulation, even if it imposed no limits on the political viewpoints that could be expressed." Id. (citing Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 428 (1993)); see also Ne. Pa. Freethought Soc'y, 327 F. Supp. 3d at 783–84 (finding that a transit authority's advertising policy, which restricted "all speech related to religion," "[wa]s a content, not viewpoint, based restriction.").

_____

[33] This Court notes that Reed clarified the scope of content-based restrictions and the strict scrutiny that applies to such restrictions in a public forum. 135 S.Ct. at 2227. The Court further notes that the Third Circuit has applied that clarification in a previous case before the undersigned. See Free Speech Coal., Inc. v. Att'y Gen. U.S., 825 F.3d 149, 160 (3d Cir. 2016). Because the Court has determined that strict scrutiny is not the appropriate test in SEPTA's non-public forum, the Court does not find these cases applicable here.

76

Content-based restrictions must be viewpoint neutral even in a non-public forum, as is the case here. See Pittsburgh League, 653 F.3d at 296 ("Viewpoint discrimination is anathema to free expression and is impermissible in both public and nonpublic fora" (citing R.A.V. v. City of St. Paul, 505 U.S. 377, 382 (1992))); see also Cornelius, 473 U.S. at 811 ("The existence of reasonable grounds for limiting access to a nonpublic forum . . . will not save a regulation that is in reality a facade for viewpoint-based discrimination.").

A content-based restriction is viewpoint discriminatory, or not viewpoint neutral, when the government "targets . . . particular views taken by speakers on a subject." Pittsburgh League, 653 F.3d at 296 (quoting Rosenberger, 515 U.S. at 829). In other words, although the government may restrict speech to a particular subject matter, "[t]he First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others." Matal v. Tam, 137 S.Ct. 1744, 1757 (2017) (quoting Lamb's Chapel v. Ctr. Moriches Union Free School Dist., 508 U.S. 384, 394 (1993)). In all forums, including non-public forums, the protections of the First Amendment apply. NAACP, 834 F.3d at 443.

Content-based restrictions are distinct from viewpoint-based restrictions, which are impermissible in any forum. See Rosenberger, 515 U.S. at 829–30 ("[W]e have observed a distinction between, on the one hand, content discrimination, which may be permissible if it preserves the purposes of that limited forum, and, on the other hand, viewpoint discrimination, which is presumed impermissible when directed against speech otherwise within the forum's limitations."); AFDI, 92 F. Supp. 3d at 324, 328 (distinguishing between content-based and viewpoint-based restrictions and concluding that "regardless of the forum's classification, viewpoint based restrictions are unconstitutional"). The level of scrutiny applicable to content-based restrictions depends on the forum. Content-based restrictions in a traditional or designated

public forum are presumptively invalid and are subject to strict scrutiny. Id. at 328. However, in a non-public forum, as is the case here, content-based restrictions are permissible "so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." Cornelius, 473 U.S. at 806. The government bears the burden of demonstrating that the distinctions drawn in a content-based regulation are viewpoint neutral and reasonable in light of the purpose of the forum. See Id.[34]

As the Court has concluded that the advertising space on SEPTA buses is a non-public forum, the Challenged Provisions are constitutional if the restrictions are reasonable in light of the purpose of the forum and are applied in a viewpoint neutral manner. The Court addresses CIR's arguments that the Challenged Provisions are viewpoint discriminatory on their face and as applied in turn.

### 1. SEPTA's Restrictions (as to be Amended) Are Viewpoint Neutral on Their Face

CIR contends that the Challenged Provisions, even as to be amended, are viewpoint discriminatory on their face. (See 11/01/18 Hearing Tr. at 10:11–12.) CIR's arguments do not account for the Court's determination, as discussed above, that parts of the Challenged provisions violate Mansky and must be amended. See supra Part V.C.1.

SEPTA contends that the Challenged Provisions are viewpoint neutral, arguing that even if its regulations "incidentally prevent[] certain viewpoints from being heard in the course of suppressing certain general topics of speech," they are not unconstitutional because it is not "[SEPTA's] intent to intervene in a way that prefers one particular viewpoint in speech over other

---

[34] The Court notes, as discussed supra Part VII.B, that SEPTA bears the burden of proving the constitutionality of the Challenged Provisions both on their face and as applied regardless of the forum. See Playboy Entm't Grp., 529 U.S. at 806 ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions.").

perspectives on the same topic." (SEPTA Post-Trial Br. at 35) (quoting MBTA, 781 F.3d at 587.)

SEPTA has shown that the Challenged Provisions do not prohibit ads taking a position on "matters of public debate" because of the viewpoint expressed. Rather, SEPTA restricts all "political" ads as well as ads expressing any viewpoint on "economic, political, religious, historical, or social issues." Just as in Northeastern Pennsylvania Freethought Society, where Judge Mannion found that a transit system ad policy that restricted all speech related to religion was a viewpoint-neutral, content-based restriction, SEPTA's policies are similarly content-based and viewpoint neutral. See Ne. Pa. Freethought Soc'y, 327 F. Supp. 3d at 783 (citing Rosenberger, 515 U.S. at 829–30).

Further, with respect to CIR's contention that "matters of public debate" is akin to "controversy," the Third Circuit has stated that the Government, "under the right circumstances," may "dedicate a limited public or nonpublic forum to controversy avoidance." NAACP, 834 F.3d at 446. In the transit context, the Supreme Court has concluded that a ban on political ads is permissible if it is a "managerial decision" aimed at increasing revenue by limiting ad space "to innocuous and less controversial commercial and service oriented advertising." Lehman, 418 U.S. at 304. The fact that the Challenged Provisions, by rejecting ads that are "political" or express or advocate an "opinion, position, or viewpoint on economic, religious, historical, or social issues," inevitably exclude arguably more controversial ads, does not mean that SEPTA seeks to avoid controversy. Further, as the Court has stricken language from Subsection (a) and the phrase "matters of public debate" from Subsection (b), the Court need not address whether the Challenged Provisions, in their original form, improperly prohibited controversial speech. Even if SEPTA sought to avoid controversy by enforcing the Challenged Provisions in the past, that fact is not determinative.

## 2. SEPTA's Restrictions are Viewpoint Neutral as Applied

The only challenges CIR brings against the Challenged Provisions as applied pertain to viewpoint discrimination. CIR contends that SEPTA has applied the Challenged Provisions in a viewpoint discriminatory manner in two ways: (1) SEPTA has applied subpart (a) to prohibit ads seeking to change government programs/policies, while permitting ads promoting government programs/policies; and (2) SEPTA approved ads from "equal housing lender" banks, but rejected CIR's ad on the same topic of "discriminatory lending" because of the ad's viewpoint. (CIR Post-Trial Br., at 35–36.)

In response, SEPTA contends that it did not view the bank ads as addressing the same subject matter as CIR's proposed ad. (SEPTA Post-Trial Br., at 35.) Rather, SEPTA avers that the proposed bank ads "appeared only to serve the promotional objective of generating business from persons who read the ad." (Id.) According to SEPTA, it was reasonable for SEPTA to conclude that ads from "equal housing lender" banks did not pertain to discriminatory lending because the ads did not acknowledge a debate or present data on discriminatory lending, and they did not address the disposition of loan applications by race, neighborhood, or otherwise. (Id. at 35–36.) SEPTA further distinguishes these bank ads from CIR's proposed ad by contending that the bank ads "look forward, not back. The ads are designed to foster future borrowing; they do not address past lending practices." (Id. at 36.)

The Court agrees with SEPTA and concludes that SEPTA did not apply the Challenged Provisions in a viewpoint discriminatory manner. SEPTA reasonably viewed CIR's ad as falling within the prohibition against ads expressing a viewpoint about economic, political, religious, historical or social issues. Further, SEPTA has shown that it does not reject certain "political" ads or ads taking a position on "matters of public debate" because of the viewpoints expressed.

The Court concludes that SEPTA did not reject CIR's ad because of its viewpoint, but because it fell into one of the content categories that SEPTA determined it would not accept—either political, economic, or social—or all of them. In other words, SEPTA has demonstrated that it rejected CIR's ad because it was related to an impermissible topic.

### a. SEPTA's Acceptance of Public-Service Advertisements

CIR contends that SEPTA has accepted several ads from governmental entities that are also "political in nature" and "involv[e] an issue that . . . directly or indirectly implicates the action, inaction, prospective action or policies of a government entity," and that SEPTA rejected CIR's ad because of its "political" viewpoint. (CIR Post-Trial Br., at 15–16.) The "public service" ads that SEPTA accepted have been submitted in this case by CIR or SEPTA include the following exhibits:

> **Trial Ex. 43**: Center for Disease Control ad stating, "Help him fight measles with the most powerful defense. Vaccines."
>
> **Trial Ex. 44**: City of Philadelphia ad stating, "Your landlord must ensure your home is safe. . . . If your landlord has not given you lead paint safety information, Call 311 or Visit Phila.Gov/LeadHealthyHomes."
>
> **Trial Ex. 45**: Philadelphia Department of Labor ad stating, "Employee or Contractor. Knowing the difference benefits you[,]" and promoting a government website informing the public about their legal rights.
>
> **Trial Ex. 46**: Montgomery County Health Department ad stating, "Employers must provide a reasonable break time for an employee to express breast milk for her nursing child for one year after the child's birth, as well as a private place to do so[,]" and directing viewers to visit a government website for more information.
>
> **Trial Ex. 47**: Commonwealth of Pennsylvania ad stating, "Wanted by law enforcement? Tired of running? Surrender & see favorable considerations. SAFE RETURN."
>
> **Trial Ex. 49**: City of Philadelphia ad including the City's "bold goal of becoming a 90% zero waste AND litter-free City by 2035[,]" and stating that "[t]he vision for a zero waste and litter-free City starts with one" and "it starts with you."

**Trial Ex. 50**: City of Philadelphia Department of Public Health ad stating, "Saving a Life Can Be this Easy," "Carry Naloxone (Narcan)," and "Prevent Opioid Overdose."

**Trial Ex. 51**: Philadelphia FIGHT Community Health Center ads stating, "Have you or someone you know been impacted by mass incarceration? Find out how to fight for your rights, and for the rights of your family, friends and community members." The ads depict wrists in handcuffs behind bars, a heart behind bars, and two people speaking on a telephone in a prison visitation room.

**Trial Ex. 58**: Philadelphia Department of Health ad stating, "Same Room. Different Beds. Better Rest for All[,]" and directing viewers to a website, "SafeSleepPhilly.org."

The Court disagrees that these ads are analogous to CIR's ad. SEPTA reasonably concluded CIR's ad, by suggesting that lending practices are discriminatory in violation of the law, was content about one of the issues that SEPTA has prohibited. Unlike CIR's ad, which promotes CIR's research and informs viewers that the banks that issued their home mortgages may be charging some borrowers more interest than others, because of race, the comparator ads are public service ads that merely inform views of their rights, the services available to them, or the City's objectives. This is true even of the FIGHT ads, which CIR highlights. (See Mot. for Prelim. Inj., at 29; CIR Post-Trial Br., at 15.) The FIGHT ads inform viewers of their rights with respect to so-called "mass-incarceration." SEPTA is entitled to discretion in such borderline cases. See SMART, 698 F.3d at 893 (holding that a transit authority's advertising policy that prohibited "[p]olitical or political campaign advertising" was viewpoint neutral, and noting that "merely because it is sometimes unclear whether an ad is political does not mean the distinction cannot be drawn in the case of a nonpublic forum. The holding in Lehman demands that fine lines be drawn. Otherwise, as a practical matter, a nonpublic forum could never categorically exclude political speech.").

This Court's conclusion is consistent with Lehman, where a plurality of the Supreme Court

upheld an advertising policy that permitted ads from public-service oriented groups and prohibited political advertising. 418 U.S. at 304. Though Lehman did not expressly address viewpoint discrimination, the Supreme Court did conclude that "the managerial decision" to limit ad space "to innocuous and less commercial and service oriented advertising does not rise to the dignity of a First Amendment violation." Id. Just as in Lehman, where the Supreme Court held that it was constitutional for a city transit system to prohibit political ads and permit public-service ads, this Court concludes that SEPTA's rejection of CIR's ad and accepting the public-service ads was constitutional.

CIR also contends that the public service ads above reflect a viewpoint on a matter of public debate in violation of Subsection (b) such that SEPTA's acceptance of these ads and rejection of CIR's ad amounts to viewpoint discrimination. (CIR Post-Trial Br., at 16.) However, the Court finds that these ads are similarly distinguishable from CIR's ad under Subsection (b). Though these ads may address "matters of public debate," unlike CIR's ad, they do not "express[] or advocat[e] an opinion, position, or viewpoint on matters of public debate." See ACLU v. WMATA, 303 F. Supp. 3d 11, 26–27 (D.D.C. 2018) (concluding that a transit authority's removal of ads promoting a political book because they violated a policy banning ads "intended to influence members of the public regarding issues on which there are varying opinions" or "intended to influence public policy" was not viewpoint discrimination, and noting that "[t]he fact that the content of an advertisement touches on matters of public prominence does not establish that the advertisement is intended to persuade or influence members of the public regarding those matters").

83

### b. SEPTA's Acceptance of Bank Advertisements is Not Accepting Viewpoint Advertisements and SEPTA's Rejection of CIR's Advertisements was Reasonable

The Court concludes that SEPTA has shown that it did not reject CIR's ad and accept the bank ads based on the viewpoints the ads expressed on discriminatory lending. SEPTA has shown that it reasonably rejected CIR's ad under Subsection (b) because of the viewpoint it expressed on a prohibited topic. Therefore, SEPTA did not violate the First Amendment by rejecting CIR's ad.

CIR contends that because each bank ad[35] identified the bank as an "Equal Opportunity Lender" or "Equal Housing Lender," they expressed a viewpoint on discriminatory lending. (See CIR Post-Trial Br., at 18–19.) However, the banks ads that CIR cites were required by law to indicate by a logotype that the banks were equal opportunity lenders or equal housing lenders. The Code of Federal Regulations governing Nondiscriminatory Advertising, 12 C.F.R. § 338.3(a) (2005), requires banks to include in their ads a "logotype" to this effect.[36]

Although CIR does not dispute that its ad reflects a viewpoint on discriminatory lending, the Court concludes that the bank ads do not. Just because the bank ads, as required by law, contain a logotype that the banks are equal opportunity lenders, and depict both Caucasian and non-Caucasian customers, does not mean that the ads are expressing a viewpoint on discriminatory lending practices. Accordingly, although CIR's ad reflects a viewpoint on discriminatory lending, SEPTA's acceptance of the bank ads and rejection of CIR's ad do not amount to contradicting decisions. The bank ads did not advocate any viewpoint on discriminatory lending.

Neither party, nor the Court, has identified any Third Circuit or Supreme Court opinions

---

[35] The Court refers to the description of the bank ads set forth earlier in this Opinion. See supra Part VII.E.2.a.

[36] See supra note 20.

84

holding that an advertiser states a "viewpoint" on a topic, such as discriminatory lending, by indicating in the ad, as required by law, that it complies with the law. However, other courts have distinguished ads that promote goods or services, like the bank ads, from ads like CIR's, which "focus on convincing the reader to take sides in a[] moral or public debate." See ACLU v. WMATA, 303 F. Supp. 3d at 26 (distinguishing ads promoting the availability of goods or services advertised from Milo Yiannopoulous ads promoting a political book, which violated transit authority prohibition on ads "intended to influence members of the public regarding issues on which there are varying opinions" or "intended to influence public policy").

The Court finds that SEPTA's bank ads are, as is obvious from their language, designed to secure loan business from a number of banks that do business in the Philadelphia area. No party introduced any direct evidence from a representative of any of these banks, but the Court can make certain inferences and findings from the content of the ads, other testimony introduced in the trial record as to SEPTA's practices with regard to ads, and the type of advertisers who advertise on the interior of SEPTA buses. These bank ads are commercial—they were placed by business entities, the banks, to promote their lending businesses. They do not state any viewpoint on any matter pertaining to politics or economics or social issues. Each bank ad is simply a straightforward invitation to SEPTA bus passengers to inquire about the bank's loan rates in the hope that a passenger will use that bank to provide the mortgages which most people need to purchase a home.

Philadelphia is one of the largest cities in the United States and is blessed with many hardworking, law abiding families who contribute to the economic welfare of the entire city and related areas. Many of them are interested in buying a home and can afford to do so. Philadelphia has a strong middle class, with a large percentage of homeowners, who live in many

demographically diverse neighborhoods. There are many more racially diverse neighborhoods in Philadelphia at the present time than in the prior fifty to sixty years, and this is a trend that is continuing.[37]

Many people ride buses to work, for school, social life, or sports events. For some, a bus is the most convenient. There is nothing in the record to detract from the concept that although a bus passenger is voluntarily riding on a bus, it may realistically be their only way of getting to a particular place, whether it is work, education, sporting events, etc. Banks have concluded, by advertising on SEPTA, that SEPTA passengers are overall a good loan risk, and by these ads the banks are soliciting their business. SEPTA has reasonably concluded the bank ads do not contain content which SEPTA prohibited in subparagraph (b).

The Court cannot criticize SEPTA's business policy of accepting ads from banks that promote bank services. The Court therefore will not force on SEPTA the additional "cost" of requiring it to take ads from CIR which attack lending practices of banks as racially discriminatory. By accepting these bank ads, SEPTA has not "opened the door" to an ad that undisputedly expresses a viewpoint on discriminatory lending, such as the ad proposed by CIR. SEPTA has not

---

[37] The city of Philadelphia has experienced an increase in home sales, and homeownership rates for the Philadelphia metropolitan region are stable with approximately 65% of residents occupying a home they own. A map published by the Urban Institute shows that Philadelphia has a higher rate of black homeownership than other parts of the country. See Mapping Philly's black homeownership gap, PLANPHILLY WHYY (March 6, 2018) http://planphilly.com/articles/ 2018/03/06/mapping-philly-s-black-homeownership-gap. This information may explain, in part, the reason for local banks advertising their mortgage lending services to SEPTA riders, who we can logically assume are a fair cross section of the city's racially diverse population. See Philadelphia 2018: The State of the City, PEW CHARITABLE TRUSTS at https://www.pewtrusts.org/- /media/assets/2018/04/philly_sotc_2018.pdf (last visited November 26, 2018); see also Housing Vacancies and Homeownership (CPS/HVS) Annual Statistics: 2017 (Including Historical Data by State and MSA) (Table 16), UNITED STATES CENSUS BUREAU https://www.census.gov/housing/hvs/data/ann17ind.html (last visited November 26, 2018). It is, of course, true that some of the SEPTA buses in which the ads appear serve suburban areas which are not as racially diverse.

endorsed or permitted a forum to address discriminatory lending by accepting the bank ads. Racial discrimination in lending by banks subject to federal or state law is illegal and abhorrent. However, there is no evidence supporting CIR's contention that SEPTA must consider these bank ads as expressing a viewpoint on discriminatory lending such that SEPTA's acceptance of these ads required SEPTA to also accept the proposed CIR ad. If CIR's argument were valid, SEPTA's acceptance of ads from frequent commercial advertisers such as educational institutions and social service agencies, which regularly appear on SEPTA buses, would require SEPTA to accept all ads accusing these advertisers of racial discrimination, thus turning its advertising space into a "traveling arena" for combative attacks on SEPTA's commercial advertisers.

The Court considers SEPTA acted reasonably in rejecting the CIR ad because it stated a viewpoint on an impermissible topic and was not responding to any other ad reflecting a viewpoint on the same topic.

In considering available advertising space, in our contemporary times, one must also consider the vast "digital solar system" that is open to virtually anyone who sets up their own internet site or "domain" and, within very broad bounds, advertises on social media outlets.

As noted above, a number of precedents in courts around the country have approved transit regulations that limit permissible ads to "commercial" ads—but SEPTA has good reason for not using the term "commercial."

## VIII. CONCLUSION

For reasons discussed above, the Court finds that CIR has succeeded in arguing that certain portions of the Challenged Provisions are incapable of reasoned application. Because this Court has ordered SEPTA to revise the overly broad language, CIR's other challenges to SEPTA's advertising restrictions—both facial and as-applied—must fail.

Perfection in the exercise of judgment is a human goal that few humans, including very few if any judges, will ever achieve. The Court concludes that SEPTA's policy, as to be amended, effectively permitting advertisements that are commercial or that promote public services, but rejecting ads on political, economic, historical, religious, or social issues, is constitutional.

O:\CIVIL 18\18-1839 Ctr for Investig Reporting v SEPTA\18cv1839 Final Memorandum 11282018.docx